FILED

2007 MAY 10  PM 5: 28

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

June 2005 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>    v.<br><br>KYLE DUSTIN FOGGO (1),<br>  aka "Dusty" Foggo,<br>BRENT ROGER WILKES (2),<br><br>           Defendants. | Criminal Case No. <u>07CR0329-LAB</u><br><br>I N D I C T M E N T<br>**(Superseding)**<br><br>Title 18, U.S.C., Sec. 371 –<br>Conspiracy; Title 18, U.S.C.,<br>Secs. 1343 and 1346 – Honest<br>Services Wire Fraud; Title 18,<br>U.S.C., Sec. 1957 – Money<br>Laundering; Title 18, U.S.C.,<br>Sec. 2 – Aiding and Abetting |

The Grand Jury charges:

### INTRODUCTORY ALLEGATIONS COMMON TO ALL COUNTS

1.   From on or about July 6, 2001 to about November 3, 2004, defendant KYLE DUSTIN FOGGO, aka "Dusty" Foggo, (hereinafter "defendant FOGGO") was the senior officer in charge of support operations at an "Overseas Location" of the Central Intelligence Agency (hereinafter "CIA"), and as such directed the Overseas Location's daily operations supplying equipment to personnel overseas.

2.   From on or about November 4, 2004 to about May 12, 2006, defendant FOGGO was the Executive Director of the CIA (then the third-highest position in the CIA), and as such directed the CIA's daily operations.

PLBH:SB:JAF:VHC:nlv:San Diego
5/11/07

1        3.   As a public official, defendant FOGGO owed the United States

2 and its citizens his honest services, including his loyal, faithful,

3 disinterested, unbiased service, to be performed free of deceit, undue

4 influence, conflict of interest, self-enrichment, self-dealing,

5 concealment, fraud, and corruption.

6        4.   The duty of honest services that defendant FOGGO owed the

7 United States and its citizens is reflected, among other places, in

8 Title 5, Code of Federal Regulations, Section 2635.101(a), which

9 provides:

10

11       Each employee has a responsibility to the United States
Government and its citizens to place loyalty to the
Constitution, laws, and ethical principles above private gain.

12       To ensure that every citizen can have complete confidence in the
integrity of the Federal Government, each employee shall respect

13       and adhere to the principles of ethical conduct set forth in
this section, as well as the implementing standards contained in

14       this part and in supplemental agency regulations.

15 5 C.F.R. 2635.101(a).

16        5.   As a public official, defendant FOGGO had a responsibility

17 to place loyalty to the United States, and its Constitution, laws, and

18 ethical principles, above private gain. Among other things, defendant

19 FOGGO was prohibited from using or permitting the use of his office

20 in a manner intended to coerce or induce another, including a

21 subordinate, to provide any benefit to himself or his friends.

22        6.   The responsibility is reflected, among other places, in

23 Title 5, Code of Federal Regulations, Section 2635.702(a), which

24 provides:

25       An employee shall not use or permit the use of his Government
position or title or any authority associated with his public

26       office in a manner that is intended to coerce or induce another
person, including a subordinate, to provide any benefit,

27       financial or otherwise, to himself or to friends, relatives, or
persons with whom the employee is affiliated in a

28       nongovernmental capacity.

2

1  Under Section 2635.702(d), an employee whose duties "would affect the
2  financial interest of a friend ... shall comply with any applicable
3  requirements of Section 2635.502."

4      7.    As a public official, defendant FOGGO had an obligation to
5  use established ethics procedures prior to participating in any
6  decision involving a friend that could raise a question as to his
7  impartiality.

8      8.    Rules governing when an employee must utilize established
9  ethics procedures can be found, among other places, in Title 5, Code
10 of Federal Regulations, Section 2635.502(a)(2), which provides:

11         An employee who is concerned that circumstances other than those
           specifically described in this section would raise a question
12         regarding his impartiality should use the process described in
           this section to determine whether he should or should not
13         participate in a particular matter.

14 The process described in Section 2635.502(a) is that "the employee
15 should not participate in the matter unless he has informed the agency
16 designee of the appearance problem and received authorization from the
17 agency designee in accordance with paragraph (d) of this section."

18     9.    From in or about 1993 through in or about 2005, defendant
19 FOGGO completed ethics training approximately eight times, and served
20 approximately two years as a Deputy Ethics Official.

21     10.   At all times material to this indictment, defendant BRENT
22 ROGER WILKES owned and controlled ADCS, Inc. and numerous related
23 entities, including Archer Defense Technologies, Inc., Group W
24 Advisors Inc., Group W Transportation Inc., and Wilkes Corporation,
25 which defendant WILKES ran as a consortium of related companies
26 (hereinafter referred to as "WILKES's companies").

27 //

28 //

3

11.   From late 2002 on, WILKES's companies' main corporate office was at 13970 Stowe Drive, Poway, California. WILKES's companies also maintained an office located at 14020 Thunderbolt Place, Chantilly, Virginia.

