1                     UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF CALIFORNIA
2

        HONORABLE LARRY ALAN BURNS, JUDGE PRESIDING
3

4  UNITED STATES OF AMERICA,       )
                                )
5                  PLAINTIFF,     )  CASE NO. 07CR00330-LAB
                                )        07CR00329-LAB
6          VS.                     )
                                )  SAN DIEGO, CALIFORNIA
7  BRENT ROGER WILKES, (1)        )  FEBRUARY 19, 2008
  KYLE DUSTIN FOGGO, (2)         )  9:30 A.M.
8                                  )
               DEFENDANTS.    )
9  _____)

10                        REPORTER'S TRANSCRIPT
11

12                        SENTENCING (1)
                    POST-TRIAL MOTIONS
13

14  APPEARANCES:

15  FOR THE GOVERNMENT:          KAREN P. HEWITT, U.S. ATTORNEY
                              BY: PHILLIP L.B. HALPERN, ESQ.
16                                    JASON A. FORGE, ESQ.
                                  SANJAY BHANDARI, ESQ.
17                                  VALERIE CHU, ESQ.
                       ASSISTANT U.S. ATTORNEYS
18                         880 FRONT STREET
                       SAN DIEGO, CA. 92101

19

20  FOR DEFENDANT WILKES:        GERAGOS & GERAGOS
                       BY: MARK J. GERAGOS, ESQ.
21                         350 SOUTH GRAND AVENUE, 39TH FL.
                       LOS ANGELES, CA. 90071
22                              -AND-
                       FEDERAL DEFENDERS, INC.
23                         BY: REUBEN C. CAHN, ESQ.
                          SHEREEN J. CHARLICK, ESQ.
24                         225 BROADWAY, STE. 900
                       SAN DIEGO, CA 92101

25

2

```
 1    CONTINUED APPEARANCES:

 2    FOR DEFENDANT FOGGO:          AKIN GUMP STRAUSS HAUER & FELD
                                    BY:   ELIZABETH TOBIO, ESQ
 3                                        ANDREW DOBER, ESQ.
                                          RANDOLPH TESLIK, ESQ.
 4                                  NEW HAMPSHIRE AVE., N.W.
                                    WASHINGTON, DC 20036-1564
 5

 6

 7


 8    COURT REPORTER:              EVA OEMICK
                                   OFFICIAL COURT REPORTER
 9                                 UNITED STATES COURTHOUSE
                                   940 FRONT STREET, STE. 2190
10                                 SAN DIEGO, CA 92101
                                   TEL: (619) 615-3103
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    **SAN DIEGO, CALIFORNIA - TUESDAY, FEBRUARY 19, 2008 - 9:30 A.M.**

2              THE CLERK:  CALLING NO. 2 ON THE CALENDAR, 07CR330,

3    UNITED STATES OF AMERICA VERSUS BRENT ROGER WILKES.

4              COUNSEL, PLEASE STATE YOUR APPEARANCE FOR THE

5    RECORD.

6              MR. GERAGOS:  GOOD MORNING, YOUR HONOR.

7              MARK GERAGOS, G-E-R-A-G-O-S, ON BEHALF OF

8    MR. WILKES.

9              MR. BHANDARI:  GOOD MORNING, YOUR HONOR.

10             SANJAY BHANDARI, PHIL HALPERN, JASON FORGE, AND

11   VALERIE CHU FOR THE UNITED STATES.

12             THE COURT:  GOOD MORNING.

13             THIS MATTER IS ON FOR SENTENCING THIS MORNING AS

14   WELL AS RESOLUTION OF POST-TRIAL MOTIONS.

15             IT SEEMS TO ME THE LOGICAL ORDER IS TO TAKE THE

16   POST-TRIAL MOTIONS FIRST.  OBVIOUSLY, IF ANY OF THOSE IS

17   GRANTED AND RELIEF IS GIVEN, WE WOULDN'T GO TO SENTENCING.

18             ANY DISAGREEMENT ON THAT?

19             MR. GERAGOS:  NO.

20             THE COURT:  MR. GERAGOS, I'M HAPPY TO HEAR FROM YOU.

21   I'VE READ ALL OF THE PAPERS BACK AND FORTH, JUST A FEW OF

22   WHICH ARE SITTING IN FRONT OF ME.  I'M FAMILIAR WITH THE

23   ARGUMENTS AND THE RESPONSE.  I'M HAPPY TO HEAR ANY ADDITIONAL

24   COMMENTS YOU HAVE.

25             MR. GERAGOS:  THANK YOU, YOUR HONOR.

PDF created with pdfFactory trial version www.pdffactory.com

4

1          AS THE COURT HAS INDICATED, I THINK THAT WE HAVE

2    PRETTY FAIRLY AND THOROUGHLY BRIEFED THE ISSUES HERE AND GONE

3    BACK AND FORTH.  I DON'T THINK THAT THERE'S ANY MERIT TO THE

4    MOTION TO STRIKE.  AND I ASSUME BY THE FACT YOU'RE AFFORDING

5    THIS ARGUMENT AT THIS POINT, THAT YOU'RE WILLING TO HEAR IT ON

6    THE MERITS.

7          THE COURT:  I DENIED IT IN A WRITTEN ORDER AND

8    SIGNED YOUR ORDER TO SHORTEN TIME ON YOUR POST-TRIAL MOTION.

9    I THINK TECHNICALLY THEY WERE RIGHT.  THEY WERE RIGHT TO SAY,

10   "WAIT A MINUTE.  HERE'S A GUY WHO'S GOING A DEMAND STRICT

11   COMPLIANCE WITH TIMELINESS RULES.  AND YET, WHAT'S AN EXCUSE

12   FOR HIS OWN UNTIMELINESS?"  THAT ASIDE, I THINK HE'S ENTITLED

13   TO HAVE THE COURT CONSIDER ON THE MERITS THE ARGUMENT YOU

14   MAKE.  SO I HAVE, AND I WILL.

15         MR. GERAGOS:  THANK YOU.

16         I THINK, FROM MY STANDPOINT AT LEAST AS TRIAL

17   COUNSEL, THAT THE MOST COMPELLING ISSUE, OBVIOUSLY, IS THE

18   ISSUE OF TIME FOR PREPARATION.  I KNOW THAT WE'VE SUBMITTED

19   SOME OF THE DOCUMENTS THAT WERE FOUND SUBSEQUENT.  I KNOW

20   HAVING LIVED IN THIS COURTROOM FOR WHATEVER PERIOD OF TIME

21   THAT IT'S BEEN, THE 28 DAYS OF TRIAL AND ALL THE OTHER DAYS, I

22   UNDERSTAND THE COURT'S POSITION ON THESE THINGS.

23         BUT FRANKLY, GIVEN THE NATURE AND THE BREADTH AND

24   THE DEPTH OF THE DOCUMENTS THAT WERE INVOLVED, GIVEN WHAT

25   IS -- AND I USE THE CHARITABLE TERM "MISUNDERSTANDING" BETWEEN

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

5

1  THE GOVERNMENT AND MY OFFICE AS TO WHAT WAS OR WAS NOT

2  AVAILABLE AND WHAT WAS BEING DISCLOSED THROUGH THE DOCUMENT

3  CONTROL CENTER, IF YOU WILL, AS OPPOSED TO THE MYRIAD OF

4  DOCUMENTS, THE TERABYTES OF DOCUMENTS, OVER AT THE FBI, THAT

5  THERE JUST WAS NOT SUFFICIENT TIME IN ORDER TO GO THROUGH ALL

6  OF THOSE DOCUMENTS AND TO DO A THOROUGH JOB IN TERMS OF

7  PREPARATION FOR BOTH THE IMPEACHMENT OF WITNESSES AND

8  CONCEIVABLY TO PUT ON OTHER WITNESSES AS WELL.

9        I THINK THAT WHETHER IT WAS FROM START TO FINISH

10  EIGHT MONTHS FOR TWO CASES, AT LEAST INITIALLY, GIVEN THE

11  SHEER VOLUME OF THE DOCUMENTS, THAT IT MAKES IT UNREASONABLE

12  FOR ANY LAWYER, LET ALONE MY OFFICE, TO BE ABLE TO ADEQUATELY

13  PREPARE.  AND I THINK THAT THAT, TO MY MIND, IS THE MOST

14  COMPELLING ISSUE ON THE MOTION FOR A NEW TRIAL.

15        I REALIZE THE COURT, AT LEAST IN STEPPING IN YOUR

16  SHOES -- AND THE GOVERNMENT QUOTES THAT ONE COLLOQUY BETWEEN

17  US.  AND AS YOU SAW, I THINK I TRIED TO PARSE THAT I

18  UNDERSTOOD YOUR POSITION AT THE POINT.  I WASN'T EMBRACING IT.

19  I WAS DOING WHATEVER I COULD TO DEFEND HIM BASED ON THE AMOUNT

20  OF TIME THAT THE COURT AFFORDED ME AND AFFORDED HIM.

21        BUT THE BOTTOM LINE AT THE END, IT WAS INSUFFICIENT

22  TIME.  AND I DON'T SAY THAT LIGHTLY, AND I DON'T LIKE

23  CONFESSING TO THE FACT THAT THERE WASN'T SUFFICIENT TIME TO

24  ADEQUATELY DEFEND SOMEBODY.  BUT I THINK IN THIS CASE IT

25  CLEARLY WAS THE SITUATION WHERE THERE WAS NO WAY POSSIBLE,

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

6

1    GIVEN THE AMOUNT OF TIME FOR THE PREPARATION, GIVEN WHAT WAS

2    GOING ON WITH THE OTHER CASE, THAT THERE WAS AN ADEQUATE

3    AMOUNT OF TIME FOR PREPARATION.

4         THE COURT:  THE LAST POINT I'M NOT SURE I FULLY

5    UNDERSTAND.  BECAUSE BY JULY 30TH, YOU WERE NOT INVOLVED IN

6    THAT CASE.  IN FACT, EVEN BEFORE THEN, EARLY IN JULY -- I HAD

7    RELIEVED YOU FROM THE WILKES/FOGGO MATTER EARLY IN JULY.  YOU

8    KNEW YOU WERE OUT OF THAT CASE.  MR. WILKES SPENT FOUR TO

9    SIX WEEKS TRYING TO COME UP WITH COUNSEL.  AND IT CULMINATED

10   IN MY APPOINTMENT OF THE FEDERAL DEFENDERS OFFICE.  SO IF YOU

11   WERE PREPARING FOR TWO CASES, THE --

12        MR. GERAGOS:  FOR A PERIOD OF TIME.  FROM THE FIRST

13   APPEARANCE IN FEBRUARY THROUGH JULY, THERE WAS STILL JUMBLING

14   THE TWO.

15        THE COURT:  IN MAY, WE SET A TRIAL DATE ON THIS

16   CASE, ON WILKES/MICHAEL.  AND I INDICATED AT THAT TIME THAT

17   THAT CASE WOULD GO FIRST.  I WOULD HAVE THOUGHT THAT YOU WOULD

18   HAVE CONCENTRATED ON THAT CASE GOING FIRST.  AND THEN WHAT WAS

19   IT?  BY JUNE, WE KNEW THAT THERE WAS A PROBLEM WITH THE

20   CLASSIFIED INFORMATION PROTECTION ACT PROCEDURES.  AND SO YOU

21   HAD FULLY THREE MONTHS.

22        I LOOKED AT THE TRANSCRIPT IN THIS CASE,

23   MR. GERAGOS.  WE ALL AGREED AT THE MAY 14TH HEARING THAT A

24   TRIAL DATE OF SEPTEMBER 18TH, '07 WAS ENOUGH TIME, WAS

25   INDICATED.  AS THE GOVERNMENT POINTS OUT, AT EACH JUNCTURE, I

PDF created with pdfFactory trial version www.pdffactory.com

1    CHASTENED THEM TO DO THINGS THAT THEY DIDN'T HAVE TO DO UNDER

2    LAW.  LIKE IT OR NOT, THEY DON'T HAVE TO GIVE OVER WITNESS

3    STATEMENTS BEFORE THE WITNESS TESTIFIES.  THEY DID IN THIS

4    CASE, AND I THINK LARGELY BECAUSE I PRESSURED THEM.

5            I SAID, "LOOK, I WANT TO BE READY.  I HEAR WHAT

6    MR. GERAGOS IS SAYING.  IT'S GOING TO BE DIFFICULT TO BE

7    READY.  PLEASE GIVE THEM THESE THINGS."  THEY COMPLIED.  THEY

8    GAVE YOU A WITNESS LIST, WHICH THEY DON'T HAVE TO DO.

9            SO WE DIDN'T GO TO TRIAL ON SEPTEMBER 18TH, AS YOU

10   RECALL.  YOU CAME IN AND SAID, "I NEED MORE TIME."  I WAS

11   BUFFETED BECAUSE AT THAT POINT WE'D SENT OUT QUESTIONNAIRES TO

12   SOME 750 PROSPECTIVE JURORS AT GREAT COST TO THE COURT SYSTEM.

13   THEY WERE 18-PAGE DOUBLE-SIDED QUESTIONNAIRES THAT WENT OUT.

14   THAT WAS A VERY EXPENSIVE THING TO DO, WARRANTED IN THIS CASE,

15   AT LEAST ONCE.

16           WE HAD 750 MEMBERS OF THE COMMUNITY THAT HAD TAKEN

17   THE TIME, PROBABLY ABOUT AN HOUR, I WOULD THINK, TO FILL THOSE

18   OUT AND TO SEND THEM BACK IN.  THOSE PEOPLE HAD BEEN

19   TIME-SCREENED.  THEY'D BEEN PUBLICITY SCREENED.

20           IT WASN'T THE ORDINARY CASE WHERE I HAD THE LATITUDE

21   TO SAY, "I DON'T HAVE ANYTHING GOING ON ON SEPTEMBER 18TH.  I

22   CAN JUST MOVE THIS."  THAT WAS ONE OF THE CONCERNS I HAD.  AS

23   YOU RECALL, MR. MICHAEL WAS STILL JOINED IN THE CASE AT THAT

24   TIME.  HE HAD NOT HAD HIS HEALTH PROBLEM YET.  WE HAD A

25   PROBLEM WITH YOUR CO-COUNSEL BECAUSE HE HAD BEEN SET FOR TRIAL

PDF created with pdfFactory trial version www.pdffactory.com

8

1    IN BROOKLYN, AS I RECALL, IN NOVEMBER AND SAID, "IF WE PUSH

2    THIS TOO FAR BACK, I WON'T BE READY."

3            I'M RELUCTANT WHEN A FELLOW HAS A TRIAL DATE SET TO

4    SAY "WELL, I'M GOING TO IMPOSE A DIFFERENT TRIAL DATE" AND

5    TELL HIM HE HAS TO BE HERE.  I WOULDN'T DO THAT.  I WOULDN'T

6    WANT THAT DONE TO ME.  SO RESPECTING THAT THE TRIAL HAD BEEN

7    SET, WE HAD TO ACCOMMODATE THAT.  AND THE ACCOMMODATION WAS

8    REACHED.  YOU ACQUIESCED.

9            MR. GERAGOS:  I ACQUIESCED ONLY BECAUSE OF THE

10   CO-COUNSEL.  THE IRONY OF THE FACT IS THAT THEY ENDED UP NEVER

11   TRYING THE CASE.  THEY NEVER TRIED THE CASE WITH US.  WE WERE

12   PLACED, I THINK -- WHATEVER IT WAS, THREE WEEKS OR 18 DAYS

13   PRIOR TO GOING TO TRIAL BASED UPON THEIR SCHEDULE, THEIR

14   ISSUES.  AND THEN THEY --

15           THE COURT:  THAT'S ALWAYS THE WAY.  WE HAVE TO MAKE

16   DECISIONS ON THE BEST INFORMATION AVAILABLE AT THE TIME.  AND

17   AT THE TIME, HE SAID, "I HAVE A TRIAL IN BROOKLYN, NEW YORK IN

18   NOVEMBER."  AND AS YOU KNOW, I'M REQUIRED TO LOOK AT THAT

19   FACTOR, TOO; THE INCONVENIENCE TO OTHER COUNSEL.  HE JUST

20   COULDN'T DO IT.  IT WAS CUTTING IT TOO CLOSE IF I GAVE A FULL

21   MONTH AT THAT POINT.

22           BUT THERE WAS AN ACCOMMODATION REACHED.  AND THE

23   TRANSCRIPT REFLECTS THAT, AND YOU AGREED TO IT.  AND THEN I

24   LOOK AT THE WAY THE TRIAL PROCEEDED, AND YOU WERE GIVEN

25   ADDITIONAL TIME.  FROM THE BEGINNING, I TOLD YOU "HAVE YOUR

PDF created with pdfFactory trial version www.pdffactory.com

9

1    WITNESSES READY BECAUSE IF YOU'RE GOING TO PRESENT A CASE WHEN

2    THE GOVERNMENT RESTS, I'M GOING TO LOOK TO YOU TO CALL YOUR

3    WITNESSES."

4          THE FIRST WITNESS YOU CALLED WAS KIND OF A FILLER.

5    AND I DON'T KNOW IF YOU'RE DESIGN HAD CRYSTALLIZED THEN TO

6    CALL MR. WILKES AS A WITNESS.  BUT CERTAINLY, HE COULD HAVE

7    BEEN CALLED THAT DAY.  AS YOU RECALL, WE RECESSED AT ABOUT

8    11:00 A.M. ON THE THURSDAY AFTER THE GOVERNMENT RESTED THAT

9    MORNING, AND WE HAD THE ONE FILLER WITNESS.

10         AND THEN I GAVE SPECIAL DISPENSATION FOR YOU TO BE

11   OFF THE NEXT DAY.

12         DO YOU REMEMBER THAT?

13         MR. GERAGOS:  I DO, THE FRIDAY.

14         THE COURT:  YOU HAD AN IMPORTANT APPOINTMENT IN

15   LOS ANGELES, WHICH I RESPECTED.  AND AT THE TIME, I THOUGHT

16   "OKAY.  HE SAYS HE NEEDS MORE TIME TO LOOK AT THESE

17   DOCUMENTS."

18         I'M NOW TOLD FROM MR. SILLER (PHONETIC) FROM THE FBI

19   THAT THEY TOOK SERIOUSLY WHAT YOU SAID, WHICH WAS "I NEED TIME

20   TO GO OVER THERE.  I HAVE OTHER LAWYERS WITH ME.  WE'LL GO

21   LOOK AT THESE THINGS.  THEN I'LL BE READY TO GO COME TUESDAY."

22   MR. SILLER SAYS WITH THAT IN MIND, HE ORGANIZED FBI AGENTS TO

23   BE READY TO STAND BY AND PROVIDE THE STUFF AND TO MONITOR

24   WHILE YOU WERE THERE.  AND ON FRIDAY AFTERNOON, HE GETS A CALL

25   SAYING, "WE'RE NOT COMING.  WE'RE NOT GOING TO COME LOOK AT

PDF created with pdfFactory trial version www.pdffactory.com

1    THIS."

2              THEN AS WE WENT FORWARD, OBVIOUSLY, THE FIRES

3    OCCURRED.  I DON'T THINK THAT WAS DISRUPTIVE TO YOU PERSONALLY

4    AS YOUR OFFICES ARE IN LOS ANGELES.  YOU WERE ABLE TO CONTINUE

5    YOUR PREPARATION THERE.  AND FROM MR. SILLER'S DECLARATION, I

6    SEE THAT AT THE FBI OFFICE, ALL THE MATERIALS WERE WAITING

7    THAT WEEK.

8              MR. GERAGOS:  MR. WILKES AND HIS MOTHER AND HIS

9    FAMILY WERE DISPLACED BECAUSE OF THE FIRES.  SO THAT IS

10   SOMEWHAT DISINGENUOUS FROM MR. SILLER'S STANDPOINT.

11             MR. SILLER ALSO KNOWS THAT WE HAD AT THAT POINT --

12   AND I BROUGHT IT TO THE COURT'S ATTENTION -- REAL ISSUES WITH

13   THE WAY THAT THE FBI WAS CONDUCTING OR ALLOWING US TO BE IN

14   THERE, TO THE POINT WHERE I -- ACTUALLY, ONE OF MY ASSOCIATES

15   GRABBED PAPERWORK THAT HE WAS COPYING WHILE WE WERE GOING

16   THROUGH THE DOCUMENTS.

17             THE COURT:  I REMEMBER THAT.  ALL OF THOSE ISSUES

18   COULD HAVE BEEN BROUGHT TO MY ATTENTION.  I WAS AVAILABLE ALL

19   WEEK.  IN FACT, YOU AND I AND GOVERNMENT COUNSEL WERE

20   AVAILABLE AND IN CONVERSATIONS VIA CELL PHONE EVEN WHILE THE

21   FIRES BURNED HERE.

22             SO THE GOVERNMENT CHARACTERIZES IT AS THE COURT

23   BENDING OVER BACKWARDS TO ACCOMMODATE YOU AND MR. WILKES AND

24   TO MAKE SURE THAT YOU HAD EVERY OPPORTUNITY TO BE PREPARED,

25   AND I THINK THAT'S A FAIR CHARACTERIZATION.  I DON'T MEAN TO

PDF created with pdfFactory trial version www.pdffactory.com

1    PAT MYSELF ON THE BACK.  BUT I THINK THAT RATHER THAN

2    PEREMPTORILY DISMISSING THE CONCERNS THAT YOU RAISED, THAT I

3    LISTENED TO THEM AND THAT I TOOK THEM INTO CONSIDERATION.  I

4    ACTED ON THEM BY POSTPONING THE TRIAL.

5             HE WAS ARRAIGNED AT THE BEGINNING OF FEBRUARY.  HIS

6    TRIAL BEGAN EIGHT MONTHS LATER.  NOW, I UNDERSTAND THERE'S A

7    LOT OF INFORMATION IN THIS CASE, BUT EIGHT MONTHS IS A LOT OF

8    TIME FOR AN EXPERIENCED LAWYER LIKE YOU TO BECOME PREPARED ON

9    THE CASE.

10            MR. GERAGOS:  SEE, THAT'S WHERE WE -- I GUESS

11   REASONABLE MINDS CAN DIFFER.  I DON'T THINK THERE IS ANY

12   LAWYER, LET ALONE LAW FIRM, THAT'S GOING TO SAY THAT THEY CAN

13   GET PREPARED IN EIGHT MONTHS GIVEN THE AMOUNT OF INFORMATION.

14   THERE IS NO WAY THAT YOU CAN SAY THAT YOU CAN GET THROUGH

15   WHATEVER IT WAS, WE'VE ESTIMATED IT FROM THREE TERABYTES TO

16   EIGHT TERABYTES AT VARIOUS TIMES --

17            THE COURT:  THOSE NUMBERS -- THAT MASS OF

18   INFORMATION IS NOT PARTICULARLY MEANINGFUL BECAUSE, AS YOU

19   CONCEDE AND AS I KNOW, A LOT OF IT WAS CHAFE.  A LOT OF IT WAS

20   THINGS THAT YOU'D ALREADY BEEN GIVEN IN HARD COPY FORM.  THE

21   SEARCH WARRANTS, FOR EXAMPLE.  YOU TOLD ME YOU HAD NO INTEREST

22   IN SURVEILLANCE REPORTS.  SOME OF IT WAS SURVEILLANCE REPORTS.

23            I TAKE YOUR POINT THAT THERE WAS A LOT OF

24   DOCUMENTATION.  AND TO KNOW WHETHER IT WAS CHAFE OR NOT, YOU

25   HAD TO AT LEAST --

PDF created with pdfFactory trial version www.pdffactory.com

1            MR. GERAGOS:  SOMEBODY HAD TO GO THROUGH IT.

2            HOW DO YOU DECIDE WHETHER IT IS OR NOT?

3            THE COURT:  YOU HAD TWO YOUNG LAWYERS WORKING WITH

4    YOU, AT LEAST TWO.  AT ONE POINT, I EXTENDED THE APPOINTMENT

5    OF FEDERAL DEFENDERS TO ASSIST WITH PART OF THIS CASE.  I

6    MEAN, THE TRUTH OF THE MATTER IS, MR. GERAGOS, YOU'RE VERY

7    MUCH IN DEMAND.  YOU'RE A VERY POPULAR LAWYER.  AND I LOOKED

8    BACK -- IN CONSIDERING THIS MOTION, I LOOKED BACK AT THE

9    TRANSCRIPTS.  AT ONE POINT, YOU WERE IN MOLDOVA FOR A COUPLE

10   WEEKS.

11           MR. GERAGOS:  FOR A WEEK.

12           THE COURT:  AT ANOTHER POINT, I KNOW YOU HAD TO

13   CANCEL AN APPEARANCE AT THE DUKE LAW SCHOOL.

14           MR. GERAGOS:  WHICH I DID CANCEL SO I COULD BE HERE.

15   THE PROBLEM WAS IS MOST OF THE ACCOMMODATIONS HAPPENED -- MOST

16   OF THE COURT'S BENDING OVER BACKWARDS HAPPENED POST-GOVERNMENT

17   CASE.  EVERYTHING THAT YOU WENT THROUGH, THE FIRES AND

18   EVERYTHING ELSE, WAS AFTER THE GOVERNMENT'S CASE.

19           THE COURT:  BUT WE HAD A SEPTEMBER 18TH TRIAL DATE,

20   AND WE DIDN'T START UNTIL OCTOBER.

21           MR. GERAGOS:  EVEN IF THERE'S THREE TERABYTES, WHAT

22   IS THAT, A TERABYTE A WEEK?  I DON'T THINK -- IF I WERE TO

23   FIGURE OUT HOW MUCH TIME IT TAKES TO GO THROUGH A TERABYTE,

24   WHICH I STILL HAVEN'T CALCULATED BECAUSE I DON'T EVEN KNOW

25   WHAT A TERABYTE IS -- I KNOW THAT IT'S A LOT MORE THAN A

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

13

1    MEGABYTE OR SOMETHING OF THAT NATURE -- HOW IN THE WORLD CAN

2    YOU SAY TO A LAWYER "YOU'VE GOT TO BE READY," NO MATTER HOW

3    MANY LAWYERS YOU HAVE WORKING FOR YOU, "TO GO THROUGH ALL

4    THESE DOCUMENTS AND TO HAVE YOUR CLIENT THEN GO THROUGH AND

5    ASSIST YOU IN PREPARING FOR IT."

6            AND FOR WHATEVER IT MAY BE ON THE DEFENSE CASE, AS

7    THIS COURT WELL KNOWS, YOU CAN TRY A CASE COMPLETELY WITHIN

8    THE GOVERNMENT'S CASE.  AND YOU HAVE TO BE PREPARED TO DEAL

9    WITH GOVERNMENT WITNESSES.  AND MOST OF THIS STUFF THAT WAS IN

10   THERE, WHETHER IT WAS THE SERVERS OR ANYTHING ELSE, GOES TO

11   THE IMPEACHMENT OF THE GOVERNMENT WITNESSES.

12           THE COURT:  HERE'S WHAT'S HAPPENED.  HERE'S WHAT I'M

13   LEFT TO BELIEVE HAS HAPPENED.

14           SOMETIME OR SOMEHOW BETWEEN THE END OF MR. WILKES'S

15   TRIAL AND WHEN YOU FILED YOUR PAPERS, YOU WERE ABLE TO GO

16   THROUGH ALL OF THIS.

17           MR. GERAGOS:  NOT ALL OF IT, BUT WE WENT THROUGH A

18   SUBSTANTIAL PORTION.

19           THE COURT:  IT'S BEEN MUCH LESS THAN EIGHT MONTHS.

20   IT'S BEEN A COUPLE OF MONTHS SINCE MR. WILKES'S CONVICTION IN

21   THIS CASE BY THE JURY.

22           MR. GERAGOS:  THREE MONTHS.

23           THE COURT:  BUT AT THE POINT YOUR PAPERS WERE FILED,

24   MAYBE TWO MONTHS.  SO IT CONVINCES ME THAT ALL OF IT COULD

25   HAVE BEEN DONE.  IT COULD HAVE BEEN DONE IN THAT PERIOD OF

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

14

1   TIME.  YOU HAD SIX ADDITIONAL MONTHS BEYOND THE TWO MONTHS,

2   OBVIOUSLY, THAT IT'S TAKEN TO DO THIS.

3           LOOK, I RESPECT YOUR STATEMENT THAT REASONABLE MINDS

4   DIFFER.  MY REASONABLE MIND TELLS ME THAT EIGHT MONTHS, GIVEN

5   ALL OF THE ACCOMMODATIONS THAT WERE MADE IN THIS CASE AND

6   SOMETHING REALLY EXTRAORDINARY, THE COURT TELLING THE

7   GOVERNMENT "I KNOW YOU DON'T HAVE TO DO THIS, BUT I'D LIKE YOU

8   TO DO THIS.  PLEASE FACILITATE THIS FELLOW'S PREPARATION TO

9   DEFEND HIS CLIENT," IT DOESN'T RESONATE WITH ME, MR. GERAGOS,

10  THAT YOU DIDN'T HAVE ENOUGH TIME.

11          I THINK YOU SPREAD YOURSELF A LITTLE THIN.  I THINK

12  YOU TAKE ON A LOT OF CASES.  I THINK THERE'S A HIGH DEMAND FOR

13  YOU.  BUT I CAN'T CONTROL THAT.  I CAN'T TELL YOU "DON'T TAKE

14  OTHER CASES WHILE YOU'RE DEFENDING OR PREPARING FOR THIS

15  CASE."  I CAN'T DO THAT.  I WOULDN'T PRESUME TO DO THAT, AND I

16  DIDN'T HERE.

17          I'M ASSUMING THAT WHEN YOU TOOK MR. WILKES'S CASE,

18  YOU TOLD HIM "I'LL BE READY."  I'M MAKING THE SAME ASSUMPTION

19  THAT ON MAY 14TH WHEN WE SET THE SEPTEMBER 18TH TRIAL DATE AND

20  YOU SAID "I CAN BE READY," THAT YOU MEANT WHAT YOU SAID.  I

21  HAVE A RIGHT TO RELY ON THAT.

22          MR. GERAGOS:  EXCEPT WHEN I MADE THE MOTION FOR A

23  CONTINUANCE TO BRING TO THE COURT'S ATTENTION WHAT I

24  CONSIDERED TO BE AN UNBELIEVABLE AMOUNT OF PAPERWORK, I DON'T

25  KNOW IF THE COURT HAS EVER EXPERIENCED THAT MAGNITUDE OF

PDF created with pdfFactory trial version www.pdffactory.com

1    DISCOVERY OR DOCUMENTS IN ANY CASE THAT IT'S EVER TRIED IN ITS

2    CAREER.  I HAVE NEVER.

3          THE COURT:  NO, I HAVEN'T.  WHEN I WAS TRYING CASES,

4    THEY DIDN'T HAVE ANYTHING CALLED A TERABYTE.  I UNDERSTAND THE

5    POINT.  I'VE HAD CASES WITH MASS DOCUMENTS.  I MEAN, LET ME

6    SAY THIS:  PART OF MY THINKING ON THIS IS CONDITIONED BY

7    WATCHING YOUR PERFORMANCE HERE.  YOU SEEMED FULLY PREPARED.  I

8    MARVELED AT HOW YOU WERE ABLE TO GET IN AND GET TO THE POINT

9    WITH SOMEBODY.  YOU HAD A FILE READY WITH EACH WITNESS.  THE

10   FIRST TEN WITNESSES, MR. GERAGOS, I SAT HERE AND MARVELED AT

11   THE PERFORMANCE BECAUSE EITHER YOU NEUTRALIZED THEM OR YOU

12   TURNED THEM AROUND.

13         YOU WERE ASSISTED BY MR. NALGIN.  I REMEMBER AT

14   TIMES MR. NALGIN HANDING YOU UP A LAPTOP COMPUTER WITH A

15   SCREEN THAT YOU USED.  SO TO SUGGEST THAT A LACK OF

16   PREPARATION HAMPERED YOUR REPRESENTATION OF MR. WILKES JUST

17   DOESN'T SQUARE WITH MY RECOLLECTION OF HOW THE TRIAL WAS

18   CONDUCTED.

19         I THOUGHT YOU DID A MAGNIFICENT JOB OF IMPEACHING

20   AND POINTING OUT INCONSISTENCIES IN THE WITNESSES' TESTIMONY.

21   IF I THOUGHT OTHERWISE, THEN MAYBE I WOULD SCRATCH MY HEAD AND

22   SAY, "WELL, I PROBABLY SHOULD HAVE GIVEN HIM ENOUGH TIME

23   BECAUSE HE WASN'T READY."  BUT THERE WAS NO HINT OF THAT IN

24   YOUR TRIAL PERFORMANCE.  YOU HAD A FOLDER FOR EACH WITNESS, AS

25   I SAID.  YOU HAD AN OBJECTIVE.  GOOD CROSS-EXAMINERS HAVE AN

PDF created with pdfFactory trial version www.pdffactory.com

16

1    OBJECTIVE.  YOU DID, AND YOU STUCK TO IT.  YOU GOT IN AND YOU

2    GOT OUT AND SAT DOWN.

3             I DON'T SAY THAT TO FLUFF YOU, MR. GERAGOS.

4    PREJUDICE IS PART OF THE CALCULATION HERE.  THERE WAS NO

5    PREJUDICE.  THESE WITNESSES WERE FULLY EXAMINED BY YOU.

6             MR. GERAGOS:  I APPRECIATE THE COURT'S COMMENTS.

7    BUT WHEN YOU GET IN AND YOU GET OUT, WHAT ENDS UP BEING --

8    SPECIFICALLY IN THIS CASE, IF YOU BELIEVE WHAT YOU READ ABOUT

9    JUROR COMMENTS AFTERWARDS, SPECIFICALLY WHAT KIND OF TURNED

10   THE TIDE FOR THEM APPARENTLY WAS PARKVIEW.

11            THE COURT WILL REMEMBER THAT I SPECIFICALLY -- ONE

12   OF MY MAIN PROBLEMS WAS THAT I KIND OF DEFERRED THE PARKVIEW

13   PORTION OF THIS CASE OVER TO MY CO-COUNSEL, WHO THEN -- I

14   GUESS IT WOULD HAVE BEEN 72 HOURS, 96 HOURS, AS THE COURT WILL

15   REMEMBER, WE WERE HAVING CONFERENCES AND PHONE CONFERENCES AND

16   TRYING TO DEAL WITH THE FACT OF THE MEDICAL SITUATION.  THEY

17   DIDN'T GO AWAY.  I'M HAVING TO GET UP TO SPEED OR TRYING TO

18   GET UP TO SPEED ON PARKVIEW, WHICH WAS NOT THE MAIN THRUST OF

19   WHAT I THOUGHT THE DEFENSE OF THIS CASE WAS.

20            SUBSEQUENT TO THAT, AS THIS COURT KNOWS BECAUSE THIS

21   COURT'S HAD A CHANGE IN THE BAIL STATUS, I THINK, AND SOME

22   OTHER CONDITIONS OF RELEASE AS TO MR. KONTOGIANNIS, THERE'S

23   BEEN CLEAR EVIDENCE OF OTHER ISSUES AS TO THAT THAT I WOULD

24   HAVE MORE FULLY EXPLORED, THAT I WOULD HAVE LOOKED THROUGH IF

25   I PREPARED THAT PORTION OF THE CASE AND THOUGHT AND EXPECTED

PDF created with pdfFactory trial version www.pdffactory.com

17

1    THAT I WAS GOING TO TAKE THE LEAD IN THAT.

2           THE COURT:  I DON'T KNOW THAT THAT WOULD HAVE

3    BOLSTERED YOUR DEFENSE, THOUGH, BECAUSE YOUR DEFENSE WAS

4    DIFFERENT FROM SAYING, "WELL, KONTOGIANNIS DIDN'T LAUNDER

5    MONEY.  KONTOGIANNIS DIDN'T COVER UP RECORDS."  YOUR DEFENSE,

6    AS I UNDERSTOOD IT, WAS MR. WILKES SAID, "I'VE NEVER MET TOMMY

7    KONTOGIANNIS.  I DON'T KNOW WHO HE IS.  WHAT I WAS TOLD BY

8    FORMER CONGRESSMAN CUNNINGHAM IS 'HERE'S AN OPPORTUNITY TO

9    INVEST IN SOMETHING,' AND SO I SENT AN INVESTMENT IN PURSUANT

10   TO THE ADVICE I GOT."

11          NOW, NONE OF THAT IMPLICATES THE PARKVIEW RECORDS.

12   WHATEVER HAPPENED ONCE HIS MONEY HIT NEW YORK HE DIDN'T KNOW

13   ABOUT.  AND HE TESTIFIED HIMSELF THAT HE MADE AN EFFORT THEN

14   TO GET THE MONEY BACK AS QUICKLY AS POSSIBLE.

15          NOW, IF THAT'S THE DEFENSE, THE PARKVIEW RECORDS

16   HAVE VERY LITTLE TO DO WITH IT.  WHAT HAPPENED THERE,

17   ACCORDING TO YOUR THEORY OF DEFENSE, WAS TOTALLY INDEPENDENT

18   AND OUTSIDE THE KNOWLEDGE OF MR. WILKES.  SO I DON'T KNOW HOW

19   ANY OF THAT IMPLICATES --

20          MR. GERAGOS:  I THINK CLEARLY WHATEVER PATTERN AND

21   PRACTICE HE HAD WITH OTHERS IN TERMS OF THESE INVESTMENTS THAT

22   WERE GOING TO PARKVIEW, HE'S PROMISING HIM SOME KIND OF RETURN

23   IF HE'S DOING OTHER KINDS OF SETTING UP THE SAME KIND OF A

24   SCAM, IF YOU WILL, WITH OTHERS, WHICH APPARENTLY HE WAS DOING.

25   AND APPARENTLY POST-TRIAL THERE'S BEEN EVIDENCE THAT THAT'S

PDF created with pdfFactory trial version www.pdffactory.com

1    SOMETHING THAT HE'S NOT ONLY DOING HERE NATIONALLY, BUT

2    INTERNATIONALLY AS WELL WHILE HE'S OUT ON BAIL.

3         THE COURT:  YOU KNEW THAT BEFORE.  MR. GRANGER STOOD

4    UP AND SAID, "JUDGE, KONTOGIANNIS IS A CROOK.  HE'S CONTINUING

5    TO COMMIT CRIMES WHILE HE'S OUT ON BAIL.  WE KNEW THAT BEFORE

6    WILKES'S CASE WENT TO TRIAL."

7         MR. GERAGOS:  EXCEPT WE KNEW WHAT THE ALLEGATIONS

8    WERE.  THE COURT, I THINK, AT ONE POINT SAID THAT THEY HAD

9    PAID HIM, I THINK, KIND OF JOKINGLY.  THE FACT IS THAT NOTHING

10   WAS ACTUALLY PROVEN OR EMBRACED BY THE GOVERNMENT UNTIL

11   POST-TRIAL.

12        YOU'LL REMEMBER AT THE TIME THAT THE GOVERNMENT DID

13   NOT OR CLAIMED TO HAVE NO KNOWLEDGE OR NO INFORMATION OF ANY

14   OF THAT AT THE TIME WHEN I WAS STANDING HERE.  IT WAS ONLY

15   AFTERWARDS THAT I THEN GO ON PACER AND FIND PROCEEDINGS WHERE

16   THE GOVERNMENT IS NOW BRINGING TO THE COURT'S ATTENTION "WAIT

17   A SECOND.  APPARENTLY, MR. GRANGER, IN THE MOTIONS AND THE

18   INVESTIGATION HE HAS DONE, HAS BORE SOME FRUIT, AND

19   KONTOGIANNIS IS THE SCAM ARTIST THAT HE PAINTED HIM OUT TO

20   BE."

21        THAT WASN'T SOMETHING THAT WE HAD PREPARED AND DEALT

22   WITH OR EMBRACED BECAUSE THAT REALLY WAS NOT -- WE HAD HOPED

23   THAT THEY WERE GOING TO AND HAD TALKED ABOUT THEM TAKING THE

24   LEAD ON ALL OF THAT.

25        THE COURT:  CONNECT THE DOTS FOR ME.

PDF created with pdfFactory trial version www.pdffactory.com

1       MR. WILKES'S POSITION AT TRIAL WAS "I DON'T KNOW

2   ANYTHING ABOUT KONTOGIANNIS.  ALL I KNOW IS THAT THIS

3   CONGRESSMAN THAT I'M FRIENDLY WITH SAID, 'HERE'S A CHANCE TO

4   EARN EIGHT PERCENT, TEN PERCENT ON YOUR MONEY.'  AND SO I

5   DISPATCHED $525,000.  NOW, WHEN I STARTED TO GET A LITTLE BIT

6   INSECURE ABOUT THAT PROPOSITION, I TRIED TO GET MY MONEY

7   BACK."

8       WHATEVER HAPPENED AT PARKVIEW HAPPENED, BUT THAT WAS

9   OF NO CONCERN OF MR. WILKES OR HIS DEFENSE ON THAT.  HIS

10  DEFENSE ESSENTIALLY WAS "I THOUGHT THIS WAS AN INVESTMENT.  I

11  DON'T KNOW WHAT KONTOGIANNIS WAS REALLY DOING WITH IT."  I

12  DON'T THINK THERE'S ANY REASON WHY HE WOULD WANT TO PROVE THAT

13  KONTOGIANNIS WAS A CROOK, HOW THAT HELPS MR. WILKES.

14      MR. GERAGOS:  CLEARLY, IF TOMMY K. IS OUT THERE AND

15  HE'S GOT A PATTERN AND PRACTICE OF TELLING PEOPLE "GIVE ME

16  MONEY.  I'M GOING TO PAY YOU NINE PERCENT," IS WHAT THE CLAIM

17  WAS --

18      THE COURT:  THIS ENTREATY CAME FROM CUNNINGHAM, NOT

19  FROM KONTOGIANNIS.

20      MR. GERAGOS:  IF TOMMY K. IS TELLING THAT TO OTHERS

21  BESIDES CUNNINGHAM -- YOU'LL REMEMBER THE GOVERNMENT'S

22  POSITION IN THE CLOSING WAS "HE CALLED CUNNINGHAM FOR

23  FINANCIAL ADVICE," BLAH, BLAH, BLAH.  WELL, IF THAT'S WHAT

24  HE'S TELLING OTHERS AND OTHER SOPHISTICATED INVESTORS ARE

25  DOING THE SAME THING AND HAVE BEEN DOING THE SAME THING FOR A

PDF created with pdfFactory trial version www.pdffactory.com

1    PERIOD OF TIME AND IF THIS GUY IS SO BRAZEN, TOMMY K., TO SIT

2    BEFORE THIS COURT AND COMMIT CRIMES AFTER THIS COURT HAS BEEN

3    KIND ENOUGH TO RELEASE HIM, THAT, I THINK, SAYS OR SPEAKS

4    VOLUMES AS TO WHETHER OR NOT YOU CAN BELIEVE ANYTHING THAT

5    EMANATES FROM PARKVIEW.

6            IF THAT'S THE CASE, WHY WOULDN'T MR. WILKES BE ABLE

7    TO PUT HIMSELF IN A POSITION WHERE HE'S ABLE TO SAY, "HEY, I

8    WAS DUPED JUST LIKE JUDGE BURNS WAS DUPED.  I WAS DUPED JUST

9    LIKE THE NEW YORK SUPERINTENDENT WAS DUPED.  I WAS DUPED JUST

10   LIKE COUNTLESS OTHER PEOPLE WHO HAVE BEEN LEFT HOLDING THE BAG

11   FOR THIS BAD MAN TOMMY K"?

12           I THINK THAT'S FAIR GAME.  I THINK THAT'S SOMETHING

13   THE JURORS WOULD EMBRACE.  AND AT A CERTAIN POINT, IF YOU PUT

14   ON -- THE FACT THAT I CHOOSE NOT TO PUT ON CONGRESSMAN

15   CUNNINGHAM, THEY CHOOSE NOT TO PUT ON CONGRESSMAN CUNNINGHAM,

16   THEY THEN MAKE THE ARGUMENT THAT "WE'RE NOT GOING TO PUT ON

17   SOMEBODY SO THAT HE GETS A SENTENCING BENEFIT," WE LATER

18   LEARNED THAT, IN FACT, THEY HAD GIVEN HIM A SENTENCING

19   BENEFIT.

20           IF I HAD KNOWN AT THE SAME TIME THAT THEY WERE GOING

21   TO WAIT UNTIL AFTER THE TRIAL TO SAY "OKAY.  NOW WE EMBRACE

22   MR. GRANGER'S POSITION.  AND JUDGE, WE WANT YOU TO DO

23   SOMETHING TO TOMMY K.," IF YOU PUT A WITNESS UP THERE LIKE

24   TOMMY K. IN FRONT OF THE JURY KNOWING NOW WHAT I KNOW ABOUT

25   HIM, HOW COULD ANY JUROR -- HOW COULD YOU LOOK AT 12 PEOPLE IN

PDF created with pdfFactory trial version www.pdffactory.com

1    THE BOX AND SAY, IF YOU WERE THE GOVERNMENT, "WELL, YOU KNOW

2    WHAT, WE WANT YOU TO FORGET ABOUT EVERYTHING HE SAYS AND JUST

3    BELIEVE THIS ONE PART OR THE FACT THAT HE HASN'T REPRESENTED

4    SOMETHING TO 25 OTHER PEOPLE OR SCAMMED 25 OTHER PEOPLE."

5             THIS IS SOMEBODY WHO CLEARLY WAS ENGAGING IN A

6    PATTERN AND PRACTICE.  I AGREE WITH YOU THAT MR. WILKES DIDN'T

7    TALK WITH HIM DIRECTLY.  BUT THE ONLY WAY YOU CAN GET TO IT

8    AND TALK ABOUT "IS THIS HOW YOU WERE MARKETING YOURSELF?  IS

9    THIS HOW YOU WERE DEALING WITH OTHER PEOPLE?  HOW HAVE YOU

10   BEEN ABLE TO DO THAT FOR SO LONG?" IS TO PUT HIM ON AND FRY

11   HIM A LITTLE BIT.

12            FRANKLY, I'M NOT SO SURE THAT I ACCEPT AT FACE VALUE

13   THE GOVERNMENT'S CONTENTION THAT THEY DIDN'T KNOW ABOUT ANY OF

14   THIS UNTIL AFTER THE TRIAL.  I JUST FIND THAT HARD TO BELIEVE.

15   I THINK THAT IF FURTHER INVESTIGATION OR FURTHER DISCLOSURE

16   WAS DONE, THAT YOU WILL FIND THAT THE GOVERNMENT WAS WELL

17   AWARE THAT TOMMY K. WAS COMMITTING THESE ACTS WELL BEFORE THIS

18   TRIAL TOOK PLACE.  AND THAT'S WHY THEY MADE A DECISION NOT TO

19   CALL HIM WHILE THEY WERE AT ALL TIMES, I THINK, CLEAR ABOUT

20   LETTING THAT PORTION OF THE CASE BE SEVERED OFF.

21            SO WHAT I'M LEFT WITH IN DEFENDING MR. WILKES IS

22   HAVING TO DEAL WITH AN AREA OR A SEGMENT OF THIS CASE THAT IS

23   NOT REALLY OUR LOOKOUT.  I MEAN, I WOULD AGREE WITH THE COURT

24   IN THIS SENSE:  I DON'T THINK THAT IT HAD ANYTHING TO DO WITH

25   THE CROSS-EXAMINATION OF THESE FIRST TEN WITNESSES.  I THINK

PDF created with pdfFactory trial version www.pdffactory.com

WHEN IT CAME TO THE FIRST TEN WITNESSES, THAT WAS THE PART OF
THE CASE THAT WAS SQUARELY SOMETHING WE COULD DEAL WITH WITH
MR. WILKES BECAUSE IT WAS WHAT WE WERE PREPARED FOR, AND IT
WAS THE TRUTH.

        THE WITNESSES -- THIS WHOLE IDEA THAT I INVITED THE
REPLY OF THE GOVERNMENT BY HOW WASHINGTON WORKS IS BELIED BY
THE FACT -- YOU KNOW WHERE THAT CAME FROM.  THAT WAS IN THEIR
OPENING STATEMENT, "THIS ISN'T HOW WASHINGTON WORKS," THEIR
MULTI-MEDIA PRESENTATION.  THEIR WHOLE OPENING STATEMENT WAS
"THIS IS NOT HOW WASHINGTON WORKS," WHICH ALL WE WERE DOING
WAS REPLYING "SORRY.  YOU DIDN'T OBVIOUSLY DO YOUR
INVESTIGATION.  THIS IS PRECISELY HOW WASHINGTON WORKS."

        THE ONLY FLY IN THE OINTMENT, SO TO SPEAK, OF THIS
CASE, I BELIEVE, HAS TO DO WITH PARKVIEW AND THE LACK OF
INFORMATION THAT WE WOULD HAVE HAD SURROUNDING THAT AND
EVERYTHING ELSE.  AND THEY KNEW ABOUT TOMMY K., I BELIEVE.  I
THINK IT WILL COME OUT AT SOME POINT.  THEY KNEW WHAT HE WAS
DOING PRIOR TO THE TRIAL.  NONE OF THAT WAS DISCLOSED.  THEY
WAITED UNTIL AFTERWARDS, CONVENIENTLY, AND IT WAS DISCLOSED.

        AND I THINK THEY THEN -- THAT WAS A CONSCIOUS
DECISION ON THE GOVERNMENT'S PART.  AND I THINK WHEN YOU
COMBINE ALL OF THAT WITH THE -- I KNOW YOU BELIEVE THAT EIGHT
MONTHS IS ENOUGH.  EVEN GIVEN THAT THERE WAS EIGHT MONTHS FOR
THEM TO SPEND EVEN THOUGH THERE WERE TWO CASES THAT WERE
PENDING FOR AT LEAST THREE OF THOSE EIGHT, I DON'T THINK THAT

PDF created with pdfFactory trial version www.pdffactory.com

1    THERE'S ANY LAWYER WHO'S GOING TO SAY THAT "IF I HAD NOTHING

2    ELSE TO DO, I CAN SPEND ALL OF MY TIME DEALING WITH HOWEVER

3    MANY TERABYTES OF INFORMATION IN PREPARING FOR THIS TRIAL."

4            THE COURT:  THERE'S ONE LAWYER WHO CAN AND DID SAY

5    THAT ON MAY 14TH, 2007.  MARK GERAGOS STOOD IN FRONT OF ME AND

6    SAID, "JUDGE, SEPTEMBER 18TH WORKS."

7            MR. GERAGOS:  THAT WAS BASED ON THEM TURNING OVER

8    DISCOVERY THROUGH THIS DOCUMENT CONTROL.  AND THEN I GET

9    HERE A WEEK BEFORE, AND ALL OF A SUDDEN MAGICALLY THERE ARE

10   120 BOXES THAT WEREN'T PRODUCED THROUGH THE DOCUMENT CONTROL.

11           THE ONE THING THAT HAS BEEN SO MEDDLESOME ABOUT THIS

12   ENTIRE DISCOVERY PRODUCTION BY THE GOVERNMENT AND THIS CLAIM

13   OF MISUNDERSTANDING, WHY IN THE WORLD DO I NEED TO GO OVER AND

14   PAY SOME DOCUMENT REPOSITORY 6,000 TO GET DOCUMENTS THAT ARE

15   SUPPOSEDLY THE DISCOVERY IN THIS CASE, HUNDREDS OF THOUSANDS

16   OF PAGES, WHEN ALL THEY'VE GOT TO DO IS SAY, "HERE'S THE

17   120 BOXES.  GO AT IT.  YOU CAN SCAN IT.  YOU CAN DO WHATEVER

18   YOU WANT"?  I COULD HAVE BOUGHT THE GREATEST SCANNER OF ALL

19   TIME FOR THE AMOUNT OF MONEY I'M SPENDING AT DOCUMENT CONTROL.

20           WHY DON'T THEY UP FRONT SAY, "THIS IS WHERE THE

21   DISCOVERY IS.  YOU WANT IT?  GO GET IT"?  I DON'T NEED IT TO

22   BE FILED OVER AT SOME DOCUMENT REPOSITORY TO BE TURNED OVER

23   UNLESS THEY KNOW THAT I'M THEN RELYING ON THE DOCUMENTS THAT

24   ARE BEING PRODUCED THERE AS THE DOCUMENTS THAT ARE DISCOVERY.

25           THE COURT:  IT'S LATE IN THE DAY FOR ME TO CONSIDER

PDF created with pdfFactory trial version www.pdffactory.com

1   THAT.  I WAS WILLING AND TOLD YOU I WAS WILLING AT ANY POINT

2   TO DEAL WITH DISCOVERY ISSUES AS THE CASE WAS BEING PREPARED.

3   YOU'LL REMEMBER THAT AT EACH JUNCTURE, I TOLD YOU "IF

4   SOMETHING COMES UP, YOU DON'T NEED TO WAIT UNTIL THE CALENDAR

5   DATE.  CALL AND PUT IT ON CALENDAR.  I'LL DEAL WITH IT RIGHT

6   AWAY."

7           THE PURPOSE OF THAT, OF COURSE, WAS MAINTAINING THE

8   TRIAL DATE THAT EVERYONE HAD AGREED UPON.  I UNDERSTAND THAT

9   SOMETIMES DISCOVERY DISPUTES COME UP AND THAT THEY CAN BE

10  CONFOUNDING.  I WANTED TO AVOID ANY SUCH PROBLEM.  THAT'S WHY

11  I MADE MYSELF WILLING ON A REGULAR DAILY BASIS.

12          TELL ME WHAT YOU HAVE TO SAY, BECAUSE I THINK WE'VE

13  EXHAUSTED THE DISCUSSION ON THIS, ON THE OTHER PORTIONS OF THE

14  MOTION.

15          YOU THINK THE GOVERNMENT COMMITTED MISCONDUCT IN

16  THEIR ARGUMENT?

17          MR. GERAGOS:  I DO.

18          THE COURT:  IT'S A LITTLE TOUGH WHEN YOU SAY "WHY

19  DIDN'T THEY CALL CONGRESSMAN CUNNINGHAM?" AND THEN THEY ANSWER

20  WHY THEY DIDN'T CALL HIM TO SAY THAT'S MISCONDUCT.

21          MR. GERAGOS:  I WOULD AGREE IF WE DIDN'T HAVE A PLEA

22  AGREEMENT WHERE THEY DID CONFER BENEFITS.  IT'S FAIR GAME FOR

23  MR. FORGE TO GET UP HERE WHEN I SAY "WHY DIDN'T THEY CALL

24  CUNNINGHAM?" FOR HIM TO GET UP AND SAY "WE DIDN'T CALL

25  CUNNINGHAM BECAUSE HE'S THE MOST CORRUPT GUY.  WE, THE

PDF created with pdfFactory trial version www.pdffactory.com

25

1    GOVERNMENT, WOULD NEVER GIVE HIM ANY BENEFITS.  WELL, EXCEPT

2    IN MY BACK POCKET IS THE SENTENCING MEMO WHERE WE DID."

3         THAT, I THINK, IS NOT FAIR PLAY.  THAT'S A REAL

4    PROBLEM.  I THINK THIS COURT WOULD SAY CLEARLY IF YOU HAD

5    KNOWN THEN WHAT YOU KNOW NOW -- I HAVE MY OWN THEORIES ABOUT

6    IT -- THAT FOR THEM TO GET UP AND SAY "WE'RE NOT GOING TO GIVE

7    BENEFITS," HOW DISINGENUOUS IS THAT?

8         HE HAD NOT BEEN DEBRIEFED AT THAT POINT THROUGH ANY

9    MEANINGFUL AMOUNT.  WHEN I WENT BACK AND LOOKED AT THE FILE,

10   IT LOOKS LIKE MR. HALPERN AND ONE OF THE FBI AGENTS IN

11   FEBRUARY, RIGHT BEFORE THE INDICTMENT, FINALLY WENT TO GO

12   VISIT HIM, WHICH IS AFTER HE HAD BEEN SENTENCED AND AFTER THEY

13   HAD CONFERRED BENEFITS.

14        SO WHEN MR. FORGE GETS UP HERE AND SAYS "WELL, WE

15   WOULD NEVER GIVE HIM A BENEFIT BECAUSE HE'S THE MOST CORRUPT

16   GUY IN HISTORY," THEY ASKED THIS COURT TO GO DOWN TWO LEVELS

17   ON THE BASIS OF COOPERATION AND SUBSTANTIAL ASSISTANCE.

18        THE COURT:  AT THE END, THOUGH, THEY ASKED ME TO

19   IMPOSE THE STATUTORY MAXIMUM TERM OF TEN YEARS.  THAT'S WHAT

20   HE FACED.  IF YOUR POINT IS "LOOK, THEY MADE A CHARGE BARGAIN

21   WITH HIM THAT WAS OVERLY GENEROUS," THEN MAYBE YOU'RE RIGHT.

22        MR. GERAGOS:  THAT KIND OF FITS IN WITH THE PATTERN.

23   "HERE'S OUR AGREEMENT, WHICH IS WE'LL MAKE A PLEA AGREEMENT

24   WHERE WE GIVE HIM TWO LEVELS.  THEN WHEN IT COMES TO COURT,

25   ORALLY WE'LL SOMETHING ELSE.  WE'LL SAY 'OKAY, JUDGE.  GIVE

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1   HIM THE MAX' EVEN THOUGH WE AGREED ALREADY TO GIVE HIM THE

2   BENEFITS."

3           THEY DO THE SAME THING WITH THE JURY.  WHY DIDN'T

4   THEY CALL CUNNINGHAM?  INSTEAD, THEY COME BACK UP AND SAY, "WE

5   WOULD NEVER GIVE HIM THE BENEFITS."  IN FACT, THEY DID GIVE

6   HIM THE BENEFITS.  YOU KNOW, HOW DOES ONE RESPOND TO THAT WHEN

7   THAT'S IN THEIR REPLY?  SO I THINK THAT THEY'VE GOT A REAL

8   PROBLEM WITH THAT.

9           THE IDEA OF VOUCHING AND SENDING A MESSAGE TO THE

10  TAXPAYERS IS CLEARLY NONSENSE.  ALL OF THOSE THINGS, I THINK,

11  LEND TO OR GIVE CREDENCE TO THE FACT THAT THE ARGUMENT CLEARLY

12  HAD CROSSED THE LINE INTO PROSECUTORIAL MISCONDUCT.

13          THE COURT:  THEN THE LAST ISSUE WHICH YOU RAISED

14  ABOUT IMPEACHMENT ON A COLLATERAL POINT?

15          MR. GERAGOS:  I THINK THE COURT -- I THINK IT'S ON

16  THE RECORD.  I'D HAVE TO GO BACK AND CHECK.

17          THE COURT:  IT IS.

18          MR. GERAGOS:  I THINK THE COURT AT THE TIME

19  RECOGNIZED IT WAS A COLLATERAL MATTER.

20          THE COURT:  WELL, IT'S BEEN POINTED OUT TO ME, WHICH

21  I DIDN'T APPRECIATE WHEN I RULED ON IT BECAUSE THERE WERE SOME

22  200 OVERT ACTS ALLEGED, THAT IT WAS ACTUALLY ONE OF THE

23  ALLEGED OVERT ACTS.  AND SO FROM THE PURE LEGAL STANDPOINT, IT

24  WASN'T COLLATERAL.

25          NOW, I REMEMBER LOOKING AT YOU AT THE TIME WHEN I

PDF created with pdfFactory trial version www.pdffactory.com

1    ASKED IF YOU WANTED TO CROSS-EXAMINE THIS FELLOW THAT THEY

2    BROUGHT DOWN FROM COEUR D'ALENE OR SPOKANE, AND YOU SORT OF

3    ROLLED YOUR EYES AND YOU MADE A COMMENT IN FRONT OF THE JURY.

4    THE FIRST QUESTION YOU HAD WAS "DID TAXPAYER MONEY PAY TO FLY

5    THIS GUY DOWN JUST TO SAY THAT?"  AND THAT WAS SORT OF MY

6    ATTITUDE ABOUT IT.  THIS IS A REAL SMALL PIECE OF EVIDENCE IF

7    WORTHY OF CONSIDERATION AT ALL.  VERY SMALL.

8         THAT COLORED MY THINKING THAT IT MIGHT BE

9    COLLATERAL.  IN A PURE LEGAL SENSE, THEY ALLEGED IT IN AN

10   OVERT ACT.  IT'S NOT COLLATERAL.  IT WASN'T IMPEACHMENT ON A

11   COLLATERAL POINT.  MR. WILKES DENIED IT.

12        NOW, IN THE GREAT SCHEME OF THINGS, DID THE CASE

13   TURN ON WHETHER RANDY DUKE CUNNINGHAM WAS SHOOTING A MACHINE

14   GUN AT COEUR D'ALENE WITH MR. WILKES AND THE OTHERS OR NOT?  I

15   DON'T THINK SO.  I DON'T THINK SO.  REALLY, WHAT I'M TALKING

16   ABOUT HERE IS TACTICS.  I THINK YOU APPRECIATED THAT AT THE

17   TIME.  SO NEED WE GO ANY FURTHER WITH THAT?  I DON'T THINK SO.

18        MR. GERAGOS:  I ALSO WOULD SUBMIT THAT I'M SURE THAT

19   THEY HAVE ASKED MR. CUNNINGHAM IF HE WAS THERE, AND THAT'S

20   NEVER BEEN DISCLOSED.  AND IF THEY KNEW THAT HE WAS NOT THERE

21   AND STILL BROUGHT DOWN A WITNESS, IF THEY THOUGHT IT WAS

22   IMPORTANT ENOUGH -- YOU'RE TELLING ME IF THEY THOUGHT IT WAS

23   IMPORTANT ENOUGH TO FLY SOMEBODY DOWN HERE, THAT THEY COULDN'T

24   WALK ACROSS THE STREET WHEN HE WAS HERE AND ASK HIM "BY THE

25   WAY, DID YOU GO SHOOTING?"

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  I DIDN'T AGREE WITH THE DECISION TO PUT

2    THAT WITNESS ON.  FRANKLY, I THOUGHT IT WAS KIND OF A WASTE

3    OF TIME AND OVER THE TOP.  IT WAS AN OVERT ACT.  THEY WANTED

4    TO IMPEACH ON THAT POINT.  YOU'RE MORE CYNICAL IN YOUR

5    ATTITUDE TOWARD THE PROSECUTORS THAN I AM.  I DON'T HAVE THAT

6    DEGREE OF CYNICISM EITHER TOWARD HIM OR TOWARD YOU.

7          I DON'T THINK THAT THEY WOULD KNOWINGLY CREATE AN

8    INFERENCE WHEN THEY KNEW CUNNINGHAM WAS GOING TO SAY, "I

9    WASN'T ALONG."  I DON'T BELIEVE THAT FOR A SECOND.  I DON'T

10   KNOW YOU'D DO THAT, AND I DON'T THINK THEY DID THAT.  THAT'S

11   TANTAMOUNT TO PUTTING ON FALSE EVIDENCE.

12         MR. GERAGOS:  I JUST QUESTION WHY SO MUCH WAS MADE

13   OF THE SHOOTING INCIDENT, AND THERE'S NOT A SINGLE REPORT OR

14   DOCUMENT THAT REFLECTS WHETHER SOMEBODY ASKED THE GUY "WERE

15   YOU THERE?"

16         THE COURT:  WHAT WE'RE TALKING ABOUT HERE IS REALLY

17   TRIAL STRATEGY AND TACTICS.  AND IF YOU'RE ASKING ME AS A

18   TACTICAL MATTER DO I AGREE WITH YOU THAT IT WAS WORTH THE

19   TIME, I DO AGREE WITH YOU.  IT WASN'T WORTH THE TIME.  BUT WAS

20   IT A LEGAL ERROR TO SAY IT WAS IMPEACHMENT ON A COLLATERAL

21   MATTER TO LET THIS FELLOW COME DOWN AND SAY, "YEAH, OUR

22   RECORDS SHOW CUNNINGHAM WAS HERE"?  I DON'T THINK SO.  THEY

23   ALLEGED IT AS AN OVERT ACT.  MR. WILKES DENIED IT.  THEY WERE

24   ENTITLED TO REBUT ON THAT POINT.

25         IT WAS A SMALL POINT.  AS I SAID, I DON'T THINK IT

PDF created with pdfFactory trial version www.pdffactory.com

1    WAS WORTH THE TIME.  IT WASN'T WORTH THE PLANE TICKET FROM

2    SPOKANE, IN MY JUDGMENT.  THAT'S THEIR DECISION TO MAKE.

3    THEY'RE IN CHARGE OF PUTTING THEIR CASE ON.  BUT I THINK AS

4    A LEGAL MATTER, THE POINT THAT YOU MAKE ABOUT ALLOWING

5    IMPEACHMENT ON A COLLATERAL POINT IS INCORRECT.  I THOUGHT

6    THAT AT THE TIME.  BUT WHEN I WAS MADE AWARE THAT IT WAS

7    ACTUALLY ONE OF THE OVERT ACTS, I THINK THAT ANSWERED THE

8    LEGAL CHALLENGE THAT YOU MAKE.

9              ANYTHING ELSE?

10             MR. GERAGOS:  NO, NOTHING ELSE BESIDES WHAT'S

11   ALREADY IN THE PAPERWORK.

12             THE COURT:  WHO SPEAKS FOR THE UNITED STATES ON THE

13   MOTION FOR A NEW TRIAL?

14             MR. FORGE:  I DO, YOUR HONOR.

15             YOUR HONOR, I'LL KEEP MY COMMENTS BRIEFS BECAUSE, AS

16   THE COURT HAS ALREADY POINTED OUT, YOU RECEIVED SIGNIFICANT

17   BRIEFING ON ALL THESE ISSUES SAVE ONE.

18             THE ONE ISSUE I DON'T THINK YOU RECEIVED ANY

19   BRIEFING ON BECAUSE IT WASN'T RAISED IN THE DEFENSE PAPERS IS

20   THIS ISSUE THAT AS OF THIS MORNING, IT'S NOW THE PARAMOUNT

21   ISSUE, WHICH IS THE PARKVIEW ISSUE.

22             JUST TO CLARIFY, IN THE DOCUMENTS THAT HAVE BEEN

23   SUBMITTED TO THE COURT THAT ARE PART OF THE PUBLIC RECORD,

24   THEY SPEAK FOR THEMSELVES AND WILL BACK UP WHAT I'M SAYING.

25   THERE IS NO INDICATION THAT THOMAS KONTOGIANNIS ENGAGED IN A

PDF created with pdfFactory trial version www.pdffactory.com

30

1    FRAUD SCHEME AGAINST INDIVIDUAL INVESTORS ALONG THE LINES OF

2    THE TYPE OF ARGUMENT THAT MR. GERAGOS WAS MAKING AT TRIAL AND

3    IS MAKING NOW.

4              THERE'S NO QUESTION HE'S INVOLVED IN WIDE-RANGING

5    FRAUD.  IT'S BANK FRAUD.  THAT'S BEEN WELL-DOCUMENTED.  AND

6    ALL OF THOSE ALLEGATIONS WERE AVAILABLE TO MR. GERAGOS WELL IN

7    ADVANCE OF TRIAL.  AND AS YOUR HONOR WAS POINTING OUT, NONE OF

8    THEM LEAD TO A DEFENSE FOR MR. WILKES.  THE FACT THAT

9    MR. KONTOGIANNIS WAS DEFRAUDING BANKS OF TENS OF MILLIONS OF

10   DOLLARS BEARS NO RESEMBLANCE WHATSOEVER TO THE ARGUMENT THAT

11   MR. GERAGOS WANTED TO MAKE WITH RESPECT TO AN INDIVIDUAL WIRE

12   TRANSFER THAT MR. WILKES SENT TO MR. KONTOGIANNIS.  I DID WANT

13   TO CLARIFY THAT POINT.

14             REGARDING THE BOXES AT THE FBI, AS YOUR HONOR

15   POINTED OUT, MR. GERAGOS, MR. WILKES, AND THE DEFENSE

16   TEAM DECLINED TO CONTINUE LOOKING AT THOSE BOXES AS OF

17   OCTOBER 19TH.  AND THAT'S IT.  FROM THAT POINT FORWARD, THEY

18   DIDN'T GO BACK.  SO AGAIN, TO PUT IN CONTEXT MR. GERAGOS'S

19   ARGUMENT, ALL THESE DOCUMENTS HE'S TALKING ABOUT NOW ARE

20   DOCUMENTS THAT THEY POSSESSED PRIOR TO THAT DATE.  IN OTHER

21   WORDS, THEY'RE NOT DOCUMENTS THAT THEY OBTAINED FROM THE

22   WAREHOUSE AFTER THAT TIME.  THEY ALREADY HAD THE DOCUMENTS

23   THAT THEY'RE TALKING ABOUT RIGHT NOW.

24             AS A MATTER OF FACT, LETTERS WERE SENT TO

25   MR. GERAGOS IN FEBRUARY AND IN MARCH OF 2007 EXPLAINING TO HIM

PDF created with pdfFactory trial version www.pdffactory.com

31

1    THAT THE SEARCH WARRANT MATERIALS WERE AVAILABLE.  THEY SIMPLY

2    WAITED UNTIL SEPTEMBER TO LOOK AT THEM.  BUT AGAIN, THESE ARE

3    DOCUMENTS LARGELY THAT WERE TAKEN FROM MR. WILKES'S BUSINESS.

4    PRESUMABLY, HE WAS AWARE OF WHAT WAS THERE.  AND PRESUMABLY,

5    THAT WAS ONE OF THE REASONS WHY HE DECIDED THAT "THERE'S NO

6    POINT LOOKING THROUGH THOSE DOCUMENTS ANYMORE.  I HAVE A

7    PRETTY GOOD IDEA OF WHAT WAS THERE.  I KNOW THERE'S NOTHING

8    ELSE THAT'S HELPFUL."  SO THEY DECLINED TO CONTINUE LOOKING.

9           THE COURT:  IS THE GOVERNMENT'S POSITION WITH

10   RESPECT TO THE DISCOVERY THAT ALL OF IT WAS AVAILABLE TO BE

11   REVIEWED WELL BEFORE TRIAL?

12          MR. FORGE:  YES.

13          THE COURT:  AND HAD BEEN FOR SOME TIME?

14          MR. FORGE:  YES.

15          THE COURT:  MR. GERAGOS HAS CONFESSED IN THE PAST

16   TO SOME MISUNDERSTANDING ABOUT JUST WHAT WAS CONTAINED.  AND

17   MS. CHU, I THINK, ADDRESSED THAT WITH ME AT SOME POINT.

18          THERE WERE LETTERS SENT TO MR. GERAGOS SAYING

19   "HERE'S WHAT'S THERE.  THIS IS ALL AVAILABLE," AND IT WAS IN

20   BOXES READY TO BE SCANNED, READY TO BE LOOKED AT?

21          MR. FORGE:  YES, YOUR HONOR.  WE DID NOT PUT IN THE

22   LETTERS THE EXACT NUMBER OF BOXES.  BUT WE CERTAINLY SAID THE

23   SEARCH WARRANT LOCATIONS, AND THE ADCS HEADQUARTERS WAS ONE OF

24   THOSE.  THAT WAS MADE CLEAR IN LETTERS.  I BELIEVE IN FEBRUARY

25   AND MARCH -- I KNOW FOR CERTAIN IN MARCH OF 2007, THAT WAS

32

1    CLEAR.

2            I THINK THE POINT -- PROBABLY THE BIGGEST POINT FROM

3    A LEGAL AND PRACTICAL PERSPECTIVE REGARDING THESE DOCUMENTS,

4    WHEN YOU ACTUALLY GET DOWN TO THE NITTY-GRITTY OF WHAT'S IN

5    THOSE DOCUMENTS AND WE ACTUALLY LOOK TO WHAT THEY ATTACHED AS

6    EXHIBITS, IT'S NOTHING OTHER THAN POTENTIAL IMPEACHMENT.  AND

7    EVEN THE POTENTIAL FOR IMPEACHMENT IS HIGHLY SUSPECT.  MANY OF

8    THESE AREAS, I AGREE WITH YOUR HONOR.  MR. GERAGOS WAS A VERY

9    FORMIDABLE FOE AT TRIAL.

10           THE COURT:  HE HAD YOU ON THE ROPES FOR THE FIRST

11   TEN WITNESSES.

12           MR. FORGE:  HE HAD US WORRIED.  THERE'S NO QUESTION

13   ABOUT THAT.  IF YOU LOOK AT THOSE DOCUMENTS THAT ARE CONTAINED

14   IN THOSE EXHIBITS, THERE'S NOTHING THOSE DOCUMENTS WOULD

15   HAVE ADDED TO WHAT WERE OTHERWISE FULLY EFFECTIVE

16   CROSS-EXAMINATIONS TO THE POINT THEY COULD HAVE BEEN

17   EFFECTIVE.  AT THE END OF THE DAY, THERE WAS NO SMOKING GUN

18   FOR THE DEFENSE BECAUSE MR. WILKES IS, IN FACT, GUILTY.  AND

19   THERE WAS NO SMOKING GUN BECAUSE IT JUST DOESN'T EXIST, NOT

20   BECAUSE THERE WASN'T TIME TO OBTAIN THAT.

21           THE DOCUMENTS THAT THEY'RE POINTING TO NOW, NOT ONLY

22   WOULD THEY NOT QUALIFY AS, QUOTE/UNQUOTE, "NEWLY DISCOVERED

23   EVIDENCE UNDER RULE 33(A)" BECAUSE THEY WEREN'T NEWLY

24   DISCOVERED -- THEY WERE IN HIS POSSESSION -- BUT THEY ALSO

25   WOULDN'T QUALIFY FOR CONSIDERATION FOR A MOTION FOR NEW TRIAL

PDF created with pdfFactory trial version www.pdffactory.com

1    BECAUSE THEY DON'T DO ANYTHING MORE THAN ARGUABLY IMPEACH A

2    FEW WITNESSES.

3           AND EVEN THE IMPEACHMENT VALUE, GOING BACK TO

4    MR. GERAGOS'S POINT, IF YOU TAKE THAT $525,000 WIRE TRANSFER

5    AS BEING ONE OF THE MOST PARAMOUNT ISSUES AT TRIAL -- AND I

6    THINK IT WAS ONE OF THE MOST PARAMOUNT ISSUES AT TRIAL -- NONE

7    OF THOSE DOCUMENTS SPEAK TO THAT ISSUE.  SO I THINK, AGAIN,

8    YOU'VE READ ALL THE BRIEFS.  IF YOU HAVE SPECIFIC QUESTIONS,

9    I'M HAPPY TO ADDRESS ANY SPECIFIC CONCERNS.  BUT I THINK IT'S

10   BEEN ADEQUATELY BRIEFED.

11          THE COURT:  THANK YOU, MR. FORGE.

12          I'LL ADDRESS THE MOTIONS FOR A NEW TRIAL IN ORDER.

13          FIRST, REGARDING THE LACK OF TIME TO PREPARE AND THE

14   NEED FOR ADDITIONAL CONTINUANCES, I'VE ADDRESSED THESE FACTORS

15   BEFORE, MOST PARTICULARLY AT THE TIME THE REQUEST FOR A

16   CONTINUANCE WAS FIRST MADE BEFORE THE SEPTEMBER 18TH TRIAL

17   DATE.

18          THE 9TH CIRCUIT LOOKS AT FOUR FACTORS IN DETERMINING

19   WHETHER A COURT ABUSES ITS DISCRETION IN DENYING A MOTION TO

20   POSTPONE A TRIAL.

21          FIRST, THE EXTENT OF DILIGENCE ON THE PART OF THE

22   DEFENSE LAWYER TO READY HIS DEFENSE PRIOR TO TRIAL.  I'VE

23   SPOKEN TO THAT HERE.  I AGREE WITH WHAT MR. FORGE SAID.  THESE

24   DOCUMENTS THAT ARE REFERRED TO, WHETHER THEY'RE TERABYTES,

25   MEGABYTES, THEY WERE AVAILABLE.  THEY'VE BEEN AVAILABLE.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1          NOW, IT MAY BE OWING TO A MISUNDERSTANDING THAT

2     MR. GERAGOS DIDN'T KNOW THE SCOPE OF THEM, BUT THERE'S A

3     SIMPLE WAY TO CLEAR UP THAT MISUNDERSTANDING.  GO LOOK AT THE

4     THINGS.  SEND THE LAWYERS THAT ARE ASSISTING YOU TO GO LOOK AT

5     THESE AND GO THROUGH THOSE.  I FIND THAT THERE WAS PLENTY OF

6     TIME AND PLENTY OF NOTICE FROM MR. GERAGOS TO DO THIS.

7          LOOK, THE TRUTH OF THE MATTER IS WITH THIS ISSUE

8     ABOUT EXTENT OF DILIGENCE IS THAT MR. GERAGOS IS A HIGHLY

9     SOUGHT-AFTER DEFENSE COUNSEL.

10          I MARVELED, MR. GERAGOS, IN THE MIDDLE OF THIS TRIAL

11     AND ALL THAT WAS GOING ON AND AS COMPLICATED, I WENT HOME ONE

12     NIGHT EXHAUSTED MYSELF AND GOT INTO MY EASY CHAIR IN MY DEN.

13     AND I TURNED ON THE NEWS, AND I'M FLIPPING AROUND, AND HERE'S

14     MR. GERAGOS ON LARRY KING LIVE THAT NIGHT.

15          MR. GERAGOS:  I THINK IT WAS TAPED.

16          THE COURT:  IT SPEAKS TO THE FACT THAT YOU'RE SPREAD

17     VERY THIN.  THERE'S HIGH DEMAND FOR YOU.  I HAVE NO WAY TO

18     CONTROL THAT OTHER THAN TO SET FIRM TRIAL DATES AND TELL YOU,

19     AND I DID THAT.  ONE LOOKING AT THE RECORD WILL SAY YOU WERE

20     ON NOTICE THAT THIS CASE WAS GOING.  I MADE THAT LOUD AND

21     CLEAR.  IT WAS LIKE A SIREN GOING OFF.

22          IN MAY WHEN YOU STOOD IN FRONT OF ME AND SAID "I CAN

23     BE READY IN SEPTEMBER," I COUNTED ON THAT REPRESENTATION.  OF

24     COURSE, THE RECORD WILL SHOW THAT THE TRIAL DATE WAS ADJUSTED

25     BASED ON SOME LAST-MINUTE DEVELOPMENTS THAT HAD NOT OCCURRED

PDF created with pdfFactory trial version www.pdffactory.com

1    TO YOU AT THE TIME YOU MADE THAT REPRESENTATION.

2              I THINK ONE REVIEWING THIS RECORD AND BEING

3    OBJECTIVE ABOUT IT WILL SAY, "THE JUDGE DID BEND OVER

4    BACKWARDS TO ACCOMMODATE MR. GERAGOS'S SCHEDULE AND

5    MR. WILKES'S NEED TO BE READY AND TO HAVE A FAIR DEFENSE

6    HERE."

7              I POSTPONED THE CASE.  AS I SAID, I WAS BUFFETED

8    BECAUSE THERE WERE OTHER CONSIDERATIONS.  WE SENT OUT THE 750

9    18-PAGE QUESTIONNAIRES.  ALL THE PROSPECTIVE JURORS WERE

10   GIVING OF THEIR TIME TO FILL THOSE THINGS OUT.  WE WERE GOING

11   TO HAVE TO GO THROUGH THAT ALL AGAIN UNLESS THE CONTINUANCE

12   WAS CONFINED WITHIN THE PERIOD OF TIME SCREENING THAT HAD BEEN

13   CONTEMPLATED.

14             SO I DO FIND THAT IF THERE IS A PROBLEM HERE, IT'S

15   OWING TO A LACK OF DILIGENCE ON THE PART OF COUNSEL IN LOOKING

16   AT THE MATERIAL THAT WAS AVAILABLE AND COULD HAVE BEEN

17   REVIEWED.

18             I CONFESS TO YOU, MR. GERAGOS, I DIDN'T HAVE TO DEAL

19   WITH TERABYTES.  I NEVER HAD A CASE WITH AS MUCH PAPER AS

20   THIS.  BUT EIGHT MONTHS IS A LONG TIME TO GET READY FOR A

21   CASE, PARTICULARLY WHEN THE DEFENSE IS CRYSTALLIZED AS IT WAS

22   OBVIOUSLY IN THIS CASE.

23             SO I FIND THAT THAT FACTOR OBVIOUSLY MILITATES

24   AGAINST GRANTING THE MOTION FOR A NEW TRIAL.

25             HOW LIKELY IS IT THAT THE NEED FOR A CONTINUANCE

PDF created with pdfFactory trial version www.pdffactory.com

1    COULD HAVE MET -- COULD HAVE BEEN MET IF THE CONTINUANCE WAS

2    GRANTED?  THIS SEEMS TO DOVETAIL WITH THE LAST CONSIDERATION.

3    MANY OF THE THINGS THAT YOU POINT TO AS PREJUDICE TO

4    MR. WILKES I FIND ARE REALLY TRIFLING.  YOU'VE GONE THROUGH

5    AND GIVEN A LIST OF WITNESSES WHO COULD HAVE BEEN FURTHER

6    IMPEACHED, AMONG THEM MITCH WADE.

7            I DON'T KNOW, MR. GERAGOS, WHAT MORE YOU COULD HAVE

8    DONE TO IMPEACH MITCH WADE.  LUCIFER HIMSELF WOULDN'T HAVE

9    FARED ANY BETTER HERE.  HERE'S A GUY WHERE IT WAS FAIRLY

10   EVIDENT TO ME -- I DON'T THINK HE'S BEEN SENTENCED YET -- HE'S

11   GOING TO GET SOME KIND OF SWEETHEART SENTENCE.  THAT WAS

12   CLEAR.  HE ADMITTED AS MUCH.  HE'S OUT ON O.R. RELEASE, HIS

13   OWN RECOGNIZANCE.  MEANWHILE, MR. WILKES AND OTHERS ARE EITHER

14   DETAINED OR $2 MILLION BAIL.

15           THIS GUY, IT'S SHOWN BY YOUR CROSS-EXAMINATION, TOOK

16   THIS THING TO AN ART FORM.  HE WAS DOING MORE THAN MR. WILKES,

17   AS FAR AS I'M CONCERNED.  HE'S HANDING BAGS OF CASH TO

18   CONGRESSMAN CUNNINGHAM.

19           SO THE OTHER POINTS THAT YOU'VE RAISED, "I WOULD

20   HAVE IMPEACHED HIM ON THAT," I THINK, FRANKLY, THAT WOULD HAVE

21   JUST UNDERCUT YOUR EFFORTS.  YOU HIT HIM WITH THE HARDEST

22   BLOWS THAT WERE AVAILABLE TO HIT HIM WITH.  I'VE ANALYZED THIS

23   WAS A GUY THAT USED TO TRY CASES AND KNOWS ABOUT CABINING

24   IMPEACHMENT SO YOU DON'T WATER DOWN YOUR MAIN POINTS.  YOU HIT

25   HIM WITH HARD BLOWS.

PDF created with pdfFactory trial version www.pdffactory.com

37

1          THE SAME IS TRUE OF THESE OTHER WITNESSES.  MOST OF

2    THIS STUFF, EVEN IF IT'S CORRECT, I THINK IS REALLY JUST

3    ALMOST COLLATERAL IMPEACHMENT.  IT'S CLEAR TO ME THAT SOME OF

4    THE WITNESSES WOULD HAVE DENIED THE ALLEGATIONS OR THE

5    IMPLICATIONS YOU SAY APPEAR TO YOU FROM REVIEWING THESE

6    PAPERS.

7          ONE OF THE FELLOWS, THIS KRATZ FELLOW, THAT WAS PUT

8    TO HIM IN THE GRAND JURY.  "WHAT ABOUT THIS REPORT?"

9          HE SAID, "I NEVER SAID THAT."

10         I THINK THAT WOULD HAVE BEEN THE SAME RESULT HERE.

11         SO TO WHAT END DO I GRANT THE MOTION FOR A NEW

12   TRIAL, SO KRATZ CAN BE ASKED A QUESTION AND DENY THE

13   IMPLICATION THAT YOU THINK IS PREGNANT IN THESE DOCUMENTS?

14         I FIND THAT THE NEED FOR A CONTINUANCE WOULD NOT

15   HAVE -- OR THE CONCERNS RAISED WOULD NOT HAVE BEEN MET EVEN IF

16   HAD A FURTHER CONTINUANCE BEEN GRANTED.

17         THE EXTENT TO WHICH THE CONTINUANCE WOULD HAVE

18   INCONVENIENCED THE COURT AND OPPOSING PARTY, INCLUDING ITS

19   WITNESSES, I'VE SPOKEN TO THAT ALREADY.  LOOK, I'M HERE EVERY

20   DAY.  AND IF IT WASN'T THIS CASE, I WOULD HAVE BEEN TRYING

21   ANOTHER CASE.  I MADE THAT VERY CLEAR.  IT WASN'T MY PERSONAL

22   CONVENIENCE AT ALL.  IN FACT, I THINK I TRIED A NUMBER OF

23   CASES AFTER THE WILKES VERDICT IN THIS CASE BEFORE THE

24   CHRISTMAS HOLIDAY.  SO MY PERSONAL CONVENIENCE WAS NOT PART OF

25   THIS.

PDF created with pdfFactory trial version www.pdffactory.com

1          WHAT WAS PART OF THIS WAS, AS I SAID, CO-COUNSEL FOR
2     MR. GRANGER --
3          MR. FORGE:  MR. LEVITT.
4          THE COURT:  -- HE HAD A TRIAL SET IN BROOKLYN,
5     NEW YORK IN NOVEMBER.  AT THE TIME I MADE THE DECISION, IT
6     TURNED OUT LATER THAT HE WAS SEVERED.  BUT AT THE TIME I MADE
7     THE DECISION, MR. MICHAEL'S CASE HAD NOT BEEN SEVERED.
8     MR. LEVITT WAS CO-COUNSEL.  AND HE SAID, "JUDGE, YOU'VE PUT ME
9     IN A SPOT HERE.  ANOTHER FEDERAL JUDGE IN BROOKLYN, NEW YORK
10    HAS SET A FIRM TRIAL DATE.  I'M SUPPOSED TO GO."  AS I SAID, I
11    WOULDN'T DO THAT.  I WOULD NOT SUPERIMPOSE MYSELF OR MY
12    SCHEDULE ON SOME OTHER JUDGE'S SCHEDULE WHEN A FIRM TRIAL DATE
13    HAS BEEN SET.  SO I WAS BUFFETED BY THAT.
14          AND AS I RECALL -- AND I THINK THE TRANSCRIPT WILL
15    BEAR THIS OUT -- YOU UNDERSTOOD THE DILEMMA THAT THAT CREATED
16    FOR ALL OF US.  AND IT WAS THE PRODUCT OF A COMPROMISE THAT
17    LED TO A FURTHER TWO-WEEK CONTINUANCE AT THAT POINT.  SO THIS
18    WASN'T A MATTER OF THE COURT STICKING STRICTLY TO A DATE THAT
19    HAD BEEN SET.  I ADJUSTED THAT DATE.  ADDITIONAL ADJUSTMENTS
20    WERE MADE THROUGH THE TIME OF TRIAL.  THE GOVERNMENT OBJECTED
21    TO THE CONTINUANCE.  I DON'T KNOW IF MR. HALPERN GAVE YOU A
22    COUNTER-INDICATION EARLIER.  BUT WHEN IT CAME TO COMING IN
23    FRONT OF ME, THEY OBJECTED TO THE CONTINUANCE.
24          SO I FIND THAT THE ACCOMMODATION THAT WAS GIVEN AND
25    WAS AGREED TO, FRANKLY, BY YOU AT THE TIME REALLY ADDRESSES

PDF created with pdfFactory trial version www.pdffactory.com

39

1    THE THIRD FACTOR THE 9TH CIRCUIT LOOKS TO.

2            THEN THE EXTENT TO WHICH MR. WILKES SUFFERED HARM

3    BECAUSE OF THE CONTINUANCE, AS I SAID, THIS CASE DID NOT TURN

4    ON THE ADDITIONAL IMPEACHMENT THAT YOU CLAIM IS IN THOSE

5    DOCUMENTS.  IT WOULDN'T HAVE MADE A DIFFERENCE, IN MY

6    JUDGMENT.  THE WITNESSES WERE THOROUGHLY IMPEACHED WITH

7    PROBLEMS EITHER IN THEIR TESTIMONY OR INCONSISTENT STATEMENTS

8    OR THINGS THAT THEY HAD DONE, WHICH I THINK GAVE A VERY CLEAR

9    AND OBJECTIVE VIEW TO THE JURY THAT TRIED THIS CASE OF WHO THE

10   WITNESS WAS AND WHAT HE'D SAID IN THE PAST.

11           I'VE LOOKED IN PARTICULAR AT THE ARGUMENT YOU MAKE

12   ABOUT EACH WITNESS.  AND I FIND WITH RESPECT TO ALL OF THEM,

13   THAT IT WOULDN'T HAVE MADE ANY DIFFERENCE HERE.  IT DIDN'T

14   PREJUDICE MR. WILKES.  AS I SAID, I MARVELED AT THE FIRST TEN

15   WITNESSES.  I THOUGHT "BOY, THE GOVERNMENT IS IN FOR IT HERE

16   BECAUSE THESE FIRST TEN PEOPLE THEY'VE CALLED HAVEN'T HELPED

17   THEM VERY MUCH.  MR. GERAGOS HAS EITHER TURNED THEM AROUND TO

18   SAY SOMETHING FAVORABLE ABOUT MR. WILKES OR HE'S NEUTRALIZED

19   THEM."  NOW, IT GOT BETTER FOR THEM AS THE CASE WENT ON.  THE

20   EVIDENCE CONTINUED TO POUR IN TO AN AVALANCHE OF EVIDENCE

21   AGAINST MR. WILKES.

22           WITH ALL RESPECT TO OUR DIFFERENCE OF OPINION,

23   MR. GERAGOS, I DENY THE NEW TRIAL MOTION BASED ON A FAILURE TO

24   CONTINUE THE CASE.  I THINK THAT THERE WAS PLENTY OF TIME,

25   PLENTY OF CONSIDERATION GIVEN TO THE CONCERNS THAT YOU'VE

PDF created with pdfFactory trial version www.pdffactory.com

40

1    RAISED.  AND AT THE END, THERE WAS ADEQUATE -- MORE THAN

2    ADEQUATE PREPARATION AND THAT YOU PERFORMED SKILLFULLY IN

3    REPRESENTING MR. WILKES.

4         LET ME TURN TO THE ARGUMENT ABOUT THE GOVERNMENT'S

5    STATEMENTS DURING THE COURSE OF THE TRIAL AND WHETHER THEY

6    AMOUNTED TO CROSSING THE LINE IN BEING IMPERMISSIBLE

7    STATEMENTS.

8         I, LIKEWISE, DENY THAT MOTION.  I HAVE REVIEWED IN

9    CONTEXT ALL OF THE ALLEGED MISCONDUCT STATEMENTS THAT

10   SUPPOSEDLY AMOUNTED TO VOUCHING OR THAT EJECTED MATTERS

11   OUTSIDE THE RECORD.  I SPECIFICALLY ADOPT THE PORTIONS OF THE

12   TRANSCRIPT AND THE COMPARISON OF THOSE PORTIONS TO THINGS THAT

13   WERE SAID THAT'S CONTAINED IN THE GOVERNMENT'S RESPONSE OF

14   OPPOSITION TO YOUR MOTION FOR A NEW TRIAL BEGINNING AROUND

15   PAGE 11 AND CONTINUING ON THROUGH PAGE 18.

16        MUCH OF THE RESPONSE AND THE REBUTTAL ARGUMENT WAS

17   INVITED BY COMMENTS YOU MADE.  YOU CAN HARDLY EXPECT THAT THE

18   GOVERNMENT IS NOT GOING TO SPEAK ABOUT WHY THEY DIDN'T CALL

19   CUNNINGHAM WHEN YOU STAND IN FRONT OF THE JURY AND SAY, "WHY

20   DIDN'T THEY CALL CUNNINGHAM?"  THEY HAVE A RIGHT TO ANSWER AT

21   THAT POINT.  IT'S DIFFERENT FROM THEM SAYING, "WE DIDN'T CALL

22   HIM BECAUSE THUS AND SO OUTSIDE THE RECORD."

23        I FIND NO MISCONDUCT IN THIS CASE, NO VOUCHING.  THE

24   GOVERNMENT STRUCK HARD BLOWS HERE, TO BE SURE, BUT NO FOULS IN

25   MY JUDGMENT.  TO THE EXTENT THERE WAS A PROBLEM, YOU OBJECTED.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1      AND I RECALL A COUPLE OF TIMES SUSTAINING THE OBJECTIONS AND

2      TELLING THE JURY TO DISREGARD STATEMENTS AND SORT OF

3      CHASTENING THE PROSECUTORS TO STICK TO THINGS THAT WERE

4      RELEVANT AND PROPER.  THAT HAPPENED, TOO.  I'VE LOOKED

5      INDEPENDENTLY AT THE TRANSCRIPT.

6               SO TO THE EXTENT THERE WAS ANY IMPROPER ARGUMENT, IT

7      WAS CURED BY THE COURT'S PROMPT RESPONSE TO THE OBJECTION AND

8      TO THE ADMONITIONS GIVEN TO THE JURY.

9               I'VE LOOKED AT EACH AND EVERY ONE OF THE ARGUMENTS

10     THAT YOU'VE MADE.  IN CONTEXT, I FIND THAT NONE AMOUNTED TO

11     PROSECUTORIAL MISCONDUCT.  NONE AMOUNTED TO ANY KIND OF

12     PROBLEM THAT DEPRIVED MR. WILKES OF A FAIR TRIAL.

13              MOREOVER, IN MAKING THIS JUDGMENT, THE STANDARD, OF

14     COURSE, IS THAT MR. WILKES HAS TO SHOW THAT HE WAS SOMEHOW

15     PREJUDICED BY IT.  WE DIDN'T HAVE A RUSH TO JUDGMENT HERE.  WE

16     DIDN'T HAVE A JURY THAT WENT OUT AND CAME BACK AN HOUR LATER

17     OBVIOUSLY INFLAMED BY IMPASSIONED ARGUMENTS.  WE HAD A JURY

18     THAT SPENT FOUR INTENSE SAYS DELIBERATING, SOMETIMES MORE THAN

19     EIGHT HOURS.  I WAITED FOR THEM TO BUZZ, AND SOMETIMES THEY

20     DIDN'T BUZZ UNTIL AFTER 5:00 EVEN THOUGH THE USUAL QUITTING

21     TIME WAS 4:30.

22              MY TAKE ON THAT FOUR INTENSE DAYS OF DELIBERATION IS

23     THEY WENT CAREFULLY THROUGH ALL THE EVIDENCE, AND THEY WEREN'T

24     INFLAMED BY SOMETHING THAT YOU SAID OR SOMETHING THAT THE

25     GOVERNMENT SAID.  THE OBJECTIVE RECORD REALLY BELIES SUCH A

PDF created with pdfFactory trial version www.pdffactory.com

1    CONCLUSION.

2            SO AGAIN, WITH RESPECT, I DENY THE MOTION FOR A NEW

3    TRIAL ON THAT BASIS.

4            WHAT'S LEFT IS THIS ISSUE THAT WE TALKED ABOUT,

5    IMPEACHMENT ON THE COLLATERAL POINT.  WHILE I AGREED WITH YOU

6    AT THE TIME, THAT IT WAS A COLLATERAL POINT, I'VE BEEN

7    DISABUSED OF THAT.  IT WAS ONE OF THE OVERT ACTS.  ONE OF THE

8    OVERT ACTS ALLEGED THAT MR. CUNNINGHAM WENT SHOOTING WITH A

9    MACHINE GUN AND THAT THAT WAS PAID FOR AND THAT THAT WAS PART

10   OF WHAT HE WAS GIVEN BY MR. WILKES.

11           NOW, IT'S NOT COLLATERAL.  IT'S THERE.  IT'S

12   ALLEGED.  IT'S ONE OF THE OVERT ACTS THAT THEY NEEDED TO

13   PROVE.  MR. WILKES DENIED THAT.  HE DENIED MR. CUNNINGHAM WAS

14   ALONG.

15           WAS IT A BIG POINT IN THE COSMIC UNIVERSE?  I DON'T

16   THINK SO.  THAT'S WHY YOU ROLLED YOUR EYES AT ME AT THE TIME.

17   THAT'S WHY YOU MADE THE STATEMENT TO THE JURY "DID TAXPAYER

18   MONEY PAY TO HAVE THIS GUY COME DOWN AND SAY THAT?"  I DIDN'T

19   GET IT EITHER.  HAD I BEEN IN THE GOVERNMENT'S SHOES, I

20   WOULDN'T HAVE CHOSEN TO TRY TO REBUT ON THAT POINT.  THEY DID.

21   THEY HAD A RIGHT TO.  THEY OBVIOUSLY DISAGREED WITH YOUR

22   JUDGMENT AND MINE ON THAT.

23           BUT I THINK THE IMPEACHMENT WAS PROPER AND NOT

24   COLLATERAL.  IN ANY EVENT, AT THE END OF THE DAY, NONE OF THAT

25   AFFECTED THE VERDICT HERE.  IT'S JUST NOT A FAIR STATEMENT TO

PDF created with pdfFactory trial version www.pdffactory.com

43

1    SAY THAT THAT LITTLE INCIDENT HAD SOME MOMENTOUS IMPACT ON THE

2    VERDICT.  IT DID NOT.

3            SO THE COURT, HAVING READ AND CONSIDERED ALL OF THE

4    ARGUMENTS, DENIES THE MOTION FOR A NEW TRIAL.  MR. WILKES WAS

5    FAIRLY TRIED.  HE GOT A FAIR TRIAL AS I PROMISED HIM HE WOULD.

6    THAT MOTION IS DENIED.

7            I THINK NOW WE SHOULD TURN TO THE MATTER OF

8    SENTENCING.

9            DO YOU AGREE, MR. GERAGOS, THAT THAT'S NEXT IN

10   LOGICAL ORDER?

11           MR. GERAGOS:  YES, YOUR HONOR.  I THINK WE NEED TO

12   DEAL WITH THE PSR OBJECTIONS.

13           THE COURT:  LET ME FIRST RECITE WHAT I HAVE READ AND

14   CONSIDERED IN CONNECTION WITH SENTENCING.

15           IN SHORT, ALL THIS STUFF IN FRONT OF ME HAS TO DO

16   WITH SENTENCING.  I'VE READ AND CONSIDERED ALL OF IT.  I SPENT

17   THE GOOD PART OF THIS WEEKEND GOING OVER EVERYTHING A SECOND

18   TIME.

19           BUT TO BEGIN WITH, I'VE READ THE PRE-SENTENCE REPORT

20   THAT WAS FILED IN THIS CASE.

21           YOU'VE FILED OBJECTIONS TO THE PRE-SENTENCE REPORT.

22   I'VE READ AND CONSIDERED THOSE.

23           THE GOVERNMENT HAS RESPONDED TO YOUR OBJECTIONS.

24   I'VE READ THE GOVERNMENT'S RESPONSE.

25           THE GOVERNMENT HAS FILED A SENTENCING MEMORANDUM.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

44

1    I'VE READ THAT.

2              THE PROBATION OFFICER FILED AN ADDENDUM RESPONDING

3    TO THE OBJECTIONS.  I HAVE READ AND CONSIDERED THAT AS WELL.

4              THERE WAS A MOTION TO STRIKE YOUR OBJECTIONS.  YOUR

5    SENTENCING MEMO WAS LATE.  AS I MENTIONED TO YOU, I DENIED

6    THAT.  ACTUALLY, IT WAS AS TO THE NEW TRIAL MOTION AS WELL AS

7    THE OBJECTIONS.  BUT I DENIED ALL OF THAT.  I HAVE CONSIDERED

8    EVERYTHING ON THE MERITS.

9              YOU FILED AN AFFIDAVIT AND REPLIED TO THE

10   GOVERNMENT'S MOTION TO STRIKE.

11             THERE'S A SENTENCING SUMMARY CHART THAT THE

12   GOVERNMENT FILED IN THIS CASE, WHICH I'VE LOOKED AT AND

13   CONSIDERED.

14             YOU FILED NUMEROUS ATTACHMENTS TO YOUR SENTENCING

15   MEMORANDUM, INCLUDING MANY, MANY LETTERS.  I'VE READ EACH AND

16   EVERY ONE OF THE LETTERS FROM MR. WILKES'S FAMILY MEMBERS,

17   FROM PEOPLE THAT WERE PART OF THE TRIBUTE TO HEROES, TALKING

18   ABOUT THAT.  I THINK THREE SEPARATE PACKAGES OF LETTERS, THE

19   FIRST PACKAGE AND THEN A SUPPLEMENT PACKAGE, AND THEN I GOT A

20   THIRD PACKAGE.  I'VE GONE THROUGH ALL OF THOSE LETTERS.

21             I THINK THAT'S IT.

22             HAVE I MISSED ANYTHING?

23             MR. GERAGOS:  I THINK YOU COVERED ALL OF THOSE.

24   OBVIOUSLY, THE COURT HAS TO -- I THINK WE HAVE ASKED FOR MORE

25   TIME AND AN EVIDENTIARY HEARING FOR THE CRAWFORD CALCULATIONS

PDF created with pdfFactory trial version www.pdffactory.com

1    PORTION OF THIS BECAUSE OBVIOUSLY THAT'S A SIGNIFICANT,

2    SIGNIFICANT ISSUE.

3           I DON'T KNOW HOW THE COURT PROPOSES TO DEAL WITH THE

4    BEYOND A REASONABLE DOUBT STANDARD.

5           THE COURT:  WELL, I CAN TELL YOU I FIND THAT THAT

6    STANDARD DOES NOT APPLY.

7           YOU'RE TALKING ABOUT WHAT FINDINGS I HAVE TO MAKE

8    IF, INDEED, I CAN MAKE FINDINGS.

9           MR. GERAGOS:  IF YOU CAN.

10          THE COURT:  BY WHAT STANDARD OF PROOF I MUST MAKE

11   THE FINDINGS.  THE GOVERNMENT HAS ESSENTIALLY TAKEN THE MIDDLE

12   GROUND OF SAYING THE GUIDELINES SPEAK IN TERMS OF

13   PREPONDERANCE OF EVIDENCE, MORE LIKELY THAN NOT.  I, FRANKLY,

14   THINK THAT THAT'S THE STANDARD.  BUT OUT OF AN ABUNDANCE OF

15   CAUTION, THEY SAID, "GO AHEAD AND APPLY CLEAR AND CONVINCING

16   EVIDENCE."  I'M PREPARED TO DO THAT.  I FIND THAT THE PROOF

17   BEYOND A REASONABLE DOUBT STANDARD DOES NOT APPLY TO MAKING

18   THE FINDINGS HERE.

19          AND LET ME SPEAK -- I SUPPOSE BEFORE I PUT THE CART

20   BEFORE THE HORSE, LET ME SPEAK TO THE -- FIRST, LET ME GET

21   CLEAR THAT I'VE READ AND CONSIDERED EVERYTHING.

22          IN YOUR JUDGMENT, THE RECITAL OF MATERIALS THAT I'VE

23   JUST GONE THROUGH, DOES THAT COVER EVERYTHING YOU FILED AND

24   YOU WANTED ME TO READ AND CONSIDER?

25          MR. GERAGOS:  I BELIEVE IT DOES.  ON THIS ISSUE,

PDF created with pdfFactory trial version www.pdffactory.com

46

1    YES.

2              THE COURT:  MR. BHANDARI, FROM THE GOVERNMENT'S

3    STANDPOINT, HAVE I READ ALL THE SUBMISSIONS THAT YOU'VE MADE?

4              MR. BHANDARI:  YES.

5              THE COURT:  LET ME DEAL, AS A PRELIMINARY MATTER,

6    THEN, MR. GERAGOS, SOME OF THE LEGALITIES ABOUT WHAT I'M

7    PERMITTED TO CONSIDER.

8              YOU'VE MADE AN OVERALL OBJECTION THAT BECAUSE THE

9    JURY DIDN'T MAKE SPECIFIC FINDINGS ON SOME OF THESE GUIDELINE

10   ADJUSTMENTS, THAT I'M NOT PERMITTED TO DO SO EITHER.  THAT

11   NECESSARILY UNDER THE 6TH AMENDMENT AND THE DEFENDANT'S RIGHT

12   TO A JURY TRIAL ON ISSUES THAT AFFECT HIS SENTENCE, THOSE

13   FINDINGS HAVE TO BE A PRODUCT OF A JURY FINDING RATHER THAN A

14   COURT FINDING.

15             ANYTHING ELSE YOU WANT TO SAY ABOUT THAT?

16             MR. GERAGOS:  NO.  I THINK THAT THAT'S -- I THINK

17   THAT THAT'S CLEARLY THE LAW AND CLEARLY THE TREND BOTH OUT OF

18   THE U.S. SUPREME COURT AND THE 9TH CIRCUIT.

19             THE COURT:  I DENY THAT MOTION.  I THINK THAT THE

20   WHOLE PROBLEM THAT YOU RAISE HAS BEEN SETTLED BY THE BOOKER

21   CASE.  MUCH OF THE ARGUMENT THAT YOU MAKE RELIES ON AND

22   DOESN'T DISTINGUISH BETWEEN DESCENDING OPINIONS AND MAJORITY

23   OPINIONS.

24             THE MAJORITY OPINION IN BOOKER SETTLED THAT.  THERE

25   WAS A REMEDIAL PORTION OF THE OPINION THAT WAS AGREED TO BY A

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    MAJORITY OF JUSTICES THAT SAID THE WAY TO FIX THIS IS NOT TO

2    SCRAP THE GUIDELINES ALTOGETHER.  IT'S TO MAKE THEM ADVISORY.

3    AND THAT WAS THE FIX.  I FIND THAT CUNNINGHAM VERSUS

4    CALIFORNIA HAS NO RELEVANCE TO A POST-BOOKER SENTENCING

5    BECAUSE BOOKER ITSELF PROVIDED THE FIX FOR MANDATORY

6    GUIDELINES BY SAYING THEY'RE NOT MANDATORY.  THEY'RE ADVISORY.

7           THE 9TH CIRCUIT HAS SPOKEN TO THIS IN UNPUBLISHED

8    OPINIONS.  THE GOVERNMENT HAS CITED 7TH CIRCUIT OPINIONS THAT

9    I FIND PERSUASIVE I THINK THAT ACCURATELY STATE THE LAW WITH

10   RESPECT TO THIS ISSUE.

11          IN U.S. VERSUS HAWKINS AT 480 FED. 3D. 476, JUDGE

12   POSNER OBJECTS, KIND OF IN AN ANIMATED WAY, TO THE VERY

13   ARGUMENTS THAT YOU MAKE.  HE SAYS, "BECAUSE THE HAWKINS TRIAL

14   LAWYERS EITHER DON'T READ JUDICIAL OPINION OR THEY DON'T

15   UNDERSTAND THEM OR THEY CAN'T DISTINGUISH A MAJORITY FROM A

16   DESCENDING OPINION OR THEY'RE IN DENIAL OR THEY'RE BOOKER

17   PROTESTORS, THEY INSIST THAT A JUDGE CAN'T BE ALLOWED TO BASE

18   A SENTENCE ON ANY FACTS OTHER THAN THOSE DETERMINED BY A JURY.

19   AS A RESULT, THEY FAILED TO RAISE THE OBJECTION," SO ON AND SO

20   FORTH.  "THIS DEMONSTRATES THAT THE LAWYERS' OBSESSIONS CAN

21   HARM CLIENTS."  NOW, I DON'T THINK YOU HAVE ANY OBSESSION, BUT

22   THIS MAKES THE POINT.  HE SAYS IT WAS SETTLED BY BOOKER.

23          IN A RELATED OPINION BY JUDGE EASTERBROOK -- AGAIN,

24   OUT-OF-CIRCUIT AUTHORITY, BUT THE 9TH CIRCUIT HASN'T SPOKEN

25   DISPOSITIVELY ON THIS.  THEY'VE INTIMATED IN THE UNPUBLISHED

PDF created with pdfFactory trial version www.pdffactory.com

48

1     CASE THAT THE GOVERNMENT CITED.

2             IN U.S. VERSUS ROTI, R-O-T-I, AT 484 FED. 3D,

3     JUDGE EASTERBROOK, CHIEF JUDGE FOR THE 7TH CIRCUIT, SAYS, IN

4     RESPONSE TO THE SAME ARGUMENTS THAT YOU RAISE HERE, "BOOKER

5     ITSELF HELD THAT THE GUIDELINES AS ENACTED VIOLATE THE 6TH

6     AMENDMENT.  THE REMEDIAL PORTION OF BOOKER SOLVED THAT

7     CONSTITUTIONAL PROBLEM BY MAKING THE GUIDELINES ADVISORY.

8     GIVEN THAT ADJUSTMENT, FINDINGS OF FACT UNDER THE GUIDELINES

9     NO LONGER DETERMINE THE STATUTORY MAXIMUM SENTENCE.

10    CUNNINGHAM VERSUS CALIFORNIA, THEREFORE, HAS NO EFFECT ON

11    POST-BOOKER FEDERAL PRACTICE.  DISTRICT JUDGES REMAIN FREE

12    THAT THE REMEDIAL PORTION OF BOOKER INSTRUCTS TO MAKE FINDINGS

13    OF FACT THAT INFLUENCE SENTENCES PROVIDED THAT THE SENTENCE IS

14    CONSTRAINED BY THE MAXIMUM SET BY STATUTE FOR EACH CRIME."

15            THAT'S PRECISELY THE SITUATION THAT WE HAVE HERE.

16    THERE'S NO ADVOCACY TO IMPOSE A SENTENCE OUTSIDE THE STATUTORY

17    MAXIMUM.  AND REALLY WE HAVE MORE THAN THAT HERE BECAUSE AS IT

18    REGARDS SOME OF THE OBJECTIONS YOU RAISE, FOR EXAMPLE,

19    CUNNINGHAM'S STATUS AS AN ELECTED OFFICIAL, THAT WAS IMPLICIT.

20    IT WAS EVEN EXPLICIT IN THE CHARGE ITSELF, IN THE BRIBERY

21    CHARGE.  HE WAS IDENTIFIED AS AN ELECTED OFFICIAL.

22            THE AMOUNTS, FOR EXAMPLE.  THE AMOUNTS THAT THE

23    GOVERNMENT CONTENDED WERE BRIBES WERE EXPLICITLY SET FORTH IN

24    THE COUNTS THAT THE JURY FOUND GUILT ON.  SO THERE'S NO

25    QUESTION THAT ONE OBSERVING THIS TRIAL OR KNOWING WHAT THE

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

49

1    JURY CONSIDERED, THAT THAT'S WHAT THE GOVERNMENT WAS SAYING.

2    MR. WILKES MADE A $525,000 BRIBE.  MR. WILKES MADE A $100,000

3    BRIBE.  THEY DIDN'T MAKE EXPLICIT FINDINGS.  WE DIDN'T HAVE A

4    SPECIAL VERDICT FORM, TO BE SURE.

5         AS I SAID, ALL OF THAT IS SOLVED BY THE REMEDIAL

6    PORTION OF BOOKER THAT SAYS THESE ARE GUIDEPOSTS ANYWAY.

7    THEY'RE NOT MANDATORY.  THEY DON'T CONSTRAIN WHAT I DO.  THEY

8    SIMPLY INFORM IT.  SO AGAIN, WITH RESPECT TO YOUR LEGAL

9    ARGUMENTS, I OVERRULE THE OBJECTIONS ON THAT BASIS.

10         NOW, LET ME GO THROUGH THE INDIVIDUAL OBJECTIONS

11   THAT YOU'VE RAISED BEGINNING WITH THE FACTUAL OBJECTIONS.

12         THE FIRST OBJECTION HAS TO DO WITH MR. WILKES'S

13   LAUNCHING ADCS.  YOU SAY IT'S INACCURATE AND INCOMPLETE.  I

14   SUSTAIN THE OBJECTION.  I WILL CONSIDER THE ADDITIONAL CONTEXT

15   THAT YOU GIVE THERE AS PART OF THAT PARAGRAPH.  I KNEW THAT TO

16   BE SO FROM HAVING HEARD THE EVIDENCE IN THIS CASE, BUT YOU'RE

17   RIGHT THAT IT'S NOT A COMPLETE RECITAL OF HIS RELATIONSHIP TO

18   ADCS.  SO IT'S SUSTAINED.

19         YOUR SECOND OBJECTION TO PAGE 2, LINE 7, THE

20   PROBATION OFFICER SAYS, "ALMOST FROM THE INCEPTION, MR. WILKES

21   WAS TREATING CONGRESSMAN CUNNINGHAM TO LAVISH MEALS AT

22   HIGH-END RESTAURANTS COSTING HUNDREDS, IF NOT THOUSANDS OF

23   DOLLARS."  I SUSTAIN THAT OBJECTION.  AGAIN, IT'S LARGELY

24   DEPENDENT UPON THE CONTEXT.  IT WAS EVIDENT THAT THERE WERE

25   THOUSAND DOLLAR MEALS, BUT THEY CAME LATER.  SO THE ARGUMENT

PDF created with pdfFactory trial version www.pdffactory.com

1    THAT IT WAS AT THE INCEPTION IS TECHNICALLY NOT ACCURATE.  BUT

2    I SUSTAIN THE OBJECTION.  I WILL CONSIDER THE CONTEXT THAT YOU

3    HAVE PROVIDED THERE.

4          THE OBJECTION TO THE STATEMENT THAT WILKES

5    DISPATCHED A LIMOUSINE TO TAKE CUNNINGHAM FROM CAPITOL HILL OR

6    THE KELLY C TO THE RESTAURANTS IS OVERRULED.  THE TESTIMONY

7    ESTABLISHED THAT THAT WAS A FACT.  I FIND THAT TO BE RELIABLY

8    REPORTED BY THE PROBATION OFFICER.

9          THE FOURTH OBJECTION, THE PROBATION OFFICER CLAIMS

10   MR. WILKES PURCHASED A JET BOAT FOR CUNNINGHAM'S USE AND

11   ENJOYMENT ALONG A TRAILER TO TRANSPORT IT.  I UNDERSTAND

12   MR. WILKES'S POSITION IS THAT HE PURCHASED IT FOR HIMSELF AND

13   OCCASIONALLY ALLOWED CUNNINGHAM TO USE IT.  APPLYING A CLEAR

14   AND CONVINCING EVIDENCE STANDARD, I DON'T HAVE CLEAR AND

15   CONVINCING EVIDENCE THAT THAT WAS NOT TRUE; THAT IS, THAT IT

16   WAS PURCHASED FOR HIM AND THEN LENT OUT TO CUNNINGHAM.  SO

17   I'LL SUSTAIN THE OBJECTION ON THAT SCORE.

18         THE FIFTH OBJECTION, THAT CUNNINGHAM EMPHASIZED THE

19   ADCS PROGRAM AS ONE OF HIS TOP LEGISLATIVE PRIORITIES, I

20   OVERRULE THAT.  I FIND THAT THAT WAS ONE OF THE CONGRESSMAN'S

21   TOP LEGISLATIVE PRIORITIES.  AGAIN, WHEN YOU GET INTO

22   QUALITATIVE STATEMENTS SUCH AS "TOP" OR "PRIORITY," THERE'S

23   SOME JUDGMENT.  AND I FIND THAT THERE WAS PLENTY OF EVIDENCE

24   TO SUPPORT THE CHARACTERIZATION USED BY THE PROBATION OFFICER

25   IN THAT INSTANCE.

PDF created with pdfFactory trial version www.pdffactory.com

51

1       THE SIXTH OBJECTION, THAT CUNNINGHAM PUSHED THE ADCS

2   PROGRAM OUTSIDE CONGRESS AS WELL BY EXERTING PRESSURE ON THE

3   DEPARTMENT OF DEFENSE OFFICIALS, I OVERRULE THAT OBJECTION.  I

4   FIND THAT THAT OCCURRED.  YOU OBVIOUSLY HAVE READ THE

5   TRANSCRIPT OF MY SENTENCING OF CONGRESSMAN CUNNINGHAM.  THAT

6   WAS ONE OF THE THINGS THAT I FOUND SO OFFENSIVE IN HIS

7   BEHAVIOR, AND I CHASTISED HIM FOR IT.  I THOUGHT IT WAS BEYOND

8   THE PALE THAT HE WOULD CALL OVER TO A LOW-LEVEL OR MID-LEVEL

9   DEFENSE DEPARTMENT OFFICIAL AND THREATEN HIS JOB.  I REALLY

10  DID.  THAT RUBBED ME THE WRONG WAY.  IT OCCURRED, AND THERE

11  WAS EVIDENCE OF IT HAVING OCCURRED IN THIS TRIAL.  SO I FIND

12  THAT THAT RECITAL IS RELIABLE AND ACCURATE, AND I OVERRULE THE

13  OBJECTION.

14      SEVEN, THIS HAS TO DO WITH THE JET BOAT BEING

15  DAMAGED AND MR. WILKES BUYING CUNNINGHAM A NEW ONE AND AN

16  INFLATABLE DOCK.  AGAIN, APPLYING A CLEAR AND CONVINCING

17  EVIDENCE STANDARD, I SUSTAIN THE OBJECTION.  THERE'S EVIDENCE

18  BOTH WAYS HERE ABOUT WHO WAS REALLY THE BENEFICIARY OF THIS

19  BOAT.  IT'S CLEAR TO ME THAT CUNNINGHAM HAD HIS WAY WITH THE

20  BOAT WHENEVER HE WANTED IT.  BUT WHETHER OWNERSHIP WAS

21  ACTUALLY WITH MR. WILKES OR MR. CUNNINGHAM, I SUSTAIN THE

22  OBJECTION ON THAT GROUND.

23      EIGHT, WILKES HAD ABSOLUTELY NO IDEA THAT CUNNINGHAM

24  HAD MADE PUBLIC COMMENTS CALLING FOR OR CRITICIZING THE

25  DISMISSAL OF THE ASSISTANT UNDER-SECRETARY OF DEFENSE.  THAT

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

52

1    IS MOOT.  IT HAS NO EFFECT.  IT WILL NOT AFFECT MY SENTENCING

2    JUDGMENT WHETHER HE DID OR DIDN'T DO THAT.  SO THAT RESOLVES

3    THAT.

4         NINE, THE PROBATION OFFICER WROTE THAT WILKES

5    CONTINUED TO WINE AND DINE CUNNINGHAM IN AN EXTRAVAGANT

6    MANNER.  THIS IS DIFFERENT.  IT'S NOT TIED INTO THE EARLY

7    PORTION OF THE ACTIVITY, AND I OVERRULE THE OBJECTION.  THERE

8    IS PLENTY OF EVIDENCE THAT THERE WERE LAVISH MEALS, VERY

9    EXPENSIVE MEALS THAT WERE PART OF THE RELATIONSHIP BETWEEN

10   MR. WILKES AND MR. CUNNINGHAM.  I THINK THAT'S A RELIABLE

11   STATEMENT.  IT WILL REMAIN.

12        THE TENTH OBJECTION, MR. WILKES WROTE TWO CHECKS IN

13   THE AMOUNT OF $100,000 OSTENSIBLY FOR THE PURPOSE OF BUYING

14   CUNNINGHAM'S BOAT.  I OVERRULE THAT OBJECTION.  I FIND BY

15   CLEAR AND CONVINCING EVIDENCE THAT THAT OCCURRED.  THE JURY,

16   AS I SAID, FOUND ON THAT MATTER.  AND THEY DETERMINED THAT THE

17   $100,000 AND THEN THE MORTGAGE PAYMENTS THAT FOLLOWED ON THE

18   BOAT WERE A FORM OF A BRIBE.  THAT WAS WHAT WAS ALLEGED, AND

19   THAT'S WHAT THE JURY FOUND.  SO THAT'S A RELIABLE RECITAL OF

20   WHAT THE EVIDENCE IS IN THIS CASE.

21        11, MR. WILKES PROVIDED CUNNINGHAM WITH ANOTHER

22   COMPUTER THAT SPECIALIZED IN NAVIGATIONAL SOFTWARE FOR THE

23   KELLY C.  I OVERRULE THE OBJECTION.  I HAVE NO PROBLEM WITH

24   THE WORD "PROVIDED."  I DON'T THINK IT'S VAGUE.  HE DID BUY

25   IT.  HE DID PAY FOR IT.  HE DID GIVE IT TO HIM.  THAT'S

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

53

1    ANOTHER WAY OF SAYING HE PROVIDED IT.  THE OBJECTION IS

2    OVERRULED.

3            12, THE PROBATION OFFICER NOTED THAT THE DAY AFTER

4    THE 100,000 KELLY C PAYMENT, CUNNINGHAM'S LEGISLATIVE DIRECTOR

5    WORKED TO ADVANCE A REQUEST FOR A $20 MILLION EARMARK FOR

6    GIDC.  THAT'S ACCURATE.  THAT'S WHAT HAPPENED.  I THINK WHAT

7    YOU OBJECT TO IS THAT THERE WAS ANY RELATIONSHIP BETWEEN --

8            MR. GERAGOS:  THAT THERE'S SOME KIND OF A TIE-IN.

9            THE COURT:  AGAIN, THAT'S A MATTER FOR JUDGMENT, AND

10   THE COURT WILL EXERCISE ITS JUDGMENT ON THAT.  IT'S NOT AN

11   INACCURATE STATEMENT TO SAY IT WAS MORE THAN COINCIDENTAL.  I

12   OVERRULE IT.  THE IMPLICATION IS A FAIR ONE GIVEN THE

13   EVIDENCE.

14           13, THE PROBATION OFFICER STATED THAT GIDC WAS YET

15   ANOTHER DOCUMENT CONVERSION PROGRAM THAT COULD BE DIRECTED

16   SOLELY TOWARD ADCS TO AVOID SKIRMISHES.  I FIND THAT'S

17   ACCURATE.  A LOT OF THE TESTIMONY ON THE DOCUMENT COPYING WAS

18   COMPLICATED, AND I DIDN'T PRESUME TO UNDERSTAND ALL OF THE

19   TECHNICALITIES.  BUT THAT WAS -- I'VE LOOKED BACK AT THE

20   TRANSCRIPT.  THAT WAS TESTIFIED TO.  I THINK IT'S RELIABLE.

21   THE PROBATION OFFICER WAS CORRECT TO REPORT IT.  SO

22   OBJECTION 13 IS OVERRULED.

23           14, MR. WILKES, YOU ACKNOWLEDGE, DID TREAT

24   CUNNINGHAM TO SOME MEALS.  HOWEVER, THEY WERE HARDLY

25   EXPENSIVE.  I'VE RULED ON THAT.  THAT'S OVERRULED.  THERE WERE

PDF created with pdfFactory trial version www.pdffactory.com

1   $4,000 MEALS AND $1300 BOTTLES OF WINE AT TIMES.  THAT'S

2   EXPENSIVE IN MY BOOK.

3        15 --

4        MR. GERAGOS:  COULD I -- THERE'S JUST ONE INDICATION

5   I WANTED TO AMPLIFY.  THE COURT DID FIND AND INDICATED THAT IT

6   HAD PROBLEMS WITH THIS IDEA OF IDAHO DURING THE TRIAL.  I WAS

7   TRYING TO -- OBJECTION 14, I THINK, FOLLOWS ALONG THE LINES OF

8   WHAT THE COURT HAD PROBLEMS WITH.  THERE CLEARLY WERE OR AT

9   LEAST THERE WAS A PRETTY STRONG SUGGESTION THAT THOSE WERE

10  LEGITIMATE CONGRESSIONAL FUND-RAISERS.  I THINK THERE WAS

11  EVIDENCE OF LARRY CRAIG.  I THINK THAT'S MORE PROBLEMATIC.

12       THE COURT:  THIS IS REALLY DIRECTED TO WHETHER I'M

13  MISLED OR ANYBODY ELSE READING THE RECORD IS MISLED.  I'M NOT.

14  I ACKNOWLEDGE YOUR POINT.  THERE WAS EVIDENCE.  AND I'M STILL

15  NOT SURE ABOUT WHETHER WITH COEUR D'ALENE THERE WAS SOME

16  APPROPRIATE PURPOSE INVOLVED.  I UNDERSTAND THE COMPETING

17  POINTS OF VIEW ON THAT.

18       BUT THERE'S NOT A BASIS FOR ME TO SUSTAIN THE

19  OBJECTION AND ORDER THAT STRICKEN FROM THE PROBATION REPORT.

20  IT'S A FAIR INFERENCE THAT THE GOVERNMENT DRAWS THAT IT WAS

21  MORE OF THE SAME, MORE TREATING MR. CUNNINGHAM THE REWARD SO

22  THAT MR. WILKES'S LEGISLATIVE GOALS WOULD BE ADVANCED BY THE

23  CONGRESSMAN.  SO IN THAT CONTEXT, I OVERRULE THE OBJECTION.

24       15, THE PROBATION OFFICER TAKES THE POSITION THAT

25  CONGRESSMAN CUNNINGHAM CONTINUED TO USE HIS OFFICE TO ENRICH

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    WILKES.  THAT'S WHAT THE CASE WAS ALL ABOUT.  I FIND THAT

2    THAT'S A RELIABLE PREAMBLE TO THE OTHER COMMENTS MADE IN THAT

3    SECTION.  I OVERRULE THE OBJECTION.

4          16, WILKES REAPED SIGNIFICANT PROFITS FROM THE GIDC

5    PROGRAM.  I'M NOT CONVINCED BY CLEAR AND CONVINCING EVIDENCE

6    THAT THAT'S THE CASE.  I SUSTAIN THE OBJECTION TO THAT

7    STATEMENT.

8          17, MR. WILKES NEVER GAVE CUNNINGHAM SUPER BOWL

9    TICKETS.  IT SEEMED TO ME -- AND I'M NOT CLEAR ON THIS POINT.

10   MAYBE THE GOVERNMENT WILL SPEAK TO THIS.  I KNOW THAT

11   MR. CUNNINGHAM WAS PART OF THE PRE-GAME SHOW AND THE TRIBUTE

12   TO THE VETERANS.  I DON'T KNOW WHETHER HE HAD A PASS INTO THE

13   SUPER BOWL INDEPENDENT.

14         DID THE EVIDENCE SHOW THAT MR. WILKES ACTUALLY

15   PROVIDED HIS TICKET IN?  IT'S A SMALL POINT.  I GUESS I SHOULD

16   SAY IT'S NOT GOING TO AFFECT MY THINKING AT ALL.  WAS THAT THE

17   EVIDENCE?

18         MR. BHANDARI:  THE TRIAL EVIDENCE DIDN'T COVER THIS

19   DETAIL.  BUT HE WAS AT THE SUPER BOWL INDEPENDENTLY, BUT HE

20   WAS NOT IN THE BOX INDEPENDENTLY.  THE BOX PRIVILEGE WAS

21   SEPARATE.  THAT WAS THE BENEFIT.

22         THE COURT:  I SUSTAIN THE OBJECTION.  MOREOVER, THAT

23   DOESN'T AFFECT MY THINKING THAT CONGRESSMAN CUNNINGHAM MADE

24   HIS WAY UP TO MR. WILKES'S BOX DURING THE SUPER BOWL WHEN

25   CUNNINGHAM WAS THERE INDEPENDENTLY TO PARTICIPATE IN THE

PDF created with pdfFactory trial version www.pdffactory.com

56

1    PRE-GAME ACTIVITIES.

2            18, THE PROBATION OFFICER CLAIMS THAT ADCS HAD A

3    FINANCIAL WINDFALL IN FISCAL YEAR 2004.  AGAIN, THIS IS ONE OF

4    THOSE QUALITATIVE JUDGMENTS AND MATTERS OF OPINION.  IT'S A

5    FAIR INFERENCE.  I OVERRULE THE OBJECTION.

6            19, THE PROBATION OFFICER USES THE WORD "BRIBE" TO

7    DESCRIBE THE 525,000.  THAT WAS SETTLED BY THE JURY IN THIS

8    CASE.  I OVERRULE THE OBJECTION.  I FIND IT'S SUPPORTED BY THE

9    EVIDENCE.

10           20, AGAIN, MR. WILKES DENIES BRIBING MR. CUNNINGHAM.

11   THERE'S A REFERENCE TO BRIBING.  THAT'S OVERRULED FOR THE SAME

12   REASONS AS THE LAST OBJECTION.

13           21, MR. WILKES WAS NOT AWARE OF ANY MONEY-LAUNDERING

14   TAKING PLACE BETWEEN WADE, MICHAEL, KONTOGIANNIS, AND

15   CUNNINGHAM.  I OVERRULE THE OBJECTION.  I FIND THAT THERE WAS

16   MONEY-LAUNDERING TAKING PLACE.  MR. WILKES'S POSITION WAS HE

17   WASN'T AWARE OF IT.  HIS POSITION FURTHER WAS THAT HE WAS

18   MAKING AN INVESTMENT.  THE JURY REJECTED HIS DEFENSE AND HIS

19   TESTIMONY ON THAT SCORE IN FINDING GUILT ON THE PERTINENT

20   COUNTS.  SO I FIND IT'S RELIABLY REPORTED THAT WAY.

21           22, NONE OF THE MONEY AND PROPERTIES LISTED ON

22   PAGE 7 OF THE PSR WAS A BRIBE.  AGAIN, I HAVE SOME PROBLEM,

23   MR. GERAGOS, WITH SOME OF THESE THINGS.  I'VE ALREADY MADE

24   FINDINGS THAT I COULD NOT FIND BY CLEAR AND CONVINCING

25   EVIDENCE THAT THESE WERE BRIBES.  LET ME TELL YOU WHAT I HAVE

PDF created with pdfFactory trial version www.pdffactory.com

57

1    NO PROBLEM WITH AMONG THE THINGS LISTED THERE.

2            I THINK THE EVIDENCE ESTABLISHED AND THE JURY FOUND

3    THAT THE 525,000 WAS A BRIBE.

4            THEY FOUND THAT THE 100,000 FOR THE KELLY C, THAT IT

5    WAS OSTENSIBLY A DOWN PAYMENT, BUT NEVER RETRIEVED BY

6    MR. WILKES.  THEY FOUND THAT THAT WAS A BRIBE.  THAT WAS THE

7    FINDING.

8            THE MORTGAGE PAYMENT ON THE KELLY C FROM ROUGHLY

9    NOVEMBER OF 2000 TO APRIL 2001, THEY FOUND THAT THOSE PAYMENTS

10   THAT AMOUNTED TO OVER $11,000 WERE A BRIBE.

11           ALL THOSE FINDINGS WERE SUPPORTED BY THE JURY

12   VERDICTS IN THIS CASE.  SO I OVERRULE THE OBJECTIONS WITH

13   RESPECT TO THOSE THREE THINGS.

14           WITH RESPECT TO THE OTHERS, I SUSTAIN THE

15   OBJECTIONS.

16           NOW, THE ONLY OTHER QUESTION REGARDING LEGAL

17   OBJECTIONS I THINK IS THE VALUATION.  I'LL LET YOU SPEAK TO

18   THIS.  LET ME TELL YOU FIRST WHAT MY FINDINGS ARE.  THEY'RE

19   NOT NECESSARILY INCONSISTENT WITH THE POSITION YOU TAKE.

20           THE GUIDELINES PROVIDE THAT THERE'S THREE WAYS TO

21   DETERMINE THE VALUE OF THE LOSS.  THAT'S SIGNIFICANT IN THIS

22   CASE BECAUSE THERE'S A CROSS-REFERENCE.  IF SOMEBODY'S

23   CONVICTED OF BRIBERY, THE GUIDELINES SAY, "WELL, HOW MUCH WERE

24   THE BRIBES OR HOW MUCH WAS THE LOSS OR HOW MUCH DID THE PERSON

25   GAIN?"  AND THEN TAKE THE GREATEST OF THOSE NUMBERS AND APPLY

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

58

1   THE LOSS TABLE THAT'S IN THE FRAUD SECTION OF THE GUIDELINES

2   AND COME UP WITH A GUIDELINE SENTENCE THAT WAY.

3          THE GOVERNMENT HAS TAKEN THE POSITION THAT I SHOULD

4   LOOK TO THE BENEFIT RECEIVED BY MR. WILKES OR THE LOSS TO THE

5   GOVERNMENT.  I REJECT THOSE LATTER TWO METHODS AS TOO

6   IMPRECISE.  I TAKE THE GOVERNMENT'S POINT THAT SOME OF THE

7   CASES HAVE SAID THAT I DON'T HAVE TO MAKE THE CALCULATIONS

8   WITH PRECISION.  BUT I FIND THAT TO RELY ON EITHER OF THOSE

9   METHODS WOULD BE WAY TOO IMPRECISE IN THIS CASE.  I DON'T HAVE

10  ANY COMFORT IN SETTING A NUMBER BASED ON HOW MUCH MR. WILKES

11  PROFITED OR HOW MUCH THE GOVERNMENT LOST.

12         I'VE READ THE DECLARATION OF THE AGENT.  HE SETS THE

13  LOSS AT $49 MILLION.  I DON'T PRESUME TO TELL HIM HIS

14  BUSINESS.  BUT THE STANDARD THAT YOU'VE AGREED THAT I SHOULD

15  APPLY IS CLEAR AND CONVINCING EVIDENCE.  I'M NOT CONVINCED

16  CLEARLY AND CONVINCINGLY THAT THAT'S THE AMOUNT OF LOSS IN

17  THIS CASE, NOR CAN I DISCERN, FOR THE SAME REASONS, HOW MUCH

18  MR. WILKES GOT IN ILL-GOTTEN GAINS.

19         I'LL GIVE YOU ONE EXAMPLE.  I KNOW THIS WAS

20  HARD-FOUGHT.  I KNOW THE GOVERNMENT TOOK THIS POSITION FROM

21  THE BEGINNING, THAT THESE THINGS WERE WORTHLESS, THAT THESE

22  CONTRACTS WERE WORTHLESS, THAT THE GOVERNMENT GOT NOTHING OUT

23  OF THEM.  YOU TOOK THAT POSITION WITH RESPECT TO THE SCANNING

24  CONTRACT IN THE PANAMA CANAL ZONE.  I HAPPEN TO AGREE WITH THE

25  ARGUMENT MR. GERAGOS MADE.  I THINK THERE WAS SOME VALUE TO

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1   THAT.

2           LOOK, WE'VE GOT A MADMAN DOWN IN VENEZUELA THAT

3   DOESN'T LIKE US.  IF THE SAME THING HAPPENS IN PANAMA AT SOME

4   POINT AND THEY SHUT DOWN THAT CANAL, WE, AS A COUNTRY, ARE

5   GOING TO HAVE TO DO SOMETHING ABOUT THAT.  TO SAY THAT HAVING

6   THE CANAL ZONE MAPPED OUT, KNOWING WHERE THE LOCKS ARE,

7   KNOWING WHERE EVERYTHING IS WOULDN'T BE OF SOME ASSISTANCE TO

8   THE UNITED STATES AT THAT POINT I THINK IS NAIVE.  I THINK

9   THAT'S THE FIRST THING THAT MILITARY COMMANDERS WOULD WANT TO

10  KNOW.  WHAT'S THE LAY OF THE LAND DOWN THERE IF WE HAVE TO

11  INVADE?

12          NOW, THIS IS ALL HYPOTHETICAL.  BUT WHEN YOU SAY

13  THERE'S NO VALUE TO WHAT MR. WILKES PROVIDED, HE PROVIDED

14  SCANS OF THAT AREA THAT PRESUMABLY ARE DIGITIZED AND REMAIN

15  THE PROPERTY OF THE UNITED STATES TODAY AND CAN BE ACCESSED AT

16  SOME POINT IF THERE'S A NEED FOR IT.

17          THAT'S THE DIFFICULTY I HAVE, MR. BHANDARI AND

18  MR. HALPERN AND MS. CHU, WITH MAKING A FINDING THAT THE VALUE

19  THE CONTRACT WAS THUS AND SO.  I DON'T KNOW WHAT THAT'S WORTH.

20  OBVIOUSLY, IF THERE'S SOME NEED TO INVADE PANAMA AT SOME

21  POINT -- I GET IT THAT THIS IS ALL HYPOTHETICAL -- BUT IT'S

22  PROBABLY WORTH A LOT THEN.  WE WOULD PROBABLY PAY MILLIONS OF

23  DOLLARS TO HAVE THAT KIND OF INFORMATION.  WE HAVE IT OWING TO

24  THE EFFORTS THAT HE DID.  DID WE PAY TOO MUCH FOR IT AT THE

25  TIME AND GIVEN THAT THE CONCERN IS ALL HYPOTHETICAL?  MAYBE.

PDF created with pdfFactory trial version www.pdffactory.com

1    MAYBE.

2              I MEAN, THE POINT THAT YOU RAISE REALLY IMPLICATES,

3    I THINK, THE WHOLE BUSINESS OF GOVERNMENT CONTRACTING.  I

4    LEARNED IN THIS TRIAL THAT WE HAVE THESE FIRM FIXED CONTRACTS

5    WHERE WE SAY, "REGARDLESS OF WHAT IT COST YOU, WE'LL PAY THIS

6    AMOUNT.  EVEN IF YOU GET IT FOR A TENTH OF THAT AMOUNT, WE'LL

7    STILL PAY YOU THIS AMOUNT."

8              NOW, MOST BUSINESSES WOULDN'T CONDUCT THEMSELVES

9    THAT WAY.  THEY'D GO OUT OF BUSINESS IF THEY DID THAT, IF THEY

10   PAID OUTRAGEOUS AMOUNTS.  ALL OF US ARE FAMILIAR WITH THE

11   $14,000 TOILET SEAT.  I DON'T THINK THE GOVERNMENT

12   CONSISTENTLY DOES A GOOD JOB OF BARGAINING FOR THE BEST PRICE

13   FOR THE THINGS THAT THEY HAVE.  THAT'S NOT TO SAY THAT THESE

14   THINGS HAVE NO VALUE.  THE PROBLEM I HAVE IN RELYING ON THE

15   OTHER TWO METHODS THAT YOU ADVOCATE IS IT ASKS ME TO ASSESS

16   VALUE WHEN IT WAS NEVER DEFINITIVELY ESTABLISHED.  I KNOW THE

17   AGENT SAYS THERE WAS NO VALUE TO ANY OF THE SERVICES PROVIDED.

18   I THINK THAT IS GOING A LITTLE TOO FAR.

19             I REMEMBER THE PICTURE, MR. HALPERN, OF THE

20   COMPUTERS LINED UP AND STACKED UP AGAINST THE WALL UNOPENED.

21   THERE IS SOME VALUE THERE.  I DON'T KNOW WHAT IT IS.  THERE

22   WERE PROBABLY TOO MANY COMPUTERS, AND THE TECHNOLOGY CHANGES

23   EVERY SIX MONTHS.  I GET THAT.

24             BUT AT THE END OF THE DAY, THIS WAS AN AUTHORIZED

25   EXPENDITURE.  I THINK THE GOVERNMENT PROBABLY FREQUENTLY PAYS

PDF created with pdfFactory trial version www.pdffactory.com

1    TOO MUCH FOR THINGS.  AND I'M NOT GOING TO, IN THIS CASE AT

2    LEAST, ENTER INTO THE FRAY AND TRY TO DETERMINE WHAT WAS FAIR

3    VALUE FOR THE COST OF SERVICES, PARTICULARLY WHEN THERE IS A

4    MUCH MORE PRECISE METHOD THAT LEADS TO A DEFINITIVE CONCLUSION

5    ABOUT WHAT THE LOSS IS.  THAT'S THE FIRST METHOD, WHICH WAS

6    THE VALUE OF THE BRIBE.

7              I'VE ALREADY FOUND AND THE JURY FOUND THAT THERE WAS

8    A $525,000 BRIBE, THERE WAS A $100,000 BRIBE, AND THERE WAS AN

9    $11,000 BRIBE IN THE FORM OF MORTGAGE PAYMENTS.  THAT ADDS UP

10   TO $650,000, ROUGHLY.  THE GUIDELINES SAY IF THE LOSS IS MORE

11   THAN 400- AND LESS THAN A MILLION, THEN 14 IS THE NUMBER TO BE

12   ADDED.  I FIND THAT THAT IS THE APPROPRIATE NUMBER TO ADD IN

13   THIS CASE.  THAT'S READILY DISCERNABLE.  I CAN FIND EASILY BY

14   CLEAR AND CONVINCING EVIDENCE THAT THAT WAS THE AMOUNT OF THE

15   LOSS IN THIS CASE.

16             AND FRANKLY, AT THE END OF THE DAY GIVEN THE

17   GOVERNMENT'S RECOMMENDATION FOR SENTENCING, IT DOESN'T AFFECT

18   MUCH.  THE GOVERNMENT HAS ADVOCATED LEVEL 22 AND PROBATION 20.

19   BUT NONE OF THAT -- ALL OF THAT WILL FALL ONCE ALL THE

20   GUIDELINE ADJUSTMENTS ARE MADE WELL WITHIN THE RECOMMENDATION

21   THAT YOU MADE.

22             ANYTHING MORE TO SAY ON THAT?

23             MR. GERAGOS:  I'LL SUBMIT.

24             THE COURT:  THOSE ARE MY FINDINGS.  I FIND THAT THE

25   RELIABLE, THE ACCURATE, THE FAIR WAY TO VALUE THE LOSS IN THIS

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

62

1    CASE IS TO LOOK AT THE AMOUNT OF THE BRIBES.  THE JURY

2    FINDINGS, AS I SAID, SUPPORT A FINDING OF $636,000 IN BRIBES

3    THAT WERE PAID.  THAT TRANSLATES TO A LEVEL 14.

4           SO WITH THAT SAID, I OVERRULE THE OBJECTION TO THE

5    METHODOLOGY.  AND I OVERRULE AND DENY THE REQUEST FOR

6    CONTINUANCE.  I WOULDN'T BE ASSISTED BY AN INDEPENDENT

7    ACCOUNTANT HIRED BY YOU THAT PRESUMED TO CONTRADICT THE

8    FINDINGS BY THE JURY.  THAT'S WHERE WE ARE.  SHE COULD COME UP

9    WITH SOME OTHER NUMBER, BUT AT THE END OF THE DAY WE'RE LEFT

10   WITH WHAT WAS IN THE INDICTMENT AND GUILT FOUND BY THE JURY.

11   AND THAT'S WHAT'S DISPOSITIVE HERE.  SO I DON'T SEE ANY NEED

12   TO POSTPONE THIS TO HAVE AN INDEPENDENT ACCOUNTANT TRY TO

13   COUNTER THE GOVERNMENT'S DECLARATION ABOUT A $49 MILLION LOSS.

14   I'M NOT RELYING ON THAT.

15          I THINK THAT ANSWERS THE LEGAL OBJECTIONS,

16   MR. GERAGOS.

17          HAVE I MISSED ANY?

18          MR. GERAGOS:  I THINK THAT'S IT.

19          THE COURT:  I KNOW THERE ARE SOME OTHER ONES THAT

20   YOU'VE RAISED, BUT THEY WERE ALL RAISED UNDER THE AUSPICES

21   THAT I HAD NO RIGHT TO MAKE FINDINGS THAT THE JURY DIDN'T

22   MAKE.

23          MR. GERAGOS:  THAT'S CORRECT.

24          THE COURT:  I'VE OVERRULED THAT OBJECTION.  I FOUND

25   THAT THE REMEDIAL PORTION OF THE BOOKER CASE PERMITS ME,

PDF created with pdfFactory trial version www.pdffactory.com

63

1   WITHIN THE MAXIMUM SET BY STATUTE, TO MAKE FINDINGS THAT

2   INFORM THE DECISION OF WHAT THE SENTENCE WOULD BE.  THE

3   FINDINGS, OBVIOUSLY, AREN'T BINDING.  THE GUIDELINES AREN'T

4   BINDING.

5           BUT I FIND HERE THAT THE BASE LEVEL IS 12.  I DO

6   FIND THAT THERE WAS MORE THAN ONE BRIBE.  THAT'S IMPLICIT IN

7   WHAT I'VE SAID SO FAR IN ALLUDING TO THREE DIFFERENT PAYMENTS

8   BY MR. WILKES TO MR. CUNNINGHAM.  SO I FIND THAT TWO POINTS

9   ARE ADDED PURSUANT TO 2(C)1.1(B)(1) FOR MORE THAN ONE BRIBE.

10          I FIND THAT MR. CUNNINGHAM WAS AN ELECTED PUBLIC

11  OFFICIAL.  FOUR POINTS ARE ADDED FOR THAT.  THAT WAS, AGAIN,

12  CLEAR AND IMPLICIT IN THE CHARGES.  IT WAS VALIDATED BY THE

13  JURY'S VERDICT ON COUNT 13.  AS I SAID, I FIND THAT THE AMOUNT

14  OF THE LOSS CORRESPONDS TO THE FRAUD TABLE AT LEVEL 14 BETWEEN

15  400,000 AND LESS THAN A MILLION.

16          SO AS TO THE BRIBERY COUNT, WHICH IS THE MASTHEAD

17  COUNT THAT THE PROBATION OFFICER AND THE GOVERNMENT'S USED TO

18  CALCULATE THE GUIDELINE SENTENCE, I FIND THAT THE TOTAL IS 32;

19  THAT IS, 12 PLUS TWO FOR MORE THAN ONE BRIBE, PLUS FOUR FOR

20  BRIBING AN ELECTED OFFICIAL, WHICH GETS US TO 18, PLUS 14 FOR

21  THE AMOUNT OF THE BRIBES, WHICH GETS US TO 32.

22          MR. WILKES WAS ALSO CONVICTED OF MONEY-LAUNDERING.

23  2(S)1.1 REQUIRES THAT THE COURT APPLY SPECIAL OFFENSE

24  CHARACTERISTICS FOR MONEY-LAUNDERING.  TWO POINTS ARE ADDED

25  BECAUSE OF THE MONEY-LAUNDERING CONVICTION PURSUANT TO

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

64

1   2(S)1.1.

2            AND THEN THERE'S A QUESTION ABOUT WHETHER THIS WAS

3   SOPHISTICATED MONEY-LAUNDERING.  I HAVE OVERRULED YOUR

4   OBJECTION ON THE PARKVIEW INFORMATION, BUT THE OBJECTION

5   REALLY WAS WHETHER YOU COULD BE PREPARED AT TIME OF TRIAL.  I

6   KNOW YOU UNDERSTAND NOW, HAVING HEARD THE CASE AND LOOKED AT

7   THEIR CHART, WHY THEY SAY IT'S SOPHISTICATED.  I AGREE WITH

8   THEM.  I SPECIFICALLY ADOPT PAGES 12 AND 13 OF THE

9   GOVERNMENT'S RESPONSE TO YOUR OBJECTIONS WHERE THEY LAY OUT

10  THE MULTIPLE LAYERS OF LAUNDERING THAT OCCURRED TO TRY TO

11  COVER THE SOURCE OF THIS PAYMENT.  IT'S EVIDENT THAT EVERYBODY

12  WAS TRYING TO COVER UP THAT MR. WILKES AND MR. WADE WERE

13  PAYING OFF CONGRESSMAN CUNNINGHAM'S MORTGAGE.  THAT WAS THE

14  WHOLE OBJECT OF THIS.  AND THE FINANCIAL TRANSACTIONS WERE A

15  RUSE TO TRY TO THROW OFF THE UNWARY AS TO WHAT WAS GOING ON.

16  IT WAS A SOPHISTICATED RUSE.  I'M CONVINCED MR. KONTOGIANNIS

17  IS A SOPHISTICATED MONEY-LAUNDERER, AND HE APPLIED HIS TRADE

18  HERE.

19            AS I SAID, THE SERIES OF TRANSACTIONS THAT ARE

20  SPELLED OUT AT 12 AND 13 ARE SPECIFICALLY ADOPTED BY ME.  THAT

21  ADDS FOUR POINTS.  SO WE'RE UP TO A 36.

22            THEN THE GUIDELINES TELL ME TO APPLY THE CHAPTER 3

23  ADJUSTMENTS.  YOU'VE OBJECTED TO THE GOVERNMENT'S AND THE

24  PROBATION OFFICER'S RECOMMENDATION THAT I MAKE A FINDING THAT

25  MR. WILKES WAS A LEADER AND ORGANIZER OF A CRIMINAL ACTIVITY

PDF created with pdfFactory trial version www.pdffactory.com

65

1    INVOLVING FIVE OR MORE PEOPLE.  I DECLINE TO MAKE THAT FINDING

2    IN THIS CASE.  LET ME TELL YOU WHY.

3         FIRST, I'M NOT PERSUADED BY CLEAR AND CONVINCING

4    EVIDENCE THAT MR. WILKES WAS THE LEADER OR ORGANIZER.  I DON'T

5    KNOW.  HE WELL COULD HAVE BEEN.  THAT'S BESIDE THE POINT.  I'M

6    SUPPOSED TO BE CLEARLY CONVINCED THAT HE WAS, AND I'M NOT.

7    YOU'VE POINTED OUT IN YOUR SENTENCING MEMORANDUM THAT THE

8    GOVERNMENT HASN'T ALWAYS BEEN CONSISTENT ON THIS.  AND

9    MR. CUNNINGHAM'S SENTENCING MEMORANDUM SUBMITTED BY THE UNITED

10   STATES IN THE CUNNINGHAM CASE, THE GOVERNMENT SAID, AMONG

11   OTHER THINGS, THAT CUNNINGHAM WAS NOT ONLY THE CENTRAL OBJECT

12   OF THE CONSPIRACY.  HE ALSO MADE THE CRITICAL DECISIONS.  THEY

13   ALSO SAID CUNNINGHAM WAS CALLING THE SHOTS.  THEY ALSO SAID

14   CUNNINGHAM DIRECTED ACTIVITIES AND NUMEROUS CRIMINALLY

15   CULPABLE PARTICIPANTS, INCLUDING HIS CO-CONSPIRATORS.

16        SO THAT WAS THEIR VIEW AT THE TIME MR. CUNNINGHAM

17   WAS SENTENCED, THAT HE WAS THE LEADER AND THE ORGANIZER.

18   THERE'S OTHER EVIDENCE THAT AT LEAST MAKES FAIRLY DEBATABLE

19   THE PROPOSITION ABOUT WHO IS THE CHICKEN AND WHO IS THE EGG

20   HERE.  I RECALL THE BRIBE LIST THAT WAS FOUND ON THE BOAT.

21   THAT WAS IN MR. CUNNINGHAM'S HANDWRITING.  AND AN AMOUNT OF

22   CONTRACT CORRESPONDED TO AN AMOUNT OF BRIBE.  THERE'S NO

23   EVIDENCE THAT MR. WILKES HAD A GUN TO  MR. CUNNINGHAM'S HEAD

24   SAYING, "EITHER YOUR SIGNATURE, OR YOUR BRAINS WILL BE ON

25   THIS.  WRITE IT LIKE THAT."  SO I'M LEFT TO TRY TO DISCERN WHO

PDF created with pdfFactory trial version www.pdffactory.com

1  WAS THE ORGANIZER.

2          ONE OF THE VEXING ASPECTS OF THIS TO ME,

3  MR. GERAGOS, IS I DON'T KNOW HOW IT STARTED.  I REALLY DON'T.

4  I DON'T KNOW WHETHER IT WAS A NUDGE BY MR. WILKES SAYING "YOU

5  KNOW, THERE'S SOME MONEY IN THIS FOR YOU IF WE CAN GET THIS

6  DONE" OR IF, ON THE OTHER HAND, CUNNINGHAM SAID "WELL, THERE'S

7  A WAY TO GET THIS DONE.  IT INVOLVES TAKING CARE OF ME

8  PERSONALLY."  I DON'T KNOW.  THERE'S NEVER BEEN ENOUGH

9  EVIDENCE FOR ME TO MAKE A FINDING ON WHAT THE GENESIS WAS OF

10  HOW THIS THING GOT STARTED.

11          I SUSPECT IT STARTED WITH THE CULTURE OF LOBBYISTS

12  AND PEOPLE APPLYING FOR FAVORS FROM ELECTED OFFICIALS, AND

13  THEN IT GOT OUT OF HAND.  BUT WHETHER CUNNINGHAM DROVE IT TO

14  THAT POINT OR MR. WILKES DROVE IT TO THAT POINT, I CAN'T BE

15  CERTAIN ON WHAT'S HERE.  CERTAINLY, I CAN'T BE CONVINCED BY

16  CLEAR AND CONVINCING EVIDENCE.

17          I KNOW ALSO THAT THE LINK TO MR. KONTOGIANNIS, WHO

18  WAS THE FACILITATOR OF THE BRIBE, WAS A LINK REALLY BETWEEN

19  MR. CUNNINGHAM AND MR. KONTOGIANNIS.  MR. WILKES NEVER KNEW

20  THIS FELLOW.  THAT SUGGESTS THAT CUNNINGHAM WAS THE KINGPIN.

21  HE'S TELLING WILKES "SEND THE MONEY TO THIS GUY YOU DON'T

22  KNOW."  SO I'M JUST NOT CONVINCED THAT HE WAS AN ORGANIZER OR

23  A LEADER.

24          THERE'S ALSO A QUESTION I HAVE ABOUT WHETHER FIVE OR

25  MORE PARTICIPANTS WERE INVOLVED IN WHAT HE WAS DOING.  YOU

PDF created with pdfFactory trial version www.pdffactory.com

1   LIST MR. WADE AS ONE OF THE PARTICIPANTS.  I UNDERSTAND THERE

2   WAS AN ASSOCIATION AT THE BEGINNING.  BUT BY THE END, HE AND

3   MR. WADE WERE COMPETITORS.  PART OF THE TESTIMONY WAS ABOUT

4   MR. WILKES'S PIQUE OVER NOT GETTING A CONTRACT AND CALLS TO

5   CUNNINGHAM THEN DIRECTED THAT IT BE REVERSED AND SOME OF THE

6   MONEY GO FROM WADE TO WILKES.  THESE GUYS WERE COMPETING WITH

7   ONE ANOTHER.  THEY WERE HARDLY IN A JOINT ENTERPRISE.

8           IF ANYTHING, IF I HAD TO MAKE A FINDING ON WHO

9   ORGANIZED AND WHO LED THIS, THE CENTRAL FIGURE, AS YOU TOLD ME

10   AT THE TIME MR. CUNNINGHAM WAS SENTENCED, WAS MR. CUNNINGHAM.

11   HE WAS THE GUY THAT WAS PUTTING ALL THE OTHER NEFARIOUS PARTS

12   OF THIS TOGETHER.  IN GOOD CONSCIENCE, I CAN'T AND I DO NOT

13   MAKE THE FINDING HERE THAT MR. WILKES WAS A LEADER OR

14   ORGANIZER.

15           NOW, MORE TO COME ON THIS LATER, MR. WILKES.  IT

16   DOESN'T ABSOLVE YOU ALTOGETHER.  YOU'RE A SHREWD FELLOW.  AND

17   WHEN WE GET TO THE 3553(A) FACTORS, IT DIDN'T PASS ME BY THAT

18   YOU SIZED UP MR. CUNNINGHAM AND HIS NEED FOR BEING FLUFFED AND

19   HIS WEAK EGO, AND YOU PLAYED ON THAT.  I'M NOT SAYING THAT

20   THAT DIDN'T OCCUR.  I THINK IT DID OCCUR IN THIS CASE.  AS I

21   SAID, I'LL SPEAK TO THAT LATER.

22           BUT I DON'T FIND, STRICTLY SPEAKING, THAT THIS MEETS

23   THE CRITERIA TO RESULT IN A FOUR-LEVEL INCREASE UNDER THE

24   GUIDELINES.  YOU'VE TAKEN THE POSITION HIS INVOLVEMENT WAS

25   OTHERWISE EXTENSIVE.  IT WAS EXTENSIVE, BUT IT'S ALL BEEN

PDF created with pdfFactory trial version www.pdffactory.com

68

1    COVERED BY OTHER ADJUSTMENTS THAT I'VE ALREADY MADE UNDER THE

2    GUIDELINES AND WILL BE THE SUBJECT AND HAS BEEN THE SUBJECT OF

3    YOUR ARGUMENT THAT THE NATURE AND SERIOUSNESS AND

4    CIRCUMSTANCES OUGHT TO TAKE INTO ACCOUNT HOW LONG THIS THING

5    WENT ON AND THE BREADTH OF IT AND THE EFFECT THAT IT HAD.

6            SO I DECLINE TO FIND THAT HE HAD A ROLE AS LEADER OR

7    ORGANIZER AND TO APPLY FOUR POINTS FOR THAT.

8            THE GOVERNMENT HAS ALSO ASKED FOR A TWO-POINT

9    ADJUSTMENT FOR OBSTRUCTION OF JUSTICE.  THEY OUTLINE MANY OF

10   WHAT THEY ALLEGE ARE LIES.  IN THIS REGARD, THE JURY AGREED

11   WITH THEM THAT CONTRARY TO MR. WILKES'S TESTIMONY, THE

12   $525,000 WAS NOT AN INVESTMENT.  AND I FIND THAT THAT FINDING

13   IS ACCURATE IN LIGHT OF THE EVIDENCE.  NOR WAS THE $100,000

14   DOWN PAYMENT ON THE KELLY C TRULY A DOWN PAYMENT.  IT WAS, IN

15   MY JUDGMENT AND THE JUDGMENT OF THE JURY, A BRIBE.  FOR

16   MR. WILKES TO SAY OTHERWISE WAS FALSE.

17           AND THEN THE SAME IS TRUE OF THE $11,000 MORTGAGE

18   PAYMENT.  THAT WASN'T IN ANTICIPATION OF HIM ACQUIRING THE

19   KELLY C.  THAT WAS BRIBE MONEY THAT WAS BEING PAID TO

20   CUNNINGHAM OVER ROUGHLY A SIX-MONTH PERIOD OF TIME.  BUT IN

21   THIS REGARD, I THINK ONE LIE SUFFICES.  AND THE ONE LIE THAT

22   THEY'VE POINTED TO THAT RESONATES WITH ME IN LIGHT OF THE

23   EVIDENCE IS THE DENIAL BY MR. WILKES THAT HE ARRANGED

24   PROSTITUTES IN HAWAII.

25           THAT, MR. WILKES, I'VE GOT TO TELL YOU, WAS JUST THE

PDF created with pdfFactory trial version www.pdffactory.com

69

1    REALLY UNBELIEVABLE PART OF YOUR TESTIMONY.  IT WAS AGAINST

2    THE WEIGHT OF THE EVIDENCE.  THEY BRING IN THESE WOMEN THAT

3    SAY, "HERE ARE THESE TWO GUYS IN THE HOT TUB."  FOR SOME

4    REASON, THEY NEVER ASKED THEM TO IDENTIFY YOU, BUT IT WAS

5    CLEAR BY IMPLICATION THAT YOU WERE THE OTHER GUY IN THE HOT

6    TUB.  AND THEN THE TWO GUYS IN THE HOT TUB TRUNDLE OFF UP TO

7    THE BEDROOM WITH THESE GALS.  I DON'T KNOW WHAT INTEREST THEY

8    HAD IN COMING IN AND SAYING THEY HAD SEX WHEN THEY DIDN'T.

9         YOU HAD YOUR OWN NEPHEW SAYING THAT "MY UNCLE ASKED

10   ME TO DO THIS, TO PROCURE THIS."  THAT WAS CREDIBLE TESTIMONY.

11   THE GUY THAT DROVE THE PROSTITUTES OVER.  IN THE CONTEXT OF

12   THIS CASE, PROSTITUTION TAKES ON A LITTLE MORE SIGNIFICANCE

13   THAN IT WOULD ORDINARILY HAVE.  ORDINARILY, YOU'D HAVE SOME

14   JUNIOR JUDGE IN THE SUPERIOR COURT HANDLING IT.  BUT HERE THE

15   PROSTITUTION WAS TO GET YOUR WAY WITH MR. CUNNINGHAM.  THE

16   GOVERNMENT ALLEGED IT WAS A BRIBE, AND THE JURY SO FOUND.  AND

17   FOR YOU TO DENY THAT, MR. WILKES, UNDER OATH, YOU COMPOUNDED

18   AN ALREADY BAD SITUATION.

19        I WANT TO TELL YOU THIS.  I TOLD YOU THIS

20   THROUGHOUT, AND I'LL REITERATE IT NOW.

21        YOU DON'T GET PUNISHED IN THIS COURT FOR GOING TO

22   TRIAL.  YOU DON'T.  I RESPECT ANYBODY'S RIGHT TO SAY, "PROVE

23   IT.  YOU BROUGHT THIS ACCUSATION.  PROVE IT."  I DIDN'T AT ANY

24   POINT HOLD IT AGAINST YOU THAT YOU INSISTED ON YOUR RIGHT TO A

25   JURY TRIAL.  YOU HAVE THAT RIGHT HERE.  AND I'M NOT GOING TO

PDF created with pdfFactory trial version www.pdffactory.com

70

1    CHILL IT BY SAYING, "OKAY.  THE JURY FOUND AGAINST YOU.

2    INVARIABLY, THAT MEANS YOU LIED IF YOU TESTIFIED."  I DON'T DO

3    THAT IN EVERY CASE.  BUT HERE I THINK THAT THE ARGUMENT IS

4    WELL-TAKEN THAT YOU GAVE FALSE TESTIMONY HERE.  YOU GET TO GO

5    TO TRIAL HERE WITHOUT CONSEQUENCE.  BUT WHAT YOU DON'T GET TO

6    DO, MR. WILKES, IS YOU DON'T GET ON THE STAND AND TAKE AN OATH

7    TO TELL THE TRUTH AND LIE ABOUT IT.  THAT'S NOT RISK-FREE.

8    THAT'S NOT RISK-FREE HERE.  AND YOU ROLLED THE DICE AND

9    GAMBLED ON THAT, AND YOU LOST.

10             SO I FIND THE OBSTRUCTION OF JUSTICE ADJUSTMENT DOES

11   APPLY IN THIS CASE.  I ADD TWO POINTS FOR THAT.

12             IN THE END, MR. GERAGOS, MY GUIDELINE

13   CALCULATIONS -- OBVIOUSLY, I'LL GIVE YOU AN OPPORTUNITY TO

14   SPEAK FULLY TO ALL THIS -- ENDS UP AT A 38.  LET ME SUMMARIZE

15   FOR US AGAIN.

16             THE BASE LEVEL IS 12.  I FIND THAT THERE WERE

17   MULTIPLE BRIBES.  THAT ADDS TWO.  I FIND MR. CUNNINGHAM, THE

18   PERSON WHO WAS BRIBED, WAS AN ELECTED OFFICIAL.  THAT ADDS

19   FOUR.  AS I SAID, I FIND THE VALUE OF THE BRIBES IS A LEVEL 14

20   ADJUSTMENT UPWARD.  MONEY-LAUNDERING ADDS TWO.  I FOUND THAT

21   THE MONEY-LAUNDERING IN THIS CASE WAS SOPHISTICATED, WHICH

22   ADDS TWO.  AND THEN I FOUND THAT MR. WILKES OBSTRUCTED JUSTICE

23   BY NOT TELLING THE TRUTH WHEN HE TESTIFIED.  THAT ADDS TWO.

24             THE TOTAL IS 38.  HE'S IN CRIMINAL HISTORY

25   CATEGORY 1.  I FIND THAT THE GUIDELINE RANGE IS 235 TO

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1   293 MONTHS.  AS I MENTIONED, MR. HALPERN AND MR. BHANDARI,

2   THAT RANGE IS WITHIN THE RECOMMENDATION I THINK MADE BY THE

3   UNITED STATES ANYWAY, ISN'T IT?  YOU'VE ADVOCATED A SENTENCE

4   OF SOMEWHERE BETWEEN 200 AND 300 MONTHS.  SO WE'RE SEVEN

5   MONTHS SHY OF THE HIGH END, BUT CLEARLY OVER THE 200 MONTHS.

6   SO TO THE EXTENT THE GOVERNMENT HAS OBJECTIONS TO THE

7   GUIDELINES CALCULATIONS, THESE CALCULATIONS SQUARE WITH THE

8   RECOMMENDATION.

9          NOW, MR. GERAGOS, I'M HAPPY TO LET YOU RESPOND TO

10  ANY OR ALL OF THIS, BUT THAT'S WHERE I AM TENTATIVELY ON THE

11  ONE FACTOR OF THE GUIDELINES.

12          MR. GERAGOS:  I UNDERSTAND THE COURT'S REASONING.  I

13  HATE TO BE IN A POSITION WHERE I'M CONTINUING TO SAY

14  REASONABLE MINDS MAY DISAGREE.  YOU AND I OBVIOUSLY BOTH SAT

15  HERE DURING THIS TRIAL.  I KNOW THE COURT TOOK THE POSITION --

16  AND I'LL START WITH THE LAST ONE FIRST -- THAT THE TESTIMONY

17  WAS UNTRUTHFUL ABOUT THE PROSTITUTES.  THE PROBLEM WITH THAT

18  IS ONE OF THE THINGS THAT I'VE DISCOVERED SUBSEQUENTLY TO THAT

19  IS THAT THERE ARE STATEMENTS BY CUNNINGHAM HIMSELF TO OTHERS

20  THAT'S IN THE DISCOVERY SINCE THE TRIAL THAT INDICATES THAT IT

21  WAS JOEL COMBS WHO WAS THE ONE WHO WAS RESPONSIBLE FOR THAT.

22  YOU TALK ABOUT THINGS THAT ARE KIND OF VEXING AS TO WHO NUDGED

23  FIRST OR WHO DIDN'T NUDGE FIRST.

24          ONE OF THE THINGS THAT'S BEEN VEXING THAT YOU JUST

25  REFERRED TO IS WHY WOULD YOU FLY THREE PEOPLE OVER HERE FROM

PDF created with pdfFactory trial version www.pdffactory.com

1    HAWAII, PUT THEM ON THE STAND, AND NEVER TURN AND ASK THE

2    QUESTION "IS THIS THE GENTLEMAN?"  AND I THINK THERE'S A REAL

3    PROBLEM THERE.  I THINK THE COURT RECOGNIZED IT AT THE TIME.

4    AND I APPRECIATE THE FACT BECAUSE IT IS RARE.  I THINK YOU AND

5    I BOTH KNOW IN TRYING CASES THAT IT'S A RARE JUDGE THAT DOES

6    NOT PUNISH YOU FOR GOING TO TRIAL.

7            UNFORTUNATELY, THE IDEA THAT WHOEVER WINS GETS TO

8    WRITE THE HISTORY, THAT'S A REALITY.  YOU ACCEPT IT, I ACCEPT

9    IT, AND WE DEAL WITH IT.

10           THE COURT:  I ASSURE YOU THAT'S NOT SO WITH ME.  I

11   HAVE MANY CASES WHERE DEFENDANTS TESTIFY AND I DON'T APPLY THE

12   OBSTRUCTION OF JUSTICE.  IN THIS CASE, I LISTENED TO THE

13   TESTIMONY MYSELF.  AND THE REFLECTIONS I GAVE REGARDING THAT

14   ONE ASPECT AND THEN RESPECT FOR THE JURY'S FINDINGS ON WHETHER

15   THIS WAS AN INVESTMENT OR A BRIBE COMPELS ME TO THE CONCLUSION

16   THAT MR. WILKES DID NOT TELL THE TRUTH.  IT'S NO INEXORABLE.

17   IT'S NOT REACTIONARY OR INSTINCTIVE.  I LISTENED TO IT MYSELF.

18   IT DIDN'T HAVE THE RING OF TRUTH TO IT.

19           MR. GERAGOS:  AND I UNDERSTAND.  LOOK, IF I COULDN'T

20   CONVINCE THE JURY, I DON'T THINK I'M GOING TO CHANGE YOUR MIND

21   ON IT.

22           THE PROBLEM IS IS WHERE -- I COULD GO THROUGH AND

23   LIST EVERY SINGLE FACTOR, SO TO SPEAK.  AND I CAN ARGUE, I

24   THINK, AND WE HAVE IN THE PAPERWORK ARGUED IT.  ULTIMATELY,

25   THOUGH, IT'S ALMOST LIKE WE'VE COME FULL CIRCLE IN THE LAST

PDF created with pdfFactory trial version www.pdffactory.com

1   25 YEARS.  THE GUIDELINES ARE NO LONGER MANDATORY.  SO WE GET

2   BACK TO, I BELIEVE, WE CAN ARGUE ABOUT THIS.  WE CAN ARGUE

3   ABOUT THAT.  BUT AT THE END OF THE DAY, IT'S ALMOST LIKE WE'RE

4   BACK IN THE EARLY '80'S.  WE COME DOWN TO WHAT IS A FAIR AND

5   WHAT IS A JUST SENTENCE?

6          THIS COURT IS MORE THAN BRIGHT ENOUGH AND MORE THAN

7   EXPERIENCED ENOUGH TO BE ABLE TO GET TO WHEREVER THE COURT

8   WANTS TO BASED ON THE GUIDELINES.  I THINK THAT THE LAST

9   PRONOUNCEMENTS BY THE U.S. SUPREME COURT HAVE BROUGHT US BACK

10  TO A PRE-GUIDELINE ERA.  WE HAVE A SITUATION NOW WHERE THE

11  GUIDELINES ARE ADVISORY.  WE CAN GO THROUGH ALL OF THIS

12  RIGMAROLE.  BUT WHEN IT COMES DOWN TO IT, WE FINALLY HAVE

13  RETURNED TO THE COURTS, I THINK RIGHTFULLY SO, THE ABILITY TO

14  IMPOSE JUSTICE.

15         AND IN THIS CASE -- AND I DON'T KNOW, AND I'M

16  PROBABLY GETTING AHEAD OF MYSELF IN TERMS OF THE PROTOCOL.

17  BUT IN THIS CASE, THE COURT HAS FOUND THAT MR. CUNNINGHAM WAS

18  PROBABLY THE RINGLEADER.  I THINK THAT THAT'S ACCURATE.

19  THAT'S THE ONLY WAY -- THE GOVERNMENT HAS TAKEN THAT POSITION

20  ALL ALONG.  OBVIOUSLY, HE ENTERED INTO A PLEA AGREEMENT FOR

21  WHATEVER IT WAS THAT WOULD EXPOSE HIM UP TO TEN YEARS.

22  OBVIOUSLY, AS THE COURT STATED, MITCH WADE, IF HE DOES A DAY,

23  I WILL BE SHOCKED, AND I'D BE WILLING TO DONATE MONEY TO YOUR

24  FAVORITE CHARITY IF HE DOES ANY TIME WHATSOEVER.

25         I WOULD VENTURE TO SAY THAT GIVEN THE AMOUNT OF

PDF created with pdfFactory trial version www.pdffactory.com

1    MONEY HE MADE, I STILL CANNOT GET OVER THE FACT THAT HE WAS

2    ABLE TO SELL HIS BUSINESS/PROPERTY FOR $20 MILLION.  THE

3    GOVERNMENT DIDN'T GET IN THE MIX OF THAT AT ALL.  AND YET

4    THEY'VE BEEN "TORTURING," FOR LACK OF A BETTER TERM, MY CLIENT

5    WITH HIS DIVORCE PROCEEDINGS FOR EVERY NICKEL AND DIME THAT

6    WENT IN ANY DIRECTION.  AND THERE'S $20 MILLION OUT THERE THAT

7    THEY NEVER SOUGHT NOR SO MUCH AS PUT A PARAGRAPH INTO THE PLEA

8    AGREEMENT.  AND THEN JOEL COMBS, I ASSUME, IS A FREE PASS.

9    YOU COME DOWN TO IT, THIS GUY DECIDES HE'S GOING TO GO TO

10   TRIAL.

11          NOW, THE JURY SPOKE.  OBVIOUSLY, I COULDN'T DISAGREE

12   MORE WITH THE JURY VERDICT.  BUT I, LIKE YOU, RESPECT THE JURY

13   DECISIONS, AND I'M NOT GOING TO SECOND-GUESS HERE THE JURY.  I

14   WILL OBVIOUSLY OR MY SUCCESSOR WILL, IF THE COURT GRANTS THE

15   MOTIONS THAT HAVE BEEN FILED IN THE COURT OF APPEAL, DEAL WITH

16   IT ACCORDINGLY.

17          I THINK THAT MR. WILKES HAS A STATEMENT THAT HE

18   WANTS TO MAKE AS WELL.  WHEN IT COMES DOWN TO IT, THE KINDS OF

19   NUMBERS THAT WE'RE TALKING ABOUT I THINK ARE ABSURD.  I

20   UNDERSTAND THE -- WHETHER IT'S THE PUBLIC PRESSURE, THE PUBLIC

21   OPINION, THINGS OF THAT NATURE.  BUT WHEN YOU TALK ABOUT

22   CUNNINGHAM GETTING EIGHT YEARS -- AND I THINK I WENT BACK AND

23   TOOK A LOOK AT SOME OF THE THINGS THAT THE COURT HAD SAID.

24   YOU HAD LOOKED, I THINK, AT THE ENTIRE LANDSCAPE AT THE TIME.

25   I THINK THERE WAS A CASE OUT OF OHIO, AND YOU HAD USED THAT TO

PDF created with pdfFactory trial version www.pdffactory.com

1    SAY, "WHERE WOULD I PUT HIM IN IN THE SCHEME OF THINGS?"

2           AND THE IDEA TO BE ASKING FOR WHETHER IT'S 60 YEARS

3    OR 25 YEARS, GIVEN MR. LERACH, WHO WAS HERE AND JUST RECEIVED

4    A TWO-YEAR SENTENCE ON A CRIME THAT LITERALLY FOR YOU AND I

5    AND FOR ALL THE LAWYERS SITTING OVER AT THE GOVERNMENT'S TABLE

6    CERTAINLY STRIKES AT THE VERY CORE OF THE LEGAL SYSTEM, THAT'S

7    TWO YEARS.  HE PAID SOME FINE, WHICH I THINK IS PROBABLY THE

8    AMOUNT THAT HE PAYS IN REFERRAL FEES TO WHOEVER BRINGS HIM ONE

9    CLASS-ACTION CASE.

10          SO I DON'T -- I'M GOING TO SUBMIT, IF YOU WILL, ON

11   THE ANALYSIS AND WHAT THE COURT HAS DONE IN MY PREVIOUS

12   OBJECTIONS.  I'D LIKE TO MOVE FORWARD, IF I COULD, TO MAKING

13   AN ARGUMENT.

14          THE COURT:  ANYTHING ELSE THE GOVERNMENT WANTS TO

15   SAY ON THE MATTER OF GUIDELINE CALCULATIONS?

16          MR. BHANDARI:  BRIEFLY ON TWO POINTS.

17          FIRST WITH RESPECT TO ROLE, YOUR HONOR, WE

18   ACKNOWLEDGE THE COURT'S COMMENTS AND THE COURT POINTING OUT

19   OUR PRIOR COMMENTS IN THE LAST PROCEEDINGS.  AS THE COURT

20   KNOWS, BECAUSE YOUR HONOR HAS REVIEWED THE TRANSCRIPT OF THE

21   CUNNINGHAM SENTENCING, YOUR HONOR AT THE TIME HESITATED.  AND

22   ULTIMATELY, YOU AWARDED NO ROLE ADJUSTMENT WHATSOEVER TO

23   CUNNINGHAM BECAUSE AT THE TIME THE FACTS WERE UNDEFINED.  YOU

24   FELT LIKE YOU DIDN'T HAVE ENOUGH EVIDENCE.

25          THE COURT:  IT REMAINS LIKE THAT FOR ME,

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    MR. BHANDARI.  I STILL AM OF TWO MINDS AS TO WHO WAS THE PRIME

2    MOVER HERE AND WHETHER THERE WAS MORE THAN ONE.  MAYBE I

3    SHOULD REGARD BOTH MR. CUNNINGHAM AND MR. WILKES AS THE PRIME

4    MOVERS.

5           THE ANALYSIS BEGINS TO FALL APART -- AS I SAID, I

6    HAVE TO FIND THAT THERE WERE MORE THAN FIVE.  HE WAS A

7    COMPETITOR OF WADE AT ONE POINT.  HE DIDN'T KNOW KONTOGIANNIS

8    AND JOHN MICHAEL.  THOSE WERE CUNNINGHAM CONTACTS.  IT JUST

9    STRIKES ME AS UNFAIR WHEN YOU CONCEDE THAT I HAVE TO BE

10   CONVINCED BY CLEAR AND CONVINCING EVIDENCE TO STICK HIM WITH A

11   FOUR-POINT ADJUSTMENT FOR THAT.  IN GOOD CONSCIENCE, I CAN'T

12   MAKE THE FINDING TO SUPPORT THAT.

13          MR. BHANDARI:  I UNDERSTAND YOUR HONOR'S RULING ON

14   THAT.  FRANKLY, THE GOVERNMENT IS INFORMED NOW BY AN

15   ADDITIONAL YEAR OF INVESTIGATION FROM THE TIME THAT WE

16   PRESENTED MATTERS TO YOUR HONOR AT THE CUNNINGHAM SENTENCING.

17   WHAT I'D LIKE YOUR HONOR TO ALSO FOCUS ON IS THIS ISSUE OF

18   WHETHER A TWO-LEVEL ADJUSTMENT IS MANDATED BY THE GUIDELINES.

19   WE WOULD SUBMIT THAT IT IS.

20          THE EVIDENCE IS CLEAR AND IT'S UNCONTROVERTED THAT

21   AT LEAST JOEL COMBS WAS DIRECTED BY THE DEFENDANT, WAS A

22   CRIMINALLY RESPONSIBLE PARTICIPANT AND TESTIFIED AS SUCH.

23   MR. GERAGOS NOW OBJECTS TO HIM GETTING A FREE PASS.  IT'S

24   CLEAR THAT JOEL COMBS WAS REPORTING TO THE DEFENDANT AND DOING

25   WHAT THE DEFENDANT SAID.  SO AT LEAST A TWO-POINT ADJUSTMENT

PDF created with pdfFactory trial version www.pdffactory.com

1   IS MANDATED.  EVEN IF YOUR HONOR FINDS THAT MR. WILKES WAS NOT

2   THE OVERALL LEADER, THE CASE LAW INDICATES THAT HE CAN BE A

3   MANAGER.

4              THE COURT:  WHAT'S THE CONTEXT?  WHAT DID COMBS DO

5   TO FURTHER THE ILLEGAL -- I KNOW HE PROCURED THE PROSTITUTES

6   FOR THE TWO IN HAWAII.  I'VE SO FOUND.  WHAT ELSE?

7              MR. BHANDARI:  HE WAS THE INTERMEDIARY ON ALL OF THE

8   BILLS OF MATERIAL, WHICH WERE THE OBJECTS OF THE BRIBERY.

9   MR. WILKES OBTAINED THOSE CONTRACTS.  MR. COMBS WAS THE PERSON

10  WHO WAS THE INTERMEDIARY.

11             MR. COMBS ALSO DIRECTLY SUPPLIED OTHER BRIBES; THE

12  SOFTWARE FOR THE BOAT, A COMPUTER, THE COMPUTER DESK THAT HE

13  DIRECTLY DELIVERED.  THERE WERE NUMEROUS OTHER BENEFITS THAT

14  MR. COMBS PROVIDED AT MR. WILKES'S BEHEST.  THERE WAS TRIAL

15  TESTIMONY ABOUT MR. WILKES GIVING MR. COMBS MONEY TO LOSE TO

16  CUNNINGHAM IN POKER.  SO IN MANY, MANY WAYS, THE TRIAL

17  EVIDENCE ESTABLISHED THAT COMBS ACTED IN A CRIMINAL WAY AT

18  WILKES'S DIRECTION.  THAT EVIDENCE IS NO CONTRADICTED.  SO

19  WITH RESPECT TO ROLE, WE WOULD SUBMIT THAT A TWO-LEVEL

20  ADJUSTMENT IS STILL MANDATED.

21             WITH RESPECT TO THE BENEFIT, ALSO, WE -- I

22  UNDERSTAND YOUR HONOR'S COMMENTS THAT THERE HAS TO BE SOME

23  VALUE TO THIS AND THAT THE GOVERNMENT GETS SOME BENEFIT OUT OF

24  THE FACT THAT THERE WERE THESE IMAGES, WHATEVER QUALITY THEY

25  ARE.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  THAT WAS JUST ONE EXAMPLE.  THERE'S A

2     STOCKPILE OF COMPUTERS, MR. BHANDARI, THAT THEY GOT.  NOW, DID

3     MR. WILKES GET THEM A LOT LESS EXPENSIVELY?  COULD THE

4     GOVERNMENT HAVE GONE OUT AND GOTTEN THEM FOR PENNIES ON THE

5     DOLLAR?  I THINK THE ANSWER IS YES.

6          BUT YOU AND I BOTH KNOW THAT THE GOVERNMENT OPERATES

7     INEFFICIENTLY.  WE PAY TOO MUCH FOR THINGS.  THERE'S NOT

8     ENOUGH OVERSIGHT.  THEY DON'T HANDLE THINGS AS YOU AND I

9     HANDLE OUR FAMILY BUDGETS.  THEY'RE NOT SMART SHOPPERS ABOUT

10    THINGS.  THE DIFFICULTY I HAVE WITH THAT IS SAYING, "OKAY.  I

11    GOT WHAT THEY PAID.  I GOT WHAT THIS IS LIKELY WORTH."  BUT

12    HOW DO I FIND WHAT'S AN UNFAIR BENEFIT THAT HE GOT OR WHAT IS

13    TOO MUCH OR WHAT IS THE REAL VALUE OF THIS?  SOME OF IT IS

14    INTANGIBLE, LIKE THE FUTURE VALUE OF THAT MAPPING SERVICE IN

15    THE PANAMA CANAL DISTRICT.  AS I SAID, IF THERE'S A PROBLEM

16    DOWN THERE, THEN THOSE MAPS ARE GOING TO BE WORTH QUITE A LOT.

17    PROBABLY MORE THAN THE GOVERNMENT PAID.  THE COMPUTERS, THE

18    TECHNOLOGY CHANGES ALL THE TIME.

19         SO IT'S VERY DIFFICULT.  AND I KNOW YOU'VE CITED A

20    CASE THAT SAYS I DON'T HAVE TO DO IT WITH PRECISION.  THE

21    PROBLEM I HAVE IS THAT THE OTHER TWO METHODS OF COMING AT

22    VALUATION ARE SO IMPRECISE THAT I THINK IT WOULD BE UNFAIR FOR

23    ME TO RELY ON THOSE.  AT THE END OF THE DAY, MR. BHANDARI,

24    WHAT DOES IT MATTER?  THE GUIDELINE RANGE THAT I'VE REACHED

25    APPLYING THESE IN WHAT I FIND TO BE A VERY CONSERVATIVE

PDF created with pdfFactory trial version www.pdffactory.com

1    FASHION COMES WITHIN THREE MONTHS OF THE UPPER END OF THE

2    SENTENCE THE UNITED STATES IS ADVOCATING HERE.

3         MR. BHANDARI:  YOUR HONOR, WHAT I'LL DO IS SIMPLY TO

4    EXPLAIN.  WE MAINTAIN THE POSITION THAT WE MAINTAINED IN OUR

5    PAPERS.  WE THINK THAT THERE IS ADEQUATE EVIDENCE FOR THE

6    COURT TO FIND AT LEAST ON THE NET BENEFIT MEASURE -- LET ME

7    SPEAK VERY QUICKLY ON THAT.  I THINK WE'LL BE ABLE TO ADDRESS

8    ALL THIS, AS YOUR HONOR INTIMATED, WHEN WE TALK MORE GENERALLY

9    ABOUT HIS APPROPRIATE SENTENCE IN LIGHT OF THE ALL THE FACTS

10   UNDER 3553(A).

11        WITH RESPECT TO THE GUIDELINES AND THE NET BENEFIT,

12   THE NET BENEFIT IS STRICTLY AN OBJECTIVE MEASURE.  IT'S THE

13   REVENUES MINUS THE DIRECT COSTS, BASICALLY THE COST OF GOODS

14   SOLD.  ALL OF THOSE THINGS ARE SUBJECT TO OBJECTIVE

15   DETERMINATION.  YOU LOOK AT HOW MUCH THE PERSON GOT UNDER THE

16   CONTRACT FOR REVENUES.  YOU LOOK AT WHAT THEIR EQUIPMENT COSTS

17   WERE.  THOSE ARE THE DIRECT COSTS.  YOU SUBTRACT THEM OUT, AND

18   YOU HAVE AN OBJECTIVE NUMBER.  AND WE'VE DONE THAT.  WE'VE

19   DONE THAT BY TALKING TO ALL THREE OF THE PEOPLE WHO WERE MOST

20   RESPONSIBLE FOR THESE BILLS OF MATERIAL, WHICH, IN OUR VIEW,

21   ARE THE MOST OBJECTIONABLE FOR THE PROFIT MARGIN.

22        AND ALL THREE OF THEM SAY, "THE GOVERNMENT'S

23   CALCULATIONS ARE ACCURATE.  THAT'S WHAT HE GOT.  THAT'S WHAT

24   WE SUPPLIED.  THOSE ARE INDEED THE COSTS."  AND THOSE PEOPLE

25   INCLUDE ARNOLD BORROMEO, THE CONTROLLER.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  IN THE CONTEXT OF GOVERNMENT

2     CONTRACTING, IT JUST SEEMS UNFAIR.  THE GOVERNMENT WILL ENTER

3     INTO FIRM FIXED CONTRACTS WHERE THEY'LL SAY, "WE DON'T CARE

4     HOW MUCH IT COST YOU.  WE'LL PAY THIS AMOUNT.  AND WE

5     UNDERSTAND THAT -- AND IT PROBABLY IS THE CASE THAT IN MOST

6     CASES, WE'RE GOING TO END UP WITH THE SHORT END OF THE STICK.

7     WE'RE GOING TO OVERPAY FOR THINGS, BUT WE WANT THEM.  AND IF

8     WE'RE WRONG AND IT COSTS MORE, THEN YOU STILL HAVE TO PROVIDE

9     THEM AT THAT PRICE."

10          IN THE CONTEXT OF A SITUATION LIKE THAT, WHICH IS

11     IMPLICATED HERE, THAT'S NOT A FAIR MEASURE TO USE.  IF YOU

12     CONCEDE THAT THE GOVERNMENT GENERALLY PAYS TOO MUCH FOR

13     THINGS, THEN ANYBODY IN A GOVERNMENT CONTRACT CASE LIKE THIS

14     ONE IS GOING TO END UP WITH AN INCREDIBLE NUMBER ASSOCIATED

15     WITH THE LOSS WHEN THAT'S JUST NOT TRUE.

16          MR. BHANDARI:  A COUPLE OF THINGS ON THAT REAL

17     QUICK.

18          THE COURT:  DO YOU DISAGREE WITH THAT?

19          MR. BHANDARI:  WELL, I DO.  NOBODY CONTRACTS

20     REGULARLY AND REPEATEDLY WITH THE GOVERNMENT, EXTRACTS THOSE

21     KINDS OF PROFIT MARGINS, DELIVERS MATERIALS THAT THE

22     GOVERNMENT IS DISSATISFIED WITH OVER AND OVER AGAIN UNLESS

23     THEY'RE BRIBING SOMEBODY.  THAT'S WHAT WE HAVE HERE.  I'M ONLY

24     GOING TO TALK ABOUT THIS BRIEFLY BECAUSE I THINK THE ANALYSIS

25     IS THERE'S THE GUIDELINE ISSUE, AND THEN THERE'S THE 3553(A)

PDF created with pdfFactory trial version www.pdffactory.com

81

1    ISSUE.  WE THINK THIS ISSUE INFORMS THAT.  YOU CAN'T CONTRACT

2    REPEATEDLY AND EXTRACT THOSE KINDS OF ASTONISHING AND

3    UNREASONABLE PROFITS REPEATEDLY WITH THE GOVERNMENT.  MAYBE

4    YOU CAN DO IT ONCE.  MAYBE YOU CAN DO IT TWICE.  BUT FIVE

5    TIMES IN A ROW, WHICH IS WHAT WE HAD HERE --

6          THE COURT:  MR. BHANDARI, LET ME ACCEPT THAT POINT.

7    THEN THE CONSIDERATION I HAVE AND THE DETERMINATION I HAVE TO

8    MAKE IS ONE STEP BEYOND THAT.  I'VE GOT TO SAY, "OKAY.  WHAT

9    IS THAT AMOUNT, THEN?  WHAT'S THE AMOUNT?"

10          AND WHAT I'M TELLING YOU IN THE GOVERNMENT CONTRACT

11    CONTEXT, I THINK IT'S UNFAIR FOR ME TO JUST USE THE MECHANICAL

12    FORMULATION THAT MIGHT OTHERWISE BE FAIR IN ANY OTHER CONTEXT.

13    IF WE AGREE THAT THE GOVERNMENT UNIFORMLY, EVEN IN A

14    NON-CRIMINAL CONTEXT, PAYS TOO MUCH FOR STUFF, IT'S NOT A FAIR

15    CALCULUS HERE.  THAT'S THE DIFFICULTY I'M HAVING WITH IT.

16    THAT PLUS, AS I SAID, THERE'S AN EASIER AND MUCH MORE

17    CONSERVATIVE AND RELIABLE METHOD THAT I CAN SLEEP WITH AT

18    NIGHT, WHICH IS TO SAY WHAT WAS THE AMOUNT OF THE BRIBES?

19          AND MR. GERAGOS DIDN'T SPEAK TO THIS.  I KNOW HE

20    OBJECTS.  I KNOW HE'S TAKEN THE POSITION THOSE WEREN'T BRIBES.

21    THE JURY HAS FOUND TO THE CONTRARY.  I'VE FOUND TO THE

22    CONTRARY.  AND THAT GETS US UP TO 14 POINTS BECAUSE HE'S

23    BETWEEN 400,000 AND A MILLION BUCKS IN BRIBES.

24          MR. BHANDARI:  I UNDERSTAND YOUR HONOR'S POSITION.

25    MAYBE AT THIS POINT IT WOULD BE BEST TO TURN TO THE 3553(A)

PDF created with pdfFactory trial version www.pdffactory.com

1   ANALYSIS.

2          THE COURT:  LET ME TURN BACK TO MR. GERAGOS.

3          MR. GERAGOS, I'M HAPPY TO HEAR ANYTHING YOU WANT TO

4   TELL ME ON THE MATTER OF ULTIMATELY SENTENCING.  I'LL BE HAPPY

5   TO HEAR FROM MR. WILKES.  I KNOW YOU HE HAD COMMENTS HE WANTS

6   TO MAKE AS WELL.

7          MR. GERAGOS:  ACTUALLY, I'D LIKE HIM TO ADDRESS YOU

8   FIRST.

9          THE DEFENDANT:  BEFORE ADDRESSING THE COURT, IF I

10  COULD, I'D LIKE TO ADDRESS SOME OF MY FAMILY AND FRIENDS THAT

11  ARE HERE, ESPECIALLY MY KIDS AND MY MOTHER, WHO HAVE BEEN

12  EXTREMELY SUPPORTIVE OF ME.  I KNOW THEY UNDERSTAND HOW

13  HELPLESS I'VE FELT IN THIS PROCESS BY BEING TOLD REPEATEDLY I

14  CAN'T SPEAK OUT.  I HAD MY FEW HOURS ON THE STAND, AT WHICH

15  TIME I GOT TO SAY VERY LITTLE OF WHAT I HAVE TO SAY.  BUT TO

16  THE EXTENT THAT I'VE FELT HELPLESS, I KNOW THAT THEY FEEL EVEN

17  MORE HELPLESS.  SO THANK YOU.

18         YOUR HONOR, AS YOU'RE AWARE, I'VE ALWAYS MAINTAINED

19  MY INNOCENCE AND CONTINUE TO DO SO.  EVEN AS I CONTINUE TO

20  WORK WITHIN THE SYSTEM TO REVERSE THIS WRONGFUL CONVICTION, I

21  ACKNOWLEDGE RIGHT NOW WE'RE IN THE NEXT PHASE OF THE

22  PROCEEDING WHERE YOU MUST FIX A PUNISHMENT.

23         I DO WISH TO SAY THAT I BELIEVE IN THE JUSTICE

24  SYSTEM, AND I'VE ALWAYS RESPECTED YOUR AUTHORITY AND YOUR

25  DECISIONS EVEN WHEN I DIDN'T ALWAYS AGREE WITH THEM.  I WOULD

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

83

1    ASK THAT IN SENTENCING ME, YOU VIEW MY ENTIRE LIFE AND

2    WHATEVER GOOD I'VE TRIED TO DO WITH IT AND NOT JUST THE

3    PICTURE WHICH I DON'T BELIEVE IS ACCURATE THAT THE PROSECUTION

4    HAS TRIED TO PAINT OF ME.

5            I ONLY ASK YOU, IN EXERCISING YOUR SENTENCING

6    AUTHORITY UPON ME, TO CONSIDER THAT I AM A MAN THAT CARES

7    DEEPLY FOR MY FAMILY, FOR THIS COMMUNITY, FOR MY COUNTRY, AND

8    I'VE ALWAYS TRIED TO ASSIST PEOPLE WHO HAVE FALLEN UPON

9    DIFFICULT TIMES.  I NOW FIND MYSELF IN THE POSITION OF BEING

10   ONE OF THOSE PEOPLE.  AND I HOPE THAT ALL THE ASSISTANCE I'VE

11   SHOWN TO OTHERS AND MY DEVOTION TO MY FAMILY AND MY COUNTRY

12   WILL BE CONSIDERED BY YOU.

13           THANK YOU.

14           THE COURT:  THANK YOU, MR. WILKES.

15           MR. GERAGOS.

16           MR. GERAGOS:  THANK YOU, YOUR HONOR.

17           TO PICK UP WHERE I LEFT OFF BEFORE, I THINK THE

18   COURT PROBABLY AGREES WE'RE AT A POINT NOW IN THE FEDERAL

19   SYSTEM, AT LEAST, THAT IT'S UP TO THE COURT, WITH THE

20   ASSISTANCE OF THE SENTENCING GUIDELINES, TO DO JUSTICE.  AND I

21   KNOW THAT YOUR HONOR'S REPUTATION IS ONE OF "I'LL GIVE YOU A

22   FAIR TRIAL, AND THEN CHARITABLY I'LL GIVE YOU A HARSH

23   SENTENCE."  I'M AWARE OF THAT.

24           THE COURT:  IS THAT SO?

25           MR. GERAGOS:  THAT TENDS TO BE YOUR REPUTATION.

PDF created with pdfFactory trial version www.pdffactory.com

84

1    FAST TO TRIAL, FAIR TRIAL, AND THEN YOU BRING DOWN THE HAMMER.

2    I UNDERSTAND THAT.  I DON'T KNOW THAT I WOULD WANT A JUDGE ANY

3    OTHER WAY, I SUPPOSE.

4            WHAT I WOULDN'T WANT, HOWEVER, IS A SENTENCE IN A

5    CASE THAT I LIVED AND BREATHED -- AND I KNOW THAT YOU CAN --

6    YOU DID AS WELL, WHICH WAS, IN LARGE PART, I THINK, TO SOME

7    DEGREE, OVERBLOWN.  I KNOW THE COURT HAS CHARACTERIZED THIS

8    CASE, AT LEAST A LARGE PORTION OF IT, MAYBE HALF OF IT, AS THE

9    WITNESSES TURNING OUT TO BE MORE FAVORABLE TO MR. WILKES THAN

10   UNFAVORABLE.

11           I THINK THE REAL REASON BEHIND THAT WASN'T ANY SKILL

12   OF MINE IN CROSS-EXAMINATION OR ANYTHING ELSE.  I THINK IT WAS

13   THE GOVERNMENT'S FUNDAMENTAL MISCHARACTERIZATION AND

14   MISUNDERSTANDING OF WHAT REALLY GOES ON.

15           AND I THINK THAT IT BECAME APPARENT ONCE YOU -- WE

16   HAD A SUCCESSION OF LOBBYIST AFTER LOBBYIST TRYING TO DRAPE

17   THEMSELVES IN THESE ROBES OF ANGELIC CHARACTER AND LEADING

18   THEMSELVES AND LEADING THE JURY, AT LEAST, TO BELIEVE THAT

19   "OH, MY GOD.  AS SOON AS I HEARD ABOUT ANY OF THIS, I WAS

20   AGHAST" AT THE SAME TIME THAT THEY HIRED SENATOR NELSON -- THE

21   ONE GUY, HE HIRED SENATOR NELSON'S SON AS HIS DIRECTOR OF

22   PROMOTIONS WHILE SENATOR NELSON WAS GETTING HIM EARMARKS IN

23   THE TENS OF MILLIONS OF DOLLARS.  THE OTHER GUY WHO'S CLAIMING

24   TO BE AS PURE AS THE DRIVEN SNOW AT THE SAME TIME THAT HE'S

25   GOT $20 MILLION IN EARMARKS THAT HE'S PUTTING ON HIS WEBSITE.

PDF created with pdfFactory trial version www.pdffactory.com

1      SO I UNDERSTAND FROM THE GOVERNMENT'S STANDPOINT

2  ECHOING WHAT I SAID BEFORE THAT WE DON'T GET TO REWRITE THE

3  HISTORY.  BUT YOU AND I WERE HERE, AND WE WATCHED THE HISTORY.

4  AND AS THE HISTORY UNFOLDED, I THINK -- AND I LOVED THAT ONE

5  WAITER, MR. HORSFALL.  I ASKED THE ONE QUESTION.  I NEVER MET

6  THE GUY BEFORE.  BUT I ASKED "HAVE YOU EVER SEEN A CONGRESSMAN

7  WHO WALKED IN THERE EVER AND PICKED UP A TAB?"

8      THE COURT:  NEVER IN 15 YEARS.

9      MR. GERAGOS:  NEVER IN 15 YEARS.  THE GUY'S BEEN

10 THERE SINCE THE DAY THE CAPITAL GRILLE OPENED, AND HE'S NEVER

11 SEEN A CONGRESSMAN PICK UP A TAB IN 15 YEARS.

12     SO IT BECAME ALMOST AS THE PROSECUTION HERE -- I

13 ALMOST FELT HALFWAY THROUGH IT ALMOST BECAME A SURROGATE FOR

14 THE GOVERNMENT WANTING TO PROSECUTE THE SYSTEM ITSELF AS

15 OPPOSED TO MR. WILKES.  I UNDERSTAND THAT THE JURY FOUND THE

16 100,000, AND I UNDERSTAND THE JURY FOUND THE 525-.  I COULDN'T

17 DISAGREE MORE, BUT I UNDERSTAND THAT.  I UNDERSTAND THAT THE

18 COURT, TO SOME DEGREE, IS BURDENED AND EMBRACES THAT.

19     BUT ULTIMATELY, THE IDEA, ECHOING WHAT MR. BHANDARI

20 WAS SAYING RIGHT HERE, THAT GOVERNMENT CONTRACTS STILL OPERATE

21 THAT WAY, WHO'S HE KIDDING?  I BLURTED OUT TO HIM OLIVER WAS A

22 PERFECT EXAMPLE.  HE SAYS NOBODY COMES BACK AND FEEDS AT THE

23 TROUGH REPEATEDLY.  HELLO.  LOOK AT THE 10D5'S THAT WERE FILED

24 WITH THE SEC OF THE GOVERNMENT CONTRACTORS, THE SINGLEMOST

25 PROFITABLE INDUSTRY.  IT'S VIRTUALLY RECESSION-PROOF.  IT'S

PDF created with pdfFactory trial version www.pdffactory.com

1   JUST NONSENSE.

2           SO WHEN YOU COME DOWN TO IT, WHAT IS THE UNIVERSE --

3   I THINK THE PROPER UNIVERSE FOR THIS COURT TO IMPOSE A

4   SENTENCE?  AND I THINK OBVIOUSLY THE PROPER UNIVERSE HAS TO BE

5   WHAT I WAS INDICATING BEFORE.  WHAT'S OUR BASELINE?  OUR

6   BASELINE IS IF IT'S DUKE CUNNINGHAM WHO'S THERE -- THERE'S A

7   PRETTY GOOD ARGUMENT HERE.  IF YOU ACCEPT EVERYTHING THAT THEY

8   PUT INTO THIS CASE AND THE WAY WE OUTLINED IT FOR THE JURY,

9   THERE'S A PRETTY GOOD ARGUMENT -- AND THEY MADE IT -- THAT

10  MITCH WADE TOOK IT TO THE NEXT LEVEL.  THAT WAS THEIR

11  ARGUMENT.

12          DURING THE CROSS-EXAMINATION, AS YOU HAD INDICATED,

13  MITCH WADE ADMITTED THAT THERE WAS A CERTAIN POINT WHEN HE

14  CROSSED THE LINE.  YOU'LL REMEMBER HE TESTIFIED.  WHEN HE

15  CROSSED THE LINE WAS WHEN HE WENT ANTIQUE SHOPPING, AND THEN

16  HE STARTED TO DO THE OTHER THINGS.  THAT'S WHEN HE FELT LIKE

17  "THIS ISN'T THE WAY THAT WASHINGTON IS SUPPOSED TO WORK."  HE

18  HID ALL OF THAT FROM MR. WILKES.

19          YOU THEN FAST-FORWARD TO HE DECIDED AT THAT POINT

20  THAT HE WASN'T GOING TO PLAY THE GAME ANYMORE.  HE WAS GOING

21  TO COME CLEAN.  WELL, I DON'T THINK THIS COURT IS THE COURT

22  THAT'S GOING TO SENTENCE HIM.  I THINK THIS COURT WOULD HAVE A

23  LOT TO SAY IF THIS COURT WERE THE ONE THAT WAS GOING TO

24  SENTENCE HIM.  I BELIEVE THAT TO MY BONES.

25          WHEN I MADE THAT OFFER BEFORE TO MAKE ANY CHARITABLE

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    DONATION OF YOUR CHOICE IF HE DOES ANY TIME WHATSOEVER OTHER

2    THAN MAYBE HOUSE ARREST, I'M BANKING ON THE FACT THAT THIS

3    COURT IS NOT GOING TO SENTENCE HIM.  BECAUSE IF THIS COURT WAS

4    GOING TO SENTENCE SOMEBODY AS REALLY THE PERSON WHO IS

5    ORCHESTRATING OUTSIDE OF CONGRESSMAN CUNNINGHAM, IT WOULD HAVE

6    TO BE MITCH WADE.

7         NOT ONLY DOES MITCH WADE GO OUT THERE AND BRAZENLY

8    TAKE IT TO A NEW LEVEL, AS THE GOVERNMENT SAYS, HE THEN GOES

9    ON -- AND, AS THE COURT KNOWS -- WE RAISED IT IN THE PAPERS

10   FOR THE MOTION FOR A NEW TRIAL -- HE THEN ENGAGES IN A SCHEME,

11   A CAMPAIGN MONEY-LAUNDERING SCHEME, IN WHICH HE HIMSELF ON THE

12   STAND ADMITTED THAT HE WAS BUYING BASICALLY CONTRACTS BY

13   DONATING TO THESE PARTICULAR -- I THINK IT WAS ONE SENATOR AND

14   ONE CONGRESS PERSON.  HE DOESN'T GET PROSECUTED FOR THAT AT

15   ALL.

16        THE GOVERNMENT HAS MADE AN ARGUMENT -- AND I DON'T

17   WANT TO REHASH IT -- BUT JUST IN TERMS OF YET ANOTHER FREE

18   PASS HE GETS, THEY'VE MADE AN ARGUMENT "WELL, THERE'S BEEN NO

19   INDICATION THAT WE HAD ANYTHING TO DO WITH NOT PROSECUTING

20   HIM."  THEY'RE PROSECUTING RIGHT NOW A VERY PROMINENT LAWYER

21   IN MICHIGAN FOR MUCH LESS.  MR. FEINBERGER'S BEEN INDICTED IN

22   MICHIGAN FOR A CAMPAIGN MONEY-LAUNDERING SCHEME, WHICH DOES

23   NOT HAVE THE PERNICIOUS ASPECT TO IT THAT MR. WADE'S DID.

24   MR. FEINBERGER'S PROSECUTION BY THE DEPARTMENT OF JUSTICE IS

25   BECAUSE HE'S CONTRIBUTING TO JOHN EDWARDS'S CAMPAIGN.  THERE'S

PDF created with pdfFactory trial version www.pdffactory.com

1    NO INDICATION THAT JOHN EDWARDS WAS GOING TO GIVE HIM ANY KIND

2    OF GOVERNMENT CONTRACTS.

3              HERE YOU'VE GOT A GUY WHO GOT UP ON THE STAND HERE

4    IN SAN DIEGO AND UNDER OATH TOLD YOU THAT HE WAS PAYING PEOPLE

5    SPECIFICALLY TO GET EARMARKS.  AND THE GOVERNMENT DIDN'T

6    PROSECUTE HIM, DIDN'T FEEL THAT THAT WAS -- THEY TOOK

7    $1 MILLION.  AFTER THE TRIAL WAS OVER, APPARENTLY, HE WAS

8    FINED $1 MILLION.  THAT WAS THE END OF THAT.  SO YOU HAVE

9    THAT.

10             YOU'VE GOT JOEL COMBS, ALBEIT HE'S THE NEPHEW.  BUT

11   JOEL COMBS, YOU KNOW, ONE OF THE THINGS THAT ALSO CAME OUT IN

12   THE TRIAL, JOEL COMBS ADMITTED THAT HE WAS KNOWN AS THE

13   BALL-DROPPER.  HE ADMITTED THAT HE WAS ONE WHO CONSISTENTLY

14   WAS CHARGING THINGS TO HIS FRIENDS AND THEN TRYING TO

15   BASICALLY DEFRAUD MR. WILKES AND THE COMPANY.  HE ADMITTED TO

16   THAT.  AND HE'S GOT A FREE PASS.  HE'S EVEN BETTER THAN MITCH

17   WADE, AND PROBABLY APPROPRIATELY SO.  HE SEEMS TO BE MORE OF A

18   DUFUS.  AND IF THERE'S SOME KIND OF A GRADE SCALE FOR PEOPLE

19   WHO ARE SOPHISTICATED, SURELY MITCH WADE IS A LOT MORE

20   SOPHISTICATED THAN JOEL COMBS IS.

21             WHEN YOU PUT SOMEBODY LIKE CONGRESSMAN CUNNINGHAM IN

22   THERE -- AND I KNOW THE COURT STRUGGLED WITH WHERE TO COME OUT

23   ON THAT.  AND THE COURT MAYBE -- AND I DON'T WANT TO EVER

24   DELVE INTO THE KIND OF ANALYSIS OF WHAT YOUR THINKING WAS.  MY

25   GUESS IS THAT IN RETROSPECT, IF YOU HAD KNOWN THEN WHAT YOU

PDF created with pdfFactory trial version www.pdffactory.com

1    KNOW NOW, YOU MIGHT HAVE COME OUT DIFFERENTLY THEN, WHICH IS

2    PROBABLY FAIR WITH MOST PEOPLE'S DECISION-MAKING PROCESSES.

3    YOU MIGHT HAVE COME OUT DIFFERENTLY AS TO HIS SENTENCE AT THE

4    TIME.  I DON'T KNOW.

5              BUT THE FACT IS THAT HE DID GET A SENTENCE WHICH IS,

6    IN ESSENCE, EIGHT AND CHANGE.  I THINK THAT YOU BASED THAT, IN

7    WHAT I READ, ON ALL OF THE LANDSCAPE OF CORRUPTION CASES.  IF

8    THAT'S THE CASE, I DON'T KNOW HOW MR. WILKES FITS IN AT A

9    HIGHER LEVEL THAN THAT.

10             EVEN ACCEPTING -- I DON'T ACCEPT IT, BUT ACCEPTING

11   THAT YOU WILL DISAGREE AND THAT YOU THINK THAT THERE WAS TWO

12   LEVELS FOR OBSTRUCTION, SO THAT FACTORS INTO WHATEVER YOUR

13   CALCULUS IS, DOES THAT MEAN THAT HE SHOULD STILL GET MORE THAN

14   DUKE CUNNINGHAM IN THIS CASE WHILE DUKE CUNNINGHAM'S GOT ONE

15   SCAM THAT HE'S RUNNING WITH MITCH WADE AND, AT LEAST ACCORDING

16   TO THE JURY, ANOTHER SCHEME THAT HE'S RUNNING WITH MY CLIENT

17   AND THAT THE GOVERNMENT CHARACTERIZED HIM AS THE MOST CORRUPT

18   POLITICIAN IN THE HISTORY OF THE UNITED STATES?

19             THAT'S AN EIGHT-YEAR SENTENCE, AND MR. WILKES IS

20   SUPPOSED TO BEAR THE BRUNT WITH BETWEEN A 200- AND 300-MONTH

21   SENTENCE ON THIS CASE?  THIS IS A GENTLEMAN WHO, WHEN THEY

22   SEARCHED HIS HOUSE, THEY'RE THE ONES -- AND IT WAS PART OF THE

23   TERABYTES OF DISCOVERY -- THEY'RE THE ONES WHO HAD THE BOXES

24   OF DOCUMENTS THAT SHOWED ALL OF HIS CHARITABLE STUFF.  I THINK

25   YOU'D BE HARD-PRESSED TO FIND ONE CHARITABLE THING MITCH WADE

PDF created with pdfFactory trial version www.pdffactory.com

90

1    HAS EVER DONE IN HIS LIFE OTHER THAN TO ENRICH MITCH WADE.

2              THIS IS A GENTLEMAN WHO HAS, AS YOU SAW BY THE

3    LETTERS -- I DON'T THINK IF I GOT STRUCK BY A BUS TOMORROW I

4    COULD GET EVEN ONE-TENTH OF THE NUMBER OF LETTERS ASSEMBLED

5    FOR ME THAT HE HAS -- FOR SOMEBODY WHO BASICALLY HAS, FOR THE

6    LAST TWO YEARS, BEEN PUMMELED IN THE PRESS AND HAS LOST, TO BE

7    SURE, VIRTUALLY EVERYTHING THAT HE HAS, HIS REPUTATION, WHICH

8    OBVIOUSLY MEANS THE MOST TO HIM, TO HAVE HIS KIDS WHO HE HAS

9    SOLE CUSTODY OF WHO ARE SITTING HERE HAVE TO LISTEN TO THIS

10   AND HAVE TO DEAL WITH THAT.  AND I HAVE KIDS THAT ARE THE SAME

11   AGE, AND I UNDERSTAND THAT THAT'S PROBABLY MORE THAN ANYTHING

12   GOT TO BE THE MOST DIFFICULT.  HE'S THE SOLE PERSON WHO TAKES

13   CARE OF HIS MOTHER.

14             INTERESTINGLY, IN A SITUATION THAT I'VE NEVER BEEN

15   IN -- IT'S RARE, AT LEAST BY MY EXPERIENCE -- HE'S GOT

16   STEPCHILDREN.  THE STEPCHILDREN HAVE BEEN BEHIND HIM

17   110 PERCENT IN THIS CASE ATTENDING COURT AND ATTENDING THE

18   TRIAL AND SUPPORTING HIM.  I THINK THAT SPEAKS VOLUMES TO THE

19   KIND OF MAN THAT HE IS.

20             I UNDERSTAND THE JURY'S VERDICT.  I'VE DEFENDED

21   QUITE A FEW CLIENTS IN MY DAY.  I CAN SAY THAT NO MATTER WHAT

22   THE COURT DOES, THAT I'VE GROWN TO LIKE HIM AND CONSIDER HIM A

23   FRIEND.  I HAVE A GREAT DEAL OF RESPECT FOR HIM.  I DON'T

24   THINK FOR A MINUTE THAT THIS COURT SHOULD IMPOSE ANYTHING

25   CLOSE TO WHERE WE'VE BEEN KIND OF TALKING ABOUT THIS MORNING.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

91

1    I JUST THINK THAT THAT WOULD BE A FUNDAMENTAL INJUSTICE.

2              I DON'T SEE FOR A MINUTE WHY THE GOVERNMENT CAN

3    POSSIBLY STAND UP HERE AND SEIZE THE MORAL HIGH GROUND WITH

4    MR. WILKES AND HAVE FOISTED MITCH WADE AND THAT WHOLE

5    ARRANGEMENT ONTO THE PUBLIC.  I JUST THINK THAT THAT IS AN

6    INSTITUTIONAL AND PROSECUTORIAL SCHIZOPHRENIA THAT THIS COURT

7    SHOULDN'T TOLERATE AND THAT THE PUBLIC SHOULDN'T TOLERATE.

8              THE IDEA THAT SOMEBODY CAN JUST GET UP HERE AND LAY

9    CLAIM AND BASICALLY FOIST EVERYTHING THAT THEY'VE GOT AND USE

10   THIS GUY AS SOME KIND OF A REPOSITORY FOR EVERYTHING THAT THEY

11   FIND WRONG THE GOVERNMENT, WHICH IS ESSENTIALLY WHAT I THINK

12   THE TRIAL DID AND THEY CONTINUE TO DO TO THIS DAY, I THINK IS

13   JUST WRONG.

14             I KNOW THAT THE COURT WILL IMPOSE WHAT IT CONSIDERS

15   TO BE A FAIR SENTENCE.  I WOULD RECOMMEND SOMETHING SOUTH OF

16   CONGRESSMAN CUNNINGHAM AS BEING A FAIR SENTENCE.  AND I WOULD

17   HOPE THAT THE COURT, AFTER HEARING FROM THE GOVERNMENT, WILL

18   LET ME RESPOND.  I DON'T THINK FOR A MINUTE THAT ANYTHING THAT

19   I'M GOING TO SAY TODAY IS GOING TO MATERIALLY CHANGE YOUR MIND

20   ONE WAY OR ANOTHER.  YOU WERE HERE.  YOU HEARD THE EVIDENCE.

21   A LOT OF THE THINGS YOU'VE SAID SO FAR IN EITHER SUSTAINING OR

22   OVERRULING THE OBJECTIONS WITH THE SAME KIND OF OBSERVATIONS

23   THAT I HAD, I THINK ANYBODY WHO IS OBJECTIVE AND LISTENED TO

24   THIS EVIDENCE KNOWS REALLY WHAT HIS ROLE WAS.  AND CLEARLY,

25   HIS ROLE WAS NOT AT A LEVEL OF MITCH WADE.  AND CLEARLY, HIS

PDF created with pdfFactory trial version www.pdffactory.com

92

1    ROLE WAS NOT LIKE CONGRESSMAN CUNNINGHAM.

2              SO I'D SUBMIT IT.  AND IF YOU'D ALLOW ME TO TALK --

3              THE COURT:  I WILL.

4              BEFORE YOU SIT DOWN, MR. GERAGOS, I WANT TO MAKE

5    SURE I'VE CROSSED ALL THE T'S AND DOTTED ALL THE I'S PURSUANT

6    TO RULE 32(H).  I ACTUALLY CAME OUT WITH CALCULATIONS THAT

7    WERE LOWER THAN BOTH THOSE OF THE PROBATION OFFICER AND THOSE

8    OF THE UNITED STATES.  BUT I WANT TO MAKE SURE THAT YOU'VE

9    HAD, IN YOUR JUDGMENT AT LEAST, A FULL OPPORTUNITY TO RESPOND

10   AND ARGUE THOSE CALCULATIONS.

11             MR. GERAGOS:  I HAVE.  AND WOULD SUBMIT ON THE

12   WRITTEN PAPERWORK.  I THINK WE ARE, IN THE LAST SIX TO EIGHT

13   MONTHS, IN A COMPLETELY DIFFERENT UNIVERSE THAN WE WERE.

14             THE COURT:  I AGREE WITH YOU.  FRANKLY, I THINK THE

15   32(H) STANDARD, AT LEAST IN NOT GIVING AN ANSWER ON

16   DEPARTURES, IS BESIDE THE POINT NOW THAT DEPARTURES ARE REALLY

17   BESIDE THE POINT.

18             MR. GERAGOS:  THAT'S EXACTLY MY FEELING.  IT'S

19   ALMOST LIKE EXERCISING EUCLIDIAN GEOMETRY OR SOMETHING.

20             THE COURT:  THANK YOU, MR. GERAGOS.

21             MR. FORGE, MR. BHANDARI, MR. HALPERN, WHO SPEAKS FOR

22   THE UNITED STATES?

23             MR. BHANDARI:  IF IT'S OKAY WITH THE COURT, I'LL

24   MAKE A FEW COMMENTS, THEN MR. HALPERN WILL ADDRESS THE COURT.

25             I JUST WANT TO BRIEFLY GO OVER SOME OF THE NEW

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    MATTERS IN THE SENTENCING PAPERS.  YOUR HONOR'S VERY FAMILIAR

2    WITH TRIAL RECORDS.

3          BASICALLY, WHAT THE DEFENDANT HAS ACCUSED THE

4    GOVERNMENT OF DOING HERE IS ATTACKING THE DEFENDANT FOR JUST

5    TRYING TO BE SUCCESSFUL IN GOVERNMENT CONTRACTING IN

6    WASHINGTON, D.C. THE WAY WASHINGTON, D.C. WORKS, AND IT'S

7    ENGAGING IN CLASS WARFARE PITTING RICH AGAINST POOR.  NEITHER

8    OF THOSE ACCUSATIONS ARE FAIR.

9          WHAT WE'RE HERE ABOUT IS THE DEFENDANT'S METHODS,

10   THE WAY THAT HE ATTAINED THE PROFITS THAT HE EXTRACTED FROM

11   THE GOVERNMENT.  THE REASON WE'RE HERE TODAY IS THAT THE

12   GOVERNMENT BELIEVES HE DID NOT PURSUE THE AMERICAN DREAM

13   FAIRLY IN THE WAY THAT WE DON'T BEGRUDGE ANYONE THE RIGHT TO

14   PURSUE, BUT RATHER HE CHEATED.  HE BOUGHT HIS WAY TO THE

15   ENJOYMENT OF THOSE FINANCIAL REWARDS THAT OBVIOUSLY DROVE HIM.

16   HE DID SO ON A SCALE THAT THIS COUNTRY HAS NEVER SEEN BEFORE.

17         WE SAID THAT IN OUR PAPERS.  IT'S NOT JUST THE

18   GOVERNMENT SAYING IT.  IT'S NOT JUST EMPTY RHETORIC FROM THE

19   GOVERNMENT.  THIS IS SOMETHING THAT IS WIDELY ACKNOWLEDGED.

20   THE PUBLIC HAS SAID THAT.  AND THE WITNESSES THEMSELVES, THE

21   PEOPLE WHO SUFFERED THE BRUNT OF THE DEFENDANT'S CONDUCT,

22   THEY, TOO, SAY THAT THE CONDUCT OF THIS DEFENDANT WAS WORSE

23   THAN ANYTHING THEY'VE EVER ENCOUNTERED IN DECADES UPON DECADES

24   OF SERVICE TO THIS COUNTRY.

25         YOUR HONOR, YOU HAVE BEFORE YOU STATEMENTS FROM SOME

PDF created with pdfFactory trial version www.pdffactory.com

94

1   OF THE WITNESSES WHO TESTIFIED AT TRIAL AND SOME OTHERS WHO

2   TALK ABOUT THE EFFECT OF THE DEFENDANT'S CONDUCT ON THEM, THE

3   IMPAIRMENT OF THIS COUNTRY'S NATIONAL SECURITY AND ITS

4   RESPONSE TO THE WAR ON TERROR AS A RESULT OF THE DEFENDANT'S

5   CONDUCT.

6        MR. BEHRENS IS SOMETHING THAT WASN'T BROUGHT OUT AT

7   TRIAL.  IN ADDITIONAL INFORMATION THAT WE SUBMITTED NOW, YOUR

8   HONOR NOW KNOWS THAT WHEN MR. BEHRENS WENT DOWN TO PANAMA

9   AFTER HAVING CLASHED WITH THE DEFENDANT ABOUT "WELL, YOU SAY

10  YOU'VE DONE WORK AT THIS ARMY BASE WHERE I WAS STATIONED.  I

11  DIDN'T SEE YOU DO ANY WORK HERE.  WHY DON'T YOU PROVE IT

12  BEFORE YOU ASK US TO PAY YOU."

13       MR. WILKES'S RESPONSE WAS ARROGANT, BULLYING,

14  THREATENING, IT WOULDN'T BE GOOD FOR HIS CAREER, HAVING

15  CUNNINGHAM CALL HIM REPEATEDLY TO HARASS HIM.

16       AND NOW YOUR HONOR KNOWS THAT WHEN MR. BEHRENS WENT

17  DOWN TO PANAMA TO CONTINUE HIS WORK ON BEHALF OF THE PEOPLE OF

18  THE UNITED STATES, WHAT DOES MR. WILKES DO?  HE LEANS OVER AND

19  HE CALLS HIM AN EXPLETIVE AND HE COOLLY INFORMS HIM THAT BAD

20  THINGS HAPPEN TO PEOPLE DOWN IN PANAMA AND WHAT IS OBVIOUSLY A

21  THREAT TO HIS PERSONAL SAFETY AND SOMETHING THAT TROUBLES

22  MR. BEHRENS TO THIS DAY.

23       MR. BEHRENS TOLD YOU -- AND I'M QUOTING FROM

24  PAGE 477 OF THE MATERIALS WE PROVIDED YOUR HONOR, HIS

25  DECLARATION -- THAT THIS WAS, QUOTE, "THE ABSOLUTE WORST

PDF created with pdfFactory trial version www.pdffactory.com

95

1   CONDUCT I'VE ENCOUNTERED IN ALL OF MY YEARS WORKING WITH

2   GOVERNMENT CONTRACTORS."

3           MR. JONES, VERY SIMILAR.  A SUPERIOR TO MR. BEHRENS,

4   MR. WILKES COMES IN, AND MR. JONES IS TRYING TO DO HIS JOB ON

5   BEHALF OF THE PEOPLE OF THE UNITED STATES AND MAKE SURE THAT

6   ANY PAYMENTS THAT ARE MADE TO MR. WILKES ARE AUTHORIZED AND HE

7   ACTUALLY EARNED THEM.  WHAT DOES MR. WILKES DO?  HE COMES IN

8   THE ROOM, THROWS THE PAPERS ACROSS THE TABLE, THEY SPILL ALL

9   OVER THE PLACE.  HE DEMANDS HIS MONEY.  AGAIN, THE SAME

10  TACTICS; BULLYING, THREATENING WITH CUNNINGHAM.

11          AGAIN, THE NEW REVELATION IN THE PAPERS, WHEN HE'S

12  DOWN IN PANAMA CHECKING UP ON MR. WILKES, CONTINUING TO DO HIS

13  WORK ON BEHALF OF THE UNITED STATES, HE, TOO, IS THREATENED.

14  HIS PERSONAL SAFETY IS THREATENED.  NOT JUST HIM.  WHAT IS

15  ABSOLUTELY GALLING AND BEYOND PALE IS SOMEBODY ACTUALLY CALLS

16  UP MR. JONES'S SCHOOL TEACHER WIFE AND SAYS, "I UNDERSTAND

17  YOUR HUSBAND IS GOING TO PANAMA.  HE'D BETTER WATCH HIS BACK

18  DOWN THERE."

19          MR. JONES THEN COMES AND GIVES HIS WIFE AN ENVELOPE.

20  A PUBLIC SERVANT OF THIS COUNTRY HAD TO COME HOME, GIVE HIS

21  WIFE AN ENVELOPE, AND EXPLAIN "LOOK, IF SOMETHING HAPPENS TO

22  ME WHILE I'M GOING TO DO THE PUBLIC'S BUSINESS DOWN HERE IN

23  PANAMA INSPECTING THIS CONTRACT WITH WILKES, HERE'S WHAT YOU

24  NEED TO DO."

25          THE FACT THAT THAT CONDUCT OCCURRED SHOULD BE --

PDF created with pdfFactory trial version www.pdffactory.com

1    YOUR HONOR HAS COMMENTED ON HOW GALLING IT IS.  NOW THAT YOU

2    KNOW THESE ADDITIONAL REVELATIONS, THE RESPONSE SHOULD BE --

3    NOW THAT WE HAVE A CHANCE TO SEND A CLEAR MESSAGE TO THOSE WHO

4    WOULD ACT IN THAT MANNER TO LOYAL PUBLIC SERVANTS WHO ARE JUST

5    TRYING TO DO THE WORK OF THE PUBLIC, THE MESSAGE THAT WE

6    SHOULD SEND IS VERY LOUD AND VERY CLEAR THAT THAT WILL BE NOT

7    TOLERATED AND PUNISHMENT WILL BE VERY SEVERE.

8              WE ACKNOWLEDGE, YOUR HONOR, THAT THE DEFENDANT HAS

9    SUBMITTED LETTERS FROM FAMILY MEMBERS, AS IS QUITE COMMON.

10   AND THE LETTERS TALK ABOUT CHARITABLE DONATIONS.  WITH RESPECT

11   TO CHARITABLE DONATIONS, MR. GERAGOS TALKED ABOUT MR. WADE AND

12   SUGGESTED THAT HE WOULD BE SHOCKED TO FIND THAT MR. WADE EVER

13   GAVE A PENNY TO CHARITIES.  IN FACT, MR. WADE HAD A CHARITABLE

14   FOUNDATION AND DID ENGAGE IN CHARITY.

15             IT'S GOOD THAT SOME OF THE MONEY THAT MR. WILKES

16   STOLE FROM THE GOVERNMENT -- IT'S GOOD THAT SOME OF THAT WENT

17   TO GOOD CAUSES.  THAT DOESN'T ABSOLVE MR. WILKES OF THE CRIME

18   OF TAKING IT.  AND THE MANNER IN WHICH HE GAVE IT WAS NOT

19   ANONYMOUSLY, BUT PROMINENTLY UNDER THE WILKES FOUNDATION.  THE

20   CHARITABLE DONATIONS APPEARED TO FOCUS ON THE DEFENSE

21   INDUSTRY, WHICH DOVETAILS INTO THE DEFENDANT'S INDUSTRY.  SO

22   BOTH THE FACT OF GIVING DONATIONS AND THE MANNER IN WHICH THEY

23   WERE GIVEN, MR. WILKES AND MR. WADE ARE NOT THAT DIFFERENT.

24             WITH RESPECT TO THE FAMILY, YOUR HONOR, ANY SENTENCE

25   THAT IS IMPOSED WILL HAVE AN IMPACT ON FAMILY, AND THAT'S

PDF created with pdfFactory trial version www.pdffactory.com

97

1   UNFORTUNATE.  THAT'S TRUE IN EVERY CASE THAT COMES BEFORE YOUR

2   HONOR.  AND IN EVERY SUCH CASE, THE BOTTOM LINE IS THE

3   DEFENDANT BROUGHT THAT UPON HIMSELF.

4        AND THAT'S PARTICULARLY SO IN THIS CASE WHEN THE

5   DEFENDANT WENT OUT TO HAWAII AND PROCURED SERVICES FOR HIMSELF

6   AND MR. CUNNINGHAM.  HE WASN'T THINKING OF HIS FAMILY AT THE

7   TIME.

8        NOR WAS HE THINKING OF HIS FAMILY WHEN HE ENGAGED IN

9   SOME OTHER CONDUCT THAT WE'VE OUTLINED FOR YOUR HONOR THAT I

10  DON'T NEED TO GO INTO DETAIL ABOUT HERE TODAY.

11       NOR WAS HE THINKING ABOUT FAMILY VALUES WHEN HE

12  CAUSED THREATS TO BE ISSUED TO THE WIFE OF A LOYAL PUBLIC

13  SERVANT, MR. JONES.

14       WITH RESPECT ON THAT POINT, I'LL SIT DOWN, AND

15  MR. HALPERN WILL ADDRESS YOU.

16       THE COURT:  THANK YOU, MR. BHANDARI.

17       MR. HALPERN.

18       MR. HALPERN:  MAY IT PLEASE THE COURT, YOUR HONOR,

19  TO PUT IT BLUNTLY, BUT TO PUT IT ACCURATELY, I'M SHOCKED THAT

20  I HAD TO LISTEN TO THAT MAN GET UP IN FRONT OF THIS COURT AND

21  PLAY LIKE HE WAS ACTING IN SOME TYPE OF LEAD IN A ROMANTIC

22  SOAP OPERA, THE VICTIM.  THAT HE COULD GET UP HERE TODAY AFTER

23  EVERYTHING THAT'S HAPPENED AND COME BEFORE THIS COURT AND SAY

24  HE'S THE VICTIM.  THAT HE COULD COME IN FRONT OF THIS COURT,

25  WHICH REPRESENTS THE UNITED STATES, AND CONTINUE TO THIS VERY

PDF created with pdfFactory trial version www.pdffactory.com

98

1    MOMENT TO SAY HE'S A PATRIOT.  TO BE COMPLETELY AND TOTALLY

2    UNREPENTANT FOR HIS CRIMES IS SHOCKING.

3         BUT, YOU KNOW, IT'S OFTEN BEEN SAID THAT AN

4    INDIVIDUAL'S WORDS CAN COME BACK TO HAUNT THEM.  THAT'S

5    PARTICULARLY TRUE WHEN WE'RE DEALING WITH MR. WILKES.  IT WAS

6    ALMOST EXACTLY A YEAR AGO TODAY WHERE HE BOLDLY PROCLAIMED

7    THAT HE WAS WAITING AND HE WAS READY AND, IN HIS WORDS, GLAD

8    THAT HE WAS GOING TO GET A JURY TRIAL.  BECAUSE IN HIS WORDS,

9    "THE TRUTH" -- AND I'M QUOTING HIM -- "FINALLY WILL EMERGE."

10        WELL, IT MAY HAVE COME AS SOME SURPRISE TO HIM, BUT

11   IT DOESN'T COME AS ANY SURPRISE TO ME AND I DOUBT IT COMES AS

12   ANY SURPRISE TO ANYBODY ELSE WHO LABORS IN THIS COURT, IT

13   COMES AS NO SURPRISE TO ANYONE WHO HAS A RESPECT FOR THE LAW,

14   A RESPECT FOR HONESTY AND WHAT IT MEANS IN THIS COURT TO FIND

15   OUT THAT DESPITE THE SEEDS OF LIES AND DECEIT THAT CONTINUES

16   UP TILL TODAY, THAT THE TRUTH DID EMERGE, THAT HE GOT EXACTLY

17   WHAT HE REQUESTED.

18        HE GOT A JURY OF HIS PEERS THAT DETERMINED, BEYOND A

19   REASONABLE DOUBT, THAT HE WAS PERHAPS NOT THE ORGANIZER,

20   PERHAPS NOT THE LEADER -- I UNDERSTAND THE COURT'S CONCERNS

21   ABOUT THOSE CALCULATIONS -- BUT CLEARLY, THE ARCHITECT OF THE

22   LARGEST BRIBERY CASE IN THE HISTORY OF OUR COUNTRY.  AND I

23   STAND BEFORE THE COURT TODAY TELLING YOU THAT AN UNPRECEDENTED

24   CRIME CRIES OUT FOR AN UNPRECEDENTED PUNISHMENT.

25        HERE'S THE TIME FOR IT TO STOP.  I HAD TO LISTEN TO

PDF created with pdfFactory trial version www.pdffactory.com

1   A MONTH'S TRIAL OF MR. GERAGOS.  I SHARE THE COURT'S

2   ADMIRATION.  HE'S A VERY, VERY ADEPT ADVOCATE.  FOR A MONTH,

3   HE ATTEMPTED TO DEFLECT HIS CLIENT'S GUILT UNSUCCESSFULLY.

4   AND HE COMES BEFORE THE COURT AGAIN TODAY ATTEMPTING TO TALK

5   MORE ABOUT OTHER PEOPLE THAN ABOUT HIS CLIENT; MORE ABOUT

6   MITCH WADE, MORE ABOUT JOEL COMBS, MORE ABOUT CONGRESSMAN

7   CUNNINGHAM THAN HIS OWN CLIENT.

8         I WOULD SUBMIT TO THE COURT THAT THE REASON FOR THAT

9   IS CLEAR.  WHEN WE LOOK AT THE LEDGER SHEET THAT WE ALL HAVE

10  AND THE LEDGER SHEET THAT MR. WILKES BROUGHT INTO THE COURT

11  TODAY, I SUBMIT IT'S BEREFT OF ANYTHING ON HIS SIDE OF THE

12  LEDGER.  HIS SO-CALLED CHARITABLE ACTS WERE FUNDED BY ILLEGAL

13  PROFITS.  AND WHO WERE THE MAIN RECIPIENTS?  HIS TRIBUTE TO

14  HEROES.  TENS OF THOUSANDS OF DOLLARS IN TAXPAYER FUNDS TO DO

15  WHAT?  TO HONOR HIS CO-CONSPIRATORS, RANDY DUKE CUNNINGHAM AND

16  DUSTY FOGGO.  THAT'S THE TYPE OF CHARITY.

17        AND WE LOOK AT HIM AS A FAMILY MAN?  TO THIS DAY,

18  WE'VE HAD TO LISTEN TO MR. GERAGOS CHARACTERIZE HIS NEPHEW AS

19  A BALL-DROPPER AND A BUFFOON.  SOME BUFFOON, YOUR HONOR.  YOU

20  SAW IN COURT ALMOST AN ENTIRE DAY HANDLING MR. GERAGOS'S

21  CROSS-EXAMINATION.  IT'S CLEAR HE WASN'T SUCH A BUFFOON THAT

22  HIS TESTIMONY WAS DISCOUNTED BY THE JURY.  WHAT HE WAS WAS

23  ANOTHER VICTIM OF THAT MAN'S CRIMES, THIS SUPPOSED FAMILY MAN

24  WHO USED HIS FAMILY TO PERPETRATE THESE CRIMES.  IT'S AN

25  AFFRONT FOR HIM TO TRY TO SUGGEST THAT THAT FACT IS ON HIS

1   SIDE OF THE LEDGER AS OPPOSED TO THE SIDE OF THE LEDGER THAT

2   SHOWS HIS WRONGDOING.

3        THIS IS A CRIME, AS THE COURT HAS NOTED, THAT TOOK

4   PLACE NOT OVER A DAY, NOT OVER A WEEK, NOT OVER A MONTH, BUT

5   OVER ALMOST A DECADE.  POINTS NOT ADDRESSED BY MR. GERAGOS.

6   THIS IS A CRIME IF NOT ORCHESTRATED, THE COURT HAS TO ADMIT,

7   SCRIPTED BY THE DEFENDANT WORD FOR WORD.  I SHARE THE COURT'S

8   CONCERN WHEN IT NOTED IN CUNNINGHAM'S SENTENCE THAT IT

9   COULDN'T SQUARE THE ACTIONS OF THIS MAN, THIS PERSON WHO THE

10  COURT AND THE ENTIRE COUNTRY LOOKED UP TO AS A WAR HERO.  HOW

11  COULD THIS MAN DO THESE THINGS?  THE PARTS ABOUT HIS BEHAVIOR

12  THAT WERE PARTICULARLY GALLING, HOW COULD HE TREAT PEOPLE IN

13  THE GOVERNMENT IN THIS WAY?  IT MADE NO SENSE.

14       AND FRANKLY, THE COURT WAS ABSOLUTELY RIGHT.  IT

15  MADE NO SENSE.  AND THE ONLY WAY IT'S UNDERSTANDABLE IS

16  THROUGH THE TRIAL OF THIS MAN BY HIS VERY WORDS.  THE

17  GOVERNMENT INTRODUCED NOT ONE, NOT TWO, OVER HALF A DOZEN

18  EXAMPLES OF SCRIPTED CONVERSATIONS.  THE ONE MR. BHANDARI

19  REFERRED TO, MR. KRATZ.  WORD FOR WORD THEY WERE SCRIPTED

20  EXACTLY.  AND THAT'S HOW THAT MAN, THIS MUCH MORE EDUCATED,

21  MORE VAIN, SOPHISTICATED BUSINESSMAN THAT MR. WILKES IS, TOOK

22  ADVANTAGE OF A MORE SIMPLE MIND, BUT IN HIS HEART AN

23  INDIVIDUAL WHO WAS WILLING TO BE CORRUPTED.

24       THE TREATMENT WAS NOT ONLY SCRIPTED, BUT, AS

25  MR. BHANDARI INDICATED, IT WAS CARRIED OUT BY MR. WILKES

PDF created with pdfFactory trial version www.pdffactory.com

1    DIRECTLY ON LOWER-LEVEL PEOPLE.  TO THIS DAY, HE REFUSES TO

2    ACCEPT ANY RESPONSIBILITY.  AS THE COURT HAS NOTED ON REPEATED

3    OCCASIONS, THIS IS NOT SIMPLE OBSTRUCTIONS OF JUSTICE, BUT

4    TIME AND AGAIN CONTINUING BEFORE THE TRIAL, DURING THE TRIAL,

5    HIS COMMENTS AFTER THE TRIAL, AND EVEN IN HIS SUBMISSIONS TO

6    THE COURT TO GET QUALIFIED COUNSEL, HE CONTINUED THE

7    OBSTRUCTION OF JUSTICE.  HE CONTINUES THIS FRAUD ON THE COURT

8    AND THE FRAUD ON THE AMERICAN PEOPLE, A FAR CRY FROM MITCH

9    WADE, THE INDIVIDUAL WHO PLED GUILTY AND STILL AWAITS HIS

10   SENTENCE.

11          AND MOST SIGNIFICANTLY WAS THE LOSS TO THE

12   TAXPAYERS.  AND WE CAN QUIBBLE ABOUT HOW MUCH IT IS.  AND I

13   UNDERSTAND THE COURT'S POSITION.  I RESPECT THE COURT'S

14   POSITION.  AT THE END OF THE DAY, IT DOESN'T MATTER.  WE'RE

15   NOT ASKING FOR A GUIDELINE RANGE MORE THAN THE COURT SEE

16   ANYWAY.  I WOULD SUBMIT, THOUGH, WE CAN'T RUN AWAY FROM THE

17   FACT THAT THE GOVERNMENT PAID MR. WILKES ALMOST $100 MILLION

18   AT THE TIME OF WAR WHEN THERE ARE SCARCE RESOURCES.  IT'S NOT

19   A MYSTERY TO THIS COURT THAT WE'RE RUNNING A LARGE DEFICIT

20   TODAY.  IT'S NO MYSTERY THAT THERE ARE NEEDS THAT ARE BEING

21   UNMET BY THE MILITARY.

22          AND AS WE PRESENTED AT TRIAL, REGARDLESS OF HOW MUCH

23   WAS TO BE PAID OR WASN'T TO BE PAID, WHAT MR. WILKES WANTED

24   WAS NOT WHAT THE MILITARY WANTED.  AND HE SUBSTITUTED THAT

25   JUGGLING.  AND YOU'LL RECALL EVEN WITH THE SCANNING, THE

PDF created with pdfFactory trial version www.pdffactory.com

102

1    EVIDENCE INTRODUCED THE LETTERS FROM THE ARMY, FROM MR. RICH,

2    WHO WAS THE HEAD OF NGIC.  THERE'S AN EXHIBIT IN EVIDENCE.  IT

3    STATED THAT THE VALUE OF THE SCANNING WAS ALMOST WORTHLESS.

4            AND MORE DISTURBING TO THE GOVERNMENT, IT STATED --

5    THE LETTER'S IN EVIDENCE -- THAT TO RELY ON THAT SCANNING

6    COULD BE DANGEROUS.  THE PARTICULAR EXAMPLE THAT WAS GIVEN,

7    THERE WAS A SCHOOL THAT WAS INDICATED TO BE A GOVERNMENT

8    FACILITY.  SO THE TYPE OF WORK HE DID IS REALLY AT THE HEART

9    OF IT, ALSO.

10           BUT WE UNDERSTAND THE COURT'S POSITION.  I'LL TALK

11   ABOUT IT FOR MAYBE TWO MORE SECONDS BEFORE I MOVE ON.

12           BUT THERE IS NO QUESTION THAT THIS MAN IS A WAR

13   PROFITEER.  AND I'M NOT SAYING THIS SO MR. GERAGOS WILL COME

14   UP HERE AND SAY I'M TRYING TO INFLAME THE COURT.  I'VE KNOWN

15   THE COURT LONG ENOUGH TO KNOW THERE'S NO CHANCE OF ANYTHING

16   THE GOVERNMENT SAYING INFLAMING THE COURT, THAT THIS COURT IS

17   GOING TO LOOK AT THIS THING ON THE MERITS AND MAKE THE

18   DISTINCTION.

19           THE FACT OF THE MATTER IS THESE ARE NOT THE

20   GOVERNMENT'S WORDS.  HE IS THE POSTER BOY FOR WAR

21   PROFITEERING.  I KNOW THE COURT GETS IT.  IT UNDERSTANDS THE

22   NEW INFORMATION.  IT UNDERSTANDS HOW TODAY MORE THAN ANYTHING

23   EVERYTHING THIS COURT SAYS GETS TRANSMITTED AROUND THE WORLD.

24   AND THE PUBLIC ITSELF COMES UP WITH OPINIONS.  IT'S NO LONGER

25   A WORLD WHERE WE JUST HAVE A HARDCOVER ENCYCLOPEDIA

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    BRITANNICA.  NOW WE HAVE ONLINE ENCYCLOPEDIAS.

2             AND IF THE COURT GOES ONLINE, OF COURSE IT WILL FIND

3    COMMENTS ABOUT THIS CASE, ABOUT THE COURT, ABOUT THE

4    GOVERNMENT.  AND IF YOU WILL LOOK AT WIKIPEDIA, YOU WILL FIND

5    UNDER THE VERY DEFINITION OF "WAR PROFITEER" AN EXAMPLE GIVEN

6    ON THE INTERNET OF MR. WILKES.  NOT THE GOVERNMENT'S WORDS.

7    THE PUBLIC'S WORDS.  I'M QUOTING.  THE DEFENDANT, QUOTE, "A

8    DEFENSE CONTRACTOR WAS ECSTATIC WHEN HEARING THAT THE UNITED

9    STATES WAS GOING TO GO TO WAR WITH IRAQ," END QUOTE, NOT

10   BECAUSE HE FELT THIS WAS A CHANCE TO LIBERATE A COUNTRY, NOT

11   BECAUSE HE THOUGHT THAT WE COULD SPREAD DEMOCRACY, BUT

12   BECAUSE, AND I QUOTE, "IT WOULD CREATE NEW OPPORTUNITY FOR HIS

13   COUNTRY," END QUOTE.

14            WHAT SENTENCE IS APPROPRIATE, YOUR HONOR, FOR A MAN

15   WHO WELCOMES THE HORROR AND DEATH IN WAR AS JUST ANOTHER

16   BUSINESS OPPORTUNITY?  THAT FACT IS ALSO CLEAR TO THE PUBLIC.

17   OUR OWN PAPER, THE UNION-TRIBUNE, WHEN EXAMINING HIS CONDUCT,

18   CONCLUDED THAT THE DEFENDANT'S ACTIONS PUT OUR COUNTRY, QUOTE,

19   "AT GREATER RISK BY JUGGLING CONTRACTS MORE FOR WHAT THEY

20   WOULD DO FOR HIM THAN FOR THE MILITARY," END QUOTE.

21            THIS IS NOT THE GOVERNMENT TALKING ABOUT THE ACTIONS

22   OF THE DEFENDANT AND HIS CO-CONSPIRATORS.  IT IS THE PUBLIC.

23   THESE FACTS ARE NOT LOST.  IT'S NOT HYPERBOLE TO SUGGEST THAT

24   THE PUBLIC BELIEVES THAT THE CRIMES WE'RE LOOKING AT TODAY DO,

25   IN FACT, GO TO THE VERY CORNERSTONE OF OUR DEMOCRACY.

PDF created with pdfFactory trial version www.pdffactory.com

1          YOU SAW THE TRIAL.  I'M NOT GOING TO GO OVER IT.

2   IT'S CLEAR.  THE JURY HAS SPOKEN.  WE NOW KNOW HOW THE

3   DEFENDANT'S ACTIVITIES TURNED WHAT WAS NOT A DEFENSE

4   CONTRACTOR, BUT AN INSIGNIFICANT LOBBYING FIRM INTO A MAJOR

5   DEFENSE CONTRACTOR IN A SHORT PERIOD OF TIME.  AND WE KNOW NOW

6   THAT HIS FORTUNE WAS TAKEN OUT OF THE WALLETS OF THE EVERYDAY

7   TAXPAYERS.  AND WHY WAS IT TAKEN OUT?  WHY DID HE TAKE THESE

8   OUT?  TO ENRICH HIMSELF SO HE COULD LIVE THE LIFESTYLE OF THE

9   RICH AND FAMOUS.

10          AND AS THE COURT KNOWS, ONE OF THE PROBLEMS,

11  REGARDLESS OF OVER PAYMENT OF GOVERNMENT FUNDS ON OCCASION,

12  IF, IN FACT, THE DEFENDANT PROFITED BY GETTING THE GOVERNMENT

13  TO GO INTO A CONTRACT UNJUSTLY, SOMEBODY ELSE LOSES OUT BY

14  NECESSITY.  IT'S ONE OF THE TRAGEDIES IN AN EVER-INCREASING

15  HOSTILE WORLD.  IF YOU RIG THE SYSTEM, YOU'RE PLAYING WITH THE

16  NATION'S SECURITY.  AND DUE SOLELY -- AND THE EVIDENCE IS

17  CLEAR.  SOLELY DUE TO THE INFLUENCE OF CONGRESSMAN CUNNINGHAM,

18  THE "TALKING POINTS," THE BRIBES, HE GOT IN THE NEIGHBORHOOD

19  OF $100 MILLION THAT WOULD HAVE GONE TO PEOPLE WHO WEREN'T

20  RIGGING THE SYSTEM.

21          AS A RESULT, THERE WERE ITEMS THAT WEREN'T REQUESTED

22  BY THE PENTAGON, THAT WERE CERTAINLY OVERPRICED THAT WERE NOT

23  NEEDED AND WERE NOT PUT TO USE.  I UNDERSTAND THE COURT CAN

24  LOOK AT IT A DIFFERENT WAY.  I DON'T WANT TO TALK ABOUT

25  CALCULATION AND LOSS.  I'M TALKING JUST ABOUT 3553.  I'M

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    LOOKING AT FACTS.  I'M NOT ASKING THE COURT TO CHANGE YOUR

2    GUIDELINE CALCULATIONS.  BUT WE PUT IN THE RAW FACTS.  AND WE

3    JUST INCLUDED A COUPLE CONTRACTS, A HANDFUL.

4            AND YOU SAW ON FIVE EQUIPMENT PURCHASES.  THE

5    GOVERNMENT PAID -- IT'S IN THE PAPERS, AND WE HAVE THEM IN THE

6    EXHIBITS -- 3 MILLION AND CHANGE.  IN RETURN, THE GOVERNMENT

7    PAID MR. WILKES OVER 19 MILLION.  AND THE PROBLEM IS THAT THE

8    SYSTEM WASN'T FAIR.  MAYBE THIS WOULD HAVE HAPPENED, MAYBE, IN

9    ANOTHER INSTANCE.  BUT THE FACT IS IT HAPPENED HERE THROUGH

10   CORRUPT ACTIVITY.

11           YOU HEARD THE TESTIMONY.  YOU HEARD ABOUT THESE

12   EQUIPMENT PURCHASES THAT THE GOVERNMENT DIDN'T WANT.  YOU

13   HEARD WHEN WE STOOD UP HERE OVER A YEAR, ALMOST TWO YEARS AGO

14   WHEN CONGRESSMAN CUNNINGHAM WAS SENTENCED THAT THE EQUIPMENT

15   WAS LYING AROUND.  IT REMAINS LYING AROUND TO THIS DAY UNUSED

16   BECAUSE IT WAS UNWANTED.  THAT'S JUST THE REALITY, YOUR HONOR.

17           THE SECOND AND FINAL EXAMPLE, THE SOFTWARE

18   PURCHASES.  YOU HEARD THE TESTIMONY.  YOU'VE GOT THE

19   DECLARATIONS.  WE PAID OVER $10 MILLION.  WHEN I SAY "WE," I'M

20   TALKING ABOUT THE COURT, THE COURT CLERKS, THE GOVERNMENT, THE

21   TAXPAYERS OF THIS COUNTRY.  WE ALL PAID.  AT THE TIME WHEN

22   MR. JONES SAID THIS STUFF WAS LYING AROUND UNUSED IN

23   SHRINK-WRAPPED PALLETS IN WAREHOUSES ROTTING, WE STILL BOUGHT

24   ANOTHER $10 MILLION.  WHY?  BECAUSE THE PRESSURE PUT ON THE

25   GOVERNMENT BY CONGRESSMAN CUNNINGHAM THAT WAS SCRIPTED.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1          THOSE SIX PURCHASES ALONE ARE OVER $25 MILLION THAT

2     WOULDN'T HAVE HAPPENED BUT FOR THE DEFENDANT'S ACTIVITY.  AND

3     IT'S $25 MILLION REGARDLESS OF ANY CALCULATIONS YOU WANT TO

4     MAKE.  THAT'S HARD FIGURES THAT THE TAXPAYERS LOST OUT ON.

5          AND ONCE AGAIN, WE SEE HERE TODAY WHEN HE COMES

6     BEFORE THE COURT ALL OF THIS, JUST THESE HANDFUL OF

7     TRANSACTIONS, WERE DONE BY THIS PREDATORY WOLF IN HIS

8     SELF-STYLED PATRIOT'S CLOTHING.  SO WHILE MR. WILKES COULD

9     LIVE THE LIFE OF THE RICH AND FAMOUS IN HIS $2.7 MILLION

10    HOUSE, WALKING HIS TWO ACRES OF LAND, SWIMMING IN HIS SWIMMING

11    POOL, LOUNGING ON HIS 5,000-SQUARE-FOOT ESTATE, DRIVING HIS

12    HUMMER, HIS JAGUAR, HIS LAND ROVER, TAKING HIS 6,000-A-NIGHT

13    VACATIONS IN CASTLES IN SCOTLAND AND ESTATES IN HAWAII, AT THE

14    VERY SAME TIME, HE WAS SQUANDERING THE TAXPAYERS' MONEY, END

15    OF STORY, FOR PRODUCTS THEY DIDN'T ASK FOR, THE MILITARY

16    DIDN'T NEED, AND THEY DIDN'T USE.

17         NOW, BECAUSE THIS IS SO CRUCIAL TO MR. GERAGOS AND

18    HIS ARGUMENT TO THE COURT, LET ME JUST TAKE A MINUTE TO

19    EXPLAIN WHY A 100-MONTH SENTENCE THAT THE COURT IMPOSED

20    FOR CUNNINGHAM WAS APPROPRIATE AND PROPER AND WHY -- BECAUSE

21    THE COURT RECOGNIZES AND THE GOVERNMENT RECOGNIZES MUCH OF

22    WHAT YOU HAD TO DO -- AND IT'S YOUR TASK TO MAKE SURE THE

23    SENTENCES ARE COMMENSURATE BETWEEN THE VARIOUS PEOPLE WHO FACE

24    THE COURT.

25         DOES CUNNINGHAM REMAIN A CENTRAL FIGURE?

PDF created with pdfFactory trial version www.pdffactory.com

1    ABSOLUTELY.  WAS CUNNINGHAM THE PUBLIC OFFICIAL?  WAS HE THE

2    PERSON WHO BETRAYED THE PUBLIC TRUST, THE ELECTED OFFICIAL?

3    AND BECAUSE OF THAT, DOES HE BEAR AWESOME RESPONSIBILITY FOR

4    HIS ACTS?  ABSOLUTELY.  WE BELIEVED IT WHEN WE MADE THE

5    ARGUMENTS IN FRONT OF THE COURT SEVERAL YEARS AGO.  WE BELIEVE

6    IT TODAY.

7            AND IT WAS BECAUSE OF THAT THAT WITHOUT LOOKING AT

8    LOSS IN THE VERY SAME WAY THE COURT DID TODAY AND WITHOUT

9    LOOKING AT ROLE, GIVING HIM A NEUTRAL, NOTHING ON ROLE, THE

10   GUIDELINE WAS 20 TO 25 YEARS.  NOW, THE COURT -- THAT'S THE

11   GUIDELINE RANGE THAT THE COURT DETERMINED, SIMILAR TO WHAT IT

12   WAS TODAY, AT A LEVEL 38.  THE COURT DIDN'T GIVE HIM THAT

13   TERM.  THE GOVERNMENT DIDN'T ASK FOR THAT TERM.  WHY?

14           NUMBER ONE, AS NOTED BY THE COURT, HE ACCEPTED

15   RESPONSIBILITY.  CONTRAST WHAT HE DID TO WHAT THIS MAN DID.  I

16   KNOW IT RESONATED WITH THE COURT.  I HEARD.  AS THE COURT MOST

17   LIKELY KNOWS, WE LISTEN.  WE GET IT WHEN THE COURT SPEAKS.  WE

18   HAVE A FEELING AS TO WHAT'S IMPORTANT.  AND WHEN THE COURT

19   SAYS "HEY, MR. CUNNINGHAM, I TAKE IT.  I SEE THAT YOU WENT

20   OUT.  YOU WENT DOWN TO THE COURTHOUSE STEPS.  AND ON THE

21   STEPS, YOU ACCEPTED RESPONSIBILITY, TEARFUL."  AND THAT MEANT

22   SOMETHING TO YOU.  WE GET THAT.  THE GOVERNMENT GETS THAT.

23           WE CONTRAST THAT WITH WHAT YOU SAW HERE TODAY.

24   PRIOR TO INDICTMENT -- NOT AT THE TRIAL, BUT PRIOR TO

25   INDICTMENT -- CONGRESSMAN CUNNINGHAM RESIGNED THAT OFFICE.

PDF created with pdfFactory trial version www.pdffactory.com

1    THAT'S NOT INSIGNIFICANT.  IT WASN'T INSIGNIFICANT TO THE

2    GOVERNMENT.  I DON'T BELIEVE IT WAS INSIGNIFICANT TO THE

3    COURT.  I DON'T WANT TO SAY IT WAS ON THE LEVEL OF RICHARD

4    NIXON RESIGNING TO AVOID A CONSTITUTIONAL CRISIS.  IT WASN'T.

5    BUT BOY, THAT WAS SIGNIFICANT.  IT MEANT SOMETHING TO US.  I

6    KNOW IT MEANT SOMETHING TO THE COURT.

7            THAT MAN WHO WAS CORRUPTED BY THE DEFENDANT SAT ON

8    SOME OF THE MOST SENSITIVE COMMITTEES THAT OUR NATION HAS,

9    ENTITLED TO INFORMATION THAT VERY FEW IN THIS COUNTRY GET.

10   THE FACT THAT WE COULD HAVE HIM RESIGN AND LEAVE OFFICE BEFORE

11   BEING INDICTED, THAT MEANT SOMETHING TO US.  THAT'S SOMETHING

12   THAT THE COURT HAD TO CONSIDER.

13           HE FORFEITED HIS HOUSE.  WHILE MR. WILKES STILL HAS

14   HIS ESTATE, CONGRESSMAN CUNNINGHAM HAS TRADED HIS IN FOR A

15   JAIL CELL BEFORE HE HAD TO BE INDICTED.  HE AGREED TO GIVE UP

16   VIRTUALLY ALL HIS EARTHLY POSSESSIONS, THOSE GAINED ILLEGALLY

17   LIKE THE ANTIQUES AND THOSE GAINED LEGALLY.  HE ACCEPTED A

18   MASSIVE AND CRUSHING TAX BURDEN THAT HE SHARES WITH HIS WIFE.

19           SO NOT ONLY DID THE CONGRESSMAN ACCEPT

20   RESPONSIBILITY, BUT IN DOING SO HE ASSISTED IN THE DESTRUCTION

21   OF HIS FAMILY BECAUSE HIS WIFE BEARS THAT TAX BURDEN TO THIS

22   DAY, WHICH IS SHARED EQUALLY.  MR. WILKES TRIES TO CLAIM "OH,

23   NO.  THOSE ARE SEPARATE ASSETS FOR MY WIFE."  CONGRESSMAN

24   CUNNINGHAM SADDLED HIS WIFE WITH THOSE NOT BECAUSE HE WANTED

25   TO, BUT BECAUSE HE ACCEPTED RESPONSIBILITY FOR WHAT HE DID,

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    SOMETHING THAT WAS IMPORTANT TO THE COURT AND TO THE
2    GOVERNMENT.
3         HE COOPERATED WITH THE GOVERNMENT INVESTIGATION, FAR
4    FROM GIVING PUBLIC PRONOUNCEMENT OR GIVING INTERVIEWS TO THE
5    NEW YORK TIMES TALKING ABOUT HE THOUGHT HANDING OUT CASH WAS
6    THE WAY HE DID BUSINESS.  AGAIN, MR. GERAGOS, TALKS ABOUT WHAT
7    THE GOVERNMENT MIGHT HAVE SAID IN THE BEGINNING OF TRIAL.  WHO
8    FIRST SAID TIT FOR TAT?  WAS IT THE GOVERNMENT OR THE DEFENSE
9    WHO SAID, "THIS IS THE WAY BUSINESS IS DONE IN WASHINGTON"?  I
10   CAN TELL YOU WILL LONG BEFORE THE TRIAL STARTED IN THE NEW
11   YORK TIMES, THE DEFENDANT SAID HOW BUSINESS WAS DONE IN
12   WASHINGTON.  AND HE TALKED ABOUT GIVING CASH OUT BEFORE WE
13   EVER GOT NEAR THE COURTHOUSE STEPS.
14        AND FINALLY AND IMPORTANT, I THINK THE COURT NOTED,
15   PROBABLY MORE IMPORTANT TO THE COURT THAN TO THE GOVERNMENT,
16   THAT HE WAS, IN FACT, A WAR HERO.  THAT MAKES IT ALL THE MORE
17   SAD.  THAT DOESN'T RELIEVE HIM OF CULPABILITY.  IT DOESN'T
18   RELIEVE HIM FROM THE CENTRAL ROLE.  BUT IT IS ON HIS SIDE OF
19   THE LEDGER.  WE HAVE A WAR HERO ON ONE SIDE OF THE LEDGER, AND
20   ON MR. WILKES'S SIDE WE HAVE A WAR PROFITEER.  NOTHING MORE.
21        ACCEPTANCE OF RESPONSIBILITY, RESIGNING FROM OFFICE,
22   GIVING UP ALL EARTHLY POSSESSIONS, SADDLING NANCY WITH A
23   MASSIVE TAX DEBT, COOPERATING WITH THE GOVERNMENT, AND BEING A
24   WAR HERO, THIS COURT, WHICH IS AGAIN WHY IT'S EASY FROM THIS
25   PART OF THE PODIUM AND HARDER FROM YOURS -- AND I KNOW THE

PDF created with pdfFactory trial version www.pdffactory.com

1   COURT STRUGGLED WITH THIS -- IMPOSED VIRTUALLY A LIFE

2   SENTENCE.

3          THE EVIDENCE WAS UNCONTRADICTED AT TRIAL.  MR. FORGE

4   ADDRESSED IT A LITTLE BIT.  BUT THE LENGTH OF HIS LIFE SPAN

5   WAS ALWAYS BY TWO DOCTORS UNCONTRADICTED GOING TO BE SEVEN

6   YEARS, 84 MONTHS.  HE'S GOT CANCER AND OTHER PROBLEMS THAT

7   DON'T NEED TO BE GONE INTO.  THE COURT KNEW THAT AT THE TIME.

8   I THINK A LOT OF THE PUBLIC DIDN'T UNDERSTAND IT AT THE TIME,

9   THAT THAT WAS FACTORED INTO WHAT THE COURT WAS DOING AND THE

10  GRAVITY OF THE SENTENCE IT IMPOSED.  DESPITE ALL THE FACTS ON

11  HIS SIDE OF THE LEDGER, THE COURT STILL FELT IT WAS

12  APPROPRIATE TO GIVE THE CONGRESSMAN A 100-MONTH SENTENCE FOR A

13  MAN WITH A LIFE EXPECTANCY OF 84 MONTHS.

14         NOW, BY THIS MATRIX, THE SENTENCE SHOULD BE WELL

15  OVER 300 MONTHS FOR THIS DEFENDANT, WHICH THE GOVERNMENT IS

16  NOT ASKING FOR.  ALL WE'RE ASKING FOR IS A SENTENCE CONSISTENT

17  WITH THE GUIDELINES AS THE COURT HAS FOUND THEM.  WE'RE NOT IN

18  THE BUSINESS OF THROWING OUT THE GUIDELINES.  I COME IN HERE

19  EVERY DAY.  I KNOW THIS COURT HAS RESPECT FOR THE GUIDELINES.

20  I KNOW THE FACT THAT THEY'RE NOT MANDATORY.  THEY ARE A FACTOR

21  TO BE CONSIDERED.

22         AND THE ONLY REASON I MENTION IT IS BECAUSE THEY DO

23  INFORM.  IT'S INTERESTING WHEN THE GUIDELINES AND THE 3553(A)

24  FACTORS BASICALLY COME OUT IN THE SAME NEIGHBORHOOD.  THAT'S

25  WHY THE GOVERNMENT, AS THE COURT HAS NOTED -- WHILE WE MAY

PDF created with pdfFactory trial version www.pdffactory.com

111

1    DISAGREE WITH THE CALCULATIONS, THAT'S ALL THEY ARE.  I DON'T

2    THINK THERE'S A DISAGREEMENT WITH THE SEVERITY OF THE CRIME

3    AND THE ROLE AND DEFENDANT PLAYED.

4            SO WE LOOK AGAIN AT THE VARIOUS SIDES OF THE LEDGER.

5    AND WE DON'T SEE SOMEBODY HERE WHO IS WET, WHO IS COLD, WHO IS

6    HUNGRY, IN THE COURT'S WORDS.  WE SEE SOMEBODY WHOSE MOTIVES

7    WERE SIMPLY SHABBY, SORDID, AND SQUALID.  HE DID THIS NOT

8    BECAUSE OF ANY DESIRE WHATSOEVER SO HELP THE MILITARY.  THAT'S

9    RUBBISH.  HE DID IT SO HE COULD LIVE HIGHER ON THE HOG.

10           AND IF ANYTHING, HIS APPETITE FAR EXCEEDED ANYTHING

11   OF THE CONGRESSMAN.  $100 CIGARS.  $1,000 BOTTLES OF WINE.

12   TENS OF THOUSANDS OF DOLLARS ON VACATION.  HUNDREDS OF

13   THOUSANDS OF DOLLARS ON CORPORATE JETS AND CARS.  MILLIONS OF

14   DOLLARS IN BUILDINGS.  AND WHY NOT?  WHY NOT?  IT WAS ALL

15   FINANCED BY THE UNITED STATES TAXPAYERS.

16           WILKES'S IDEA OF AN AMERICAN DREAM IS SIMPLY A

17   NIGHTMARE FOR THE AMERICAN PUBLIC AND THE AMERICAN TAXPAYER.

18   THERE'S NO BETTER WINDOW ON THIS SUPPOSED FAMILY MAN, YOUR

19   HONOR.  YOU HEARD IT AT TRIAL, THE MAN WHO COMES IN HERE AND

20   ASKS FOR FORGIVENESS.  HE DOESN'T ADMIT ANYTHING, BUT SAYS

21   HE'S A GOOD FAMILY MAN.

22           WHAT HAPPENED WHEN HIS FINANCIAL EMPIRE STARTED TO

23   COLLAPSE?  YOU HEARD IT FROM THAT WITNESS STAND.  A MAN WHO IS

24   SOPHISTICATED, MUCH MORE SOPHISTICATED IN FINANCIAL MATTERS

25   THAN I AM, HE ADMITTED WHAT HE DID TO PROFIT UP, HE TOOK MONEY

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

112

1   OUT OF HIS KIDS' COLLEGE FUNDS.

2         AND THE REASON I MENTIONED THAT IS HE HAD TO ADMIT

3   IT AT THE SAME TIME HE WAS MAINTAINING A LUXURY BOX AT THE

4   PADRES.  HE WAS PAYING OVER $200,000 A YEAR AT THE SAME TIME

5   HE DRAINED HIS KIDS' COLLEGE FUNDS.  THAT'S THE FAMILY MAN?

6   YOU MAY RECALL THE LITTLE BACK-AND-FORTH WE HAD ON THIS POINT.

7   HE SAID, "IT'S MY MONEY.  I PUT IT IN THERE.  I'M A

8   BUSINESSMAN.  I'M ENTITLED TO KNOW HOW MONEY CAN GO IN AND

9   OUT."

10        WELL, WE NOW KNOW IT GOES OUT WHEN THE PADRES BOX

11  COMES IN.  IT ONLY GOES BACK IN, IF AT ALL, WHEN THE

12  GOVERNMENT IS ABOUT TO SEIZE IT OR WHEN THE COURT MIGHT WANT

13  TO FORFEIT THESE ILL-GOTTEN GAINS, THE STOLEN TAXPAYER FUNDS.

14  THAT'S THE ONLY TIME IT GOES BACK IN.  AT THE SAME TIME, THE

15  GOVERNMENT IS PAYING FOR HIS COURT-APPOINTED LAWYERS WHO ARE

16  IN THE COURT TODAY.  "MAYBE THERE I'LL PUT SOME MONEY BACK IN

17  THE COLLEGE FUNDS BECAUSE I'M A FAMILY MAN."

18        IN CONCLUSION, THIS IS THE YARDSTICK.  EVERYBODY

19  LOOKS TO THIS COURT.  IT'S YOUR DETERMINATION WHAT TO DO.  AND

20  THE REASON IT'S IMPORTANT IS BECAUSE THIS IS EITHER GOING TO

21  CONFIRM OR DISCREDIT THE CRITICS, THE BLOGGERS, THE PUBLIC WHO

22  BELIEVE THAT THIS COURT OR ANY COURT GIVES FAVORABLE TREATMENT

23  TO A WHITE COLLAR CRIMINAL OVER THE FAR LESS FORTUNATE PEOPLE

24  THAT COME BEFORE THIS COURT EVERY DAY.

25        IT'S NOT EASY TO GIVE PEOPLE SENTENCES FOR A ONE-DAY

PDF created with pdfFactory trial version www.pdffactory.com

1    CRIME FOR ECONOMIC REASONS.  THEY GET CAUGHT WITH 50, 60,

2    70 POUNDS OF COCAINE.  THE COURT'S HANDS ARE TIED.  I'VE SEEN

3    THE COURT TIME AND AGAIN STRUGGLE WITH THE FACT THAT THAT TYPE

4    OF CRIME WARRANTED A SERIOUS SENTENCE.  AND I WOULD BESEECH

5    THE COURT THAT IT'S IMPORTANT FOR EVERY SINGLE ONE OF THOSE

6    LESS FORTUNATE PEOPLE THAT COME IN HERE THAT WE SEE THAT SAME

7    YARDSTICK OF JUSTICE.

8           AND THE GOVERNMENT BELIEVES IT'S NOT ADEQUATE, IT'S

9    NOT ADEQUATE DETERRENCE FOR SOMEBODY WHO RIGGED THE SYSTEM,

10   WHO OBSTRUCTED JUSTICE, WHO ROBBED THE PUBLIC TREASURY, WHO

11   BULLIED GOVERNMENT OFFICIALS, WHO OBSTRUCTED JUSTICE AND IS

12   UNREPENTANT TO GET A SENTENCE THAT IS EVEN CLOSE TO THE DECADE

13   THAT HE COMMITTED HIS ILLEGAL ACTS AND ENJOYED THEIR FRUITS.

14          IT'S FOR THAT REASON THAT WE SUGGEST THAT THIS COURT

15   GIVE A SIGNIFICANTLY HIGHER SENTENCE THAN ONE THAT IT WOULD

16   GIVE TO A CO-CONSPIRATOR WHO PLED GUILTY, COOPERATED, TRADED

17   HIS CONGRESSIONAL OFFICE FOR A JAIL CELL, AND FORFEITED ALL

18   HIS EARTHLY POSSESSIONS.

19          ABOUT 150 YEARS AGO -- AND THIS, YOUR HONOR, MAY

20   SEEM LIKE HYPERBOLE, BUT IT STRIKES TO THE GOVERNMENT HERE --

21   IN ANOTHER TIME OF WAR, ANOTHER PRESIDENT, ABRAHAM LINCOLN,

22   SAID AND URGED THE NECESSITY OF MAKING SURE THAT WE WOULD HAVE

23   GOVERNMENT OF THE PEOPLE, BY THE PEOPLE, FOR THE PEOPLE.

24   BECAUSE, IN HIS WORDS, IF NOT, WE WOULD END UP PERISHING FROM

25   THE EARTH.

PDF created with pdfFactory trial version www.pdffactory.com

1           BRENT WILKES'S CRIMES GO THE HEART OF THIS LEGACY.

2    THERE'S NO SHORTCUT HERE.  THIS IS A CRIME AGAINST OUR SYSTEM

3    OF JUSTICE.  WE WOULD ASK THAT THE COURT IMPOSE AN APPROPRIATE

4    SENTENCE.

5           THE COURT:  THANK YOU, MR. HALPERN.

6           MR. GERAGOS:  WOULD THE COURT ALLOW ME TO RESPOND?

7           THE COURT:  YES, MR. GERAGOS.

8           MR. HALPERN:  DO I GET A SURREBUTTAL?

9           THE COURT:  THE DEFENDANT IS GOING TO GET SENTENCED

10   TODAY.  I'LL GIVE MR. GERAGOS THE LAST WORD.

11          MR. GERAGOS:  I SAT HERE AND LISTENED TO THIS.  I

12   DON'T KNOW WHAT YOU -- HOW YOU WANT TO CHARACTERIZE IT.  MY

13   BELIEF WAS WHEN WE TRIED THIS CASE, WE TRIED ON WHAT HAPPENED

14   IN THE COURTROOM.  WE WERE NOT TRYING THIS CASE BECAUSE OF

15   MR. HALPERN'S PREOCCUPATION FOR GOING ONLINE OR ON THE

16   INTERNET OR WIKIPEDIA OR WORRIED ABOUT BLOGGERS OR ANYTHING

17   ELSE.  WE'VE REALLY REACHED A PITIFUL POSITION WHEN YOU HAVE

18   REPRESENTATIVES OF THE GOVERNMENT GETTING UP HERE AND SAYING,

19   "WE'VE GOT TO WORRY ABOUT WHAT THE BLOGGERS MIGHT SAY.  WE'VE

20   GOT TO WORRY ABOUT SOME ANONYMOUS PERSON POSTED SOMETHING ON

21   WIKIPEDIA."  FOR ALL I KNOW, YOU CHECK THE IP ADDRESS AND IT

22   CAME FROM THE SAN DIEGO U.S. ATTORNEY'S OFFICE.  I DON'T HAVE

23   ANY IDEA WHO POSTED IT.  BUT THE FACT IS IF WE WANT TO GO TO

24   WIKIPEDIA, WHEN I GET HOME, I'LL GO TO MY IP ADDRESS.

25   I'LL POST IN THE TERM "GRANDSTANDING," AND I'LL PUT IN THE

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    SAN DIEGO U.S. ATTORNEY'S OFFICE.

2              THIS CASE WAS TRIED IN THIS COURT.  THE COURT, I

3    THINK, PAID ATTENTION.  THE COURT WENT THROUGH THIS MORNING

4    THE OBJECTIONS THAT WE HAD, SUSTAINED SOME AND OVERRULED SOME,

5    WAS NOT DELUSIONAL ABOUT WHAT TRANSPIRED.  THE IDEA OF

6    INVOKING THE CIVIL WAR AND THE IRAQ WAR AND EVERY OTHER THING

7    WE CAN COME UP WITH TO PUT ON HIS BACK IS MORE THAN JUST A

8    LITTLE BIT LUDICROUS.

9              THIS IS A CASE IN ITS CONTEXT WHERE YOU'VE GOT MITCH

10   WADE WITH VIRTUALLY NO TIME.  YOU'VE GOT JOEL COMBS AND A FREE

11   PASS.  YOU'VE GOT DUKE CUNNINGHAM AT EIGHT YEARS.  I DID NOT

12   KNOW THAT I HAD TO DEFEND JOHN WILKES-BOOTH IN ADDITION TO IT.

13   I TAKE GREAT EXCEPTION TO IT.  THIS CASE IS SOMEWHERE, IN MY

14   VIEW, BETWEEN ZERO AND EIGHT.  I THINK THAT'S THE UNIVERSE.

15   OBVIOUSLY, I THINK IT'S CLOSER TO ZERO THAN THE EIGHT.  BUT AS

16   MR. HALPERN SAID, AS IF IT MAKES ANY DIFFERENCE, WE LEAVE IT

17   TO THE COURT.

18             I WOULD ASK THE COURT TO IMPOSE A SENTENCE.  AND I

19   DO TAKE A LITTLE AFFRONT TO THE IDEA THAT I'VE TALKED ABOUT

20   AND DEFLECTED EVERYTHING AWAY FROM MR. WILKES.  WE HAVEN'T RUN

21   AWAY FROM MR. WILKES AT ALL EITHER IN THE FILINGS OR DURING

22   THE TRIAL.  WE PUT HIM ON.  THERE SEEMS TO BE A DEGREE OF

23   ANIMUS BETWEEN MR. HALPERN.  AND THAT MAY BE AS A RESULT OF

24   HIS CROSS-EXAMINATION OF MR. WILKES.  I DON'T KNOW.  MAYBE

25   SOME THERAPY LATER CAN DEAL WITH THAT.

PDF created with pdfFactory trial version www.pdffactory.com

116

1        BUT THE FACT REMAINS THAT MR. WILKES HAS SPENT

2    50-SOME-ODD YEARS WITHOUT SO MUCH AS A BLEMISH ON HIS RECORD.

3    HE'S RAISED A FAMILY, A DEVOTED FAMILY.  FAR BE IT FOR

4    MR. HALPERN OR ANYBODY ELSE TO CAST ASPERSIONS ON WHAT I THINK

5    IS A PRETTY EXEMPLARY BACKGROUND PAST AND HOPEFULLY FUTURE.

6        AND I SUBMIT IT ON THAT.

7        THE COURT:  THANK YOU, MR. GERAGOS.

8        THE COURT HAS CALCULATED THE SENTENCING GUIDELINES

9    SINCE THE BOOKER CASE.  THE GUIDELINES ARE A FACTOR, AN

10   IMPORTANT FACTOR.  I HAVE CONSIDERED THEM.  AND I'VE

11   CONSIDERED THE RANGE THAT I CONCLUDED FITS WHAT HAS BEEN

12   PROVED HERE, 235 TO 293 MONTHS.

13       IN THE PERIOD SINCE BOOKER WAS DECIDED, THE COURT IS

14   ALSO TO LOOK AT STATUTORY FACTORS THAT ARE SET FORTH UNDER

15   3553(A).  AND I THINK, MR. GERAGOS, THIS IS WHAT YOU AND, TO

16   SOME EXTENT, MR. HALPERN AND MR. BHANDARI HAD IN MIND.  YOU

17   REMINISCED BACK TO A TIME WHEN WE DIDN'T HAVE GUIDELINES AND

18   THAT COMMON SENSE FACTORS THAT HAVE MEANING TO EVERYDAY PEOPLE

19   WERE TAKEN INTO CONSIDERATION.  I THINK 3553 GIVES US THAT

20   LATITUDE.

21       BY SAYING THAT, I'M NOT A DISPARAGER OF THE

22   GUIDELINES.  ORDINARILY, I FIND MYSELF, AT LEAST TENTATIVELY

23   BEFORE I HEAR ARGUMENT ON CASES, IN AGREEMENT WITH THE RANGE

24   THAT'S PRODUCED BY APPLICATION OF THE GUIDELINES.  THE FIRST

25   OF THOSE FACTORS THAT I'M TO LOOK AT IS THE NATURE AND

PDF created with pdfFactory trial version www.pdffactory.com

1    CIRCUMSTANCES AND THE SERIOUSNESS OF THE OFFENSE.  THAT HAS

2    BEEN ALLUDED TO BY BOTH SIDES IN THIS CASE.  I FIND THAT THAT

3    IS AN AGGRAVATING FACTOR HERE.

4         THIS WAS A LONG AND CONTINUOUS CRIME.  IT WAS A

5    PREMEDITATED CRIME.  THE EVIDENCE AT TRIAL SHOWED THAT THE

6    TIME PERIOD THAT MR. CUNNINGHAM WAS BRIBED AND REALLY WAS AT

7    THE BECK AND CALL OF MR. WILKES AND MR. WADE AND POSSIBLY EVEN

8    OTHERS SPANNED NINE YEARS.  IT WAS BROAD IN SCOPE AS WELL.

9         ONE OF THE INTERESTING THINGS ABOUT THIS CASE IS

10   THAT HERE'S A FELLOW WHO'S A CERTIFIED PUBLIC ACCOUNTANT.

11   HE'S GOT A DEGREE IN ACCOUNTING.  YET WHEN HE GETS INTO THE

12   GOVERNMENT CONTRACT AREA, HE'S SORT OF A GENERALIST.  HE GOES

13   WHEREVER THE CONTRACTS ARE.  "IF IT MEANS SCANNING DOCUMENTS,

14   I CAN DO THAT.  IF IT MEANS SOFTWARE PROGRAMS, I CAN DO THAT."

15        IT'S AGGRAVATING IN THIS CONTEXT:  I AGREE GENERALLY

16   WITH THE ARGUMENT THE GOVERNMENT HAS MADE THAT BUT FOR

17   MR. WILKES'S RELATIONSHIP WITH CONGRESSMAN CUNNINGHAM, A LOT

18   OF THESE CONTRACTS NEVER WOULD HAVE BEEN ACTED UPON BY THE

19   UNITED STATES.  I THINK A LOT OF THIS STUFF WAS STUFF THAT THE

20   GOVERNMENT REALLY DIDN'T NEED, THAT THE PEOPLE THAT WERE IN

21   THE KNOW SAID WE DIDN'T NEED.  AND PROBABLY THEY SHOULD HAVE

22   BEEN LISTENED TO.  GREATER DEFERENCE SHOULD HAVE BEEN GIVEN TO

23   THEM.  BUT IT WAS BECAUSE OF THAT ILLICIT RELATIONSHIP BETWEEN

24   MR. WILKES AND CONGRESSMAN CUNNINGHAM THAT CONTRACTS WERE

25   EFFECTED AND ENTERED INTO AND THE GOVERNMENT ENDED UP WITH

PDF created with pdfFactory trial version www.pdffactory.com

1    SUCH THINGS AS A ROOMFUL OF COMPUTERS SITTING AROUND WITH NO

2    ONE TO USE THEM.  THAT GOES TO THE CIRCUMSTANCES OF THIS

3    OFFENSE.

4            I MENTIONED EARLIER THAT I COULDN'T FIND BY CLEAR

5    AND CONVINCING EVIDENCE THAT MR. WILKES WAS AN ORGANIZER OR

6    LEADER.  BUT THERE WAS AN ASPECT TO THIS THAT IS TROUBLESOME

7    TO ME.  AND IT SHOWS, I THINK, HOW SHREWD AND EXPLOITIVE

8    MR. WILKES WAS.  IT HAS BECOME ABUNDANTLY CLEAR TO ME IN

9    HANDLING THESE TWO CASES THAT CONGRESSMAN CUNNINGHAM, AT LEAST

10   AT THE TIME OF THESE OFFENSES, HAD AN OVERBLOWN EGO.  HE WAS A

11   GUY THAT YOU KNEELED TO AND LIKE TO GET FLUFFED.  AND

12   MR. WILKES SAW THAT.  HE SAW THAT CHARACTERISTIC.  HE KNOWS

13   HUMAN NATURE.  HE'S ADEPT AT FIGURING THINGS OUT LIKE THAT

14   OUT.

15           AND MUCH OF HIS ACTIVITY HERE DESIGNED TOWARD

16   ULTIMATELY HIS OWN ENDS AND HIS OWN PROFIT INVOLVED EXPLOITING

17   THAT FOIBLE ON CONGRESSMAN CUNNINGHAM'S PART.  THERE WAS AN

18   ALLUSION BY MR. BHANDARI TO THE POKER GAME TESTIMONY.

19   MR. WILKES TOOK SUBORDINATES OUT AND SAID, "LET DUKE WIN."

20   THEN THERE WAS THE POKER GAME UP IN IDAHO WHERE APPARENTLY

21   SOMEBODY HAD THREE OF A KIND AND DUKE HAD TWO PAIR AND THAT

22   PERSON WON AND MR. WILKES TOOK HIM OUT AND SCOLDED HIM

23   AFTERWARDS AND SAID, "I SAID LET DUKE WIN."

24           THEN I'M REMINDED OF THE SCUBA-DIVING ADVENTURE

25   WHERE MR. WILKES WAS ASTUTE ENOUGH TO HAVE A ROCK PLANTED

PDF created with pdfFactory trial version www.pdffactory.com

1    SOMEWHERE ON THE BOTTOM OF THE OCEAN WITH DUKE'S NAME ON IT

2    AND THEN THE FEIGNED DELIGHT WHEN THE ROCK WAS SHOWN TO THE

3    VIDEOGRAPHER AND EVERYBODY WAS POINTING.

4         THAT'S A PRETTY SHREWD FELLOW, MR. GERAGOS.  THAT'S

5    THE CHARACTER OF MR. WILKES.  THOSE TWO INCIDENTS, INNOCUOUS

6    AS THEY ARE, THEY SORT OF COLOR MY VIEW ON WHAT HE DID IN THIS

7    CASE AND HOW HE MANIPULATED THE FOIBLES OF ANOTHER INDIVIDUAL

8    WHO WAS RIPE FOR MANIPULATION.  BUT HE TOOK ADVANTAGE OF THAT.

9    THERE WAS A LEVEL OF SOPHISTICATION AND SHREWDNESS TO THAT

10   THAT I THINK INFORMS THE JUDGMENT ABOUT WHAT HE DID IN THIS

11   CASE AND HOW HE KNEW WHAT HE WAS DOING.

12        I DON'T ACCEPT FOR A SECOND, FOR EXAMPLE, THE

13   TESTIMONY THAT HE WOULD TAKE INVESTMENT ADVICE TO THE TUNE OF

14   A HALF A MILLION DOLLARS FROM DUKE CUNNINGHAM.  THIS IS THE

15   FELLOW THAT HE SCRIPTED THE STATEMENT "I, DUKE," IN

16   PARENTHESES.  THIS IS A FELLOW WHOSE INTELLIGENCE AND

17   INTELLECT MR. WILKES DIDN'T PARTICULARLY RESPECT, BUT IT

18   HAPPENED THAT HE HAD THE COMMISSION TO GET THESE THINGS DONE.

19   SO HE HAD TO USE HIM.

20        THAT'S PART OF THE CASE THAT I LOOK AT AND I

21   CONSIDER AGAINST THE BACKDROP OF THE THINGS THAT HAPPENED

22   HERE.  THAT'S COMMON SENSE THINGS THAT EVERYDAY PEOPLE WHO

23   KNOW HUMAN NATURE UNDERSTAND.

24        PART OF THE SERIOUSNESS OF THIS OFFENSE AND ONE OF

25   THE CIRCUMSTANCES IS I DO FIND THAT FUNDS WERE DIVERTED FROM

COMPUTER-AIDED TRANSCRIPTION

1  OTHER WORTHY PROJECTS.  I'M NOT GOING TO EMBRACE THIS

2  CHARACTERIZATION OF WAR PROFITEER.  THAT MAY HAVE BEEN THE

3  EFFECT ON THE GOVERNMENT'S VIEW OF WHAT HAPPENED.  MR. WILKES

4  WAS A GUY THAT WAS GOING TO GET CONTRACTS WHEREVER HE COULD,

5  AND HE WAS GOING TO USE MR. CUNNINGHAM TO MANIPULATE THAT

6  PROCESS.

7          I USED THE TERM IN SENTENCING MR. CUNNINGHAM

8  "BID-RIGGING."  WAS THAT REALLY WHAT WAS GOING ON HERE.  THESE

9  PEOPLE APPLYING FOR GOVERNMENT CONTRACTS THOUGHT THERE WAS A

10 LEVEL PLAYING FIELD, AND THEY WERE VERY NAIVE.  THERE WASN'T.

11 THEY NEVER HAD A CHANCE.  CUNNINGHAM WAS CARRYING THE WATER

12 FOR MR. WILKES AND MR. WADE AND BEING PAYING HANDSOMELY FOR

13 THAT.

14          THEN, OF COURSE, THERE'S THE EFFECT OF WHAT HAPPENED

15 HERE.  WE HAD A PUBLIC OFFICIAL, AN ELECTED OFFICIAL, FROM

16 THIS AREA OF THE COUNTRY WHO WAS CORRUPTED.  HE ADMITS HE WAS

17 CORRUPTED AND HAS BEEN SHOWN TO HAVE BEEN CORRUPTED.  THE

18 EVIDENCE IN THIS CASE HAS SHOWN THAT MR. WILKES WAS ONE OF

19 THOSE WHO DID THE CORRUPTING.  AND THAT IS TROUBLING TO ME.

20          WE'RE IN AN ELECTION YEAR NOW.  ALREADY THE CANNONS

21 HAVE COME OUT ON BOTH SIDES.  WE'RE VERY CYNICAL ABOUT

22 POLITICIANS GENERALLY ANYMORE.  AND WHAT HAS HAPPENED HERE AND

23 WHAT MR. WILKES WAS A PARTY TO WAS ADDING TO THAT CYNICISM

24 TOWARD OUR SYSTEM OF GOVERNMENT AND ELECTED OFFICIALS.

25          I HOPE THERE ARE STILL ELECTED OFFICIALS WHO EVERY

PDF created with pdfFactory trial version www.pdffactory.com

1    DAY STRIVE TO DO THEIR BEST FOR THEIR CONSTITUENCIES AND FOR

2    THE UNITED STATES.  I THINK THAT'S TRUE.  I THINK THIS IS THE

3    EXCEPTION IN THIS CASE.  BUT YOU KNOW THERE ARE A LOT OF

4    PEOPLE THAT DON'T BELIEVE THAT.  THEY DON'T EMBRACE THAT VIEW.

5    THEY'RE VERY CYNICAL ABOUT THAT.  AND UNFORTUNATELY, A

6    SITUATION LIKE THIS JUST GIVES THEM A LOUDER VOICE AND ADDS TO

7    THE CYNICISM THAT THEY HAVE ABOUT OUR WHOLE POLITICAL PROCESS.

8    AND THAT'S BAD FOR YOU AND BAD FOR ME AND BAD FOR EVERYBODY

9    HERE.  IF WE DON'T HAVE SOME CONFIDENCE IN ELECTED OFFICIALS

10   TO RESPONSIBLY HANDLE OUR PROBLEMS, THEN WE'RE IN DEEP

11   TROUBLE.

12         MR. WILKES, I SAY TO YOU THAT YOU HAVE DAMAGED THE

13   COUNTRY IN THAT RESPECT.  THINGS THAT YOU'VE DONE HAVE HAD

14   THAT EFFECT.

15         I'M TO LOOK, ALSO, AT THE HISTORY AND

16   CHARACTERISTICS OF THE DEFENDANT.  I HAVE CONSIDERED THAT VERY

17   CAREFULLY.  I'VE READ THE LETTERS TWICE.  THERE WERE MANY,

18   MANY LETTERS OF SUPPORT FOR MR. WILKES.  THE GOVERNMENT TAKES

19   THE POSITION THAT THIS IS BLACK AND WHITE.  HE'S MR. HYDE

20   ALONE.  I DON'T SEE IT THAT WAY.  THE LETTERS BESPEAK OF A

21   FELLOW WHO'S A GOOD FATHER.  THEY TALK ABOUT SOMEONE WHO

22   ADOPTED HIS STEPCHILDREN AND RAISED THEM AS HIS OWN.  HE CARED

23   FOR THEIR NEEDS, FINANCIAL AND OTHERWISE.

24         PARTICULARLY COMPELLING WAS A LETTER I GOT FROM

25   MR. WILKES'S DAUGHTER.  AND I READ THAT CAREFULLY.  I HAVE

PDF created with pdfFactory trial version www.pdffactory.com

122

1    CHILDREN, MR. WILKES, ABOUT THE SAME AGE.  AND IT IS IMPORTANT

2    TO ME, AS I KNOW IT IS TO YOU, TO BE RESPECTED BY YOUR KIDS.

3    YOU LET THEM DOWN IN THIS CASE.  YOUR DAUGHTER, IN HER LETTER

4    TO ME, SPEAKS ABOUT HOW IT'S UNLIKELY THAT YOU'LL BE THERE

5    WHEN SHE GRADUATES COLLEGE.  IT'S UNLIKELY THAT YOU'LL BE

6    THERE WHEN SHE GETS MARRIED.  THAT'S A VERY TOUCHING ACCOUNT

7    FROM HER.  AND I THOUGHT ABOUT THAT.

8            I'M SYMPATHETIC TO THE EFFECT THAT SENTENCING YOU TO

9    A TERM OF JAIL IS GOING TO HAVE ON YOUR FAMILY, YOUR MOTHER.

10   YOU HAVE BROTHERS AND AUNTS AND UNCLES THAT FLEW IN WHO TALKED

11   ABOUT HOW MR. WILKES WAS THERE IN THE TIME OF FINANCIAL AND

12   OTHER NEED.  YOU SENT CHECKS FOR $5- OR $10,000 WHEN THERE WAS

13   A LACK OF HEALTH INSURANCE.  I THINK THOSE THINGS ARE ALL ON

14   THE POSITIVE SIDE OF THE LEDGER FOR YOU, MR. WILKES.

15           BUT HERE'S WHERE I'M TROUBLED:  YOU MAINTAINED TODAY

16   IN YOUR STATEMENT TO ME, WHICH I LISTENED TO CAREFULLY, THAT

17   YOU'RE NOT GUILTY, THAT YOU WERE ACTING WITH PURE MOTIVES AND

18   CLEANLY.  AND I THINK ABOUT THAT AND THE EFFECT IT MUST HAVE

19   ON YOUR FAMILY.  I THINK IF YOU WERE TO DO THE RIGHT THING

20   ABOUT THIS, TODAY IS THE RIGHT TIME TO OWN UP.  YOU'RE GOING

21   TO GO OFF TO JAIL, AND YOUR FAMILY IS GOING TO BE CRUSHED BY

22   THAT BECAUSE THEY BELIEVE YOU.  THEY BELIEVE THAT THERE WAS

23   NOTHING TO THIS, THAT THIS WAS ALL A MANIPULATION OF

24   COINCIDENTAL FACTS BY THE UNITED STATES AND AN INNOCENT PERSON

25   IS GOING TO JAIL.

PDF created with pdfFactory trial version www.pdffactory.com

123

1           THE JURY KNEW THAT THAT WASN'T TRUE, AND I KNOW

2     THAT'S NOT TRUE, AND YOU KNOW THAT'S NOT TRUE.  A GUY THAT

3     CARES ABOUT HIS FAMILY IS AT LEAST GOING TO COME CLEAN TO

4     THEM.  SO WHILE IT MAY NOT BE ENTIRELY COMFORTING TO THEM, AT

5     LEAST THEY'LL HAVE SOME PEACE OF MIND THAT THIS IS ABOUT

6     SIMPLE ACCOUNTABILITY, THAT YOU'RE IN JAIL BECAUSE YOU DID

7     SOMETHING THAT VIOLATED THE LAW.  YOU HAVEN'T GIVEN THEM THAT

8     LEVEL OF COMFORT.  YOU JUST HAVEN'T.  SO I TAKE THAT INTO

9     CONSIDERATION AS WELL.

10          I'M TOLD THAT I'M TO LOOK TO PROMOTE RESPECT FOR THE

11    LAW.  THAT'S ONE OF THE FACTORS.  I THINK I'VE SPOKEN TO THAT.

12    IT'S SERIOUS BUSINESS WHEN OUR ELECTED OFFICIALS ARE CORRUPTED

13    AND THE ORDINARY PROCESS OF THE GOVERNMENT IS TURNED ON ITS

14    HEAD.  THAT'S WHAT HAPPENED IN THIS CASE.

15          I'M TOLD I'M TO LOOK TO DETERRENCE.  HERE I THINK

16    THERE IS A NEED FOR SOME SPECIFIC DETERRENCE.  THERE'S A

17    DISCONNECT, MR. GERAGOS AND MR. WILKES, IN THE ATTITUDE OF

18    MR. WILKES.  I DON'T HAVE ANY STRONG FEELING, GOOD FEELING

19    TODAY THAT HE GETS IT, THAT HE UNDERSTANDS THAT HE'S DONE

20    WRONG AND THAT THERE'S A TIME TO ATONE FOR THAT AND A PLEDGE

21    THAT "I WOULDN'T DO THIS KIND OF THING AGAIN."  IF ANYTHING,

22    HE'S COMPOUNDED THE PROBLEMS FOR HIMSELF BY NOT TELLING THE

23    TRUTH ON THE STAND.

24          THE GOVERNMENT'S ALLUDED TO THE FINANCIAL

25    DECLARATION THAT WAS FILED WITH ME.  THAT'S TROUBLING TO ME.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

124

1    I'M NOT GOING TO TAKE IT INTO ACCOUNT HERE.  BUT AT BEST, I

2    THINK IT WAS MISLEADING.  SO I SEE A FELLOW WHO IS CONTINUING

3    DOWN A PATH OF TRYING TO BLOW THINGS BY PEOPLE.  THERE'S A

4    CERTAIN ARROGANCE INVOLVED IN THAT.  NOT EVERYBODY IS DUKE

5    CUNNINGHAM.  MR. WILKES ISN'T SMARTER THAN THESE PROSECUTORS

6    OR I DARE SAY HE CAN BLOW ONE BY ME.  HE HASN'T.

7              SO I THINK THE NEED FOR SPECIFIC DETERRENCE IS

8    IMPLICATED HERE.  HE DOESN'T GET IT.  HE DOESN'T GET THAT THIS

9    ISN'T THE WAY TO CONDUCT YOURSELF.

10             I HAVE GLOSSED OVER THIS.  I WANT TO GO BACK TO IT

11   BECAUSE IT WAS AN IMPORTANT FACTOR IN MY THINKING, TOO.  I WAS

12   IMPRESSED WITH HIS UPBRINGING.  HERE'S A FELLOW WHO WAS RAISED

13   BY A SINGLE MOTHER, A NUMBER OF SIBLINGS, FATHER'S NOT AROUND.

14   AND AN IMPRESSIVE GUY.  GOES TO COLLEGE.

15             THE TRAGEDY OF THIS WHOLE THING IS I THINK HE'S GOT

16   THE SMARTS AND THE WHEREWITHAL TO HAVE ACCOMPLISHED ALL THIS

17   LEGITIMATELY.  HE WOULD MAYBE HAVE HAD TO WORK A LITTLE HARDER

18   AND NOT TAKE ALL THE SHORTCUTS.  AND MR. GERAGOS, YOU'VE

19   MENTIONED AT TIMES THAT THERE WAS AN ELEMENT OF CLASS WARFARE.

20   NONE OF THAT AFFECTS MY THINKING HERE.  PEOPLE ARE ENTITLED TO

21   HAVE $100 CIGARS OR FLY ON PRIVATE JETS OR TO HAVE EXPENSIVE

22   MEALS.  BUT YOU CAN'T DO THAT WHEN IT'S NOT YOUR MONEY AND

23   IT'S BEING DIVERTED FROM THE TAXPAYERS.

24             THE GOVERNMENT'S POINTED TO THE FACT OF THE

25   NECESSITY FOR SENDING A MESSAGE HERE.  I'M NOT BIG ON SENDING

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

125

1    MESSAGES IN MOST CASES, BUT I THINK THIS IS A CASE THAT WILL

2    BE LOOKED TO AS A BENCHMARK.  WE'VE GOT A LOT OF LOBBYISTS OUT

3    THERE.  THERE ARE RULES.  THERE ARE LAWS.  THERE ARE

4    REGULATIONS.  WE HAVE POLITICIANS OUT THERE, AND I DO THINK

5    PEOPLE WILL PAY ATTENTION TO WHAT HAPPENED HERE.

6          I'VE ALLUDED TO THE TRAFICANTE SITUATION.  AND

7    THINGS LIKE THAT GET REPORTED, AND PEOPLE REMEMBER THEM.  THEY

8    CREATE A BASELINE FOR WHAT HAPPENS OR AT LEAST FAIR WARNING TO

9    PEOPLE WHO ARE GOING TO RISK VIOLATING THE LAW.

10          I'M TOLD THAT I SHOULD LOOK TO THE KINDS OF

11   SENTENCES THAT ARE AVAILABLE AND I SHOULD AVOID UNWARRANTED

12   SENTENCING.  AND THIS IS SORT OF AT THE CRUX OF MY THINKING.

13   I LOOK AT THE OTHER PARTICIPANTS IN THIS.  DUKE CUNNINGHAM GOT

14   EIGHT AND A HALF YEARS.  JOEL COMBS, WHO WAS INVOLVED, GOT

15   IMMUNITY.  HE WON'T BE PROSECUTED.  I DON'T KNOW.  I'M NOT

16   GOING TO TAKE YOUR PROPOSITION ON WHAT HAPPENS TO MR. WADE,

17   BUT I DON'T EXPECT THAT HE'S GOING TO BE GETTING A SENTENCE

18   ANYWHERE IN THE NEIGHBORHOOD OF WHAT IS BEING ADVOCATED TODAY.

19   MR. KONTOGIANNIS HAS PLED GUILTY TO THE CHARGE THAT CARRIES NO

20   MORE THAN TEN YEARS.  MR. JOHN MICHAEL, I THINK HIS EXPOSURE

21   IS EVEN LESS.  THAT INFORMS MY THINKING TO SOME EXTENT.

22          ON THE OTHER HAND, I THINK MR. HALPERN IS RIGHT TO

23   POINT OUT AND THE CASES HAVE RECOGNIZED, MOST PARTICULARLY THE

24   CASE CITED BY THE GOVERNMENT, U.S. VERSUS EVERS, WHERE BERNIE

25   EVERS GOT A 25-YEAR SENTENCE AND NO ONE ELSE GOT A SENTENCE

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

126

1    APPROACHING THAT.  THEY GOT FIVE YEARS.  AND THE 2ND CIRCUIT

2    SAID, "LOOK, IT'S COMMON SENSE WHEN SOMEBODY FOLDS UP THEIR

3    TENT, ACKNOWLEDGES GUILT, AND COOPERATES WITH THE GOVERNMENT

4    THAT THAT'S GROUNDS FOR LENIENCY.  WHEREAS SOMEBODY WHO FIGHTS

5    THE CHARGE AND IS BELLIGERENT AT EACH POINT IN ACKNOWLEDGING

6    THE OBVIOUS DESERVES MORE."  THAT'S AT PLAY HERE.

7          YOU DON'T GET PUNISHED HERE, MR. GERAGOS, FOR GOING

8    TO TRIAL.  YOU DON'T.  I HEAR A LOT OF CASES THAT IN THE

9    PARLANCE REALLY AMOUNT TO SLOW PLEAS.  YOU KNOW WHAT THAT

10   MEANS.  BUT I DON'T PUNISH PEOPLE FOR GOING TO TRIAL.  YOU

11   HAVE A RIGHT.  THAT'S THE BEAUTY OF THAT CONSTITUTIONAL

12   PROTECTION UNDER THE 6TH AMENDMENT TO SAY, "PROVE IT.  IT'S

13   NOT ENOUGH TO BRING THE ACCUSATION.  YOU'VE GOT TO PROVE IT."

14   AND MR. WILKES, I AM NOT PUNISHING YOU FOR EXERCISING YOUR

15   RIGHT TO TRIAL.

16         HAVING SAID THAT, MR. HALPERN IS CORRECT TO POINT

17   OUT THAT THERE'S DIFFERENCES BETWEEN YOUR SITUATION AND THAT

18   OF CONGRESSMAN CUNNINGHAM AND THE OTHERS INVOLVED IN THIS

19   CASE.  CONGRESSMAN CUNNINGHAM, ON THE NEGATIVE SIDE OF THE

20   LEDGER FOR HIM, WAS AN ELECTED OFFICIAL.  HE HAD A DUTY NOT

21   JUST TO THE PUBLIC NOT TO VIOLATE LAWS, BUT BEYOND THAT.  IT

22   WAS HONEST SERVICES.  YOUR SITUATION IS DIFFERENT.  NO ONE

23   ELECTED YOU AND HAD PUBLIC TRUST IN YOU.  IT'S HARDLY A

24   CALLING CARD FOR WHAT HAPPENED HERE OR SOME KIND OF

25   CREDENTIAL, BUT THAT WAS AN AGGRAVATING FACTOR WITH RESPECT TO

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

127

1    CUNNINGHAM THAT DOESN'T EXIST IN YOUR CASE.  YOU WEREN'T

2    ELECTED.

3            ON THE OTHER HAND, AS MR. HALPERN RECITES, THERE

4    WERE A NUMBER OF MITIGATING FACTORS IN CUNNINGHAM'S CASE THAT

5    DON'T APPLY HERE.  YOU'RE NOT IN ILL HEALTH, AS FAR AS I KNOW.

6    I DID CONSIDER THAT.  I WAS IMPRESSED AND GAVE CREDIT FOR

7    CUNNINGHAM'S WAR RECORD EVEN THOUGH THE GOVERNMENT SAID HE'D

8    WORN OUT HIS DANCE CARD ON THAT.  I TOOK INTO ACCOUNT THAT HE

9    HAD A HIGHER SENTENCE OF DUTY AND HAD ACTED ON THAT AT ONE

10   POINT.

11           I DID WHAT YOU ASKED ME TO DO, MR. WILKES, AND WHAT

12   MR. GERAGOS ASKED ME TO DO.  I LOOKED AT THE WHOLE LIFE OF THE

13   PERSON, NOT JUST THE LAST FIVE OR NINE YEARS.

14           IT TOOK GUTS, I THINK, ON CUNNINGHAM'S PART TO

15   FINALLY COME AROUND AND WALK DOWN IN FRONT OF THIS COURTHOUSE

16   AND ADMIT THAT HE WAS CORRUPT AND THAT HE ENGAGED IN CORRUPT

17   ACTS.  HE DID SO IN A VERY TEARFUL MANNER.  I REMEMBER

18   WATCHING ON TV.  THEN HE CAME INTO COURT A BROKEN MAN.  WHEN I

19   SENTENCED HIM, I REMEMBER LOOKING AT HIM AND BEING ASTONISHED

20   AT HIS LOOK WHEN HE APPEARED FOR SENTENCING BECAUSE HE'D LOST

21   SO MUCH WEIGHT.  HE WAS JUST A SHELL OF HIS FORMER SELF.  ALL

22   OF THAT WAS TAKEN INTO ACCOUNT.

23           YOUR SITUATION IS DIFFERENT, MR. WILKES.  YOU HAVE

24   NOT, EVEN TO THIS MOMENT, TO THIS VERY MOMENT THAT I SPEAK,

25   INDICATED AT ALL ANY SENSE OF CONTRITION FOR THIS.  INSTEAD, I

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    GUESS YOUR APPROACH IS TO SAY "I NEVER DID THIS" UP AGAINST

2    THE WEIGHT OF THE EVIDENCE, THE AVALANCHE OF EVIDENCE.  YOU'VE

3    CONTINUED TO DENY WHAT I THINK IS OBVIOUS TO ANY OBSERVER OF

4    THIS, WHICH IS THAT YOU HAD THIS CORRUPT RELATIONSHIP WITH THE

5    CONGRESSMAN, AND YOU PROFITED FROM IT.  SO THAT'S DIFFERENT.

6         I DON'T, AS I SAID, PUNISH YOU FOR GOING TO TRIAL,

7    BUT NEITHER DO I REWARD YOU FOR CONTRITION OR ACCEPTING

8    RESPONSIBILITY BECAUSE YOU HAVE NOT.

9         I LOOK AT MR. WADE.  I HAVE TAKEN THAT INTO THE

10   CALCULUS.  I DON'T KNOW WHERE HE'S GOING TO END UP.  NO ONE'S

11   GOING TO ADVOCATE EIGHT AND A HALF YEARS OR 100 MONTHS, 200 OR

12   300 MONTHS FOR WADE.  THAT'S NOT GOING TO HAPPEN.  YOU AND I

13   BOTH KNOW THAT.  THE GOVERNMENT KNOWS THAT, TOO.

14        I'VE LOOKED AT THE OTHERS INVOLVED AND THEIR

15   EXPOSURE.  MR. KONTOGIANNIS HAS GOT A PRIOR FOR BRIBERY, AND

16   NOW HE'S PLED GUILTY TO BRIBERY IN FRONT OF ME.  HE'S GOT

17   ANOTHER PRIOR.  IT'S A DIFFICULT TASK.  IT'S APPLES AND

18   ORANGES.  THE QUALITATIVE JUDGMENT THAT YOU HAVE TO MAKE ON

19   THIS IS VERY DIFFICULT.  THERE'S NOT A FORMULA FOR DOING THIS.

20   IT'S ONE OF THE DIFFICULT THINGS WE DO.

21        NOW, IT WAS INTERESTING THAT YOU MENTIONED

22   MR. LERACH.  I EVEN THOUGHT ABOUT THAT THIS WEEKEND IN MY

23   CONSIDERATION.  HERE'S A FELLOW WHO YOU SAY AND I THINK THE

24   GOVERNMENT ACKNOWLEDGES HAS CORRUPTED THE LEGAL SYSTEM IN A

25   VERY PROFOUND WAY.  NOT THESE PROSECUTORS, BUT THE GOVERNMENT

PDF created with pdfFactory trial version www.pdffactory.com

129

1    OF THE UNITED STATES LIMITED HIS EXPOSURE TO TWO YEARS.  AND

2    IN TERMS OF THE LEGAL SYSTEM, THE CORRUPTION AND THE HARM DONE

3    THERE WAS, IN MY HUMBLE OPINION, ABOUT ON PAR WITH WHAT HAS

4    HAPPENED HERE.  SO I DO TAKE THAT INTO CONSIDERATION AS WELL.

5    I TRY TO LOOK AT THE UNIVERSE OF CASES AND WHAT'S FAIR.

6            THE AGGRAVATORS HERE, FROM MY PERSPECTIVE, IS THAT

7    THERE HAS BEEN NO ACCEPTANCE OF RESPONSIBILITY.  THERE HAS

8    BEEN NO CONTRITION.  THERE HAS BEEN A COMPOUNDING OF THE

9    DISHONEST CONDUCT THAT LED TO MR. WILKES'S BEING IN THIS

10   COURTROOM BOTH IN TERMS OF -- WELL, IN TERMS OF HIS MAKING

11   FALSE STATEMENTS ON THE STAND.

12           ALL THAT SAID, I THINK THIS IS ONE OF THOSE CASES

13   WHERE THE GUIDELINES PRODUCE A RANGE THAT IS LONGER.  YOU

14   ADVOCATED THIS PRINCIPLE OF PARSIMONY, MR. GERAGOS.

15   SUFFICIENT SENTENCE, BUT NOT GREATER THAN NECESSARY TO GET THE

16   POINT ACROSS.

17           MR. WILKES AND I ARE ABOUT THE SAME AGE.  YOUR

18   BIRTHDAY IS IN MAY.

19           YOU'LL BE 54 YEARS OLD?

20           THE DEFENDANT:  YES.

21           THE COURT:  THIS WEEKEND I WAS SITTING OUT WITH A

22   LONG-TIME FRIEND OF MINE.  HE'S ABOUT OUR AGE, TOO.  AND WE

23   CONCLUDED THAT WHATEVER TIME WE HAVE LEFT, THE NEXT TEN YEARS

24   IS PROBABLY GOING TO BE BEST OF THAT TIME THAT'S LEFT.  AND

25   SOME SAY THE BEST YEARS ARE BEHIND US NOW.  I'M NOT SURE OF

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

130

1    THAT.  BUT I'M FAIRLY CONFIDENT THAT DURING THE NEXT TEN

2    YEARS, IT'S GOING TO BE THE BEST OF WHAT'S LEFT.  THEN OLD AGE

3    STARTS TO CREEP IN, AND YOUR JOINTS GIVE OUT ON YOU.

4            I THINK IT'S A SIGNIFICANT PENALTY, MR. WILKES, FOR

5    YOU AT YOUR AGE AND YOUR STATION IN LIFE WITH FAMILY

6    RESPONSIBILITIES TO BE IN PRISON DURING THAT TIME.  I THINK

7    THAT'S A SIGNIFICANT PENALTY IN ITS OWN RIGHT.

8            I HAVE CONCLUDED THAT THE APPROPRIATE SENTENCE IN

9    THIS CASE, TAKING INTO CONSIDERATION ALL OF THESE HUMAN

10   FACTORS, THE GOOD AND THE BAD, IS THAT YOU SHOULD BE SENTENCED

11   TO 144 MONTHS, A 12-YEAR SENTENCE.  THAT WILL PUT YOU OUT

12   SOMEWHERE AROUND YOUR 64TH BIRTHDAY.  IT WILL GIVE YOU A

13   CHANCE TO MAYBE ATONE FOR THIS IF YOU'RE WILLING AT THAT

14   POINT.  MAYBE WHEN IT'S SETTLED BY THE COURT OF APPEALS,

15   YOU'LL ACCEPT THE JUDGMENT.

16           I WISH YOU WOULD DO SO TODAY.  IT WOULD GIVE COMFORT

17   TO THESE FAMILY MEMBERS OF YOURS WHO ARE SITTING OUT HERE

18   BELIEVING WHAT YOU'VE SAID; THAT NONE OF THIS WAS ILLEGAL ON

19   YOUR PART, THAT YOU WERE ALL WELL-INTENTIONED.  I WISH YOU

20   WOULD DO THAT BECAUSE I THINK IT WOULD ALLOW THE TIME TO PASS

21   FOR THEM IN AN EASIER MANNER THAN IT WILL OTHERWISE.

22           AT THE END OF THE DAY, I THINK THAT A 144-MONTH

23   SENTENCE IS SUFFICIENT, BUT NOT GREATER THAN IS NECESSARY.

24   IT'S LONGER THAN CONGRESSMAN CUNNINGHAM'S SENTENCE, BUT THERE

25   ARE GOOD OBJECTIVE REASONS FOR THAT.  IT TAKES INTO ACCOUNT

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

131

1    WHAT'S HAPPENED OR LIKELY WILL HAPPEN TO THE OTHER PEOPLE THAT

2    WERE INVOLVED IN THIS CASE. IT'S A SUBSTANTIAL VARIANCE FROM

3    THE BOTTOM END OF THE GUIDELINES.

4           BUT HERE, AS I'VE SAID, I THINK THERE ARE FACTORS

5    UNDER 3553(A) THAT WERE NOT ACCOUNTED FOR FULLY BY THE

6    GUIDELINE RANGE. WHEN I LOOK AT THE PERSON OF MR. WILKES AND

7    HIS AGE AND HIS STATION IN LIFE AND THE EFFECT THAT THIS

8    PENALTY WILL HAVE ON HIM DURING THIS NEXT TEN YEARS, I BELIEVE

9    IN MY HEART AS WELL AS IN MY MIND THAT IT'S THE APPROPRIATE

10   MEASURE OF PUNISHMENT FOR THESE CRIMES THAT HE COMMITTED.

11          SO THE SENTENCE AND JUDGMENT OF THE COURT,

12   MR. WILKES, IS THAT YOU SHOULD SPEND 144 MONTHS IN THE CUSTODY

13   OF THE ATTORNEY GENERAL.

14          I AM IMPOSE A $100 PENALTY PER COUNT FOR A TOTAL OF

15   $1300.

16          THE COURT, ALTHOUGH A FINE HAS NOT BEEN ADVOCATED,

17   ALSO BELIEVES A FINE IS APPROPRIATE. MR. GERAGOS, I HAVEN'T

18   ALLOWED YOU TO SPEAK TO THAT. I WILL NOW. LET ME TELL YOU,

19   TO ELABORATE A LITTLE BIT, THIS IS NOT SOMETHING I TOOK INTO

20   CONSIDERATION IN FIXING HIS SENTENCE. NOT AT ALL. BUT I'M

21   CONVINCED AT A MINIMUM THAT I WAS MISLED BY THE FINANCIAL

22   DECLARATION THAT HE FILED. I BELIEVE HE HAS SUBSTANTIAL

23   ASSETS. I BELIEVE HE COULD HAVE HIRED HIS OWN COUNSEL IN THE

24   OTHER CASE. IT'S A LITTLE GALLING TO ME, I HAVE TO ADMIT TO

25   YOU, THAT WITH ALL OF THIS GOING ON, ON TRIAL FOR FRAUD AND

PDF created with pdfFactory trial version www.pdffactory.com

132

1    DISHONESTY, THAT HE WOULD PERPETUATE THAT BY SUBMITTING AN

2    AFFIDAVIT TO ME.  I'M NOT GOING TO MAKE A FINDING ABOUT

3    PERJURY ON THE AFFIDAVIT.  I'LL LEAVE THAT FOR ANOTHER DAY.

4    AT A MINIMUM, IT WAS MISLEADING.

5            I THINK HE HAS SUBSTANTIAL ASSETS.  I THINK HE'S GOT

6    HIS HOME, WHICH HAS BEEN PLEDGED.  HE'S GOT EQUITY IN OTHER

7    PROPERTIES, WHICH HE HAS NOT ACTIVELY REVEALED.  AND I THINK

8    PART OF THE PUNISHMENT HERE HAS TO BE A PROVISION THAT HE PAY

9    BACK SOME OF THE MONEY.

10           I'M INCLINED TO IMPOSE A FINE IN THIS CASE OF

11   $1 MILLION.  I THINK HE HAS THE WHEREWITHAL TO PAY THAT FINE.

12   I THINK IT'S AN APPROPRIATE ADJUNCT TO THE CUSTODIAL SENTENCE.

13   I WANT TO GIVE YOU THE OPPORTUNITY TO SPEAK TO THAT.

14           MR. GERAGOS:  IF I COULD, IF THE COURT WAS GOING TO

15   OFFER THAT AGAINST THE AMOUNT THAT THE PURPOSEFUL GRAND JURY

16   LEAKS CAUSED TO APPEALING THE SALE OF THE OFFICE BUILDING, AS

17   THE COURT WILL REMEMBER WHEN WE WERE TALKING ABOUT THE GRAND

18   JURY LEAKS IN THIS CASE, IT WAS OUR POSITION AND IS OUR

19   POSITION THAT ONE OF THE MAIN REASONS THAT THAT HAPPENED PRIOR

20   TO WAS BECAUSE THERE WAS A SALE OF THAT OFFICE BUILDING AT AN

21   AMOUNT --

22           THE COURT:  YOU'RE GIVING TOO MUCH CREDIT TO WHOEVER

23   IT WAS THAT LEAKED.  WHOEVER LEAKED THIS INFORMATION MAYBE

24   WANTED TO STRENGTHEN A RELATIONSHIP THAT THAT PERSON MAY HAVE

25   HAD WITH THE PRESS.  MAYBE THEY WANTED TO PREJUDICE A LITTLE

PDF created with pdfFactory trial version www.pdffactory.com

133

1   BIT IN ADVANCE.  BUT I NEVER THOUGHT THAT SOMEBODY HAD IN MIND

2   "OH, HE'S GOT A BUILDING FOR SALE.  I CAN REALLY SCREW THAT

3   UP."

4          MR. GERAGOS:  EXCEPT MY INVESTIGATION REVEALED, AT

5   LEAST WITH THE LAWYERS AND THE BROKERS WHO WERE INVOLVED, THAT

6   SPECIFICALLY BECAUSE OF THOSE LEAKS CALLED THEM TO PUT THE

7   SCHOOL DISTRICT -- PUT THAT ON THE AGENDA.  THE SCHOOL

8   DISTRICT THEN CONTACTED THE U.S. ATTORNEY'S OFFICE AND

9   ACTUALLY HAD CONVERSATIONS WITH MR. HALPERN ABOUT WHETHER OR

10  NOT THEY COULD GO FORWARD WITH THAT DEAL.  OUT OF POCKET, IT

11  WAS A CLEARLY DEFINABLE LOSS OF OVER $3 MILLION.

12          THE COURT:  IF IT COMES IN FRONT OF ME AT SOME POINT

13  THAT A PERSON LEAKED GRAND JURY INFORMATION ON THIS CASE, I'LL

14  HANDLE IT APPROPRIATELY.  I'LL BE THAT FELLOW WITH A VERY

15  STIFF SENTENCE THAT YOU ALLUDED TO.  I DON'T THINK THERE'S

16  MUCH CONNECTION BETWEEN THAT AND THE PROPOSITION HERE THAT

17  PART OF THE PUNISHMENT IN THIS CASE OUGHT TO BE FINANCIAL

18  GIVEN THE DEFENDANT'S TRACK RECORD.  I THINK HE DOES HAVE THE

19  MEANS TO PAY THAT FINE.

20          I'M NOT SURE, FRANKLY, LOOKING AT EVERYTHING AND NOW

21  KNOWING I WAS DECEIVED BY A PHONY FINANCIAL AFFIDAVIT, THAT

22  I'VE ACCOUNTED FOR ALL OF THE ASSETS.  THEY COULD BE

23  SQUIRRELED AWAY SOMEWHERE.  THAT'S A VERY REAL POSSIBILITY IN

24  MY MIND.

25          MR. GERAGOS:  EXCEPT PART OF WHAT THE COURT SHOULD

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    BE MISLED BY -- AND I DON'T KNOW IF THE COURT SAW THE MOST

2    RECENT FILING BY FEDERAL DEFENDERS, BUT WE SENT IN THE E-MAIL.

3    THE GOVERNMENT KNEW EXACTLY WHAT WAS GOING ON AT ALL TIMES.

4            THE COURT:  THAT MAY BE.  I DIDN'T.  I GOT AN

5    AFFIDAVIT THAT ESSENTIALLY ZEROED THINGS OUT.  AND I'VE GOT TO

6    TELL YOU, THE MISLEADING ASPECT OF IT WAS "OH, NO.  SUPERIOR

7    COURT IS SCRUTINIZING ALL OF THIS AND CONTROLLING ALL OF

8    THIS," AND THAT'S NOT TRUE.  THAT'S NOT TRUE.

9            AT THE VERY TIME THAT MR. WILKES WAS PLEADING

10   POVERTY TO ME, HE'S TAKING DISBURSEMENTS TO HIMSELF UP TO

11   $65,000 A MONTH.  AND I'M NOT GOING TO REVEAL EXACTLY WHAT WAS

12   IN THERE.  I'M GOING TO SPEAK IN A HIGH LEVEL OF GENERALITY.

13   AND HE WAS MAKING PAYMENTS TO RETAINED LAWYERS OF $90,000.

14   THAT'S NOT A GUY WHO OUGHT TO BE ON THE PUBLIC'S NICKEL IN

15   BEING DEFENDED IN THIS CASE, MR. GERAGOS.  YOU AND I BOTH KNOW

16   THAT.  IT'S OFFENSIVE TO ME THAT MR. WILKES WILL TRY TO BLOW

17   THAT BY ME.

18           MR. GERAGOS:  IF THE COURT WANTED TO HAVE A HEARING

19   ON THAT, I THINK THAT I COULD TURN THE COURT AROUND ON THAT.

20   I THINK IF THE COURT UNDERSTOOD EXACTLY WHAT WAS GOING ON AND

21   WHAT THE GIVE BACK AND FORTH WAS WITH THE GOVERNMENT, I JUST

22   DON'T THINK THAT ANYBODY IS BLOWING ANYTHING PAST YOU.

23           THE COURT:  THEY OBJECTED AT THE TIME.  I TOLD THEM

24   IF THEY HAD CONTRARY EVIDENCE, THEY COULD SUBMIT IT.  BOTH

25   SIDES HAVE NOW SUBMITTED ADDITIONAL EVIDENCE.  I'VE REVIEWED

PDF created with pdfFactory trial version www.pdffactory.com

135

1    IT ALL.  I'VE CAREFULLY GONE OVER IT.  I'M NOT AN ACCOUNTANT,

2    AND I DON'T HAVE THE SAME HEAD FOR NUMBERS THAT MR. WILKES

3    DOES.  BUT I CAN SEEN ENTRIES.

4            I DON'T UNDERSTAND WHY IN NOVEMBER AT HIS REQUEST IN

5    A LAWYER TRUST FUND HE GETS $65,000, AND YET HE COMES IN AND

6    TELLS US "I NEED THE GOVERNMENT TO PAY FOR MY LAWYER IN THE

7    WILKES/FOGGO MATTER."  THAT'S AGGRAVATING TO ME.  AS I SAID,

8    PUTTING ASIDE, I GAVE IT NO EFFECT IN FASHIONING THE SENTENCE.

9    BUT IT DOES INFORM THE QUESTION OF WHETHER HE HAS RESOURCES TO

10   PAY A FINE, AND I THINK HE DOES.  AND I THINK APPLYING IT IS

11   AN APPROPRIATE COMPONENT OF HIS SENTENCE HERE.

12           DO YOU HAVE ANYTHING MORE ON HIS ABILITY?

13           MR. GERAGOS:  I THINK CLEARLY ALL THE COURT HAS AT

14   THIS POINT IS WHAT IT HAS BEEN GIVEN WHETHER YOU BELIEVE IT TO

15   BE MISLEADING, WHICH WE OBVIOUSLY CONTEST.  AND A MILLION

16   WOULD BE GROSSLY DISPROPORTIONATE TO WHAT THE COURT HAS BEFORE

17   IT.

18           THE COURT:  WHAT'S THE EQUITY IN HIS HOME?  HE'S GOT

19   A BOND OF $2 MILLION SECURED BY HIS HOME.

20           MR. GERAGOS:  WELL, AT THE TIME I BELIEVE THE EQUITY

21   WAS 800,000.

22           THE COURT:  I'M TALKING ABOUT TODAY.

23           MR. GERAGOS:  TODAY, I DON'T THINK IT'S EVEN CLOSE

24   TO THAT.

25           THE COURT:  THERE'S BEEN PAYOFFS SINCE THEN.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. GERAGOS:  I UNDERSTAND THAT, BUT THIS IS NOT

2     EXACTLY A HOTBED OF THE REAL ESTATE MARKET HERE.

3          THE COURT:  I GET THAT.

4          MR. GERAGOS:  IT WOULD NOT SURPRISE ME OVER AND

5     ABOVE THE PAYOFF IF THE EQUITY HAS BEEN WIPED OUT OVER THE

6     LAST YEAR.  MR. HALPERN INDICATES THAT IT'S ALMOST A YEAR TO

7     THE DAY.  I CAN TELL YOU THAT IF YOU JUST READ THE BUSINESS

8     JOURNALS AND FOLLOW THE REAL ESTATE MARKET, A TEN PERCENT

9     DOWNTURN OR A 25 PERCENT DOWNTURN IS NOT SOMETHING THAT'S OUT

10    OF THE ORDINARY IN THIS MARKET, ESPECIALLY IN THAT PRICE

11    RANGE.  THAT PRICE RANGE HAS TAKEN ONE OF THE BIGGEST HITS

12    ANYWHERE.

13         THE COURT:  WHAT'S THE GOVERNMENT'S VIEW ON THE

14    APPROPRIATENESS OF A FINE AND THE DEFENDANT'S ABILITY TO PAY A

15    FINE?

16         MR. FORGE:  WE DO THINK A FINE IS APPROPRIATE FOR

17    THE REASONS YOUR HONOR POINTED OUT.  OBVIOUSLY, WE SHARE THE

18    SAME CONCERNS THE COURT DOES REGARDING MR. WILKES'S FINANCIAL

19    WHEREWITHAL.  WE DON'T HAVE AS MUCH INFORMATION AS YOU DO ON

20    THIS FRONT.  WE DO HAVE ENOUGH.  WE PRESENTED IT TO YOU.

21    ENOUGH TO SHOW THAT HE HAS CERTAINLY HAD ACCESS TO, IN SOME

22    FORM OR ANOTHER, UPWARDS OF $1.5, $1.6 MILLION JUST SINCE THE

23    TIME HE SUBMITTED THAT FINANCIAL AFFIDAVIT.

24         FOR ME WHAT REALLY GUIDES MY POSITION ON THIS IS

25    HE'S NEGOTIATING SETTLEMENTS WITH VARIOUS CREDITORS.  HE'S

PDF created with pdfFactory trial version www.pdffactory.com

1   PAYING TENS OF THOUSANDS OF DOLLARS TO LAWYERS.  TO ME THAT

2   SMACKS OF SOMEBODY WHO'S PROTECTING A POT OF MONEY.  IF HE WAS

3   IN THE RED, IF HIS NET VALUE WAS NEGATIVE, THERE'S NO REASON

4   TO THROW THAT GOOD MONEY AFTER BAD.  BUT TO ME THAT SMACKS AS

5   SOMEBODY WHO HAS MONEY TO PROTECT.  I THINK THE PAPERS,

6   LIMITED AS THEY MAY BE, THAT WE'VE SUBMITTED CORROBORATE THAT.

7           THE COURT:  DO YOU HAVE ANY EVIDENCE THAT THERE ARE

8   ASSETS HELD OTHER THAN HERE IN THE UNITED STATES?

9           MR. FORGE:  NO, YOUR HONOR, WE DO NOT.

10          THE COURT:  TAKING INTO ACCOUNT, MR. GERAGOS, YOUR

11  INPUT ABOUT THE FALLEN VALUE OF PROPERTY, THE COURT FINDS THAT

12  A $500,000 FINE IS APPROPRIATE.  THAT IS ROUGHLY CONSISTENT

13  WITH THE AMOUNT OF BRIBES THAT I FIND HE GAVE.  THE FIGURE

14  CAME OUT A LITTLE HIGHER THAN THAT.  I THINK THAT IS

15  PROPORTIONATE.  I THINK THERE SHOULD BE A FINANCIAL COMPONENT

16  TO THIS.  I FIND MR. WILKES DOES HAVE, BASED ON THE BEST

17  INFORMATION I HAVE TO DATE, THE ABILITY TO PAY A $500,000

18  FINE.  SO I ASSESS THAT AS WELL.

19          NOW, IN TERMS OF HOW THE JUDGMENT READS, I IMPOSE

20  THE SENTENCE ON THE BRIBERY COUNT, COUNT 13 --

21          IS THAT CORRECT?

22          MR. BHANDARI:  YES, YOUR HONOR.

23          THE COURT:  THAT'S THE OFFENSE THAT CARRIES A

24  SENTENCE OF UP TO 15 YEARS.  SO THIS IS WITHIN THE STATUTORY

25  MAXIMUM.  I HAVE CONFIRMED AND TAKEN INTO CONSIDERATION THE

PDF created with pdfFactory trial version www.pdffactory.com

1    GUIDELINES.  I HAVE GIVEN THE GUIDELINES WEIGHT.  I FIND AT

2    THE END OF THE DAY, THOUGH, APPLYING THE PRINCIPLE THAT I MUST

3    NOW APPLY, SUFFICIENT BUT NOT GREATER THAN NECESSARY, THAT THE

4    144-MONTH SENTENCE FITS THAT BILL FOR THE REASONS I'VE

5    ARTICULATED.

6              THE SENTENCE SHALL RUN CONCURRENTLY, TO THE EXTENT

7    POSSIBLE, ON THE OTHER COUNTS WHERE THE SENTENCE -- IT CAN DO

8    SO ON ALL THE COUNTS BECAUSE THE OTHERS ARE PUNISHABLE BY

9    20 YEARS EXCEPT FOR THE CONSPIRACY COUNT, WHICH IS FIVE YEARS.

10   I RUN IT CONCURRENTLY ON THAT COUNT UP TO A PERIOD OF FIVE

11   YEARS.

12             THE COURT ALSO IMPOSES A PERIOD OF SUPERVISED

13   RELEASE WHICH WILL FOLLOW MR. WILKES ONCE HE'S RELEASED FROM

14   CUSTODY.  THE PERIOD OF TIME OF SUPERVISED RELEASE WILL BE

15   THREE YEARS.  IT WILL RUN CONCURRENTLY.

16             MR. WILKES, HERE ARE THE TERMS OF SUPERVISED RELEASE

17   ONCE YOU'VE COMPLETED YOUR JAIL SENTENCE:

18             YOU'RE NOT TO POSSESS FIREARMS, EXPLOSIVE DEVICES,

19   OR OTHER DANGEROUS WEAPONS.

20             YOU'RE NOT TO OPEN CHECKING ACCOUNTS OR INCUR ANY

21   CREDIT CARD CHARGES OR ADDITIONAL LINES OF CREDIT WITHOUT

22   APPROVAL OF THE PROBATION OFFICER.

23             YOU'RE TO GIVE A COMPLETE ACCURATE ACCOUNTING OF

24   YOUR PERSONAL AND BUSINESS FINANCIAL RECORDS TO THE PROBATION

25   OFFICER.

PDF created with pdfFactory trial version www.pdffactory.com

139

1        YOU MUST SUBMIT TO A SEARCH OR YOUR PERSON,

2    PROPERTY, RESIDENCE, OR VEHICLE AT A REASONABLE TIME AND IN A

3    REASONABLE MANNER AS DIRECTED BY THE PROBATION OFFICER.

4        YOU'RE TO REPORT TO THE PROBATION OFFICER ALL

5    VEHICLES YOU OWN, OPERATE, OR HAVE AN INTEREST IN.

6        ANY OTHER CONDITIONS THE GOVERNMENT THINKS ARE

7    WARRANTED IN LIGHT OF THE OFFENSE AND THE OFFENDER?

8        MR. BHANDARI:  NO OTHER SUPERVISED RELEASE

9    CONDITIONS.  WE DID WANT TO SPEAK TO FORFEITURE.

10        THE COURT:  MR. BHANDARI, WE'RE A LITTLE JAMMED ON

11    THAT, I THINK, BECAUSE I RELEASED THE JURY WITHOUT BEING

12    REMINDED BY YOU IN ASKING THAT THEY GO BACK IN AND DELIBERATE

13    ON A FORFEITURE ALLEGATION.  MY MISTAKE AND YOURS, TOO.  I

14    DON'T THINK IT'S SELF-EXECUTING.  HE'S ENTITLED TO A JURY

15    TRIAL ON THAT.

16        MR. BHANDARI:  WITH RESPECT, WE DISAGREE.  WE SET

17    FORTH OUR POSITION IN OUR MEMORANDUM, WHICH CITED A FEW CASES

18    ESTABLISHING THAT IT'S THE DEFENDANTS'S OBLIGATION TO

19    SPECIFICALLY AND EXPRESSLY IN OPEN COURT ASK FOR A JURY TRIAL

20    ON FORFEITURE SPECIFICALLY AND THAT A DEFENDANT WHO STANDS

21    SILENT WHILE THE JURY IS DISCHARGED, WHICH IS EXACTLY WHAT

22    HAPPENED HERE, AFTER A GUILTY VERDICT, THE DEFENDANT WAIVES

23    HIS RIGHT TO A JURY DETERMINATION OF FORFEITURE.

24        IN THAT MEMO, WE EXPLAINED THAT IT MADE SENSE TO DO

25    THE FORFEITURE DETERMINATION AT SENTENCING WHEN YOUR HONOR WAS

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

140

1    GOING TO BE REVIEWING THE EVIDENCE RELATING TO PROCEEDS,

2    RELATING TO THE PROPERTY INVOLVED IN THE CRIMES.  AND WHY DO

3    THE SAME DETERMINATION TWICE?  THAT'S WHY WE'RE HERE NOW.

4            THE COURT:  HAS THE ISSUE BEEN MOOTED BY THE COURT'S

5    IMPOSITION OF A FINE IN THIS CASE?

6            MR. BHANDARI:  NO, YOUR HONOR.  FORFEITURE IS

7    STATUTORILY MANDATED.  THE COURT MUST IMPOSE FORFEITURE WHERE

8    THE DEFENDANT HAS BEEN FOUND GUILTY ON CHARGES THAT BEAR

9    FORFEITURE.  AND THE COURT'S FINDINGS THAT THE 525,000 AND THE

10   111,000, THE 636,000 WOULD BE STATUTORILY MANDATED.

11           THE COURT:  MR. GERAGOS.

12           MR. GERAGOS:  THAT'S NOT THE CASE.  THE ONUS WAS ON

13   THEM.  WHEN THEY LET THE JURY WALK OUT -- AND YOU'LL REMEMBER

14   YOU ASKED THEM WHY THEY DIDN'T BRING IT UP, AND THEY GAVE

15   CERTAINLY A DIFFERENT EXPLANATION THAN THEY GAVE TODAY.  THEY

16   DID NOT SAY THAT THE ONUS WAS ON THE DEFENSE.  THEY SAID,

17   "WELL, WE FORGOT.  AND WE DIDN'T PUT IT IN OUR PLEADINGS."

18           THE COURT:  HE SAYS NOW, THOUGH -- AND I'VE LOOKED

19   AT THE CASE.  I THINK HE'S CORRECT IN CHARACTERIZING IT.  HE

20   SAYS NOW THAT THAT AMOUNTS TO A WAIVER WHEN THE DEFENDANT

21   DOESN'T OBJECT AND HAVE ME HOLD THE JURY TO RULE ON THAT.

22           MR. GERAGOS:  I BELIEVE THE COURT DID --

23           THE COURT:  I DON'T THINK WE TALKED ABOUT

24   FORFEITURE.

25           MR. GERAGOS:  WE TALKED ABOUT FORFEITURE.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

141

```
 1              THE COURT:  BEFORE THE JURY --
 2              MR. GERAGOS:  AFTER YOU HAD RELEASED THEM, WITHIN
 3    THE SAME TIME PERIOD, THE JURY VERDICT CAME BACK AND --
 4              THE COURT:  ONCE THEY'RE OUT THE DOOR,
 5    MR. GERAGOS --
 6              MR. GERAGOS:  WE TALKED ABOUT IT, AND YOU SAID THAT
 7    THEY WAIVED IT.  AND I AGREED AND SAID THAT YOU COULD NOT
 8    BRING THEM BACK.
 9              THE COURT:  LET ME SAY THIS, THEN:  TO THE EXTENT
10    THAT FORFEITURE IS MANDATORY, I'LL ALLOW BOTH SIDES TO APPEAL
11    THIS ORDER.
12              THE COURT FINDS, FOR THE SAME REASONS I'VE GIVEN
13    ABOUT THE VALUATION, THE MANDATORY AMOUNT IS $636,116.  THAT'S
14    THE AMOUNT OF THE 525,000 BRIBE, THE 100,000 BRIBE, AND THE
15    11,116.
16              AM I RIGHT?
17              MR. BHANDARI:  636,000 IS 525- PLUS 11- AND 100-.
18              THE COURT:  I ORDER THAT AS THE MANDATORY
19    RESTITUTION AMOUNT.  MR. GERAGOS, IF I'M WRONG THAT IT'S NOT
20    FORFEITED ON YOUR PART BY A WAIVER, I EXPECT THAT YOU'LL TAKE
21    THAT UP AND MAKE ME STRIKE THAT PORTION FROM THE JUDGMENT IF
22    THAT'S INCORRECT.  I'M RELYING ON THE CASES CITED BY
23    MR. BHANDARI, AND I FIND THAT THE PROVISION IS MANDATORY.
24              I'VE GOT TO SAY, MR. BHANDARI, HAVING IMPOSED A
25    $500,000 --
```

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. GERAGOS:  I THINK THERE'S A DOUBLE-JEOPARDY

2     ASPECT TO THIS.

3          THE COURT:  HE SAYS NO JURY TRIAL RIGHT IF IT'S

4     WAIVED.  HE'S SAYING BY STANDING SILENT OR AT LEAST NOT

5     OBJECTING BEFORE THE JURY WAS RELEASED, IT'S BEEN WAIVED.  SO

6     I FIND IN THIS CASE THAT THERE HAS BEEN A WAIVER.  I INVITE

7     YOU TO TAKE THAT ISSUE TO THE COURT OF APPEALS.  BECAUSE

8     FRANKLY, THE $500,000 FINE ACCOMPLISHES THE SAME THING.  IT'S

9     GOING TO BE PAID BACK THE SAME WAY.  THIS IS PUBLIC CORRUPTION

10    AFTER ALL.  THE VICTIM IS THE PUBLIC.

11         MR. GERAGOS:  THE COURT INFORMS ITS DECISION TO GIVE

12    THE $500,000 FINE, I ASSUME, BASED, IN PART, ON THE EXACT

13    PREDICATES COMING UNDER THE STATUTE.

14         THE COURT:  I DO.  I'M BUFFETED HERE BECAUSE I'M

15    TOLD IT'S A MANDATORY PROVISION.  IT'S ERROR FOR ME TO IGNORE

16    IT.

17         AND THE QUESTION IS WHERE'S THE FAULT?

18         MR. GERAGOS:  THEN ELIMINATE THE FINE.

19         THE COURT:  HERE'S WHAT I'LL DO:  WITH RESPECT TO

20    THE FINE, I'M GOING TO ORDER THAT IF THE RESTITUTION ORDER IS

21    AFFIRMED BY THE COURT OF APPEALS, THEN I'LL STAY THE FINE.

22         MR. BHANDARI:  DOES YOUR HONOR FIND THAT THE 636,000

23    IS RESTITUTION OR FORFEITURE?

24         THE COURT:  I FIND THAT'S TO BE FORFEITED UNDER THE

25    MANDATORY ACT.  AS I SAID, IF THAT FINDING IS AFFIRMED, THEN

PDF created with pdfFactory trial version www.pdffactory.com

143

1    THE FINE IS STAYED.  THE FINE IS AN ALTERNATIVE TO THE PAYMENT

2    OF RESTITUTION BECAUSE BOTH WERE IMPOSED, IN MY JUDGMENT, TO

3    COVER THE SAME WRONGS HERE.

4          NOW, THERE IS PENDING BEFORE THE COURT A MOTION FOR

5    BAIL PENDING APPEAL.  I'VE READ THE PAPERS.  I'VE READ THE

6    OPPOSITION.  I'M HAPPY TO HEAR FROM YOU ON THAT, MR. GERAGOS.

7          MR. GERAGOS:  WE'VE GOT THE OTHER ISSUE OF MY MOTION

8    TO --

9          THE COURT:  I'M NOT INCLINED TO DO THAT IN LIGHT OF

10   WHAT I SAID ABOUT THE FINANCIAL AFFIDAVIT.  I DIDN'T MISREAD

11   THAT, MR. GERAGOS.  I WENT BACK VERY CAREFULLY THIS WEEKEND,

12   AND I WENT THROUGH IT.

13         I UNDERSTAND THAT AT TIMES ON THIS CASE I ALLOWED

14   THE FEDERAL DEFENDER TO BE INVOLVED.  I'M NOT ENTHUSIASTIC

15   ABOUT DOING THAT ANY FURTHER NOW THAT I KNOW WHAT THE

16   DEFENDANT'S FINANCIAL WHEREWITHAL IS.

17         MR. GERAGOS:  THE PROBLEM WITH THAT, AT LEAST FROM A

18   PRELIMINARY STANDPOINT, IS THAT I BELIEVE THAT THAT WAS RAISED

19   IN THE CONTEXT OF THE 2-9 CASE AS OPPOSED TO THE 3-0 CASE.

20         THE COURT:  YOU FILED A MOTION.  THAT'S WHAT I'M

21   DEALING WITH NOW.

22         MR. GERAGOS:  AND SPECIFICALLY, I THINK THAT I

23   REFERENCED THE SPECIFIC RULE, WHICH WAS 9-1.2(E).  WHEN A

24   DEFENDANT IS ON BAIL AT THE TIME THE MOTION IS FILED IN THIS

25   COURT, THE BAIL WILL REMAIN IN EFFECT UNTIL THE COURT RULES ON

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

144

1    THE MOTION.

2         SPECIFICALLY UNDER 3143, WE HAVE GOT THAT THERE'S NO

3    FLIGHT RISK.  HE'S NO DANGER TO THE COMMUNITY.  HE'S NEVER

4    LIVED, ABSENT, AS THE COURT HEARD, FOR VARIOUS PERIODS OF TIME

5    IN SOME OTHER PARTS OF THE U.S.  HE'S THE FATHER OF FOUR.  TWO

6    OF THEM ARE MINORS.  HE EMPLOYS OR HE'S DEALING WITH HIS

7    ELDERLY MOTHER AS WELL, AS THE COURT KNOWS.  HE WAS BORN AND

8    RAISED IN SAN DIEGO.  HE'S BEEN ACTIVE IN THE COMMUNITY.

9    YOU'VE GOT ALL OF THE LETTERS.  HE WAS EDUCATED HERE, WENT TO

10   SCHOOL HERE, RECEIVED HIS DEGREE HERE.  YOU'VE GOT A

11   SIGNIFICANT AMOUNT ON THE BOND.

12        OBVIOUSLY, THERE IS GOING TO BE AN ISSUE ON THE FINE

13   VERSUS THE STATUTORY FORFEITURE.  I DON'T BELIEVE THERE IS

14   ANYTHING ALONG THE LINES OF AN ECONOMIC DANGER.  I THINK THE

15   CASE IS FRIEDMAN.

16        THE COURT:  HOLD ON FOR ONE SECOND.

17        IF YOU GENTLEMAN WILL STAY, I DO INTEND TO TAKE UP

18   THE CIVIL PRE-TRIAL MATTER AS SOON AS WE'RE DONE HERE.

19        MR. GERAGOS:  I DO NOT THINK THERE HAS BEEN ANY

20   SUGGESTION THAT THE APPEAL WILL BE DELAYED.  I THINK THIS

21   COURT WOULD KNOW INTUITIVELY THAT'S NOT THE CASE.

22        THE COURT:  I DON'T THINK IT'S FOR DELAY.  I DON'T

23   THINK HE'S A FLIGHT RISK.  I DISAGREE WITH YOU ABOUT THE

24   DANGER BECAUSE THE 9TH CIRCUIT HAS MADE CLEAR THAT IT INCLUDES

25   ECONOMIC DANGER.  AND, AS I SAID, HERE'S A FELLOW WHO WAS ON

PDF created with pdfFactory trial version www.pdffactory.com

145

1   TRIAL FOR FRAUD AND BRIBERY AND FINANCIAL CRIMES.  HE

2   COMPOUNDS AND PERPETUATES THOSE PROBLEMS BY TESTIFYING

3   FALSELY.

4           HERE THE MATTER OF THE SUBMISSIONS COMES UP TO ME.

5   AS I SAID, I WON'T GO SO FAR AS TO MAKE A FINDING ABOUT

6   PERJURY, BUT IT'S HIGHLY MISLEADING.  YOU KNOW WHAT'S

7   INTERESTING, MR. GERAGOS?  WHEN I ASKED YOU AT THE TIME

8   WHETHER YOU THOUGHT HE QUALIFIED FOR COUNSEL AT THE INCEPTION

9   OF THIS, YOU SAID, "NO."  I'M ASSUMING YOU WERE PRIVY THEN TO

10  THE INFORMATION I AM NOW PRIVY TO.

11          I WOULD HAVE AGREED WITH THAT ANSWER.  THAT WAS AN

12  HONEST ANSWER; THAT "NO, HE CAN AFFORD HIS OWN LAWYER."  HE

13  DOESN'T GET TO TAKE 65,000 A MONTH PAYOUTS.  HE DOESN'T GET TO

14  FUND EDUCATION ACCOUNTS AND DO ALL THESE OTHER THINGS TO SUIT

15  HIS PERSONAL CONVENIENCE AND THEN HAVE THE TAXPAYERS PAY FOR

16  HIS LAWYER.

17          I ASKED MYSELF A GUY THAT'S GOING TO TAKE THE STAND

18  AND LIE UNDER OATH AND THEN SUBMITS A FINANCIAL DECLARATION TO

19  A FEDERAL JUDGE THAT'S MISLEADING, IS THAT GUY GOING TO

20  CONTINUE TO POSE AN ECONOMIC DANGER TO THE COMMUNITY?  IS

21  THERE A CHANCE THAT HE'S GOING TO DEFRAUD OTHERS OR CONTINUE

22  TO DEFRAUD THE LEGAL SYSTEM?

23          REMEMBER HERE I'M GOOD AT APPLYING STANDARDS.

24  YOU'VE GOT TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT HE'S

25  NOT A DANGER.  MY INCLINATION AT THIS POINT IS TO ALMOST FIND

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    ON THE OTHER SIDE.

2              MR. GERAGOS:  EXCEPT I DON'T THINK THAT AN ECONOMIC

3    DANGER IN THIS CIRCUIT IS GOING TO CONSTITUTE --

4              THE COURT:  U.S. VERSUS REYNOLDS, 952 FED. 2D. 192,

5    "IF A RELEASE OF THE DEFENDANT WOULD POSE A RISK OF ECONOMIC

6    OR PECUNIARY HARM TO THE COMMUNITY, THE DANGER ELEMENT IS

7    MET."

8              MR. GERAGOS:  THE COURT CITED WHICH CASE?

9              THE COURT:  REYNOLDS, 952 FED. 2D. 192.  JUDGE

10   WALLACE WAS ON THE PANEL.  "THE TERM 'DANGER' ENCOMPASSES

11   ECONOMIC DANGER.  THAT IS, IF A RELEASE OF THE DEFENDANT WOULD

12   POSE A RISK OF ECONOMIC OR PECUNIARY HARM TO THE COMMUNITY,

13   THE DANGER ELEMENT IS MET."

14             MR. GERAGOS:  THAT WAS SOMEBODY THAT WAS CONVICTED

15   OF WITNESS TAMPERING, TWO COUNTS OF WITNESS TAMPERING, AND

16   VIOLATING THE PRE-TRIAL TERMS OF RELEASE, NEITHER OF WHICH WE

17   HAVE REMOTELY HERE.  YOU'VE GOT --

18             THE COURT:  ONE OF THE CONDITIONS OF PRE-TRIAL

19   RELEASE WAS THAT HE NOT VIOLATE ANY OTHER LAWS.  A GUY THAT

20   TAKES THE STAND AND DOESN'T TELL THE TRUTH VIOLATES ANOTHER

21   LAW.  YOU, YOURSELF, MR. GERAGOS, SAID AT THE BEGINNING OF

22   YOUR REMARKS -- AND I WROTE IT DOWN ON MY CALENDAR -- YOU SAID

23   "BRAZEN" IN REFERENCE TO KONTOGIANNIS.  "BRAZEN" FOR HIM TO

24   COMMIT CRIMES AFTERWARDS, AFTER HE'S BEEN CHARGED.  I AGREE

25   WITH YOU.  IT WAS.  IT OFFENDED ME AT THE TIME.  I LEARNED AND

PDF created with pdfFactory trial version www.pdffactory.com

147

1      HAD DOCUMENTS SUBMITTED TO ME THAT ESTABLISHED, IN MY

2      JUDGMENT, PROBABLE CAUSE TO BELIEVE MR. KONTOGIANNIS WAS

3      COMMITTING CRIMES.

4              AND YOU KNOW WHAT I DID?

5              MR. GERAGOS:  I KNOW.

6              THE COURT:  I REVOKED HIS BAIL RIGHT AWAY.  HE'S IN

7      A HOSPITAL NOW UNDERGOING HEART BYPASS AFTERCARE WITH U.S.

8      MARSHALS GUARDING HIM BECAUSE I DON'T TRUST THAT HE'S NOT

9      GOING TO CONTINUE THIS ILLEGAL CONDUCT.

10             MR. GERAGOS:  THERE'S A QUALITATIVE DIFFERENCE

11     BETWEEN THE COURT MAKING THE DETERMINATION THAT YOU DIDN'T

12     BELIEVE A PORTION OF THE TESTIMONY FROM SOMEBODY WHO'S OUT

13     THERE COMMITTING FINANCIAL CRIMES.  I DON'T EVEN THINK WE'RE

14     IN THE SAME BALLPARK.

15             FIRST OF ALL, THE COURT WAS NOT THE FACT-FINDER,

16     OBVIOUSLY.  THE FACT-FINDER WAS THE JURY.  THERE WAS NO

17     FINDING BY THE JURY THAT THEY DISBELIEVED THAT PARTICULAR

18     THING.  IN FACT, IF YOU TAKE A LOOK AT ONE OF THE JUROR'S

19     COMMENTS -- MR. HALPERN, I'M SURE, CAN GO ON THE INTERNET AND

20     FIND IT FOR US -- ONE OF THE REPORTS BY THE JURORS SAYS THEY

21     PUT ABSOLUTELY NO CREDENCE INTO THE PROSTITUTION PORTION OF

22     THIS CASE.  I BELIEVE IT WAS THE FOREPERSON.

23             SO FOR THE COURT TO NOW SAY "WELL, I'M GOING TO TAKE

24     A PORTION OF THE CASE THAT THE JURY WAS DISMISSIVE OF OR PUT

25     NO CREDENCE IN" --

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

148

1          THE COURT:  A JUROR --

2          MR. GERAGOS:  THE FOREPERSON.

3          THE COURT:  THAT UNDERCUTS A LITTLE BIT WHAT I SAID.

4    I TOLD YOU THAT I ACCEPTED THEIR VERDICT ON THE 525,000 BEING

5    A BRIBE, THE 100,000 BEING A BRIBE.  MR. WILKES TESTIFIED "NO.

6    IT WAS AN INVESTMENT."  WERE I TO CITE THAT AS THE RELEVANT

7    PORTION WHERE HE GAVE FALSE TESTIMONY, IT WOULD BE -- I'M

8    TELLING YOU THAT PERSONALLY AS I SAT AND LISTENED TO HIM, THE

9    WEIGHT OF THE EVIDENCE WAS THE STRONGEST ON WHAT YOU AND THE

10   FOREPERSON MIGHT HAVE THOUGHT WAS A TRIVIAL ASPECT OF THIS,

11   WHICH WAS PAYING FOR PROSTITUTES.  WHEN YOU'RE UNDER OATH, A

12   LIE IS A LIE.  THERE'S NO SMALL LIES OR BIG LIES.

13         MR. GERAGOS:  EXCEPT CAN YOU IMAGINE IF IT HAD BEEN

14   A NOT GUILTY VERDICT OR IF YOU HAD ASKED FOR A SPECIFIC

15   FINDING AND THEY HAD COME BACK AND SAID, "NO, WE DIDN'T FIND

16   ANYTHING ABOUT THE PROSTITUTION"?  THE DIFFERENCE BETWEEN

17   GETTING UP AND TESTIFYING AT TRIAL ALWAYS, BY VIRTUE OF BEING

18   A DEFENDANT, IS A RIGGED GAME.  WE WERE TALKING ABOUT RIGGED

19   GAMES.

20         HOW DO YOU EVER PUT SOMEBODY ON IN A TRIAL AND THEN

21   SAY, "OKAY.  NOW I WANT BAIL ON APPEAL BECAUSE BY VIRTUE OF

22   THE DEFENDANT LOSING, THE DEFENDANT IS GOING TO HAVE TO HAVE

23   LIED BECAUSE THE JURY DID NOT TAKE HIS SET OF CIRCUMSTANCES"?

24         THE COURT:  THAT'S NOT THE ONLY CONSIDERATION.  I'VE

25   TRIED TO MAKE CLEAR THAT I HAVE OTHER CONSIDERATIONS.  I HAVE

PDF created with pdfFactory trial version www.pdffactory.com

1    A FELLOW HERE TODAY WHO STANDS HERE AND SAYS, "I NEVER DID

2    ANYTHING."  THAT'S A FELLOW THAT I'M NOT NO SURE IS AMENABLE

3    TO CONDITIONS OF SUPERVISION.  AND HE HAS NOT SHOWN HIMSELF TO

4    BE.  IT'S NOT JUST WHAT I THINK WAS PERJURY AND OBSTRUCTION OF

5    JUSTICE.  I'M VERY UPSET WITH THE AFFIDAVIT.  IT WAS

6    MISLEADING.  YOU KNOW THAT, AND I KNOW THAT.

7              MR. GERAGOS:  THE PROBLEM IS WHO ARE YOU GOING TO

8    LET STAY OUT ON BAIL ON APPEAL, SOMEONE WHO MAINTAINS THEIR

9    INNOCENCE OR SOMEONE WHO SAYS, "YEAH, I'M THE GUY WHO DID IT"?

10   YOU'RE LESS LIKELY OF GETTING IT REVERSED IF YOU'RE UP HERE

11   SAYING, "JUDGE, I DID IT.  I'M GOING TO TAKE IT UP ON APPEAL."

12   ON WHAT BASIS?

13             THE COURT:  THAT'S ONE OF THE FACTORS I'VE RECITED.

14             MR. GERAGOS:  I DON'T THINK THAT THERE IS A

15   SUFFICIENT BASIS UNDER THE GOVERNMENT CASE LAW.  WE, I

16   BELIEVE, HAVE SUBSTANTIAL QUESTIONS OF LAW OR FACT.  AT THE

17   VERY LEAST, THE LAST ONE THAT THE COURT HAS CITED.

18             THE COURT:  THAT'S NOT LIKELY TO RESULT IN A

19   REVERSAL.

20             MR. GERAGOS:  IT'S AN IMMUNITY ISSUE.  THAT'S A

21   SUBSTANTIAL ISSUE.

22             THE COURT:  I MADE FINDINGS ON THAT AT THE TIME.

23   THEY'RE RECITED IN THE GOVERNMENT'S RESPONSE.

24             MR. GERAGOS:  THE GRAND JURY LEAKS?

25             THE COURT:  WE LISTENED VERY CAREFULLY TO WHETHER

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

150

1    THE GOVERNMENT HAD MADE ANY SPECIFIC PROMISES TO TRY TO KEEP

2    SOMEBODY -- OR THREATS, I SHOULD SAY, TO TRY TO KEEP SOMEBODY

3    OFF THE STAND.  AND AS IT PLAYED OUT, ONE OF THE TWO WITNESSES

4    YOU WANTED WAS PREPARED TO TESTIFY.  AND THEN YOU DECIDED YOU

5    DIDN'T WANT TO CALL HIM.  WILLIAMS WAS NOT PREPARED, AND THE

6    GOVERNMENT WAS NOT PREPARED TO GO ANY FURTHER.

7           I DON'T FIND THEY DID THAT TO PREVENT MR. WILKES

8    FROM HAVING A WITNESS.  I MADE THAT FINDING AT THE TIME.  I'VE

9    REVIEWED IT IN THE TRANSCRIPT AGAIN.  IT WAS CORRECT.

10          MR. GERAGOS:  IT'S FAIRLY DEBATABLE.  I UNDERSTAND

11   THE COURT HAS A DISPUTE.  BUT OBVIOUSLY, THE QUESTION IS IS

12   THIS A SUBSTANTIAL ISSUE ON APPEAL?  I WOULD ALSO CITE THE

13   COURT TO U.S. VERSUS DOWIE, WHICH IS D-O-W-I-E.  AND I'VE GOT

14   A COPY HERE.

15          IF I COULD APPROACH.

16          THE COURT:  SURE.  YOU MAY PRESENT IT TO THE

17   CLERK.

18          MR. GERAGOS:  IT WAS REFERRED TO AS EXHIBITS E AND

19   F.

20          SPECIFICALLY IN THAT CASE, THAT WAS A GENTLEMAN WHO

21   WAS TRIED IN JUDGE SEES (PHONETIC) COURT IN THE CENTRAL

22   DISTRICT AND WAS GIVEN A 42-MONTH SENTENCE.  IT WAS A

23   CONSPIRACY TO DEFRAUD THE DEPARTMENT OF WATER & POWER.  AND

24   JUDGE SEES GAVE HIM A 42-MONTH SENTENCE.  THE THREE

25   SUBSTANTIAL QUESTIONS, IF YOU CAN BELIEVE IT, WAS AN ERRONEOUS

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    ALLOCATION OF THE SENTENCING GUIDELINE, ADMITTING EVIDENCE OF

2    ANOTHER FRAUDULENT SCHEME, AND A DISTRICT COURT SHOULD HAVE

3    ADMITTED EVIDENCE IF HE WAS WILLING TO SUBMIT TO A POLYGRAPH.

4            I WOULD SUGGEST TO THE COURT THOSE ISSUES DON'T EVEN

5    COME INTO THE BALLPARK OF WHAT WE HAVE HERE.

6            THE COURT:  I AGREE THAT THE STANDARD IN THIS

7    CIRCUIT IS A VERY DEFERENTIAL ONE.  IT'S NOT A HIGH THRESHOLD.

8    THE PROBLEM HERE IS IT WAS GIVEN IN THIS CASE -- AND I JUST

9    LOOKED IT OVER -- THAT THERE WAS AT LEAST A FINDING OR NO

10   CONTRARY FINDING THAT THE DEFENDANT, BY CLEAR AND CONVINCING

11   EVIDENCE, WAS NOT A DANGER.

12           I'M TELLING YOU THAT I'M NOT PREPARED TO MAKE THAT

13   FINDING HERE.  I HAVE ABIDING DOUBT ABOUT WHETHER HE'S GOING

14   TO CONTINUE DOWN THE PATH THAT HE'S TAKEN SO FAR.

15           MR. GERAGOS:  EXCEPT THAT THE GOVERNMENT HAS WITHIN

16   THE LAST TEN DAYS DISMISSED THE ONLY OTHER ACTION THAT HE HAS.

17   THE ONLY PERIL THAT HE EVER HAS IN HIS ENTIRE LIFE IS WHEN HE

18   GETS MARCHED INTO THIS COURTHOUSE.  OTHER THAN THAT, THERE'S

19   NO PROBLEM.

20           THE COURT:  I'M NOT TALKING ABOUT THE OTHER CASE.

21   THAT'S NOT A FACTOR IN MY CONSIDERATION BECAUSE YOU'RE RIGHT.

22   THEY HAVE MOVED TO DISMISS IT WITHOUT PREJUDICE.  AND I'M

23   PREPARED TO GRANT THAT MOTION.

24           ANYTHING ELSE ON THIS, MR. GERAGOS?

25           MR. GERAGOS:  YES.  IF THE COURT IS NOT INCLINED,

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

152

1    THEN I'D ASK THAT AS SOON I FILE THE MOTION -- THE NOTICE OF

2    APPEAL, THAT THE COURT CAN ALLOW HIM OUT LONG ENOUGH FOR US TO

3    APPEAL TO THE 9TH CIRCUIT FOR RECONSIDERATION, WHICH I BELIEVE

4    IS WHAT'S CALLED FOR UNDER THE RULE.

5          THE COURT:  WHAT'S THE GOVERNMENT'S POSITION

6    RESPECTING BAIL PENDING APPEAL?

7          MR. FORGE:  YOUR HONOR, OUR POSITION IS SET FORTH

8    ACCURATELY IN THE PAPERS.  I THINK AS THE COURT HAS

9    RECOGNIZED, THE STATUTE IS VERY CLEAR.  AT THIS STAGE IN THE

10   PROCEEDINGS, IT BASICALLY DOES A 180.  THERE IS A VERY, VERY

11   HIGH PRESUMPTION FOR A NUMBER OF GOOD REASONS.  THERE'S AN

12   INCREASED INCENTIVE TO FLEE.  THE CONFIRMATION THAT THE

13   DEFENDANT IS GUILTY VERSUS A PRESUMPTION OF INNOCENCE.  THERE

14   ARE VERY GOOD REASONS WHY THE LEGAL LANDSCAPE CHANGES.

15         HERE, IN ADDITION TO ALL THOSE REASONS, WE HAVE THE

16   CONDUCT YOUR HONOR HAS DESCRIBED HERE TODAY AND IS OUTLINED IN

17   OUR PAPERS.  WE THINK ON ACTUALLY BOTH FRONTS, FLIGHT RISK AND

18   ECONOMIC DAMAGE TO THE COMMUNITY, MR. WILKES HAS FAILED TO

19   MEET THAT HIGH BURDEN HERE.  WE DO MOVE TO REMAND.

20         THE COURT:  THANK YOU, MR. FORGE.

21         I'VE GIVEN THIS A GREAT DEAL OF THOUGHT.  I'VE READ

22   THE SUBMISSIONS BY BOTH SIDES.  THERE DOES APPEAR TO BE, AS

23   MR. FORGE HAS ALLUDED, SOME LACK OF UNDERSTANDING AS TO THE

24   FEDERAL BAIL LAWS.  SOME HAVE SUGGESTED THAT THIS REQUIREMENT

25   IS SOMEHOW PECULIAR TO ME OR THIS COURT.  IT'S NOT.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

153

1          JUST AS THERE IS A PRESUMPTION THAT A PERSON PENDING

2     CHARGES AND NOT YET ADJUDICATED GUILTY EITHER BY PLEA OR BY

3     VERDICT IS ENTITLED TO BE OUT FOR A LOT OF SENSIBLE REASONS,

4     TO ASSIST IN HIS DEFENSE, TO CONTINUE TO MAKE MONEY TO PAY FOR

5     THE LAWYER OF HIS CHOOSING, THERE'S A COUNTER PRESUMPTION THAT

6     ONCE A JURY HAS FOUND BEYOND A REASONABLE DOUBT THAT CRIMINAL

7     CHARGES ARE TRUE, THAT THE PERSON SHOULD BE DETAINED.  WE

8     LAWYERS KNOW HOW TO CONSTRUCT STATUTES.  THIS ONE SPEAKS IN

9     MANDATORY LANGUAGE.

10          18 USC 3143(B) REQUIRES -- AND WHEN I SAY

11     "REQUIRES," IT SAYS, "THE JUDICIAL OFFICER SHALL ORDER."

12     "SHALL" IS A MANDATORY TERM UNDER FAMILIAR CANONS OF

13     CONSTRUCTION.  "SHALL ORDER DETENTION OF A PERSON FOUND GUILTY

14     AND SENTENCED TO A TERM OF IMPRISONMENT UNLESS CERTAIN

15     EXCEPTIONS ARE MET."

16          SO IT'S FAR FROM THIS BEING SOME KIND OF PECULIARITY

17     ASSOCIATED WITH THIS COURT.  IT IS THE LAW OF THE UNITED

18     STATES.  THERE'S A PRESUMPTION IN FAVOR OF DETENTION UNLESS

19     THE DEFENDANT CAN SHOW ESSENTIALLY THE CIRCUMSTANCES EXIST

20     THAT WOULD REBUT OR OFFSET THE PRESUMPTION.  AND THE SHOWING

21     MUST BE BY CLEAR AND CONVINCING EVIDENCE.  NOT JUST

22     PREPONDERANCE, BUT CLEAR AND CONVINCING.

23          WHAT THAT MEANS, ACCORDING TO THE 9TH CIRCUIT MODEL

24     CIVIL INSTRUCTION, IS THAT I HAVE TO BE PERSUADED THAT IT'S

25     HIGHLY LIKELY THAT A DEFENDANT WILL NOT POSE A DANGER OR A

PDF created with pdfFactory trial version www.pdffactory.com

154

1    FLIGHT RISK.  IT'S A HIGHER STANDARD THAN MORE LIKELY THAN

2    NOT.

3         SO BEGINNING WITH THE PRESUMPTION IN FAVOR OF

4    DETENTION, I LOOK TO THE EXCEPTIONS.  I ASK MYSELF AM I

5    CLEARLY -- IS THERE CLEAR AND CONVINCING EVIDENCE THAT

6    MR. WILKES WON'T FLEE OR POSE A DANGER TO THE COMMUNITY AND DO

7    I FIND THAT THE APPEAL IS NOT FOR PURPOSES OF DELAY AND RAISES

8    SUBSTANTIAL ISSUES OF LAW OR FACT LIKELY TO RESULT IN

9    REVERSAL?

10        MR. GERAGOS, I AGREE WITH YOU.  HE'S HERE TODAY,

11   WHICH IS THE BEST PROOF KNOWING THAT HE FACED A SUBSTANTIAL

12   SENTENCE AND THAT I WAS DISINCLINED TO GRANT BAIL PENDING

13   APPEAL THAT HE'S GOING TO FLEE.  HE'S BEEN TO OTHER PLACES IN

14   THE WORLD.  BUT UNLIKE SOME DEFENDANTS, MR. KONTOGIANNIS, FOR

15   EXAMPLE, WHO I THINK HAS DUAL CITIZENSHIP IN GREECE,

16   MR. WILKES POSES NO SUCH THREAT.  I'M PREPARED TO MAKE A

17   FINDING BY CLEAR AND CONVINCING EVIDENCE THAT HE'S NOT A

18   FLIGHT RISK.

19        WHERE HE FALLS DOWN UNDER THE STANDARD IS THE OTHER

20   SECTION, WHICH IS THAT HE'S NOT A DANGER.  AS I MENTIONED,

21   UNDER (A), THE TERM "DANGER" ENCOMPASSES ECONOMIC DANGER.  THE

22   COURT RELIES ON THE REYNOLDS CASE FOR THAT PROPOSITION.  IT'S

23   GOOD LAW.  "WHERE RELEASE OF A DEFENDANT WOULD POSE A RISK OF

24   ECONOMIC OR PECUNIARY HARM TO THE COMMUNITY, THE DANGER

25   ELEMENT IS MET."

PDF created with pdfFactory trial version www.pdffactory.com

155

1          IN THIS CASE AND WITH REGARD TO MR. WILKES, I CANNOT
2     MAKE THE REQUIRED FINDING BY CLEAR AND CONVINCING EVIDENCE
3     THAT HE IS NOT AN ECONOMIC DANGER TO THE COMMUNITY.  LET ME
4     EXPLAIN WHY.
5          FIRST, I NOTE THAT THE OFFENSES OF CONVICTION, THE
6     13 CRIMES THAT HE STANDS CONVICTED OF, THEY WERE MOSTLY
7     ECONOMIC IN NATURE.  THEY INVOLVED BRIBERY.  THEY INVOLVED
8     MONEY-LAUNDERING.  THEY INVOLVED WIRE FRAUD.  SIGNIFICANT TO
9     MY ANALYSIS OF WHETHER THE DEFENDANT POSES AN ONGOING THREAT
10    OF ECONOMIC HARM IS THAT THESE CRIMES, AS FOUND BY THE JURY,
11    WERE ONGOING AND CONTINUOUS IN NATURE.  AS I'VE MENTIONED IN
12    THE SENTENCING PHASE AND AS FOUND BY THE JURY, THE CRIME SPREE
13    SPANNED OVER NINE YEARS.
14         ADDITIONALLY, I FIND THAT THE CRIMES WERE
15    SOPHISTICATED.  THEY INVOLVED GREAT STEALTH AND GUILE ON THE
16    DEFENDANT'S PART.  THEY INCLUDED ATTEMPTS TO DISGUISE AND
17    COVER UP.  SOME OF THE CRIMINAL ACTIVITY WAS ACCOMPLISHED BY
18    SOPHISTICATED MEANS, AS I'VE ALREADY FOUND.  AS AN EXAMPLE,
19    I'VE POINTED AGAIN TO THE MULTIPLE LAYERS OF MONEY-LAUNDERING
20    THAT WERE USED TO DISGUISE THE PAYOFFS TO FORMER CONGRESSMAN
21    CUNNINGHAM'S MORTGAGES.
22         THROUGHOUT HIS PERPETRATION OF THE CRIMES,
23    MR. WILKES HAS DEMONSTRATED THE ABILITY, AS I SAID, TO BE
24    SHREWD AND CRAFTY AND DEVIOUS.  AND HE HAS EXERTED SUBSTANTIAL
25    CONTROL OVER OTHERS.  IF I LOOKED SIMPLY TO CONGRESSMAN

PDF created with pdfFactory trial version www.pdffactory.com

156

1   CUNNINGHAM AND MR. COMBS, THAT IS TRUE.  I'M REMINDED HERE

2   AGAIN OF HOW THOROUGHLY ADEPT AND MANIPULATIVE MR. WILKES WAS

3   IN PRESSING HIS AGENDA WITH CONGRESSMAN CUNNINGHAM.  I

4   MENTIONED THAT IN THE SENTENCING.

5        ADDITIONALLY, I HAVE DOUBTS ABOUT MR. WILKES'S

6   TRUSTWORTHINESS AND, IN TURN, HIS ABILITY TO FOLLOW ANY

7   CONDITIONS OF RELEASE THAT I MIGHT SET.  HE EXERCISED HIS

8   RIGHT TO TESTIFY AT TRIAL.  BUT IN MY VIEW AND THAT OF THE

9   JURY, HE DIDN'T TESTIFY TRUTHFULLY.  WE'VE GONE OVER THIS

10  ALREADY.  THERE ARE NUMEROUS EXAMPLES THAT BEAR OUT THE

11  CONCLUSION.  NOT JUST THE TESTIMONY ABOUT THE PROSTITUTES, BUT

12  THE NATURE OF THE MONEY TRANSFERS AND WHAT THEY REPRESENTED.

13       ALL OF THAT WAS CONTRADICTED BY THE GREAT WEIGHT OF

14  THE EVIDENCE.  AND I FIND THAT IT WAS FALSE TESTIMONY GIVEN BY

15  MR. WILKES.  THAT ITSELF WOULD JUSTIFY, I THINK, IN THIS CASE

16  DENYING BAIL PENDING APPEAL.  THERE'S A NEW CRIME COMMITTED

17  WHILE ON BOND.  YOU'VE ASKED EACH DEFENDANT THEN RISKS THAT

18  RIGHT.  I'VE TOLD YOU BEFORE I DON'T MAKE THAT FINDING IN

19  EVERY CASE, AND CERTAINLY NOT EVERY CASE WHERE THE DEFENDANT

20  TESTIFIES.  IN THIS CASE, HE ROLLED THE DICE.  AND HE FALSELY

21  TESTIFIED.  NOW HE'S ASKING ME TO IGNORE THAT, THAT THAT WAS

22  RISK-FREE.  IT'S NOT.

23       HIS WILLINGNESS TO GIVE FALSE TESTIMONY ON A MATTER

24  OF CONSEQUENCE AT TRIAL RENDERS HIM UNTRUSTWORTHY IN MY

25  JUDGMENT AND CONVINCES ME THAT HE WILL NOT ADHERE TO THE

PDF created with pdfFactory trial version www.pdffactory.com

157

1    CONDITIONS OF SUPERVISION IF HE'S RELEASED ON BOND PENDING

2    APPEAL.

3              THE FINDING IS ALSO BUTTRESSED BY MY CONCLUSION THAT

4    AT A MINIMUM MR. WILKES HAS MISLED THE COURT IN RELATION TO

5    HIS FINANCIAL SITUATION.  ON JULY 30TH LAST YEAR, I APPOINTED

6    COUNSEL TO REPRESENT HIM IN THE WILKES/FOGGO CASE.  I LATER

7    EXPANDED THAT APPOINTMENT TO INCLUDE REPRESENTATION ON ASPECTS

8    OF THIS VERY CASE.  I MADE THE DECISION TO APPOINT COUNSEL

9    AFTER REVIEWING THE FINANCIAL AFFIDAVIT THAT MR. WILKES FILED

10   STATING, IN ESSENCE, THAT HE HAD NO AVAILABLE ASSETS.

11             THE GOVERNMENT OBJECTED AT THE TIME TO MY FINDING.

12   AND THEY ARGUED THAT BASED ON THEIR INVESTIGATION, THAT HE DID

13   HAVE ASSETS.  HE COULD HIRE HIS OWN LAWYER.  ALTHOUGH I

14   OVERRULED THE OBJECTION AT THE TIME, I RESERVED FOR THE

15   GOVERNMENT THE RIGHT TO PRESENT ANY INFORMATION THEY MIGHT

16   COME ACROSS OR HAD IN THEIR POSSESSION WHICH CONTRADICTED THE

17   FINDING THAT THE DEFENDANT WAS IMPECUNIOUS.

18             THE GOVERNMENT HAS SINCE LODGED WITH ME A

19   FINANCIAL AFFIDAVIT -- FINANCIAL RECORDS, I SHOULD SAY, AS HAS

20   MR. WILKES.  I'VE CAREFULLY STUDIED THE FINANCIAL AFFIDAVIT

21   THAT MR. WILKES ORIGINALLY FILED WITH ME, AND I'VE COMPARED IT

22   TO INFORMATION THAT IS INCLUDED IN THE FINANCIAL RECORDS I'VE

23   RECENTLY RECEIVED.

24             FROM THAT COMPARISON, I'VE DETERMINED THAT CONTRARY

25   TO THE REPRESENTATIONS IN THE FINANCIAL AFFIDAVIT, MR. WILKES

PDF created with pdfFactory trial version www.pdffactory.com

158

1    NOW HAS AND HE HAS HAD THE ABILITY TO PAY FOR HIS OWN LEGAL

2    COUNSEL.  MUCH OF THE MATERIAL REMAINS UNDER SEAL.  SO TO

3    PROTECT MR. WILKES'S PRIVACY, I'LL SPEAK IN BROAD STROKES

4    ABOUT THIS AS I HAVE SO FAR.

5          WHAT THE RECORDS SHOW IS THAT WITHIN MONTHS OF

6    TELLING ME THAT HE DIDN'T HAVE FUNDS TO RETAIN A LAWYER TO

7    REPRESENT HIM, HE MADE OR AUTHORIZED SUBSTANTIAL PAYMENTS

8    TOTALING AT LEAST $90,000 TO TWO OTHER LAWYERS HE HAS ON

9    RETAINER.

10          IN ADDITION, DURING THE PERIOD OF TIME, HE RECEIVED

11    PAYOUTS HIMSELF OF UP TO $65,000 A MONTH.

12          FINALLY, THERE IS A NUMBER OF THEN EXISTING ASSETS

13    WHICH WERE LATER AWARDED TO HIM IN HIS DIVORCE SETTLEMENT.

14    THEY APPEAR NOWHERE ON THE AFFIDAVIT.  VEHICLES, BOATS, ALL OF

15    THAT.  AND THE AFFIDAVIT SPECIFICALLY CALLS FOR THAT.  IT

16    SPECIFICALLY CALLS FOR SUCH INFORMATION.  IT'S NOT THERE, AND

17    NO EXPLANATION HAS BEEN OFFERED.

18          IT'S BEEN EXPLAINED BY WAY OF MITIGATION THAT THESE

19    FUNDS WERE SUBJECT TO THE APPROVAL AND THE JURISDICTION OF THE

20    SUPERIOR COURT WHEN MR. WILKES'S DIVORCE CASE WAS PENDING.

21    WITH ALL RESPECT, I FIND THAT TO BE BESIDE THE POINT.  THE

22    REAL POINT HERE IS THAT THE DEFENDANT, WITH THE APPROVAL OF

23    THE SUPERIOR COURT, ENJOYED ACCESS TO THE FUNDS.

24          IN FACT, AT ONE POINT SHORTLY AFTER BY APPOINTED

25    COUNSEL, THE SUPERIOR COURT AUTHORIZED ABOUT A MILLION AND A

PDF created with pdfFactory trial version www.pdffactory.com

159

1    HALF GOING TO HIS LAWYER'S TRUST ACCOUNT.  AND FROM WHAT I CAN

2    GATHER FROM LOOKING AT THE RECORDS, IT WAS MR. WILKES'S

3    REQUEST OF THE LAWYER THAT TRIGGERED THE DISSEMINATION OF

4    THOSE FUNDS TO HIM.  AND THE LAWYER'S RECORDS BEAR THAT OUT AS

5    WELL.

6          SO IT'S APPARENT TO ME FROM REVIEWING THE RECORD AND

7    THE DIVORCE LAWYER'S DECLARATION THAT SUBSTANTIAL AMOUNTS OF

8    MONEY WERE DISBURSED TO MR. WILKES AS HE SAW FIT.

9          I THINK YOU'VE HEARD THIS TERM BEFORE, MR. WILKES:

10   "CHUTZPAH."  IT MEANS UNBELIEVABLE, GALL, OR AUDACITY.  AND

11   WHEN ONE IS CHARGED WITH SERIAL CRIMES INVOLVING FRAUD AND

12   DISHONESTY AND BRIBERY, I THINK IT TAKES INCREDIBLE CHUTZPAH

13   TO COMPOUND THOSE WRONGS BY MATERIALLY MISREPRESENTING ONE'S

14   FINANCIAL CONDITION.  I FIND THAT'S WHAT HAPPENED HERE.

15         I CONCLUDE THAT THE DEFENDANT'S CONTINUING

16   WILLINGNESS TO ENGAGE IN A PATTERN OF DECEITFUL CONDUCT,

17   INCLUDING GIVING FALSE TESTIMONY AT TRIAL AND PROVIDING

18   MISLEADING FINANCIAL INFORMATION TO THE COURT, STRONGLY

19   SUGGESTS -- CONTRARY TO THE FINDING THAT I HAVE TO MAKE,

20   STRONGLY SUGGESTS THAT HE WILL POSE AN ECONOMIC DANGER TO THE

21   COMMUNITY AND TO OTHERS.  CERTAINLY, I CAN MAKE NO CONTRARY

22   FINDING BY CLEAR AND CONVINCING EVIDENCE.  AND NO CONTRARY

23   FUNDING IS WARRANTED GIVEN HIS RECORD.

24         LIKEWISE, AS I SAID, I FIND BASED ON THAT THAT

25   MR. WILKES IS LIKELY TO CONTINUE DOWN THE SAME PATH AND,

PDF created with pdfFactory trial version www.pdffactory.com

160

1    THEREFORE, WILL BE NOT AMENABLE TO ANY CONDITIONS THAT HE MAY

2    REGARD AS INCONVENIENT OR NOT CONSISTENT WITH HIS OWN AGENDA.

3         NOW, I'VE BEEN ASKED BY THE GOVERNMENT TO MAKE

4    SEPARATE AND ALTERNATIVE FINDINGS UNDER THE LIKELIHOOD OF

5    SUCCESS ON APPEAL.  I DECLINE TO DO THAT.  I FIND THAT IT IS A

6    VERY DEFERENTIAL STANDARD, AS MR. GERAGOS HAS STAKED OUT.

7         LET ME TELL YOU THIS, MR. GERAGOS, TO BE COMPLETE IN

8    THIS RECORD:  I UNDERSTAND THE FAIRLY DEBATABLE STANDARD.  I

9    LOOKED AT HANDY AGAIN AND THE CASE THAT FOLLOWED IT.  BUT THE

10   PROPOSITION THAT IT'S FAIRLY DEBATABLE THAT HE WAS FORCED TO

11   TRIAL OR RUSHED TO TRIAL, I DON'T THINK SO.  I DON'T THINK

12   THREE SMARTER PEOPLE ON THE APPELLATE COURT ARE GOING TO AGREE

13   WITH THAT WHEN THEY LOOK AT THIS WHOLE RECORD AND APPLY THE

14   STANDARDS THAT THEY'VE GIVEN.

15        LIKEWISE, I DON'T FIND IT FAIRLY DEBATABLE OR FAIRLY

16   DOUBTFUL THAT THE GOVERNMENT CROSSED THE LINE IN CLOSING

17   ARGUMENT AND SAID THINGS THAT HAD THE EFFECT OF PREJUDICING

18   MR. WILKES'S ABILITY TO GET A FAIR TRIAL.  I'VE LOOKED BACK AT

19   THE PRE-TRIAL MOTIONS THAT YOU RAISED, SPECIFICALLY THE GRAND

20   JURY MOTION.  WHAT HAPPENED WAS WRONG.  THE GRAND JURY

21   INFORMATION WAS LEAKED.  THE GOVERNMENT HAS CONCEDED THAT.

22   BUT THAT'S NOT THE END OF THE INQUIRY.  THE INQUIRY IS WHAT

23   EFFECT, IF ANY, DID IT HAVE ON MR. WILKES'S ABILITY TO GET A

24   FAIR TRIAL?  IT HAD NONE.  WE CAREFULLY SCREENED FROM A HUGE

25   POOL OF PROSPECTIVE JURORS.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. GERAGOS:  EXCEPT THAT ARGUMENT DOES NOT TAKE

2     INTO ACCOUNT THE INSTRUCTIONAL ISSUE, AND I DON'T WANT TO

3     BELABOR THAT.

4          THE COURT:  I'M HAPPY TO TALK ABOUT THAT, TOO.  THIS

5     IS NOT THE SAME IMPANELMENT THAT HAS BEEN THE SUBJECT OF MANY,

6     MANY MOTIONS.  I THINK YOU HAD TO STRAIN TO FIND SOMETHING

7     WRONG WITH THE GRAND JURY CHARGE, WHICH I GAVE IN THIS CASE.

8     I'M NOT DEFENSIVE ABOUT IT, BUT IT WAS FULLY CONSISTENT WITH

9     THE GUIDELINES FROM NAVARRO-VARGAS.  FULLY CONSISTENT.

10          THE IDEA THAT THE 9TH CIRCUIT IS GOING TO SAY

11     THERE'S A PIMPLE ON THIS GRAND JURY CHARGE AFTER HE'S HAD A

12     FAIR TRIAL BY AN IMPARTIAL JURY WHO -- BY THE WAY, ON THE

13     MATTER OF INSTRUCTIONS, WE HAVE A REMARKABLE DEGREE OF

14     AGREEMENT ON THE JURY INSTRUCTIONS.  I DON'T THINK THERE WERE

15     ANY OBJECTIONS AT THE END OF THE DAY.  I THINK ALL

16     INSTRUCTIONS GIVEN TO THE TRIAL JURY WERE AGREED TO BY YOU AND

17     MR. CAHN.  I ACCOMMODATED THE ISSUES THAT YOU RAISED BY GIVING

18     THOSE.

19          USUALLY, INSTRUCTIONAL ERROR IS A BIG DEAL ON

20     APPEAL.  IT'S ABSENT HERE.  WE DON'T HAVE ANY OBJECTIONS TO

21     THE INSTRUCTIONS.  SO WHAT WE HAVE WITH RESPECT TO THIS JURY

22     IS ONE THAT YOU PARTICIPATED IN SELECTING ALONG WITH

23     MR. WILKES.  THEY WERE PRE-SCREENED.  THEY WERE FAIR --

24     EXCEEDINGLY FAIR, AND THEY WERE PROPERLY INSTRUCTED.

25          NOW, ALL OF THAT, IN MY JUDGMENT, PURGES ANY TAINT

PDF created with pdfFactory trial version www.pdffactory.com

162

1    THAT MIGHT HAVE OCCURRED BEFORE, INCLUDING GRAND JURY LEAKING

2    OR IF YOU SAY THERE WAS A MISSTATEMENT -- I DON'T FIND THAT

3    THERE WAS ANY IN THE GRAND JURY CHARGE -- IT PURGES THE TAINT

4    OF THAT.  YOU'LL HAVE TO SHOW PREJUDICE TO THE 9TH CIRCUIT,

5    AND I DON'T THINK YOU CAN UNDER THE CIRCUMSTANCES.

6         NOTWITHSTANDING THAT, I APPRECIATE THE DIFFICULTY OF

7    BEING THE REVIEWER OF MY OWN JUDGMENTS.  THEY DON'T WANT TO

8    PUT ME IN THAT POSITION.  I DON'T MAKE ANY FINDING ON THAT.

9    BUT I'M NOT PREPARED TO MAKE A FINDING THAT THERE'S A

10   SUBSTANTIAL LIKELIHOOD OF REVERSAL IN THIS CASE.  MR. WILKES

11   GOT A FAIR TRIAL HERE.  AS THE GOVERNMENT SAID AND I'VE

12   ALLUDED TO HERE, I'VE BENT OVER BACKWARDS TO ENSURE A FAIR

13   PROCESS FOR HIM.  AND I THINK HE GOT THAT AT THE END OF THE

14   DAY.

15        THIS VERDICT IS THE RESULT OF THE EVIDENCE AND AN

16   OBJECTIVE AND FAIR ANALYSIS OF THE EVIDENCE, NOT OTHER

17   EXTRANEOUS FACTORS.

18        MR. GERAGOS:  JUST SO THE RECORD'S CLEAR, THE

19   COURT'S NOT MAKING THE FINDING ONE WAY OR THE OTHER?

20        THE COURT:  NO, I'M NOT MAKING A FINDING.  I THINK I

21   HAVE TO FIND AFFIRMATIVELY THAT HE HAS A FAIR CHANCE OF

22   REVERSAL ON APPEAL UNDER THE FAIRLY DEBATABLE STANDARD.  I

23   DON'T MAKE THAT FINDING HERE.  I, LIKEWISE, DO NOT MAKE A

24   FINDING BY CLEAR AND CONVINCING EVIDENCE THAT HE POSES NO

25   ECONOMIC DANGER TO THE COMMUNITY.  I THINK HE DOES.

PDF created with pdfFactory trial version www.pdffactory.com

163

1        SO THE MOTION FOR BAIL PENDING APPEAL IS DENIED.

2   MR. WILKES IS ORDERED REMANDED ON THIS CASE TO BEGIN SERVING

3   THE SENTENCE IMPOSED BY THE COURT.

4            MR. GERAGOS:  I'VE GOT THE NOTICE OF APPEAL.

5            DOES THE COURT --

6            THE COURT:  YOU'LL HAVE TO GET THE STAY FROM THEM.

7   I FOLLOW THE LETTER OF THE INSTRUCTION HERE.  THE MOTION FOR

8   STAY IS DENIED.  I HAVE A WRITTEN ORDER ON MY FINDINGS

9   RESPECTING BAIL PENDING APPEAL, WHICH I'LL SIGN.  YOU SHOULD

10  HAVE A COPY OF IT.

11           MR. GERAGOS:  9-1.2(E), THE COURT IS NOT INCLINED TO

12  FOLLOW THE BAIL AT THE TIME THE MOTION WAS FILED IN THIS

13  COURT, THAT THE BAIL WILL REMAIN IN EFFECT UNTIL THE COURT

14  RULES ON THE MOTION?

15           THE COURT:  NO, I'M NOT INCLINED TO FOLLOW THAT.  AS

16  I SAID, I FIND REASON HERE TO REVOKE BAIL.  INDEPENDENT OF THE

17  FACT THAT HE'S BEEN ON BAIL, HE'S VIOLATED THE TRUST OF THE

18  COURT IN SUBMITTING WHAT I FIND TO BE VERY MISLEADING

19  INFORMATION TO ME.  HE'S COMMITTED A NEW OFFENSE WHILE ON

20  BOND.

21           SO INDEPENDENT OF LEAVING HIM ON, I WOULD REVOKE

22  BAIL FOR THOSE REASONS.  YOU'LL HAVE TO GET HIM A STAY FROM

23  THE COURT OF APPEALS.  THE ORDER HAS BEEN SIGNED.

24           THERE IS ANOTHER MATTER PENDING THAT MR. WILKES

25  NEEDS TO BE HERE FOR.  SO HOLD THE LINE.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

164

1           MR. WILKES AND MR. GERAGOS, YOU, AS YOU KNOW, HAVE A

2    RIGHT TO APPEAL THE JUDGMENT AND SENTENCE OF THE COURT.  YOUR

3    NOTICE OF APPEAL HAS TO BE FILED WITHIN TEN DAYS.  IT NEEDS TO

4    BE FILED IN THIS COURT.  MR. GERAGOS WILL ASSIST YOU IN FILING

5    THAT.  OR IF YOU NEED HELP FROM THE CLERK OF THE COURT, SHE'LL

6    HELP YOU.

7           DO YOU UNDERSTAND YOUR RIGHT TO APPEAL THE JUDGMENT

8    OF THE VERDICT AND THE SENTENCE OF THE COURT?

9           THE DEFENDANT:  YES.

10           THE COURT:  ANYTHING ELSE ON THIS MATTER?

11           MR. FORGE:  NO.

12           MR. GERAGOS:  NOT FROM THE DEFENDANT.

13           THE COURT:  TISH, IF YOU'LL CALL THE RELATED CASE.

14           MR. GERAGOS, I'LL HAND YOU BACK THESE MATERIALS.

15                          --O0O--

16           THE CLERK:  CALLING NO. 1 ON THE CALENDAR, 07CR239,

17    UNITED STATES OF AMERICA VERSUS KYLE DUSTIN FOGGO AND BRENT

18    ROGER WILKES.

19           MAY WE HAVE THE APPEARANCES, PLEASE.

20           MR. FORGE:  JASON FORGE, SANJAY BHANDARI, PHIL

21    HALPERN, AND VALERIE CHU FOR THE UNITED STATES.

22           THE COURT:  GOOD AFTERNOON ONCE AGAIN.

23           MR. CAHN:  REUBEN CAHN AND SHEREEN CHARLICK FOR

24    MR. WILKES.

25           THE COURT:  DO WE HAVE COUNSEL FOR MR. FOGGO ON?

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1         MR. TESLIK: WE DO. IT'S RANDOLPH TESLIK, ANDREW

2    DOBER, AND LIZ TOBIO FOR MR. FOGGO.

3         THE COURT: THANK YOU FOR BEING PATIENT.

4         I HAVE BEFORE ME A MOTION TO DISMISS, WHICH IS IN

5    THE WILKES/FOGGO MATTER. IT'S UNOPPOSED EXCEPT THAT COUNSEL

6    FOR MR. WILKES BELIEVES THAT THE DISMISSAL SHOULD BE WITH

7    PREJUDICE RATHER THAN WITHOUT.

8         I'M HAPPY TO HEAR FROM YOU, MR. CAHN.

9         MR. CAHN: LET ME REMIND THE COURT OF THE

10   CIRCUMSTANCES. FOR A LONG TIME, WE'VE HAD A MOTION PENDING TO

11   TRANSFER THIS CASE. THE GOVERNMENT OPPOSED IT VEHEMENTLY AT

12   ALL TIMES. QUITE RECENTLY, IN FACT, MR. WILKES AT LAST AGREED

13   TO A MOTION TO TRANSFER. MR. FOGGO AMENDED HIS MOTION TO MOVE

14   TO TRANSFER NOT TO THE EASTERN DISTRICT OF VIRGINIA, BUT TO

15   THE DISTRICT OF COLUMBIA. MR. WILKES WITHDREW HIS OBJECTION

16   AND AGREED TO THE TRANSFER.

17        THE COURT: RIGHT.

18        MR. CAHN: THE CIRCUMSTANCES ARE NOW SUDDENLY THE

19   GOVERNMENT SEEKS A TRANSFER TO A DISTRICT TO WHICH NO

20   DEFENDANT HAS A MOTION PENDING. AND THEY DISMISSED

21   MR. WILKES'S CASE WITH THE CLEAR INTENTION OF REINDICTING HIM

22   IN A DISTRICT WHICH HE HASN'T CONSENTED TO TRANSFER.

23        THE GOVERNMENT SAYS THAT I SUGGESTED THIS TO THEM.

24   I SUGGESTED IT WAS AN APPROPRIATE WAY IN WHICH THEY COULD

25   CONSOLIDATE CASES THAT WEREN'T OTHERWISE CONSOLIDATABLE. I

PDF created with pdfFactory trial version www.pdffactory.com

166

1      NEVER SUGGESTED THAT THE GOVERNMENT HAD THE RIGHT TO FORUM

2      SHOP.  INDEED, THE RULE IS SPECIFICALLY DESIGNED TO PREVENT

3      THAT.  THE GOVERNMENT HAS NO RIGHT TO MOVE THE CASE.  THAT

4      RIGHT IS GIVEN SOLELY TO THE DEFENDANT.

5              AT THIS POINT WHAT WE HAVE IS THE GOVERNMENT USING

6      ITS POWER TO MANIPULATE THE SYSTEM TO TAKE MR. WILKES TO A

7      DISTRICT HE DOESN'T BELONG IN, TO WHICH HE HASN'T BEEN

8      SENTENCED, AND THAT'S THE EASTERN DISTRICT OF VIRGINIA.  IN

9      ADDITION TO THAT, THERE'S PRACTICAL CONCERNS THAT THE COURT

10     SHOULD CONSIDER.

11             ONE IS THAT THE EASTERN DISTRICT OF VIRGINIA IS NOT

12     A PUNITARY DISTRICT.  IT'S NOT ONLY ALEXANDRIA.  I DON'T

13     BELIEVE THE COURT, BASED ON MY READING OF THE RULE, HAS THE

14     POWER TO SPECIFY THE PARTICULAR LOCATION WITHIN A DISTRICT.

15     IT INCLUDES NORFOLK, AND IT INCLUDES RICHMOND, ALL OF WHICH

16     WOULD BE EXTRAORDINARILY INCONVENIENT.

17             THE COURT:  IF I GRANT THAT MOTION, MY INCLINATION,

18     MR. CAHN, WOULD BE TO LEAVE IT TO THE CHIEF JUDGE IN THE

19     EASTERN DISTRICT AND DETERMINE WHAT DIVISION THE CASE IS

20     ASSIGNED TO.  YOU'RE RIGHT.  THAT'S NONE OF MY BUSINESS.

21             MR. CAHN:  I UNDERSTAND THAT.  BUT MY POINT IS THE

22     GOVERNMENT'S MOTION IS NOT WELL-TAKEN AS FAR AS TRANSFERRING

23     THIS CASE TO THE EASTERN DISTRICT OF VIRGINIA WHEN THERE'S NO

24     PENDING MOTION.  AND PARTICULARLY FROM MR. WILKES'S POINT OF

25     VIEW, OUR OBJECTION IS TO DISMISS IT WITHOUT PREJUDICE.  IF

PDF created with pdfFactory trial version www.pdffactory.com

167

1    THEY WISH TO DISMISS HIM, IT SHOULD BE WITH PREJUDICE.  IF

2    THEY WISH TO DISMISS HIM WITHOUT PREJUDICE IN ORDER TO GAIN A

3    TACTICAL ADVANTAGE AND GET HIM IN A DISTRICT THAT HE DOESN'T

4    BELONG IN, THAT'S NOT A PROPER PURPOSE FOR DISMISSAL.

5              THE COURT:  I AGREE WITH YOU.  FIRST OF ALL, I'VE

6    GOT TO TELL YOU I'M NOT ABSOLUTELY CONVINCED HE'S GOING TO BE

7    REINDICTED.  HE'S JUST BEEN SENTENCED TO 12 YEARS.  AND IF THE

8    GOVERNMENT FEELS THAT THIS IS A DEFENSIBLE SENTENCE, THEN I

9    DON'T KNOW.  I'M NOT MAKING A FINDING THAT HE'S NOT, BUT I

10   DON'T HAVE ENOUGH INFORMATION TO SAY FOR SURE HE'S ABOUT TO BE

11   REINDICTED.

12             MR. CAHN:  WE HAVE THE PEOPLE HERE THAT CAN SPEAK TO

13   THAT MATTER.  THEY'VE CHOSEN NOT TO DISAVOW MY STATEMENT.  IF

14   THEY WANT TO SPEAK TO IT, LET THEM DO SO.  IF THEY DON'T CARE

15   TO DENY IT, THEN I THINK MY CLAIM IS WELL-TAKEN.

16             THE COURT:  MR. FORGE, WHO SPEAKS FOR THE UNITED

17   STATES ON THIS CASE?

18             MR. FORGE:  I'LL SPEAK SO THE GENTLEMEN ON THE LINE

19   CAN HEAR US.

20             I'M NOT GOING TO TAKE MR. CAHN'S BAIT.  IT SMACKS OF

21   A CIVIL LAWYER WHO FAXES A LETTER AT 4:55 P.M. AND SAYS, "IF I

22   DON'T HEAR FROM YOU TO THE CONTRARY BY 5:00 P.M., I'LL ACCEPT

23   THAT YOU'VE CONCEDED TO THE POINTS I'VE RAISED IN THIS

24   LETTER."

25             YOUR HONOR IS CORRECT, AND WE ALL KNOW THAT THE

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

168

1    DECISION ON WHETHER OR NOT TO REINDICT MR. WILKES WILL WAIT

2    FOR ANOTHER DAY.  OBVIOUSLY, THIS IS A VERY SIGNIFICANT EVENT.

3            THE COURT:  IT'S NOT CLEAR THAT HE'S GOING TO BE

4    REINDICTED.  THIS ISN'T STEP 1.

5            MR. FORGE:  THAT'S CORRECT.  THAT DIE IS NOT CAST.

6            BUT MORE IMPORTANTLY, TO THE SUBSTANCE OF THE ISSUE,

7    MR. CAHN IS JUST WRONG ON THE LAW.  THE REALITY IS MR. WILKES

8    COULD HAVE BEEN INDICTED ON DAY ONE IN THE EASTERN DISTRICT OF

9    VIRGINIA.  HE HAD ABSOLUTELY NO RIGHT NOT TO BE INDICTED IN

10   THE EASTERN DISTRICT OF VIRGINIA.  WITH THE 6TH AMENDMENT

11   HOLDS, A DEFENDANT HAS A RIGHT TO BE INDICTED IN THE DISTRICT

12   IN WHICH THE CRIMES OCCURRED.

13           THE COURT:  YOU GUYS CHOSE THIS VENUE.  I DIDN'T

14   UNDERSTAND IT AT THE TIME.  YOU'LL REMEMBER AT THE INCEPTION

15   OF THIS CASE, ONE OF THE FIRST QUESTIONS I PUT TO THE UNITED

16   STATES WAS "WHAT'S THE CONNECTION BETWEEN THESE TWO THINGS?"

17   WHICH IS ANOTHER WAY OF SAYING "WHY IS THIS CASE HERE?"

18           MR. FORGE:  I UNDERSTAND.  YOU'RE RIGHT.  YOU DID

19   SAY THAT REPEATEDLY.  AND THE REALITY IS, AS I'M SURE YOUR

20   HONOR CAN APPRECIATE, WE ARE LOCATED HERE, AND MOST OF THE

21   AGENTS ARE LOCATED HERE.

22           THE COURT:  ARE YOU SURE ABOUT THAT?  BECAUSE

23   MR. MAC DOUGALL AND MR. FOGGO TAKE A VERY DIFFERENT POSITION

24   TO WHERE MOST OF EVEN THE AGENTS ARE LOCATED.  THEY SAY MOST

25   OF THE AGENTS ARE LOCATED THERE.  THEY'VE DONE ACCOUNTING

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    BASED ON INFORMATION IN THE DISCOVERY SO FAR.  NOT JUST LAY

2    WITNESSES, BUT AGENTS.

3           MR. FORGE:  IF IT'S CONTRARY TO THAT, I WOULD TAKE

4    ISSUE TO THAT.  I KNOW FOR CERTAIN THAT THE MAJORITY OF THE

5    AGENTS ARE HERE.  THE INVESTIGATING PROSECUTORS ARE LOCATED

6    HERE.  AND THE CASE WAS PROPERLY BROUGHT HERE.  I FULLY

7    RECOGNIZE YOUR CONCERNS AND THE CONCERNS MR. FOGGO HAS RAISED

8    REGARDING HIS CONVENIENCE.  I'M NOT DISCOUNTING THOSE.  I'M

9    SIMPLY SAYING THAT FROM OUR PERSPECTIVE, IT WAS MORE

10   CONVENIENT FOR IT TO BE HERE.  THAT'S ENTIRELY APPROPRIATE.

11          THE COURT:  IT'S A DIFFERENT ISSUE ANYWAY NOW WITH

12   RESPECT TO MR. WILKES.  WE'RE TALKING ONLY ABOUT WHETHER THE

13   CHARGES SHOULD BE DISMISSED WITH OR WITHOUT PREJUDICE.

14          MR. FORGE:  AS WE POINTED OUT IN OUR PAPERS, THERE

15   IS NO PREJUDICE TO MR. WILKES BY DISMISSING THEM WITHOUT

16   PREJUDICE.  THE SPEEDY TRIAL CLOCK IS FROZEN IN TIME HERE.  WE

17   DON'T GET TO START OVER AGAIN.  IN FACT, ODDLY IN THEIR

18   PAPERS, MR. WILKES PROFESSES A DESIRE TO GET THIS CASE TO

19   TRIAL, YET THEY ARE CHOOSING A DISTRICT WHICH, BY ALL

20   ACCOUNTS, WILL ALMOST GUARANTEE TWICE OR MAYBE A LONGER TIME

21   UNTIL THIS CASE GETS TO TRIAL.

22          SO I THINK WE HAVE TAKE WITH MORE THAN A GRAIN OF

23   SALT THEIR CONTENTION THAT BY SOMEHOW DISMISSING WITHOUT

24   PREJUDICE, WE ARE GOING TO DEPRIVE THEM OF HIS RIGHT TO A

25   SPEEDY TRIAL.  THAT'S JUST NOT THE CASE.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

170

1          THE COURT:  THE COURT FINDS AS FOLLOWS:  FIRST,
2    THERE'S A PRESUMPTION IN THE CASE LAW UNDER RULE 48 THAT I
3    SHOULD GRANT THE RULE 48(A) MOTION WITHOUT PREJUDICE UNLESS I
4    MAKE CONTRARY FINDINGS THAT THE BASIS FOR THE MOTION WAS
5    DESIGNED TO PREJUDICE THE DEFENDANT.  I DON'T MAKE THOSE
6    FINDINGS HERE.
7          MR. CAHN:  MAY I SPEAK TO ONE OTHER MATTER?
8          THE COURT:  SURE.
9          MR. CAHN:  I SPOKE ABOUT THE SPECIFIC INTENT TO
10   MANIPULATE JURISDICTION, BUT I THINK THERE'S ANOTHER THING AT
11   ISSUE HERE.  I KNOW THE COURT HAS SOME PROBLEMS WITH THIS, BUT
12   I NEED TO ADDRESS IT NOW.  THAT'S THE QUESTION OF COUNSEL AND
13   ACCESS TO COUNSEL.  I ALSO BELIEVE THAT THERE'S A DELIBERATE
14   EFFORT TO INTERFERE AND MANIPULATE MR. WILKES'S ABILITY TO
15   ACCESS COUNSEL.
16         THE COURT:  WE DON'T EVEN KNOW THAT THEY'RE GOING TO
17   REINSTATE THIS CHARGE.  IF THEY DON'T, THEN HE HAS NEITHER A
18   RIGHT OR A NEED FOR COUNSEL.
19         MR. CAHN:  IF THEY DON'T.  BUT, YOU KNOW, JUDGE,
20   I'VE BEEN DOING THIS A LONG TIME.  I KNOW YOU HAVE, ALSO.
21         THE COURT:  YES.
22         MR. CAHN:  AND MY JUDGMENT IS BASED ON THE
23   UNWILLINGNESS TO MAKE ANY STATEMENT.  AND BASED UPON
24   EVERYTHING I'VE SEEN, HE'S VERY LIKELY TO BE REINDICTED.  HE
25   IS VERY LIKELY TO FACE THESE CHARGES.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

171

1        THE COURT:  IS THERE ANYTHING THAT WOULD FORECLOSE A

2   DISTRICT JUDGE IN THE EASTERN DISTRICT OF VIRGINIA, IF THAT'S

3   WHERE THE INDICTMENT CROPS BACK UP, FROM APPOINTING YOU?  YOU

4   AND MS. CHARLICK WERE PREPARED TO GO TO D.C.  HE HAD WAIVED

5   HIS RIGHT, AND YOU WERE GOING TO CONTINUE AS COUNSEL THERE.

6   IS THERE ANYTHING YOU CAN POINT TO THAT SAYS THAT MR. WILKES

7   CAN SAY, "WAIT A MINUTE.  I HAVE A COUPLE OF REALLY GOOD

8   LAWYERS I HAVE CONFIDENCE IN.  THEY'RE APPOINTED.  I'VE

9   QUALIFIED FOR APPOINTED COUNSEL"?

10       MR. CAHN:  YOUR HONOR, I'D LIKE TO SPEAK TO THAT,

11  ALSO.

12       THE COURT:  IS THERE ANYTHING -- ASSUMING THOSE

13  HURDLES ARE MET, IS THERE ANYTHING PRECLUDING A JUDGE IN THE

14  EASTERN DISTRICT FROM APPOINTING YOU TO REPRESENT HIM?

15       MR. CAHN:  THE QUESTION, I BELIEVE, WOULD BE THE

16  PLAN OF THAT DISTRICT AND WHETHER THAT DISTRICT ALLOWED SUCH

17  APPOINTMENT.  I DON'T KNOW THE ANSWER TO THAT QUESTION.  I SAY

18  THIS ADVISEDLY.  I'VE DONE SOME LOOKING INTO THE MATTER.

19  MR. FORGE HAS ALSO DONE SOME LOOKING INTO THE MATTER.

20       AT THE SAME TIME THEY WERE FILING THEIR MOTIONS TO

21  TERMINATE OUR ROLE AS COUNSEL FOR MR. WILKES AND MOVING TO

22  DISMISS THIS CASE, MR. FORGE WAS CONTACTING THE ADMINISTRATIVE

23  OFFICE OF THE COURTS TRYING TO FIND OUT WHETHER OR NOT WE

24  COULD PRACTICE OUTSIDE OF THIS DISTRICT.  I BELIEVE THIS IS A

25  DELIBERATE EFFORT ON THE PART OF THE PROSECUTION TO INTERFERE

PDF created with pdfFactory trial version www.pdffactory.com

1    WITH MR. WILKES'S RIGHTS.

2              SO THE ANSWER TO THAT QUESTION IS IT'S UNKNOWN

3    WHETHER OR NOT WE WOULD BE ABLE TO BE APPOINTED AND WHETHER OR

4    NOT WE COULD REPRESENT MR. WILKES.

5              I'D ALSO LIKE TO SPEAK VERY BRIEFLY TO THE ISSUE OF

6    THE AFFIDAVIT BECAUSE YOU SAID SOME THINGS THAT TOUCHED

7    PARTICULARLY UPON OUR ROLE --

8              THE COURT:  I HAVEN'T INTENDED TO.

9              MR. CAHN:  I DIDN'T MEAN IT IN THE WAY THAT YOU WERE

10   CASTING ASPERSIONS UPON US, BUT I DO THINK IT'S IMPORTANT TO

11   SAY THESE THINGS, YOUR HONOR.

12             I'VE BEEN DOING THIS FOR A LOT OF YEARS.  FOR OVER

13   20 YEARS, I'VE BEEN INVOLVED IN PUBLIC DEFENSE.  I'VE DONE

14   MANY OTHER THINGS.  I CHOSE TO TAKE THIS ROLE BECAUSE I

15   BELIEVE STRONGLY THAT PEOPLE WHO DO NOT HAVE THE MONEY DESERVE

16   THE BEST REPRESENTATION THAT'S AVAILABLE, NO LESS THAN THOSE

17   WHO DO.  I HAVE MANY TIMES TOLD CLIENTS, WHO I LOOKED INTO

18   THEIR FINANCIAL SITUATION, LEARNED THAT THEY HAD ASSETS THAT

19   MAYBE THE COURT WASN'T AWARE OF OR MAYBE MIGHT GIVE THEM THE

20   ABILITY TO HIRE COUNSEL.  I'VE TOLD THEM "YOU SHOULD JUST GO

21   OUT AND HIRE COUNSEL SO I DON'T NEED TO GO TO THE COURT ON

22   THIS MATTER."

23             I'M FAMILIAR WITH MR. WILKES'S SITUATION.  I'VE

24   FILED PAPERS.  THEY ARE ABBREVIATED BECAUSE MATTERS ARE UNDER

25   SEAL.  HIS PRIVACY RIGHTS ARE AT STAKE.  NOT JUST MR. WILKES,

PDF created with pdfFactory trial version www.pdffactory.com

173

1    BUT HIS WIFE AND FAMILY.  I'VE TRIED TO EXPLAIN TO THE COURT.

2    BUT THE LAST THING THAT WE DID IN OUR LAST MOTION TO MOVE TO

3    STRIKE, OUR FURTHER MOTION TO STRIKE, WAS SAY TO THE COURT

4    IF THE COURT WAS INCLINED TO LOOK IN ANY WAY IT CAN AT

5    MR. WILKES'S AFFIDAVIT, WE SHOULD BE ENTITLED TO A FULL

6    HEARING, WHICH WOULD INCLUDE WITNESSES AND EXPERT WITNESSES

7    THAT APPEARED IN DIVORCE COURT AND PRESENT FACT WITNESSES TO

8    TALK ABOUT WHAT HAPPENED IN A SPECIFIC SITUATION.

9            SO IT CONCERNS ME GREATLY WHEN THIS COURT TAKES THE

10   VIEW THAT IT'S BEEN MISLED AND THAT THE APPOINTMENT WASN'T

11   APPROPRIATE UNDER THE CIRCUMSTANCES WHEN WE HAVEN'T HAD AN

12   OPPORTUNITY TO MAKE THAT SHOWING.

13           I'M VERY MUCH CONCERNED THAT MR. WILKES HAS

14   ABSOLUTELY NO ASSETS TO HIRE COUNSEL, NO ASSETS TO PROTECT

15   HIMSELF FROM THE GOVERNMENT.  HE'S BEEN PLACED IN AN

16   EXTRAORDINARILY DIFFICULT POSITION BY THIS DISMISSAL WITHOUT

17   PREJUDICE AND BY THE CIRCUMSTANCES OF THE COURT'S FINDINGS.

18           THE COURT:  I'M ASSUMING, MR. CAHN, THAT THIS WILL

19   ALL BE LOOKED AT FRESH IN THE EVENT THERE IS A NEW INDICTMENT.

20   THERE WILL BE A MAGISTRATE JUDGE WHO DETERMINES APPOINTMENT OF

21   COUNSEL.  HE'LL BE ASKED TO FILL OUT A FINANCIAL AFFIDAVIT.

22           I'M JUST TELLING YOU THAT I HAVE REVIEWED NOT THE

23   SEALED MATERIAL.  I HAVEN'T LOOKED AT ANY OF THAT.  BUT ON THE

24   BASIS OF THE MATERIAL YOU'VE SUBMITTED, WHICH IS UNDER SEAL

25   BUT NOT SUBPOENAED HERE -- I GUESS I SHOULD SAY I'VE LOOKED AT

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

174

1    THE SUBPOENAED MATERIAL THAT THE GOVERNMENT HAS SUBMITTED.

2    IT'S ABUNDANTLY CLEAR TO ME THAT THE INFORMATION IN THE

3    FINANCIAL AFFIDAVIT WAS NOT ACCURATE AND COMPLETE.

4            WE'RE SORT OF WHISTLING PAST THE GRAVEYARD TO SAY "I

5    HAVE NO MONEY.  IT'S ALL IN THE JURISDICTION OF THE SUPERIOR

6    COURT" WHEN HE KNEW AND HE HAD TO KNOW.  BECAUSE SEVEN DAYS

7    LATER, ALL OF THAT IS SETTLED AND THE MONIES ARE DISBURSED

8    PURSUANT TO A STIPULATION BETWEEN HIM AND HIS WIFE.  AND THEN

9    A MILLION AND A HALF OR MORE GO INTO HIS LAWYER'S TRUST

10   ACCOUNT NOT SUPERVISED BY THE COURT.

11           MR. CAHN:  THAT'S INCORRECT.  THE $1.5 MILLION IN

12   HIS LAWYER'S TRUST ACCOUNT REMAINED UNDER SUPERVISION OF THE

13   COURT, AND ALL OF IT WAS DISBURSED IN ACCORDANCE WITH ORDERS

14   OF THE COURT, AND NONE OF IT WAS DISBURSED TO PAY OTHER

15   THINGS.

16           THE COURT:  IT WAS PURSUANT TO STIPULATIONS BETWEEN

17   HIM AND HIS EX-WIFE.  AND THE COURT HAD NO REAL RESPONSIBILITY

18   OTHER THAN FUNCTIONARY TO SIGN OFF AND SAY, "THIS HASN'T BEEN

19   AGREED TO.  I ORDER IT."

20           MR. GERAGOS:  JUDGE, THAT'S NOT ACCURATE.  THIS WAS

21   NOT AN UNCONTESTED DIVORCE MATTER IN WHICH THERE WERE FRIENDLY

22   AGREEMENTS.

23           THE COURT:  TELL ME THIS, MR. CAHN:  I SAW AT ONE

24   POINT THERE WAS A TRANSFER OF FUNDS PURSUANT TO THE COURT

25   ORDER TO HIS LAWYER'S ACCOUNT.  THEREAFTER, THE INDICATIONS

PDF created with pdfFactory trial version www.pdffactory.com

175

1   ESSENTIALLY AMOUNT TO MISCELLANEOUS.  AND IT'S APPARENT TO ME

2   THAT MR. WILKES WENT TO HIS LAWYER AND SAID "I NEED SOME MONEY

3   FOR MONTHLY EXPENSES," AND THE LAWYER DISBURSED THOSE FUNDS.

4          MR. CAHN:  THAT'S NOT CORRECT.  I DON'T HAVE ALL THE

5   DOCUMENTS HERE TO SHOW THE MANNER IN WHICH THOSE WERE

6   DISBURSED.  BUT THE VAST MAJORITY OF THE MONEY WAS DISBURSED

7   TO PAY CREDITORS WHO HAD LIENS OR WHO HAD CLAIMS IN FRONT OF

8   THE --

9          THE COURT:  THAT HAPPENED UP FRONT WHEN WE WERE

10  TALKING ABOUT 2.6.

11         MR. CAHN:  FURTHER, THERE WERE AN EXTRAORDINARY

12  NUMBER OF DEBTS OUTSTANDING, INCLUDING THE MORTGAGE ON THE

13  HOUSE WHICH SECURED THE BOND.

14         THE COURT:  WHAT ABOUT ALL THE VEHICLES AND BOATS

15  AND THE SEA-DOOS AND ALL OF THOSE THINGS?  THE AFFIDAVIT

16  SPECIFICALLY SAYS, "TELL ABOUT ANY VEHICLES OR AUTOMOBILE."

17  THERE'S A ZERO WITH A LINE THROUGH IT.

18         MR. CAHN:  THEY'RE SIMPLY NOT IN HIS POSSESSION.  HE

19  OWNS ONE VEHICLE.  THE VEHICLE IS A FORD TRUCK OF SOME SORT.

20  HIS DAUGHTER OWNS ONE VEHICLE THAT HAD BEEN GIFTED TO HER

21  SEVERAL YEARS BEFORE.  THE WIFE OWNS ONE VEHICLE ON WHICH

22  MONEY WAS STILL OWED.

23         THE COURT:  WHAT ABOUT THE BOATS AND IN PARENTHESES

24  NEXT TO THEM 2?

25         MR. CAHN:  IT WAS A DIVORCE PETITION, YOUR HONOR.

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    IN DIVORCE LITIGATION, ALL ASSETS THAT HAVE EVER BEEN

2    POSSESSED HAD TO BE LISTED AND ADDRESSED IN ORDER TO MAKE SURE

3    THAT ONE SPOUSE CAN'T LATER COME BACK AND SAY, "OH, YOU HAD

4    THESE OTHER THINGS."  THE FACT IS HE DIDN'T HAVE THOSE THINGS.

5    THEY HAVE LONG AGO BEEN DISPOSED OF, BEEN GIVEN AWAY, BEEN

6    SOLD.  BUT AS A MATTER OF DEALING WITH THE DIVORCE COURT AND

7    THE WAY IN WHICH DIVORCE COURTS WORK -- THIS IS WHY I ASKED

8    FOR THE OPPORTUNITY TO BRING IN THE WITNESSES WHO WERE

9    ACTUALLY PART OF THE DIVORCE AND THE WITNESSES WHO WERE THE

10   EXPERT WITNESSES WHO COULD SPEAK ABOUT THE WAY IN WHICH

11   DIVORCE COURT WORKS.

12        THERE ARE VEHICLES LISTED THAT SIMPLY DON'T EXIST OR

13   DON'T EXIST ANYWHERE WITHIN MR. WILKES'S PURVIEW OF CONTROL.

14   SO THAT'S ONE OF THE THINGS THAT DISTURBS ME MOST ABOUT THE

15   WAY IN WHICH I BELIEVE THESE DOCUMENTS CAN BE MISINTERPRETED

16   AND MISUNDERSTOOD.  I THINK THAT'S HAPPENED HERE.

17        THE SAME WAY IN WHICH THE BARE DOCUMENTS SHOWING

18   DISBURSEMENTS WITHOUT EXPLANATIONS FOR THE PEOPLE WHO MADE

19   THOSE DISBURSEMENTS PURSUANT TO COURT ORDERS TO ACCOMPLISH

20   CERTAIN PURPOSES LEAVE A MISIMPRESSION ABOUT WHAT WAS ACTUALLY

21   GOING ON.

22        I'VE TRIED TO CORRECT THAT MISIMPRESSION IN MY

23   PAPERS.  OBVIOUSLY, I HAVEN'T BEEN AS EFFECTIVE AS I WOULD

24   LIKE.  SO IF THE COURT'S GOING TO PROCEED ON ITS UNDERSTANDING

25   OF WHAT HAPPENED IN THIS DIVORCE PROCEEDING, I WOULD REALLY

PDF created with pdfFactory trial version www.pdffactory.com

177

1    LIKE THE OPPORTUNITY TO BRING THE WITNESSES ON AND CONVINCE

2    THE COURT THAT THE OPPOSITE IS TRUE.

3           THE COURT:  MR. CAHN, THERE'S ONE OTHER THING THAT I

4    LOOKED AT AND I'VE ALLUDED TO.  THERE WAS A PAYMENT OF $90,000

5    APPROVED BY THE COURT TO RETAIN LAWYERS, DIVORCE LAWYERS AND

6    OTHER LAWYERS.  $90,000 CAME OUT.

7           WHY WOULD I BELIEVE THAT THE COURT WOULDN'T APPROVE

8    A PAYMENT FOR A RETAINED LAWYER TO DEFEND MR. WILKES ON THE

9    WILKES/FOGGO CASE?  IT APPEARS TO BE A LEGITIMATE EXPENSE THAT

10   THE COURT'S RECOGNIZING.  WHY DIDN'T HE?  WHY DID HE COME AND

11   ASK ME TO GIVE HIM A TAXPAYER-FUNDED LAWYER WHEN HE'S PAYING

12   90,000 FOR OTHER LAWYERS?

13          MR. CAHN:  LET ME ADDRESS THAT.  LET ME BACK UP A

14   SECOND TO WHAT THE COURT SAID LAST.

15          I THINK IT'S REALLY IMPORTANT, IN LOOKING AT THIS,

16   THE COURT NEEDS TO REMEMBER THE CONTEXT OF THIS.  THE CONTEXT

17   OF THIS IS THAT MR. WILKES -- AND I'VE SAID THIS BEFORE --

18   DIDN'T WANT PUBLIC COUNSEL.  THE COURT ORDERED HIM TO EITHER

19   SHOW UP WITH A LAWYER FILE YOUR AFFIDAVIT ON THAT DATE.  HE

20   ACTIVELY AVOIDED PUBLIC COUNSEL.

21          WHEN HE FIRST MET WITH MS. CHARLICK, HE MADE CLEAR

22   TO HER HE WANTED NOTHING TO DO WITH THE FEDERAL DEFENDERS'

23   OFFICE.  HE DIDN'T WANT US.  HE BELIEVED WE WERE BEING PAID BY

24   THE GOVERNMENT, WE WERE AN ARM OF THE GOVERNMENT, AND WE WOULD

25   NOT REPRESENT HIM PROPERLY.  HE'S BEEN DISABUSED OF THAT

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

178

1    NOTION.  MR. WILKES UNDERSTANDS OUR COMMITMENT TO THE WORK,

2    AND THAT'S NO LONGER AN ISSUE.

3            BUT THAT WAS HOW HE FELT THEN AT THE TIME HE FILED

4    THIS AFFIDAVIT.  SO WITH THAT CONTEXT IN MIND, IT'S IMPORTANT

5    FOR THE COURT TO UNDERSTAND THAT HE HAD NO INTEREST IN

6    MISLEADING THE COURT TO COME TO A CONCLUSION THAT HE DIDN'T

7    HAVE ASSETS THAT HE HAD.

8            NOW, LET ME ADDRESS THE MONEY ITSELF.  THERE WAS ONE

9    PAYMENT THAT WAS ALLOWED TO A CRIMINAL DEFENSE ATTORNEY THAT

10   PAID A VERY SMALL PORTION OF HIS FEE, AND THAT WAS AFTER

11   ENTREATIES BY MR. WILKES AND HIS LAWYERS TO THE COURT AND TO

12   THE LAWYERS ON THE OTHER SIDE TO NOT FIGHT THIS.  BUT THERE

13   WAS NO MONEY RELEASED TO OTHER LAWYERS OTHER THAN THE DIVORCE

14   LAWYER.

15           THE COURT:  THAT'S ONE OF THE POINTS.  THE PROBLEM I

16   HAVE WITH THIS IS THAT MR. WILKES APPARENTLY HAS RESERVED UNTO

17   HIMSELF THE RIGHT TO PRIORITIZE DEBTS AND SAY, "WELL, I WANT

18   TO PAY FOR THIS" OR "I WANT TO FUND MY KIDS' EDUCATION, BUT I

19   DON'T WANT TO PAY YOU FOR MY CRIMINAL DEFENSE.  EVEN THOUGH AT

20   FIRST I HAD SOME RELUCTANCE ABOUT IT, I'VE NOW SAT DOWN WITH

21   MR. CAHN AND MS. CHARLICK.  I REALIZE THAT THEY'RE TOP-FLIGHT

22   LAWYERS.  I'M HAPPY WITH THIS.  SO WHY NOT LET THE GOVERNMENT

23   PAY?"

24           MR. CAHN:  THAT'S SIMPLY NOT THE CASE.  AND WHAT I

25   WAS ABOUT TO DO WAS ADDRESS THE PAYMENTS TO THE DIVORCE

PDF created with pdfFactory trial version www.pdffactory.com

179

1    LAWYERS.  IT'S QUITE SIMPLY AN EXAMPLE OF THE SOLACES OF THE

2    VARIOUS COURTS THAT YOU THINK FROM THEIR PARTICULAR

3    PERSPECTIVES.  AND THE SAME WAY BANKRUPTCY COURT PROVIDES

4    SUPER-PRIORITY FOR THE THIEVES AND THE BANKRUPTCY ATTORNEYS

5    WHO ARE BEFORE THEM.  THEY GET PAID BEFORE EVERYONE ELSE NO

6    MATTER HOW LONG OUTSTANDING THE PRIOR DEBTS WERE.

7             THE DIVORCE COURTS ARE THE SAME WAY.  THEY MAKE SURE

8    THAT THE PEOPLE -- THE MEDIATORS, THE ACCOUNTANTS, THE DIVORCE

9    ATTORNEYS -- COMING BEFORE THEM GET PRIORITY TO THOSE MONIES.

10   THAT'S ALL THAT HAPPENED HERE.  MR. WILKES DESPERATELY WANTED

11   TO HIRE ANOTHER ATTORNEY.  AND MR. IREDALE, WHO WAS HERE, HE

12   TRIED DESPERATELY TO CONVINCE MR. IREDALE THAT "IF YOU GIVE ME

13   SOME TIME, I'LL FREE UP ENOUGH CASH AND EQUITY AND PROPERTIES

14   THAT WILL ALLOW YOU TO BE HIRED."

15            MR. IREDALE IS AN EXPERIENCED ATTORNEY AND

16   EXPERIENCED IN MATTERS THAT I'M NOT, WHICH IS THE MANNER IN

17   WHICH A CRIMINAL DEFENSE ATTORNEY CAN ACTUALLY ENSURE THAT

18   THEY COLLECT FEES THAT THEY'RE ENTITLED TO.

19            HE LOOKED AT THE DIVORCE PROCEEDINGS.  HE LOOKED AT

20   THE EQUITY IN THE PROPERTIES, INCLUDING THE LIENS THAT WERE

21   PLACED AGAINST THOSE PROPERTIES IN CONNECTION WITH THE BOND

22   AND THE LIENS THAT WERE PLACED BY OTHER CREDITORS AND THE

23   UNDERSTANDING OF THE WAY IN WHICH THE DIVORCE COURT WOULD WORK

24   TO ACQUIRE ASSETS TO BE USED TO PAY COMMUNITY DEBTS RATHER

25   THAN SEPARATE DEBTS IN ORDER TO ENSURE THAT THE OTHER MEMBER

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    OF THE COMMUNITY, THE SPOUSE, WOULDN'T BE REQUIRED TO PAY

2    THOSE DEBTS AFTER THE FACT.  HE CAME TO THE POINT OF VIEW THAT

3    MR. WILKES COULDN'T PAY EVEN THE SMALLEST PORTION OF HIS FEE.

4              NOW, COULD MR. WILKES HAVE BEEN MORE DETAILED ABOUT

5    EVERYTHING?  HE CERTAINLY COULD HAVE.  HAD HE GOTTEN A CHANCE

6    TO SIT DOWN WITH MS. CHARLICK OR MR. GERAGOS AND HAD GOTTEN

7    MORE ADVICE ABOUT IT, HE PROBABLY WOULD HAVE LISTED IN DETAIL.

8    BUT THE BOTTOM LINE WOULD HAVE BEEN THE SAME.  THERE WERE NO

9    ASSETS FOR HIM TO GET TO TO PAY THE LAWYER.

10             AND I SAY THAT WITH MY YEARS OF EXPERIENCE BEHIND

11   EVALUATING THESE KINDS OF THINGS, WITH MY COMMITMENT TO MAKING

12   SURE THAT OUR SERVICES, WHICH ARE LIMITED, ARE RESERVED FOR

13   THOSE WHO CAN'T PAY IN ORDER TO ENSURE THOSE PEOPLE THE BEST

14   REPRESENTATION POSSIBLE AND WITH MY KNOWLEDGE OF THE FACTS

15   HAVING TALKED SPECIFICALLY TO PEOPLE INVOLVED IN THE DIVORCE

16   PROCEEDING ABOUT WHAT WENT ON.

17             SO I'D ASK BEFORE THE COURT RELIES IN ANY WAY ON

18   THAT VIEW OF WHAT HAPPENED HERE, THAT THE COURT GIVE US A

19   CHANCE TO ACTUALLY BRING ON LIVE WITNESSES AND CONVINCE THE

20   COURT OF THE OPPOSITE.

21             THE COURT:  ANYTHING ELSE, MR. FORGE?

22             MR. FORGE:  I CAN ADDRESS PRETTY MUCH EVERYTHING

23   MR. CAHN TALKED ABOUT.  I DON'T SEE HOW ANY OF THIS IS GERMANE

24   TO THE ISSUE ABOUT DISMISSING MR. WILKES WITHOUT PREJUDICE.

25   HE HAS THESE GREAT ARGUMENTS.  HE CAN MAKE THEM.

PDF created with pdfFactory trial version www.pdffactory.com

1            THE COURT:  WELL, THERE IS A PENDING MOTION TO HAVE

2    HIM REPAY FUNDS.  I'M NOT INCLINED TO GRANT THAT.

3            MR. GERAGOS:  THE PROBLEM IS -- THIS IS EXACTLY WHY

4    I ASKED FOR THE HEARING -- THE COURT HAS MADE CERTAIN FINDINGS

5    REGARDING HIS BAIL STATUS.  AND ABSENT SOME KIND OF A

6    HEARING -- AND ALL OF THOSE GO TO THE GRAVAMEN OF HIS

7    FINANCIAL AFFIDAVIT.  AND UNLESS WE HAVE SOME KIND OF A

8    HEARING TO GET TO THE BOTTOM OF THIS, THE COURT'S MADE CERTAIN

9    FINDINGS THAT I DON'T THINK ARE CORRECT.

10           THE COURT:  I DISAGREE.  THE GOVERNMENT DISAGREES

11   WITH YOU, TOO.  WITH ALL RESPECT TO MR. CAHN, WHOSE EXPERIENCE

12   AND HONESTY I RESPECT AND HOLD VERY HIGH, I READ THE FINANCIAL

13   RECORDS THAT HAVE BEEN PROVIDED QUITE DIFFERENTLY THAN

14   MR. CAHN DOES AND YOU DO.  THE GOVERNMENT READS THEM THE SAME

15   WAY I DO.

16           THERE WERE DISBURSEMENTS TO HIM OF $65,000 IN

17   NOVEMBER.  AND I'VE LOOKED BACK.  I'VE LOOKED AT THE EARLIER

18   DISBURSEMENTS TO PAY OFF OVERDUE MORTGAGES, TAXES, AND THE

19   LIKE.  ALL OF THAT CAME OUT OF THE 2.6.  AND HIS KIDS' TRUST

20   FUNDS GOT FUNDED OUT OF THAT, TOO.  I HAVEN'T TAKEN ISSUE WITH

21   THAT BECAUSE I UNDERSTAND THAT THE ARRANGEMENT WAS MADE IN

22   2001 FOR THAT.

23           IT'S A LITTLE IRONIC IN LIGHT OF WHAT MR. HALPERN

24   POINTS OUT THAT WHEN HE NEEDED TO TAKE MONEY OUT OF THOSE

25   FUNDS FOR HIS OWN PURPOSES, HE DID.  BUT IT'S ABOUT ACCESS

PDF created with pdfFactory trial version www.pdffactory.com

182

1    HERE.  AND MR. SCHULER'S DECLARATION DOESN'T DO ANYTHING TO

2    DISABUSE ME OF WHAT'S APPARENT ON THE FACE OF THAT

3    DECLARATION, WHICH IS WHEN MR. WILKES ASKED AND IF IT WAS AT

4    LEAST ON ITS FACE A CREDIBLE REASON, MR. SCHULER WOULD

5    DISBURSE FUNDS TO HIM.

6          LIKE I SAID, IT'S GREAT THAT THE DIVORCE COURT

7    THINKS DIVORCE LAWYERS OUGHT TO BE PAID.  I THINK CRIMINAL

8    LAWYERS OUGHT TO BE PAID.  AND I'M NOT BOUND BY THAT

9    DETERMINATION.  HERE ARE THE DIVORCE LAWYERS TAKING HUGE

10   PORTIONS OUT OF THIS.  WHY COULDN'T THE DIVORCE HAVE WAITED?

11   HERE'S A FELLOW --

12          MR. GERAGOS:  THERE'S A LOT OF GUYS WHO WOULD LIKE

13   TO ASK THAT QUESTION.

14          THE COURT:  HERE'S A FELLOW WHO'S ON FIRE AND NEEDS

15   SOMEBODY TO PUT HIM OUT RIGHT AWAY, AND THAT PERSON IS A

16   RETAINED CRIMINAL DEFENSE LAWYER, AND YOU MEAN TO TELL ME THAT

17   THE DIVORCE HAS PRIORITY OVER THAT?  I DON'T THINK SO.  I

18   THINK ALL MR. WILKES HAD TO DO WAS DIG IN HIS FEET AND SAY,

19   "WAIT A MINUTE.  THEY'RE TRYING TO PUT ME IN JAIL.  AND SO

20   LET'S HOLD OFF ON THIS THING.  I NEED MONEY TO DEFEND MYSELF."

21   MONEY WAS APPROPRIATED FOR HIS DEFENSE, AND I HAVE NO REASON

22   TO SEE WHY ADDITIONAL MONIES WOULDN'T HAVE BEEN APPROPRIATED.

23   SO I'VE HEARD IT.  YOU CAN TAKE -- IT'S NOT PARTICULARLY

24   GERMANE TO THIS.

25          THE COURT GRANTS THE MOTION TO DISMISS WITHOUT

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    PREJUDICE.  THERE'S A PRESUMPTION THAT I MUST DO SO UNDER

2    RULE 48(A) UNLESS I FIND THAT THE PURPOSE OF THE DISMISSAL WAS

3    TO PREJUDICE THE DEFENDANT OR TO FORCE THE SYSTEM AROUND.  I

4    DON'T FIND THAT HERE.  I THINK THEY BROUGHT THIS IN THIS

5    DISTRICT IN THE FIRST INSTANCE FOR THEIR OWN CONVENIENCE.

6    THERE WAS AN ARGUABLE NEXUS HERE.  SOME OF THE THINGS

7    HAPPENED.  I WAS CONVINCED BY THE FIRST APPLICATION ON PART OF

8    COUNSEL FOR FOGGO THAT MOST OF WHAT HAPPENED OCCURRED IN THE

9    EASTERN DISTRICT OF VIRGINIA.  AND FOR ALL OF THE REASONS SET

10   OUT IN THE RULE, THAT WAS THE APPROPRIATE VENUE FOR THE PLACE.

11          I WAS PREPARED, AS YOU KNOW, TO SEND THE CASE THERE,

12   EXCEPT THAT I BECAME CONVINCED THAT I HAD TO HAVE MR. WILKES'S

13   ACQUIESCENCE TO THAT WHETHER OR NOT HE WAS IN CUSTODY, AS HE

14   NOW IS.

15          HE GAVE UP AND SAID, "WELL, I'LL GO TO D.C."  I WAS

16   GOING TO SEND THE CASE THERE.  THAT WAS MY NEXT MOVE.  I THINK

17   THAT THE APPLICATION WAS APPROPRIATE.  I THINK THAT THE

18   CIRCUMSTANCES JUSTIFIED TRANSFER OF THIS CASE TO WHERE THE

19   CASE OCCURRED.  BUT AS I SAID, THAT'S A LITTLE CART BEFORE THE

20   HORSE.  WHAT I HAVE TO FIND HERE TO DISMISS WITH PREJUDICE IS

21   THAT THE GOVERNMENT HAD SOME IMPROPER MOTIVE AND THEY

22   MANIPULATED THIS CHARGE TO HIS DETRIMENT.  THEY DON'T GET ANY

23   ADVANTAGE UNDER THE SPEEDY TRIAL ACT IN THE EVENT THEY

24   REINDICT.

25          I CAN'T SAY WHETHER THEY WILL.  I DON'T KNOW.  IT IS

PDF created with pdfFactory trial version www.pdffactory.com

184

1    A LITTLE SUSPICIOUS TO ME, AS YOU POINT OUT, THAT MR. FORGE

2    WOULD BE QUESTIONING WHETHER YOU COULD BE APPOINTED COUNSEL IN

3    THE EASTERN DISTRICT OF VIRGINIA.  I'LL TAKE HIM AT HIS WORD.

4    TODAY HE'S TOLD ME THAT THE DIE HAS NOT BEEN CAST ON THAT.

5    THEY DON'T KNOW WHETHER THEY'RE GOING TO REINDICT.

6          AND I SUPPOSE WHAT THEY WERE WAITING ON WAS TO HEAR

7    WHAT THE SENTENCE WAS IN THIS CASE.  IF I IMPOSED 300 MONTHS,

8    YOU MIGHT EVEN HAVE A DIFFERENT VIEW OF WHETHER THEY WERE

9    GOING TO BRING AN ADDITIONAL CHARGE AGAINST HIM IN THE EASTERN

10   DISTRICT OF VIRGINIA.

11         SO I DON'T KNOW HOW IT CUTS THAT I IMPOSED THE

12   SENTENCE I DID.  I DON'T THINK THEY'VE BEEN GAMING THE SYSTEM.

13   LOOK, YOU'RE A FINE LAWYER, AND SO IS MS. CHARLICK.  AND MAYBE

14   THE GOVERNMENT'S A LITTLE AFRAID.  MAYBE THEY DON'T WANT YOU

15   ON THE CASE.  THAT HAS NEVER MOTIVATED ME.  I'VE KEPT YOU ON

16   THE CASE.  THEY DON'T HAVE ANY SAY IN THAT.  IF A MAGISTRATE

17   JUDGE IN THE EASTERN DISTRICT OF VIRGINIA IN THE EVENT THE

18   CASE GETS REINDICTED WANTS TO APPOINT YOU AND CALLS ME, I'LL

19   SAY, "YEAH, THIS IS A FELLOW THAT'S VERY WELL-EQUIPPED TO

20   DEFEND THIS GUY AND HAS BACKGROUND IN THIS CASE ALREADY.  AND

21   IT SEEMS TO ME THAT WOULD BE A GOOD EXPENDITURE OF PUBLIC

22   FUNDS."  BUT I LEAVE THAT FOR ANOTHER DAY AND ANOTHER JUDICIAL

23   OFFICER.

24         THE MOTION TO DISMISS WITHOUT PREJUDICE IS GRANTED.

25         NOW, TURNING MY ATTENTION TO COUNSEL FOR MR. FOGGO,

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    YOU'VE TAKEN THE POSITION THAT A TRANSFER TO EITHER THE

2    EASTERN DISTRICT OF VIRGINIA OR THE DISTRICT OF COLUMBIA IS

3    APPROPRIATE.

4            DO YOU ADHERE TO THAT POSITION TODAY?

5            MR. TESLIK:  YES, YOUR HONOR.  YOU KNOW BY WAY OF

6    BACKGROUND WE INITIALLY BROUGHT OUR REQUEST SEEKING TRANSFER

7    TO THE EASTERN DISTRICT OF VIRGINIA.  WE THEN MODIFIED THAT

8    AND ASKED THAT THE TRANSFER BE TO THE DISTRICT OF COLUMBIA.

9    THAT, OF COURSE, WAS IN CONSULTATION WITH COUNSEL FOR

10   MR. WILKES.

11           FRANKLY, WE THINK THAT EITHER OF THOSE JURISDICTIONS

12   WILL BE CONVENIENT FOR THE PARTIES AND THE WITNESSES.  WE

13   THINK THAT JUSTICE REQUIRES IT TO BE TRANSFERRED TO THIS AREA,

14   AS YOUR HONOR KNOWS.  NOTWITHSTANDING THE SUGGESTION THAT THIS

15   COULD GO TO RICHMOND OR NORFOLK, WHICH I GUESS IS A

16   POSSIBILITY, WE WOULD CERTAINLY -- IF YOUR HONOR WERE TO

17   TRANSFER THIS TO THE EASTERN DISTRICT OF VIRGINIA, WE WOULD

18   CERTAINLY SEEK TO HAVE IT IN ALEXANDRIA.  BUT WE WOULD BE

19   HAPPY WITH EITHER JURISDICTION, YOUR HONOR.

20           THE COURT:  THE GOVERNMENT HAS FILED A NOTICE OF

21   NON-OPPOSITION TO THE TRANSFER OF THE FOGGO CASE AT THIS

22   POINT?

23           MR. FORGE:  TO THE EASTERN DISTRICT OF VIRGINIA,

24   YOUR HONOR, YES.

25           THE COURT:  THE COURT GRANTS THE MOTION TO TRANSFER

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com

1    THE FOGGO CASE, WHICH IS NOW A STAND-ALONE CASE, TO THE

2    EASTERN DISTRICT OF VIRGINIA.  I ADOPT THE INITIAL APPLICATION

3    FILED ON BEHALF OF MR. FOGGO AND THE REASONS SET FORTH THAT

4    THE TRANSFER IS WARRANTED IN THIS CASE.

5              IN ESSENCE, IT TURNS ON THIS:  MOST OF THE EVENTS --

6    IT'S HARD TO QUANTIFY, BUT LET'S SAY 95 PERCENT OF THE EVENTS

7    OCCURRED -- AT LEAST AS ALLEGED OCCURRED IN THAT DISTRICT.

8    MOST OF THE WITNESSES ARE IN THAT DISTRICT.  MR. FOGGO IS

9    BEING REPRESENTED BY PRO BONO COUNSEL.  AND I FIND THAT IT'S

10   HIS CONVENIENCE AND TAKES INTO CONSIDERATION PRO BONO COUNSEL

11   IS ALREADY OPERATING ON THEIR OWN NICKEL TO TRANSFER THE CASE

12   THERE.

13             IN ADDITION, THE LATEST INFORMATION CONVINCES ME

14   THAT THERE IS MULTIPLE SCIF SPACE AVAILABLE.  A SCIF IS

15   A PRIVATE ROOM WHERE SOME OF THESE CLASSIFIED DOCUMENTS HAVE

16   TO BE REVIEWED.  AND ALTHOUGH ONE IS BEING CONSTRUCTED IN THIS

17   DISTRICT AND I'M TOLD ONE EXISTS IN THE DISTRICT OF COLUMBIA,

18   I'M ALSO TOLD THAT THERE ARE MULTIPLE SCIF'S THAT COULD BE

19   AVAILABLE FOR FURTHER REVIEW AND PREPARATION OF THIS CASE IN

20   THE EASTERN DISTRICT.

21             SO I FIND IT'S IN THE INTEREST OF JUSTICE.  I GRANT

22   MR. FOGGO'S MOTION TO TRANSFER THE CASE THERE.  A WRITTEN

23   ORDER TO THAT EFFECT WILL FOLLOW.

24             HAVE YOU PREPARED SUCH AN ORDER, MR. BHANDARI?

25             MR. FORGE:  WE HAVE NOT.  WE'LL CONSULT WITH

PDF created with pdfFactory trial version www.pdffactory.com

1    MR. FOGGO'S COUNSEL.

2              THE COURT:  MS. CHU SAYS YES.

3              MR. FORGE:  I'M SORRY.  I APOLOGIZE.  WE HAVE

4    PREPARED AN ORDER.

5              THE COURT:  IT'S SOMEWHERE IN THIS MASS OF PAPERS.

6    PLEASE RESUBMIT THAT ORDER.  THE MOTION IS GRANTED.

7              WHAT'S LEFT, MR. CAHN, IS THIS MOTION TO REQUIRE

8    REPAYMENT.  I DECLINE TO DO THAT.  YOU, AS THE HEAD OF FEDERAL

9    DEFENDERS, HAVE AN INTEREST IN MAINTAINING THE FISK OF FEDERAL

10   DEFENDERS.  AND IF YOU THINK -- OBVIOUSLY, YOU THINK THIS

11   APPOINTMENT WAS WARRANTED.  SO I'M GOING TO DEFER TO YOU.  I

12   DENY THE MOTION TO MAKE MR. WILKES PAY ANY MONEY BACK.

13             IF ASKED BY A MAGISTRATE JUDGE IN THE EASTERN

14   DISTRICT OF VIRGINIA IN THE EVENT OF A REINDICTMENT TO

15   RECOMMEND COUNSEL, I WOULD RECOMMEND YOU AND MS. CHARLICK.

16   YOU ARE EXPERIENCED, AND YOU HAVE A GRASP OF THIS CASE, AND

17   YOU HAVE A SUBSTANTIAL INVESTMENT OF TIME IN IT.  SO THAT'S MY

18   RECOMMENDATION TO THE MAGISTRATE JUDGE.  WHETHER THAT SQUARES

19   WITH THEIR PROCEDURES, I DON'T KNOW.  BUT THAT'S MY

20   RECOMMENDATION.  AND YOU CAN HAVE THE PERSON CALL ME IF YOU

21   WANT IN THE EVENT THERE'S A NEW INDICTMENT.  I DON'T KNOW THAT

22   THERE WILL BE.

23             ANYTHING ELSE FROM COUNSEL FOR MR. FOGGO?

24             MR. TESLIK:  NO, YOUR HONOR.

25             THE COURT:  ANYTHING ELSE ON BEHALF OF MR. WILKES ON

COMPUTER-AIDED TRANSCRIPTION

188

1    THE WILKES/FOGGO CASE?

2           MR. CAHN:  ON THE WILKES/FOGGO CASE, NOTHING

3    FURTHER.  I THINK MR. GERAGOS HAS SOMETHING.

4           THE COURT:  MR. GERAGOS.

5           MR. GERAGOS:  I DO.

6           ON THE RECORD, COULD I FILE THE NOTICE OF APPEAL?

7           THE COURT:  YOU MAY.

8           WE'RE IN RECESS ON THIS MATTER.

9                        --OOO--

10

11

12              I HEREBY CERTIFY THAT THE TESTIMONY

13              ADDUCED IN THE FOREGOING MATTER IS

14              A TRUE RECORD OF SAID PROCEEDINGS.

15

16          S/EVA OEMICK                2-21-08

17          EVA OEMICK                    DATE
            OFFICIAL COURT REPORTER
18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

PDF created with pdfFactory trial version www.pdffactory.com