### Count 1

### CONSPIRACY

12.   Paragraphs 1 through 11 of this Indictment are hereby realleged as if fully set forth herein.

13.   Beginning on a date unknown to the Grand Jury, and continuing through in or about September 2006, within the Southern District of California and elsewhere, defendants KYLE DUSTIN FOGGO, aka "Dusty" Foggo, and BRENT ROGER WILKES, did knowingly and intentionally conspire with each other, and with others known and unknown to the Grand Jury, to commit the following offenses against the United States:

a.   Honest Services Wire Fraud, in violation of Title 18, United States Code, Sections 1343 and 1346, that is, devising a material scheme to defraud the United States and its citizens' of defendant FOGGO's honest services, including their right to his loyal, faithful, disinterested, unbiased service, to be performed free of deceit, undue influence, conflict of interest, self-enrichment, self-dealing, concealment, fraud, and corruption, and in furtherance thereof transmitting and causing to be transmitted in interstate commerce by means of wire communications, certain writings, signs, signals and sounds; and

b.   Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of Title 18, United States Code, Section 1957, that is, knowingly engaging and attempting

4

1  to engage in monetary transactions by, through, or to a financial
2  institution, affecting interstate and foreign commerce, in criminally
3  derived property of a value greater than $10,000, such property having
4  been derived from a Specified Unlawful Activity, that is, Honest
5  Services Wire Fraud in violation of Title 18, United States Code,
6  Sections 1343 and 1346.

7                          **METHODS AND MEANS**

8      14.   The conspirators used the following methods and means, among
9  others, to carry out the objects of the conspiracy:

10         a.   Defendant WILKES and other conspirators provided things
11  of value to defendant FOGGO, and defendant FOGGO accepted these things
12  of value.

13         b.   Defendant FOGGO agreed to be corruptly influenced in
14  his performance of his official duties.

15         c.   The  coconspirators  misrepresented  and  concealed
16  material facts in dealings with the CIA and its employees.   Such
17  material facts included defendant WILKES's role and interest in
18  certain CIA contract matters, defendant FOGGO's receipt and
19  expectation of benefits from defendant WILKES and WILKES' companies,
20  and  relevant particulars of defendant FOGGO's life-long friendship
21  with defendant WILKES.

22         d.   The coconspirators created and used shell companies and
23  straw men to conceal defendant WILKES's financial interest and role
24  in certain CIA contracts, and to launder money obtained from CIA
25  contracts.

26         e.   Defendant FOGGO used his senior position with the CIA
27  (including that of Executive Director) to influence the CIA to award
28  government contracts to defendant WILKES.

1            f.    Defendant FOGGO used his senior position with the CIA
2 to suggest to CIA contractors and outside businesses (*e.g.*, a private
3 security firm) that it would be beneficial to conduct joint ventures
4 with WILKES's companies.

5            g.    Defendant FOGGO used his senior position with the CIA
6 (including that of Executive Director) to influence CIA employees to
7 utilize defendant WILKES to purchase a variety of goods and services
8 for which defendant WILKES had no prior expertise (*i.e.*, providing
9 armored vehicles, air support services, and a Sensitive Compartmented
10 Information Facility (hereinafter "SCIF") for use working on
11 classified projects).

12            h.    Defendant FOGGO misrepresented and concealed material
13 facts to the CIA and its employees regarding defendant WILKES's lack
14 of expertise in the aviation industry.

15            i.    Defendant FOGGO provided defendant WILKES with
16 sensitive, internal information related to our national security in
17 order to allow him to prepare a proposal – requiring many months of
18 work – that was directed at getting a government contract in an area
19 (civil aviation) in which defendant WILKES had no prior expertise.

20            j.    Defendant FOGGO used his position as Executive Director
21 of the CIA to influence CIA employees to use defendant WILKES to
22 provide commercial cover for CIA air operations (recognizing that he
23 had no prior experience in aviation).

24            k.    Defendant WILKES, with defendant FOGGO's support,
25 presented a proposal to provide commercial cover for CIA air
26 operations, which called for a government contract in excess of
27 $100 million (which is also referred to herein as a contract involving
28 "Air Support" services).

6

1         1.   Defendant FOGGO provided defendant WILKES and other

2  coconspirators with internal government information, including

3  classified information, about the CIA, CIA contractors, and other

4  matters, to help defendant WILKES obtain money from the CIA and CIA

5  contractors; despite the fact that defendant WILKES never had the

6  requisite security clearance to receive classified information from

7  defendant FOGGO.

8                            **OVERT ACTS**

9     15.  In furtherance of the conspiracy and to effect the objects

10  thereof, defendants FOGGO and WILKES committed, and caused to be

11  committed, the following overt acts, among others, within the Southern

12  District of California and elsewhere:

13         (1)  By no later than December 2002, WILKES reserved

14  an office for FOGGO near WILKES's own office in the executive suite

15  of WILKES's companies' new Poway headquarters, and offered FOGGO a

16  high-level, high-paying position in WILKES's companies, an offer which

17  remained open and under consideration by FOGGO at all material times.

18         (2)  On or about February 21, 2003, WILKES executed a

19  Certification of Trust naming FOGGO as one of three Trustees of the

20  "Brent and Regina Wilkes Family Trust" upon the death of WILKES and

21  his wife.

22         (3)  On or about March 30, 2003, FOGGO sent WILKES an

23  email inquiring whether he could get "Duke" [Cunningham] to assist in

24  obtaining an immigration visa on behalf of an individual who FOGGO had

25  just met (later to become FOGGO's business contact who assisted WILKES

26  in delivering water to the CIA).

27         (4)  On or about May 14, 2003, FOGGO sent WILKES an

28  email stating in part as follows with respect to a certain CIA

1  Contractor with whom FOGGO's Overseas Location had negotiated large

2  contracts (hereinafter, "the CIA Contractor"):  "I have been throwing

3  millions at his company for about 18 months - and I'm thinking we

4  should be able to leverage some Wilkes Group contacts."

5          (5)  On or about June 17, 2003, WILKES treated FOGGO

6  to a dinner (in which FOGGO introduced WILKES to the CIA Contractor)

7  at the Capital Grille in Washington, D.C., for which WILKES paid

8  $1,724.39, of which FOGGO's pro rata share was approximately $344.87.

9          (6)  On or about July 25, 2003, FOGGO concealed from

10  a subordinate the identity and contact information of an associate

11  (hereinafter, FOGGO's "Water Contact") that FOGGO knew could supply

12  the Overseas Location with bottled water at a much lower price than

13  the Overseas Location had been paying.

14          (7)  On or about August 3, 2003, WILKES paid for FOGGO

15  and his family to join WILKES and his family for a vacation in

16  Scotland.  This vacation included over $12,000 in private jet flights,

17  over $4,000 for a helicopter ride to a round of golf at Carnoustie,

18  and over $44,000 for a stay at the Pitcastle Estate, which included

19  trout fishing on hill lochs, salmon fishing on the River Tay, clay

20  pigeon shooting, archery, and a seven-person staff.

21          (8)  On or about September 10, 2003, FOGGO sent WILKES

22  an email titled "Scotland and Cigars," stating in part:  "I'll work

23  the water thing with [FOGGO's Water Contact] - but you sending a

24  follow-up email is a good idea, I want to insure [sic] that B-

25  connection is not forgotten....Group W is in this deal."

26          (9)  On or about September 17, 2003, FOGGO sent an

27  email to WILKES, stating that FOGGO's Water Contact was ready to work

28  with WILKES, and that WILKES should "work the price" with the Water

8

1  Contact "and then have a US firm (Group W?) fax to me an offer to sell
2  at X price."

3          (10) On or about October 22, 2003, WILKES caused one
4  of WILKES' assistants to send an email to a close associate and
5  subordinate of WILKES (hereinafter, "Wilkes Subordinate X"), reminding
6  Wilkes Subordinate X of tasks WILKES had assigned him in connection
7  with the project to supply water to FOGGO's Overseas Location.

8          (11) In or about December 2003, at a party at WILKES's
9  offices in Poway, WILKES introduced FOGGO to a group of employees as
10 a future executive in WILKES's companies.

11         (12) In or about December 2003, at the same party,
12 FOGGO told an ADCS employee in human resources that he wanted to "get
13 a profile" on some other ADCS employees.

14         (13) On or about December 14, 2003, WILKES provided
15 FOGGO with three tickets to the San Diego Chargers - Green Bay Packers
16 football game at Qualcomm Stadium, for which WILKES paid approximately
17 $130.

18         (14) From on or about December 27, 2003 to January 3,
19 2004, FOGGO joined WILKES for a vacation at the "Sullivan Estate" in
20 Haleiwa, Hawaii, for which WILKES paid approximately $32,000.

21         (15) On or about January 1, 2004, WILKES treated FOGGO
22 to a dinner at Hy's Steak House in Honolulu, Hawaii, for which WILKES
23 paid $961.97, of which FOGGO's pro rata share was approximately
24 $480.98.

25         (16) On or about January 7, 2004, immediately after his
26 Hawaiian vacation with WILKES, FOGGO sent Wilkes Subordinate X an
27 email with a subject line of "Re: Aloha," stating:  "Had a great time
28 - no diving, but still fun.  I would like the 'President' or 'CEO' of

9

1 '[entity]' to come visit.  Brent told me that was you (smile), so lets
2 [sic] get to it.  I'll need to brief you a bit on how we need to play
3 this, but that needs to be face to face, before you meet my people."
4         (17) On or about January 25, 2004, WILKES treated FOGGO
5 to a dinner at Ristorante La Perla of Washington, for which WILKES
6 paid $997.55, of which FOGGO's pro rata share was approximately
7 $110.83.
8         (18) On or about January 25, 2004, FOGGO asked Wilkes
9 Subordinate X if he could write a letter (falsely indicating that the
10 son of Foggo's Water Contact was going to work for a WILKES controlled
11 company) so that he would be able to get a visa to stay in the United
12 States.
13         (19) On or about January 27, 2004, FOGGO met with
14 WILKES, Wilkes Subordinate X, and the CIA Contractor at CIA
15 headquarters.
16         (20) On or about January 27, 2004, at the above
17 meeting, FOGGO told Wilkes Subordinate X that FOGGO would get Wilkes
18 Subordinate X a procurement services contract with the CIA.
19         (21) On or about January 28, 2004, WILKES treated FOGGO
20 to a dinner at the Capital Grille in Washington, D.C., for which
21 WILKES paid $1,195.96, of which FOGGO's pro rata share was
22 approximately $398.65.
23         (22) On or about January 28, 2004, the CIA Contractor
24 entered into contracts with WILKES, agreeing to pay a WILKES company
25 $375,000 every three months for lobbying services; to form a joint
26 venture with WILKES to explore non-CIA business; and to pay WILKES
27 (through Group W Advisors, Inc.) 30 percent of the joint venture's net
28 income in 2004, and 20 percent in subsequent years.

1           (23) On or about January 29, 2004, defendant WILKES
2   (through Group W Advisors, Inc.) received $375,000 from the CIA
3   Contractor.

4           (24) On or about February 5, 2004, FOGGO sent an email
5   to an ADCS employee offering to act as a "broker" with a CIA client
6   that FOGGO believed could be used to rent space in a SCIF that WILKES
7   had built in ADCS's Chantilly office.

8           (25) On or about February 9, 2004, WILKES sent FOGGO
9   an email asking FOGGO to suggest to the CIA Contractor that WILKES was
10  playing a role in structuring a prospective CIA contract because doing
11  so, "[d]oesn't cost you anymore but gives me a %."

12          (26) On or about February 9, 2004, FOGGO sent WILKES
13  an email stating that he would arrange for Wilkes Subordinate X to "
14  meet with [FOGGO] and [his] procurement people to see how Archer
15  Defense might be able to help out [his] outfit."

16          (27) In or about late February 2004, WILKES and Wilkes
17  Subordinate X traveled separately to FOGGO's Overseas Location to
18  discuss the procurement services contract.

19          (28) On or about February 26, 2004, FOGGO instructed
20  Wilkes Subordinate X not to tell other CIA employees about the long-
21  standing personal relationship they had through WILKES, and instead
22  to tell CIA employees that Wilkes Subordinate X and FOGGO met in a
23  cigar bar in Washington, D.C.

24          (29) On or about February 26, 2004, FOGGO introduced
25  Wilkes Subordinate X to lower-level CIA employees as someone who could
26  assist them in procurement activities, and both FOGGO and Wilkes
27  Subordinate X acted as if they were merely arms-length business
28  associates.

1    (30) On or about February 28, 2004, in a meeting at
2 FOGGO's overseas home, FOGGO, WILKES, and Wilkes Subordinate X agreed
3 that they needed to ensure that any procurement services business
4 obtained from the Overseas Location could not be directly traced back
5 to FOGGO and WILKES's relationship, and that WILKES would therefore
6 take his share of the proceeds through subcontracts.

7    (31) On or about March 14, 2004, FOGGO sent an email
8 to the CIA Contractor stating that he had discussed the CIA
9 Contractor's recent classified contract proposal with WILKES, and
10 stating further: "I must tell you - I am very pleased that you and
11 Brent are working together."

12    (32) In or about March 2004, Wilkes Subordinate X
13 (using Archer Defense) caused to be delivered to the Overseas Location
14 a shipment of bottled water, for a price that was marked-up over 60%
15 from the price FOGGO's Water Contact charged.

16    (33) On or about April 5, 2004, FOGGO filed and
17 certified the truthfulness, completeness, and accuracy of a "Public
18 Financial Disclosure Report" (Form SF-278) for calendar year 2003,
19 which Report called for disclosure of (among other things) all gifts
20 "received from one source totaling more than $285" and agreements or
21 arrangements for future employment, and from which Report FOGGO
22 omitted any mention of (a) the thousands of dollars in benefits he
23 received from WILKES in 2003, or (b) his job offer from WILKES.

24    (34) On or about April 5, 2004, in an email to a CIA
25 ethics officer, to which email FOGGO attached his 2003 Form SF-278,
26 FOGGO stated in part:  "Greetings from [Overseas Location].  Having
27 been the 'Ethic's [sic] Guy' in both the DS&T and the DA, I wish you
28 the best with this annual exercise."

12

1              (35) On or about May 12, 2004, WILKES, in San Diego

2  County, executed a "Declaration of Trust" indicating, among other

3  things, that FOGGO was to be Sole Trustee of the "Brent Wilkes Life

4  Insurance Trust."

5              (36) On or about May 27, 2004, FOGGO, at an Overseas

6  Location, executed a "Certification of Trust" naming him as Sole

7  Trustee of the "Brent Wilkes Life Insurance Trust" and naming the

8  Trustor as Brent Wilkes.

9              (37) On or about June 11, 2004, while visiting the

10  Overseas Location to negotiate the procurement services contract,

11  Wilkes Subordinate X treated FOGGO to a dinner at a restaurant near

12  the Overseas Location, for which Wilkes Subordinate X paid $235.82,

13  of which FOGGO's pro rata share was approximately $117.91.

14             (38) On or about June 16, 2004, FOGGO sent an email to

15  a private security firm (which  provided total security solutions

16  worldwide to a wide range of clients) that alluded to a separate

17  discussion in which FOGGO suggested "a possible venture that could be

18  useful for Archer Defense" and the private security company.

19             (39) On or about June 25, 2004, Wilkes Subordinate X

20  presented to ADCS an expense voucher (which referred to business

21  development related to FOGGO's Water Contact) seeking reimbursement

22  for the $235.82 dinner with FOGGO near the Overseas Location.

23           (40) On or about July 29, 2004, at WILKES's direction,

24  Wilkes Subordinate X formed a new corporation of which he was

25  nominally the only director, officer, or employee, hereinafter "Shell

26  Company No. 1", to receive the procurement services contract from the

27  CIA.

28

1         (41) On or about August 19, 2004, FOGGO sent emails to

2  Wilkes Subordinate X, informing him that FOGGO had instructed his

3  deputy to "check and push [the procurement contract] along to insure

4  completion" and also stating with regard to Wilkes Subordinate X's

5  request for an advance payment of one-half the total amount of service

6  fees for the procurement contract: "I can help with that.  I'll work

7  it."

8         (42) On or about September 16, 2004, FOGGO sent an

9  email to WILKES regarding concerns that the CIA Contractor had raised

10  about WILKES, stating: "As you know I do have influence with him [the

11  CIA Contractor] and know I could get him to listen . . . that said if

12  this issue is beyond repair in your mind – I am now, have been in the

13  past, and will continue to as long as I breath [sic] – be your partner

14  . . . so what do you want me to do?"

15         (43) On or about September 20, 2004, effective

16  September 1, 2004, FOGGO caused the Overseas Location to enter into

17  a one-year procurement services contract with Shell Company No. 1,

18  with a firm fixed-price fee of $1,699,904 for services to be provided.

19         (44) On or about September 23, 2004, FOGGO caused the

20  CIA to wire-transfer to Shell Company No. 1 an $850,000 advance

21  payment on the procurement services contract.

22         (45) On or about September 24, 2004, Wilkes Subordinate

23  X caused $555,000 to be wire-transferred from Shell Company No. 1 to

24  WILKES's companies.

25         (46) On or about October 28, 2004, without having

26  received any additional service funds from the CIA, Wilkes Subordinate

27  X caused $150,000 more to be wire-transferred from Shell Company No. 1

28

1  to WILKES's companies, bringing WILKES's direct share of the initial

2  $850,000 to $705,000.

3          (47) On or about November 20, 2004, WILKES treated

4  FOGGO to a dinner at the Serbian Crown restaurant in Great Falls,

5  Virginia, for which WILKES paid $773.65, of which FOGGO's pro rata

6  share was approximately $257.88.

7          (48) On or about November 20, 2004, WILKES gave FOGGO

8  an Ellie Bleu cigar humidor, which Wilkes Subordinate X had purchased

9  for $2,307.38 at WILKES's direction.

10          (49) On or about November 21, 2004, WILKES treated

11  FOGGO to a dinner at the Capital Grille in Tyson's Corner, Virginia,

12  for which WILKES paid $712.15, of which FOGGO's pro rata share was

13  approximately $237.38.

14          (50) On or about November 22, 2004, WILKES treated

15  FOGGO to a dinner at Ruth's Chris Steak House in Fairfax, Virginia,

16  for which WILKES paid $902.33, of which FOGGO's pro rata share was

17  approximately $225.58.

18          (51) In or about December 2004, Foggo discussed with

19  Wilkes Subordinate X the idea that WILKES might be able to get a

20  government contract to supply air support services for the CIA.

21          (52) In or about January 2005, WILKES directed various

22  ADCS employees to begin pursuing plans to work on an air support

23  proposal that would be designed to answer the CIA's needs as outlined

24  by FOGGO.

25          (53) On or about February 3, 2005, an individual

26  employed by WILKES's companies sent Wilkes Subordinate X an email

27  (using a Wilkes Corporation email address) enclosing an engagement

28

1  letter with a law firm hired to assist with the Air Support proposal

2  to the CIA.

3  (54) On or about February 8, 2005, an individual

4  employed by WILKES's companies sent Wilkes Subordinate X an email

5  (using a TPG Advisors email address) asking whether he wanted an

6  update on the [Air Support] project.

7  (55) On or about February 9, 2005, WILKES treated FOGGO

8  to a dinner at the Capital Grille in Washington, D.C., for which

9  WILKES   paid   $1,396.31,   of   which   FOGGO's   pro   rata   share   was

10 approximately $232.71.

11 (56) On or about February 11, 2005, FOGGO hosted a

12 luncheon in the CIA dining room for WILKES (and other WILKES employees

13 and associates), which FOGGO charged to the government and certified

14 that   "the   attendance   of   these   individuals   facilitated   the

15 accomplishment of his duties."

16 (57) On or about February 11, 2005, WILKES treated

17 FOGGO to a dinner at P.F. Chang's in Fairfax, Virginia, along with

18 members of the Group W advisory board for which WILKES paid $404.78,

19 of which FOGGO's pro rata share was approximately $25.

20 (58) On about February 15, 2005, FOGGO inquired of his

21 former deputy at the Overseas Location regarding whether Wilkes

22 Subordinate X "was put in for his Secret Clearance?"

23 (59) On or about Saturday, February 19, 2005, FOGGO

24 personally  met with Wilkes Subordinate X at CIA headquarters (and

25 discussed outstanding business between the CIA and WILKES).

26 (60) On or about February 22, 2005, an individual

27 employed by WILKES's companies sent Wilkes Subordinate X an email

28 (using a TPG Advisors email address) enclosing a Customer Presentation

16

1  and Legal Questions for the lawyers engaged to assist with the Air

2  Support proposal to the CIA.

3         (61) On or about February 28, 2005, Wilkes Subordinate

4  X caused $110,000 to be wire-transferred from Shell Company No. 1 to

5  WILKES's companies.

6         (62) On or about March 9, 2005, Wilkes Subordinate X

7  decided that the initial corporate name for their business designed

8  to provide air support to the CIA should be "JC Industries."

9         (63) On or about March 14, 2005, WILKES treated FOGGO

10  to a dinner at the Capital Grille in Tyson's Corner, Virginia, for

11  which WILKES paid $800.26, of which FOGGO's pro rata share was

12  approximately $200.06.

13         (64) On or about March 20, 2005, FOGGO sent an email

14  to a bank loan officer stating in part: "I plan to retire in circa 3

15  years - while I have a big offer from a company in California - I may

16  stay in the area due to my worth to local companies...I guess I can't

17  give you a firm answer - I would bet we will be elsewhere - which

18  leads me to consider renting..."

19         (65) On or about March 31, 2005, WILKES sent Wilkes

20  Subordinate X an email stating: "I talked to the big guy last night.

21  He will sprinkle some magic dust today that should solve your problem.

22  BRW."

23         (66) On March 31, 2005, FOGGO sent an email to the

24  acting head of the Overseas Location inquiring about delays in

25  payments to Shell Company No. 1, resulting in three service fee

26  payments totaling $231,792 to Shell Company No. 1 in less than thirty

27  days.

28

1         (67) On or about March 31, 2005, WILKES sent FOGGO an
2 email thanking him for inquiring with the Overseas Location (about
3 obtaining payment on his CIA contract).

4         (68) On or about April 11, 2005, FOGGO agreed to speak
5 with Wilkes Subordinate X about a proposal for one of WILKES's
6 companies to supply armored vehicles to the CIA.

7         (69) On or about April 14, 2005, Wilkes Subordinate X
8 sent WILKES an email indicating that he was concealing WILKES
9 participation in an upcoming dinner with FOGGO and Wilkes
10 Subordinate X (held on April 24, 2005) from other CIA employees.

11         (70) On or about April 24, 2005, WILKES paid for a
12 dinner at the Capital Grille in Tyson's Corner, Virginia, for himself,
13 Wilkes Subordinate X and FOGGO (in which they discussed, among other
14 things, the air support proposal that FOGGO wanted WILKES to present
15 to the CIA), for which Wilkes paid $994.05, of which FOGGO's pro rata
16 share was approximately $248.51.

17         (71) On or about April 28, 2005, FOGGO filed and
18 certified the truthfulness, completeness, and accuracy of a "Public
19 Financial Disclosure Report" (Form SF-278) for calendar year 2004,
20 which Report called for disclosure of (among other things) all gifts
21 "received from one source totaling more than $285" and agreements or
22 arrangements for future employment, and from which Report FOGGO
23 omitted any mention of (a) the thousands of dollars in benefits he
24 received from WILKES in 2004, or (b) his job offer from WILKES.

25         (72) On or about May 6, 2005, Wilkes Subordinate X
26 wired $50,000 in government contract funds to a San Diego account of
27 defendant WILKES's companies.

28

(73) On or about May 17, 2005, WILKES purchased for FOGGO's wife a round-trip, business class airline ticket from the Overseas Location to Washington, D.C.

(74) In or about early June 2005, Foggo told a CIA employee involved with air operations that he had a friend involved with civil aviation who could provide commercial cover for CIA air operations.

(75) On or about June 5, 2005, WILKES treated FOGGO to a dinner at the Capital Grille in Tyson's Corner, Virginia, for which Wilkes paid $2,918.27, of which FOGGO's pro rata share was approximately $194.55.

(76) On or about June 6, 2005, FOGGO personally introduced WILKES at a meeting held at the CIA as an individual who was involved in aviation and who could assist in providing commercial cover for CIA air operations.

(77) On or about June 6, 2005, WILKES sent FOGGO an email stating that "the meeting is over" and he'd "like to know what they think."

(78) On or about June 9, 2005, FOGGO sent an email to the chief of CIA's air operations inquiring how the June 6, 2005 meeting went with WILKES.

(79) On or about June 10, 2005, WILKES sent an email to FOGGO requesting that he provide him with information "that would be helpful in the development" of WILKES's proposal to provide commercial cover for CIA air operations.

(80) On or about June 10, 2005, FOGGO spoke with WILKES regarding the proposal for one of WILKES's companies to supply armored vehicles to the CIA.

1   (81) On or about June 13, 2005, FOGGO sent an email to
2   Wilkes Subordinate X asking him about a meeting at the CIA involving
3   the proposal by one of WILKES company to supply armored vehicles to
4   the CIA.

5   (82) On or about June 15, 2005, at a meeting held at
6   the CIA, WILKES presented a proposal directed at providing commercial
7   cover for CIA air operations, which called for the CIA to pay $132
8   million to a WILKES-controlled entity.

9   (83) On or about June 15, 2005, WILKES treated FOGGO
10  to a dinner at Damon's in Chantilly, Virginia, for which WILKES paid
11  $182.98, of which FOGGO's pro rata share was approximately $45.74.

12  (84) On or about June 16, 2005, FOGGO instructed CIA
13  employees that the agency was going to move forward on three different
14  options directed at providing an enhanced capability for CIA air
15  operations, and suggested that WILKES could provide commercial cover
16  for these enhanced capabilities.

17  (85) On or about June 16, 2005, FOGGO spoke with a CIA
18  employee and indicated that he "definitely wanted [the CIA] to use
19  [SCIF] space" that would be rented from Shell Company 1.

20  (86) On or about June 16, 2005, WILKES treated FOGGO
21  to a dinner at the Capital Grille in Tyson's Corner, Virginia, for
22  which WILKES paid $595.47.

23  (87) On or about June 20, 2005, FOGGO sent an email to
24  the chief of CIA's air operations offering to use some "EXDIR grease"
25  in order to ensure that WILKES and his attorney was quickly cleared
26  to receive classified information.

27  (88) On or about June 21, 2005, in carrying out FOGGO's
28  directions, the Deputy Chief of CIA's air operations sent an email to

20

1   CIA legal counsel informing her that they planned to use WILKES to
2   implement an enhanced capability for CIA air operations.

3           (89) On or about June 28, 2005, in carrying out FOGGO's
4   directions, a CIA air operations employee sent an email to a first
5   line supervisor that contained estimated costs to the CIA "based upon
6   preliminary pricing data" supplied by WILKES in his proposal to
7   provide commercial cover for CIA air operations.

8           (90) On or about June 28, 2005, Wilkes Subordinate X
9   sent an email to an ADCS employee informing him that the meeting with
10  the CIA relating to renting space in WILKES's SCIF went well.

11          (91) On or about July 6, 2005, Wilkes Subordinate X
12  wired $30,000 in government contract funds to a San Diego account of
13  defendant WILKES's companies.

14          (92) On or about July 6, 2005, FOGGO sent an email to
15  the head of the Overseas Location informing him that he should meet
16  privately with Wilkes Subordinate X, who he claimed was "out of pocket
17  lots of cash" due to the fault of the CIA.

18          (93) On or about July 13, 2005, FOGGO indicated to a
19  CIA employee that he was "keen to work with" [Shell Company 1] that
20  was offering SCIF space for use by the CIA.

21          (94) On or about July 14, 2005, WILKES sent FOGGO an
22  email requesting that FOGGO speak to the chief of CIA's air operations
23  and "poke" him to respond to WILKES.

24          (95) On or about August 6, 2005, FOGGO sent an email
25  to the head of the Overseas Location discussing, among other things,
26  WILKES's proposal to supply armored vehicles for an agency-wide
27  rollout.

28

21

1    (96) On or about August 12, 2005, FOGGO sent WILKES an
2  email telling him that he would check on the status of his proposal
3  to provide commercial cover for CIA air operations.

4    (97) On or about August 16, 2005, following the
5  execution of search warrants at WILKES's San Diego business
6  headquarters, FOGGO instructed a CIA employee that they should no
7  longer use WILKES to provide commercial cover for air operations as
8  federal agents had searched his business.

9    (98) On or about September 8, 2005, Wilkes Subordinate
10  X wired $60,000 in government contract funds to a San Diego account
11  of defendant WILKES's companies.

12    (99) On or about September 8, 2005, Wilkes Subordinate
13  X wired $20,000 in government contract funds to a San Diego account
14  of defendant WILKES's companies.

15    (100) From in or about December 2005 through May 2006,
16  FOGGO misled CIA employees and actively concealed the full extent of
17  his knowledge regarding WILKES's relationship with CIA business.

18    (101) On or about September 12, 2006, FOGGO filed and
19  certified the truthfulness, completeness, and accuracy of a "Public
20  Financial Disclosure Report" (Form SF-278) for calendar year 2005,
21  which Report called for disclosure of (among other things) all gifts
22  "received from one source totaling more than $305" and agreements or
23  arrangements for future employment, and from which Report FOGGO
24  omitted any mention of (a) the thousands of dollars in benefits he
25  received from WILKES in 2005, or (b) his job offer from WILKES.
26  All in violation of Title 18, United States Code, Section 371.
27  //
28  //

22

**Counts 2 through 22**

**HONEST SERVICES WIRE FRAUD**

16.   Paragraphs 1 through 11 and 14 of this indictment are hereby realleged as if fully set forth herein.

17.   Beginning on a date unknown to the Grand Jury, and continuing through in or about September 2006, within the Southern District of California and elsewhere, defendants KYLE DUSTIN FOGGO, aka "Dusty" FOGGO, and BRENT ROGER WILKES, devised and intended to devise a material scheme to defraud the United States and its citizens of defendant FOGGO's honest services, including their right to his loyal, faithful, disinterested, unbiased service, to be performed free of deceit, undue influence, conflict of interest, self-enrichment, self-dealing, concealment, fraud, and corruption; said scheme more fully described elsewhere in this indictment.

**WIRE TRANSMISSIONS IN EXECUTION OF THE SCHEME**

18.   On or about the dates set forth below (Column "A"), within the Southern District of California and elsewhere, defendants KYLE DUSTIN FOGGO, aka "Dusty" FOGGO, and BRENT ROGER WILKES, for the purpose of executing the above-described scheme to defraud, transmitted and caused to be transmitted in interstate commerce by means of wire communications, certain writings, signs, signals and sounds as alleged below (Column "B"):

//
//
//
//
//
//

| | (A) | (B) |
|---|---|---|
| COUNT | DATE | TRANSMISSION |
| 2 | 3/30/03 | Email (requesting assistance with an immigration problem related to FOGGO's Water Contact) from defendant FOGGO, outside of California, to defendant WILKES, through San Diego County California. |
| 3 | 5/14/03 | Email (regarding leveraging CIA Contractor to give WILKES business) from defendant FOGGO, outside of California, to defendant WILKES, through San Diego County, California. |
| 4 | 9/10/03 | Email (regarding a potential contract to supply bottled water to the Overseas Location) from defendant FOGGO, outside of California, to defendant WILKES, through San Diego County, California. |
| 5 | 9/17/03 | Email (instructing WILKES on details of water deal with CIA) from defendant FOGGO, outside of California to defendant WILKES, through San Diego Country, California |
| 6 | 10/22/03 | Email (regarding water supply tasks WILKES assigned to Wilkes Subordinate X), from an assistant to defendant WILKES, through San Diego County, California, to Wilkes Subordinate X, outside of California. |
| 7 | 1/7/04 | Email (regarding how to "play" Wilkes Subordinate X's role in procurement contract with FOGGO's Overseas Location, "before you [Wilkes Subordinate X] meet my people") from defendant FOGGO, outside of California, to Wilkes Subordinate X, through San Diego County, California. |
| 8 | 2/5/04 | Email (in which Foggo offered to act as a "broker" to rent out SCIF space built by WILKES) from defendant FOGGO, outside of California to Wilkes Subordinate X, through San Diego County, California. |
| 9 | 2/9/04 | Email (regarding FOGGO helping WILKES to obtain money from CIA Contractor) from defendant WILKES, through San Diego County, California to defendant FOGGO, outside of California. |
| 10 | 3/14/04 | Email (requesting FOGGO's assistance convincing the CIA Contractor that WILKES "added value") from Defendant WILKES, through San Diego County, California to defendant FOGGO, outside of California. |

24

| | (A) | (B) |
|---|---|---|
| COUNT | DATE | TRANSMISSION |
| 11 | 6/16/04 | Email (discussing possible joint venture involving Archer Defense and private security firm) from Defendant FOGGO, outside of California, to Wilkes Subordinate X, among others, through San Diego County, California. |
| 12 | 9/16/04 | Email (stating that FOGGO would be WILKES's "partner" for as long as FOGGO breathed) from defendant FOGGO outside of California to defendant WILKES, through San Diego County, California. |
| 13 | 2/3/05 | Email (enclosing an engagement letter with a law firm hired to assist with the Air Support proposal to the CIA) from a TPG Advisors employee through San Diego County California to Wilkes Subordinate X, outside of California. |
| 14 | 2/8/05 | Email (asking Wilkes Subordinate X if he wanted an update on [Air Support] project) from a Wilkes Corporation employee through San Diego County California to Wilkes Subordinate X, outside of California. |
| 15 | 2/22/05 | Email (enclosing Customer Presentation and Legal Questions for lawyers engaged to assist with Air Support proposal to the CIA) from a TPG Advisors employee through San Diego County California to Wilkes Subordinate X, outside of California. |
| 16 | 3/9/05 | Email (indicating that WILKES "thinks [they] are just about ready to set up" JC Industries) from a TPG Advisors employee, through San Diego County California to Wilkes Subordinate X, outside of California. |
| 17 | 3/31/05 | Email (thanking FOGGO for expediting payments to Shell Company No. 1) from defendant WILKES, through San Diego County, California to Wilkes Subordinate X, outside of California. |
| 18 | 6/06/05 | Email (letting FOGGO know WILKES would like to know what CIA employees thought of his presentation) from defendant WILKES, through San Diego County, California, to defendant FOGGO, outside of California. |
| 19 | 6/10/05 | Email (informing WILKES that he is "set to meet" CIA personnel the following week) from defendant FOGGO, outside of California, to defendant Wilkes, through San Diego County, California. |

| | (A) | | (B) |
|---|---|---|---|
| COUNT | DATE | | TRANSMISSION |
| 20 | 6/15/05 | | Email (enclosing Air Support proposal to be given to Defendant WILKES) from WILKES Corporation Employee, through San Diego County to ADCS email account, outside of California. |
| 21 | 7/14/05 | | Email (requesting that Foggo "poke" CIA employee in charge of Air Support proposal) from defendant WILKES, through San Diego County to defendant FOGGO, outside of California. |
| 22 | 8/10/05 | | Email (asking Foggo to check on status of Air Support proposal) from defendant WILKES, through San Diego County to defendant FOGGO, outside of California. |

All in violation of Title 18, United States Code, Sections 1343 and 1346, and 2.

### Counts 23 through 30

### MONEY LAUNDERING – UNLAWFUL MONETARY TRANSACTIONS

19.   Paragraphs 1 through 11 and 14 of this indictment are hereby realleged as if fully set forth herein.

20.   On or about the dates set forth below (Column "A"), within the Southern District of California and elsewhere, defendants KYLE DUSTIN FOGGO, aka "Dusty" FOGGO, and BRENT ROGER WILKES, did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000 as set forth below (Column "B"), such property having been derived from a Specified Unlawful Activity, that is, Honest Services Wire Fraud in violation of Title 18, United States Code, Sections 1343 and 1346:

//

//

26

|  | | (A) | (B) |
| --- | --- | --- | --- |
| | COUNT | DATE | TRANSACTION |
| | 23 | 1/29/04 | Wire transfer of $375,000 from a CIA contractor's bank account outside of California to a San Diego bank account in the name of Group W Advisors, Inc. |
| | 24 | 9/24/04 | Wire transfer of $555,000 in government contract funds from the Virginia bank account of Shell Company No. 1 to a San Diego account of defendant WILKES's companies. |
| | 25 | 10/28/04 | Wire transfer of $150,000 in government contract funds from the Virginia bank account of Shell Company No. 1 to a San Diego account of defendant WILKES's companies. |
| | 26 | 2/28/05 | Wire transfer of $110,000 in government contract funds from the Virginia bank account of Shell Company No. 1 to a San Diego account of defendant WILKES's companies. |
| | 27 | 5/6/05 | Wire transfer of $50,000 in government contract funds from the Virginia bank account of Shell Company No. 1 to a San Diego account of defendant WILKES's companies. |
| | 28 | 7/6/05 | Wire transfer of $30,000 in government contract funds from the Virginia bank account of Shell Company No. 1 to a San Diego account of defendant WILKES's companies. |
| | 29 | 9/8/05 | Wire transfer of $60,000 in government contract funds from the Virginia bank account of Shell Company No. 1 to a San Diego account of defendant WILKES's companies. |

|  | (A) |  | (B) |
|---|---|---|---|
| COUNT | DATE |  | TRANSACTION |
| 30 | 9/8/05 |  | Wire transfer of $20,000 in government contract funds from the Virginia bank account of Shell Company No. 1 to a San Diego account of defendant WILKES's companies. |

All in violation of Title 18, United States Code, Sections 1957 and 2.

DATED: May 10, 2007.

A TRUE BILL:

_[signature]_

Foreperson

KAREN P. HEWITT
United States Attorney

By: _[signature]_
SANJAY BHANDARI
Assistant U.S. Attorney

By: _[signature]_
VALERIE H. CHU
Assistant U.S. Attorney

By: _[signature]_
JASON A. FORGE
Assistant U.S. Attorney

By: _[signature]_
PHILLIP L.B. HALPERN
Assistant U.S. Attorney

28